1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP
Margret M. Caruso (CA Bar No. 243473)
2 |   margretcaruso@quinnemanuel.com
Carolyn M. Homer (CA Bar No. 286441)
3 |   carolynhomer@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
4 | Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
5 | Facsimile:     (650) 801-5100

6 | *Attorneys for Plaintiff*
*Google Inc.*

7 |

8 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
9 | **SAN JOSE DIVISION**

10 |

11 | **Google Inc.**,                           Case No. 17-CV-_____

12 |              Plaintiff,

13 |       vs.                                 **COMPLAINT**

14 | **Equustek Solutions Inc., Clarma**
**Enterprises Inc.** and **Robert Angus**,
15 |

16 |              Defendants.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Plaintiff Google Inc. ("Google"), by and through its attorneys, hereby alleges:

## INTRODUCTION

1.      Google brings this action to prevent enforcement in the United States of a Canadian order that prohibits Google from publishing within the United States search result information about the contents of the internet.  As part of a Canadian lawsuit brought by Canadian plaintiffs against Canadian defendants, a Canadian trial court enjoined Google (a non-party based in California) from including in its search results links to dozens of the Canadian defendants' websites—not just on Google's www.google.ca site for Canada, but *worldwide*, including within the United States.  As a result, Google, alone among search engines and other providers of interactive computer services, is compelled to censor the information it provides to its users around the globe about the existence of the Canadian defendants' websites.

2.      The Canadian trial court recognized that Google is an "innocent bystander" to the case.  Nevertheless, it issued a novel worldwide order against Google, restricting what information an American company can provide to people inside of the United States and around the world.  Google appealed the order to the Court of Appeal and then the Supreme Court of Canada.  There, the Attorney General of Canada intervened to argue the order disregarded principles of territoriality and international comity to the detriment of Canadian law enforcement.  Although the Canadian plaintiffs acknowledged the risk that Canadian courts would misapply U.S. law, they urged that it was not an issue for the Canadian court to consider; it would be up to a U.S. court to clarify U.S. law.

3.      The Supreme Court of Canada affirmed the global injunction against Google on June 28, 2017, dismissing Google's concerns about the injunction violating U.S. law as "theoretical."  The opinion recognizes that Google is an innocent non-party which cannot be held "liable" for any underlying competitive harm, but simultaneously justifies an unprecedented global injunction by characterizing Google—a single provider on interactive computer services—as "the determinative player in allowing the harm to occur."  As of the June 28, 2017 decision, Google has exhausted its Canadian appeals.

4.      Google now turns to this Court, asking it to declare that the rights established by the First Amendment and the Communications Decency Act are not merely theoretical.  The Canadian order is repugnant to those rights, and the order violates principles of international comity, particularly since the Canadian plaintiffs never established any violation of their rights under U.S. law.  Pursuant to well-established United States law, Google seeks a declaratory judgment that the Canadian court's order cannot be enforced in the United States and an order enjoining that enforcement.

## PARTIES

5.      Plaintiff Google provides an internet search engine service.  Google is a subsidiary of Alphabet Inc., and is incorporated in Delaware with its principal place of business in Mountain View, California.

6.      Upon information and belief, Defendant Equustek Solutions Inc. is a provider of industrial networking technology.  Defendant Equustek Solutions Inc. is incorporated in British Columbia, Canada with its principal place of business at 5489 Byrne Road Burnaby, British Columbia, V5J3J1, Canada.

7.      Upon information and belief, Defendant Clarma Enterprises Inc. is incorporated in British Columbia, Canada with its registered office at Box 12102, Suite 1008, 808 Nelson Street, Vancouver, British Columbia, V6Z2H2, Canada.

8.      Upon information and belief, Defendant Robert Angus is a professional engineer and principal of Defendants Equustek Solutions Inc. and Clarma Enterprises Inc., with a last known place of residence at 1838 W. 19th Avenue, Vancouver, British Columbia, V6J2N9, Canada.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, namely the First Amendment to the U.S. Constitution and the Communications Decency Act, 47 U.S.C. § 230.

10.      This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  An "actual controversy" exists in the

1   Northern District of California regarding Google taking and continuing to take actions in the

2   United States to comply with the delisting order the Defendants (collectively "Equustek")

3   obtained in Canada.

4        11.     This Court has personal jurisdiction over the Defendants because, *inter alia*, the

5   Defendants have knowingly engaged in a course of conduct whereby they sought and obtained

6   injunctive orders in the *Equustek v. Jack* litigation in Canada that are expressly aimed at requiring

7   Google to undertake actions in the United States—specifically, to delist search results in the

8   United States and throughout the world.  In November 2012 Equustek served Google with a

9   Notice of Application to the British Columbia court at Google's offices in Mountain View,

10  California.  Equustek thereafter renewed the Application for a delisting injunction on May 13,

11  2013; sought and obtained a trial court injunction on June 13, 2014; and maintained its position

12  adverse to Google through the Canadian appellate process.  The Supreme Court of Canada

13  confirmed in its June 28, 2017 opinion that the Canadian order was intended to require Google to

14  take steps where its search engine is controlled—namely, California.

15       12.     A substantial part of the events or omissions giving rise to the claims alleged in this

16  Complaint occurred in this Judicial District, specifically, Google's delisting of search results

17  pursuant to the Canadian court order.  Venue therefore lies in the United States District Court for

18  the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

19  **FACTUAL BACKGROUND**

20  <u>**Google Offers Search Services Around The World.**</u>

21       13.     Google is an American company that offers a free and popular internet search

22  engine, accessible at www.google.com.  Google's United States and worldwide search engine

23  operations are conducted from, and controlled by, Google's headquarters in Mountain View,

24  California.  Google also offers it search engine via more than a hundred different country-specific

25  portals, such as www.google.mx and www.google.fr (targeted, respectively, to users in Mexico

26  and France).  Google's Canadian portal, www.google.ca, is offered in English and French.

27  Google.ca has historically received approximately 95% of all Google searches originating from

28  Canada.

14.     Google's search results are based on Google's computers crawling, indexing, and algorithmically analyzing the trillions of webpages that make up the public internet.  The results of each individual search are returned automatically, but they are based on judgments Google has made, and subsequently programmed into Google's ranking algorithms, about what material users are most likely to find responsive to their queries.

15.     Google is not the internet.  The vast majority of internet websites are hosted by and operated through service providers other than Google.  The entities with the technical ability to remove websites or content from the internet altogether are the websites' owners, operators, registrars, and hosts—not Google.

16.     Removing a website link from the Google search index neither prevents public access to the website, nor removes the website from the internet at large.  Even if a website link does not show up in Google's search results, anyone can still access a live website via other means, including by entering the website's address in a web browser, finding the website through other search engines (such as Bing or Yahoo), or clicking on a link contained on a website (*e.g.*, CNN.com), or in an email, social media post, or electronic advertisement.

**Equustek Sues Competitor Datalink In Canada.**

17.     In 2011, in Vancouver, British Columbia, Equustek sued a group of individual and corporate defendants connected with a former distributor and rival business selling network interfacing hardware (collectively, "Datalink").  The case is captioned *Equustek Solutions Inc. v. Jack*, Case No. S112421 (Sup. Ct. British Columbia).  Equustek alleged, *inter alia*, that Datalink had colluded with a former Equustek engineer to incorporate Equustek's trade secret hardware designs and source code into a Datalink product, the GW1000; that Datalink sold the GW1000 instead of Equustek products that customers thought they were ordering; and that Datalink made misleading statements about Equustek on its websites.

18.     The Canadian court initially denied the asset freeze Equustek sought.  But after Datalink refused to comply with court discovery orders and orders to remove references to Equustek from its website, and after Datalink stopped appearing in the litigation, Equustek procured multiple court orders against Datalink in the summer of 2012.  These included the

striking of Datalink's response to Equustek's initial pleading, an asset freeze, and a permanent injunction against Datalink continuing to sell the product at issue. Datalink refused to comply, continued to operate its business, and fled the country. Finding that the Datalink defendants may be in contempt of court, the Canadian court issued an arrest warrant in September 2012 for the primary individual defendant, but he has not yet been apprehended. To this day, Datalink continues to offer the GW1000 for sale online.

**Equustek Obtains Canadian Injunction Prohibiting Google From Including Links To Datalink's Websites In Search Results Displayed Anywhere In The World.**

19. In September 2012 Equustek asked Google to "cease indexing" Datalink's websites in Google's search results. Pursuant to its policies, Google declined to do so at that time. In December 2012, the Canadian court granted Equustek's motion for a further injunction against Datalink, "prohibiting [Datalink] from carrying on business through any website." In light of that order, and pursuant to its policies, Google voluntarily blocked more than 300 individual webpage links associated with Datalink from appearing in Google's Canadian search results on www.google.ca. However, Google rejected Equustek's demand that Google "delist" all links to Datalink's websites on its search services targeted to users outside of Canada's borders, including in the United States.

20. Equustek then returned to court, seeking an order requiring Google to remove the webpage links from Google's global search results. On June 13, 2014, the Canadian trial court issued an unprecedented order, requiring that Google delist Datalink search results in every country Google search services are available, including in the United States. The court recognized that Google was an "innocent bystander," which "operates its search engines in the ordinary course of its business, independently of the [Datalink] defendants and not in order to assist them in their breach." Nevertheless, the court found that Google "is unwittingly facilitating the defendants' ongoing breaches of this Court's orders" and concluded "[t]here is no other practical way for the defendants' website sales to be stopped." The court did not cite any evidence in support of its finding, yet it "compell[ed] Google to block the defendants' websites from Google's search results world-wide."

21.     Google sought a stay of the June 2014 order pending its appeal, but that was denied.  Since then, Google has complied with the Canadian court's order, delisting 33 Datalink websites from its search results globally, whether those results were being generated for users based in Australia or Zambia.  Because Datalink nonetheless continued to develop and operate other websites selling the GW1000, the trial court issued, at Datalink's request, nine additional supplemental orders requiring Google to block more than 75 additional Datalink-associated webpages and websites.  Collectively, the June 2014 order and all supplements are referred to herein as the "Canadian Order."  A true and correct copy of the June 13, 2014 order and the supplemental orders issued thus far are attached as Exhibit A.  Google has continued to comply with the Canadian Order.

22.     The Canadian Order has proven ineffective in preventing Datalink's online operations.  Although the Canadian Order has been in effect for more than three years, many Datalink websites remain publicly available.  More than a third of the Datalink websites Google delisted are still active today.  It does not appear that Equustek has sought to enjoin the registrars or webhosts of Datalink's  websites.  Unlike mere search delisting, registrars and webhosts have the power to remove the enjoined content from the internet.

23.     Equustek has only sought to enjoin Google's search results; it has neither sought nor obtained similar orders mandating that other search engines delist the Datalink websites.  Instead, searching for "GW1000" on Google's competitors' search engines shows that they are returning links to Datalink websites that Google was ordered to delist.

**Google Exhausts Its Appeals In Canada.**

24.     Google promptly appealed the Canadian Order to the Court of Appeal for British Columbia, which affirmed the order on June 11, 2015.  The Court of Appeal for British Columbia held, among other things, that the Canadian Order did not "offend the sensibilities of any other nation."

25.     Google further appealed to the Supreme Court of Canada, which affirmed the order on June 28, 2017.  A true and correct copy of the June 28, 2017 Supreme Court of Canada order is attached as Exhibit B.  Applying a "balance of convenience" test, the Supreme Court of Canada

held that there is "no harm to Google which can be placed on its 'inconvenience' scale arising from the global reach of the order" mandating indefinite compliance because the "only obligation the interlocutory injunction creates is for Google to de-index the Datalink websites."  The Supreme Court did not explain how its characterization of Google as the "determinative player in allowing the harm to occur" to Equustek was possible when, despite three years of Google's compliance, Datalink websites are still live and in business, and can still be found through other search engines and internet sources.

26.     In a dissenting opinion, two Justices of the Supreme Court of Canada contended that the Canadian Order was improper, and the trial court should have exercised judicial restraint. They explained that "Google did not carry out the act prohibited by the December 2012 Order." Nor has Google "aided or abetted Datalink's wrongdoing; it holds no assets of Equustek's, and has no information relevant to the underlying proceedings."  Instead of simply preserving the status quo, "[t]he Google Order is mandatory and requires [ongoing] court supervision," including through multiple supplemental orders.  Meanwhile, the Datalink websites are still live, and can still "be found using other search engines, links from other sites, bookmarks, email, social media, printed material, word-of-mouth, or other indirect means.  Datalink's websites are open for business on the Internet whether Google searches list them or not."  "The most that can be said is that the Google Order might reduce the harm to Equustek which Google is inadvertently facilitating."  The dissent concluded that the Canadian Order therefore "has not been shown to be effective," particularly where "Equustek has alternative remedies."

**A Case Or Controversy Exists.**

27.     With no further means of appeal of the Canadian Order, Google seeks relief from this United States Court.  The Canadian Order is an enforcement order, requiring Google to take actions in the United States to delist publicly available content from its search results in the United States.  Equustek expected that the United States would be the next venue in its battle.  Its counsel argued before the Supreme Court of Canada that the enforceability of the Canadian Order "in the United States is a question for U.S. courts and has nothing to do with this case," and that after the Canadian court's decision, "the American courts [can] then tell us what the law really is."

28.     Without a declaration from a United States court that enforcement of the Canadian Order in the U.S. is unlawful, Google believes that Equustek will continue to pursue enforcement of the Canadian Order and seek to hold Google in contempt if Google stops complying with it for search results displayed within the United States.

29.     Google now seeks a declaration from this Court that will protect its rights by enjoining enforcement of the Canadian Order in the United States.  This Court's order will confirm that the rights established by the First Amendment and the Communications Decency Act are not merely "theoretical."

## FIRST CAUSE OF ACTION

### U.S. Const. Amend. I; Declaratory Judgment Act, 28 U.S.C. § 2201

### (Against All Defendants)

30.     Google incorporates all of the above paragraphs as though fully set forth herein.

31.     The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. Amend. I.  Internet search results are fully protected speech under the First Amendment.

32.     The First Amendment's prohibition on abridgments of speech extends to judicial restraints on free speech.  Because the Canadian Order is directed to a specific speaker—Google—and is content-specific, it is subject to strict scrutiny.

33.     Enforcing the Canadian Order in the United States would violate the First Amendment.  The Canadian Order furthers no compelling interest (nor a substantial interest), and is not narrowly tailored to achieve one.  The existence of the Datalink websites is, and remains, a matter of public record.  Equustek cannot show that it has no alternatives available other than enjoining Google's search results outside of Canada.  Upon information and belief, Equustek has not sought similar delisting injunctions against the world's other search engines, such as Bing or Yahoo; has not taken action against other third-party websites (such as social media or press websites) displaying links to Datalink websites; has not pursued more targeted remedies against Datalink's registrars or its webhosts, which could remove Datalink's websites from the internet

1  entirely; and has not stopped the sale of Datalink's products through Amazon. Equustek did not

2  even seek to seal the Datalink website addresses themselves before any court.

3      34.    On information and belief, if Defendants are not enjoined from enforcing the

4  Canadian Order in the United States, Defendants will continue to use the Canadian Order to

5  require Google to take action in the United States to delist search results in the United States and

6  around the world.

7      35.    As the direct and proximate result of Defendants' conduct, Google has suffered

8  and, if Defendants' conduct is not stopped, will continue to suffer, irreparable injury absent

9  injunctive relief. Although Google considers enforcement of the Canadian Order to be unlawful in

10  the United States, it is presently complying with it in the United States until such time as this

11  Court affords relief.

12              **SECOND CAUSE OF ACTION**

13  **Communications Decency Act, 47 U.S.C. § 230; Declaratory Judgment Act, 28 U.S.C. § 2201**

14              **(Against All Defendants)**

15      36.    Google incorporates all of the above paragraphs as though fully set forth herein.

16      37.    The Communications Decency Act provides clear legal immunity to providers of

17  interactive computer services for content on their services created by others: "No provider or user

18  of an interactive computer service shall be treated as the publisher or speaker of any information

19  provided by another information content provider." 47 U.S.C. § 230(c)(1).

20      38.    The Communications Decency Act preempts law inconsistent with it, other than

21  U.S. federal intellectual property law. 47 U.S.C. § 230(e)(3); *Perfect 10, Inc. v. CCBill LLC*, 488

22  F. 3d 1102, 1107-08, 1118-19 (9th Cir. 2007). Because Equustek's action is grounded in

23  *Canadian* trade secret law (not U.S. federal intellectual property law or trade secret laws), Section

24  230 preempts Equustek's attempted enforcement of the Canadian Order against Google in the

25  United States.

26      39.    Google Search satisfies Section 230's definition of an "interactive computer

27  service" because it is an information service providing access to the Internet. 47 U.S.C. §

28  230(f)(2).

40.    Datalink, not Google, is the information content provider that supplies the content of its websites.  The fact that Google's search results may contain snippets from third-party websites such as Datalink's does not transform those snippets into content created by Google.

41.    Enforcement of the Canadian Order treats Google as if it were the publisher of the contents of the Datalink websites by enjoining Google's display of accurate search results.  Equustek's enforcement of the Canadian Order boils down to forcing Google to exclude material that third parties have posted online.

42.    On information and belief, if Defendants are not enjoined from enforcing the Canadian Order in the United States, Defendants will continue to use the Canadian Order to require Google to delist search results in the United States.

43.    As the direct and proximate result of Defendants' conduct, Google has suffered and, if Defendants' conduct is not stopped, will continue to suffer, irreparable injury absent injunctive relief.  Although Google considers enforcement of the Canadian Order to be unlawful in the United States, it is presently complying with it in the United States until such time as this Court affords relief.

**THIRD CAUSE OF ACTION**

**Enforcement Trespasses on Comity; Declaratory Judgment Act, 28 U.S.C. § 2201**

**(Against All Defendants)**

44.    Google incorporates all of the above paragraphs as though fully set forth herein.

45.    It is a foundational principle of jurisprudence that each country is the master of its own territory.  Foreign courts therefore ordinarily refrain from issuing worldwide injunctions because they only have jurisdiction to prescribe conduct that, wholly or in substantial part, takes place within or affects their own territories.

46.    Recognizing these principles, the Canadian Attorney General intervened in Google's appeal to the Supreme Court of Canada and argued that the Canadian Order "constitutes an impermissible exercise of extraterritorial enforcement jurisdiction."

47.     Disregarding this, the Supreme Court of Canada declared "The Internet has no borders—its natural habitat is global" as a means to justify a global injunction.  But no one country should purport to control the global internet.

48.     Equustek's counsel repeatedly acknowledged that United States courts might view the Canadian Order as violating United States law—but urged the Canadian courts to not reverse on that basis.  For example, Equustek's counsel argued to the Supreme Court of Canada: "Whether the order might be enforceable in the United States is a question for US courts and has nothing to do with this case."

49.     The Canadian Order is repugnant to United States public policy surrounding the First Amendment and the immunity against imposing liability on interactive computer service providers.

50.     The Canadian Order is further repugnant to United States public policy because it issued an injunction against Google, an innocent non-party, merely for the sake of "convenience." The non-party injunction standard applied by the Supreme Court of Canada did not come close to satisfying well-settled United States law for imposing injunctions.  The Canadian standard only considers "the balance of convenience," and not the "balance of equities," and the Canadian court placed the burden on Google, a non-party, to disprove Equustek's rights in every country outside of Canada, rather on Equustek, the plaintiff in the action, to prove its entitlement to removal of search results in each country in which it sought removal.  Moreover, the Canadian standard took no account of the "public interest" at all.

51.     As aptly summarized by the dissenting justices in the Supreme Court of Canada: Equustek "seek[s] a novel form of equitable relief—an effectively permanent injunction, against an innocent third party, that requires court supervision, has not been shown to be effective, and for which alternative remedies are available."

52.     The Canadian Order purports to place the Canadian court in the position of supervising the law enforcement activities of a foreign sovereign nation (the United States) against the United States' own citizens on American soil.  Because the Canadian courts ignored principles of international comity, corrective action by this Court is required.  This Court need not defer to

1  the Canadian Order because the Canadian courts failed to extend proper comity to the United

2  States.

3       53.    On information and belief, if Defendants are not enjoined from enforcing the

4  Canadian Order in the United States, Defendants will continue to use the Canadian Order to

5  require Google to delist search results in the United States.

6       54.    As the direct and proximate result of Defendants' conduct, Google has suffered

7  and, if Defendants' conduct is not stopped, will continue to suffer, irreparable injury absent

8  injunctive relief.

9  **PRAYER FOR RELIEF**

10      WHEREFORE, Google respectfully requests the following relief:

11      1.    Declare that the Canadian Order is unenforceable in the United States as

12  inconsistent with the First Amendment, the Communications Decency Act, and the public policy

13  surrounding enforceability of foreign judgments pursuant to international comity;

14      2.    Issue judgment in Google's favor and against Defendants on all causes of action

15  alleged herein;

16      3.    Grant Google preliminary and permanent injunctive relief enjoining enforcement of

17  the Canadian Order in the United States;

18      4.    Grant such other and further relief as the Court may deem to be just and proper.

19  DATED: July 24, 2017         QUINN EMANUEL URQUHART &
                            SULLIVAN, LLP

20

21

22                         By

23                            Margret M. Caruso
                          Carolyn M. Homer

24

25                            *Attorneys for Plaintiff*
                          *Google Inc.*

26

27

28

# EXHIBIT A

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:      *Equustek Solutions Inc. v. Jack,*
               2014 BCSC 1063

Date: 20140613
Docket: S112421
Registry: Vancouver

Between:

**Equustek Solutions Inc.
Robert Angus and Clarma Enterprises Inc.**

Plaintiffs

And

**Morgan Jack, Andrew Crawford,
Datalink Technologies Gateways Inc., Datalink 5, Datalink 6,
John Doe, Datalink Technologies Gateways LLC and Lee Ingraham**

Defendants

Before: The Honourable Madam Justice Fenlon

## Reasons for Judgment

| | |
|---|---|
| Counsel for the Plaintiffs: | R.S. Fleming |
| Counsel for the Respondents to Application Google Canada Corporation and Google Inc.: | S.R. Schachter, Q.C. G.B. Gomery, Q.C. |
| Place and Date of Hearing: | Vancouver, B.C. October 22 and 23, 2013 February 7, 2014 |
| Further Written Submissions: | March 7 and 24, 2014 May 23 and 29, 2014 |
| Place and Date of Judgment: | Vancouver, B.C. June 13, 2014 |

2014 BCSC 1063 (CanLII)

2014 BCSC 1063 (CanLII)

## I.    INTRODUCTION

[1]     The plaintiffs apply for an interim injunction restraining two non-parties, Google Inc. and Google Canada Corporation, from including the defendants' websites in search results generated by Google's search engines. This application raises novel questions about the Court's authority to make such an order against a global internet service provider.

[2]     Although the plaintiffs seek an order against Google Inc. and Google Canada Corporation, there is no evidence that Google Canada Corporation is involved in the search services the plaintiffs seek to enjoin. It was common ground at the hearing that Google Inc. provides those internet search services. The order sought, if it is to be made, must thus be made against Google Inc. Accordingly, when I use the term "Google", I am referring only to Google Inc. I use the term "Google Canada" to refer to Google Canada Corporation in places.

## II.    THE UNDERLYING ACTION

[3]     The plaintiffs manufacture networking devices that allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

[4]     The plaintiffs claim that the defendants other than Andrew Crawford and Lee Ingraham (hereinafter referred to as "the defendants"), while acting as a distributor of the plaintiffs' products, conspired with one of the plaintiffs' former engineering employees and others to design and manufacture a competing product, the GW1000. The plaintiffs say that the defendants designed their competing product using the plaintiffs' trade secrets.

[5]     The plaintiffs also claim that for many years before they made the GW1000 the defendants covered over the plaintiffs' name and logo and passed off the plaintiffs' products as their own. Later when the defendants began manufacturing the GW1000, they relied on the plaintiffs' goodwill by exclusively advertising the plaintiffs' products on their websites. The defendants then delivered their own

competing product when they received orders for the plaintiffs' products, in a tactic amounting to "bait and switch".

[6]     This underlying action was commenced on April 12, 2011. The defendants failed to comply with various court orders from the outset of proceedings, resulting in the defences of Morgan Jack and Datalink Technologies Gateways Inc. being struck in June 2012.

[7]     The defendants originally carried on business in Vancouver but now appear to operate as a virtual company. They carry on business through a complex and ever expanding network of websites through which they advertise and sell their product. These websites have been the subject of numerous court orders, including a December 2012 order prohibiting the defendants from carrying on business through any website. The defendants continue to sell the GW1000 on their websites in violation of these court orders.

[8]     Google is not a party to this action. It operates and maintains internet search services that include the defendants' various websites in Google's search results. Google acknowledges that it has the ability to remove websites from its search engine results, and routinely does so in various situations.

[9]     Following the December 2012 order prohibiting the defendants from carrying on business through any website, Google voluntarily complied with the plaintiffs' request to remove specific webpages or uniform resource locations ("URLs") from its Google.ca search results (*i.e.* from searches originating in Canada), removing 345 URLs in total. However, Google is unwilling to block an entire category of URLs, sometimes referred to as "mother sites" from its search results worldwide.

## III.     POSITION OF THE PARTIES TO THIS APPLICATION

[10]     The plaintiffs take the position that an injunction should be granted against Google because Google's search engine facilitates the defendants' ongoing breach of the Court's orders by leading customers to Datalink websites.

2014 BCSC 1063 (CanLII)

2014 BCSC 1063 (CanLII)

[11]    Google takes the position that the Court does not have jurisdiction over either Google Inc. or Google Canada because neither is present in British Columbia and because the application for an injunction does not relate to Google doing or refraining from doing anything in either British Columbia or Canada. Google argues that even if this Court has jurisdiction, the order sought should not be made for two main reasons:  (i) because it would amount to a worldwide order that could not be enforced and (ii) because it would constitute an unwarranted intrusion into Google's lawful business activities as a search engine.

## IV.    ISSUES

[12]    The application raises three main issues:

    (i)    Does this Court have territorial competence over a worldwide internet search provider such as Google?

    (ii)    If the answer to the first question is yes, should this Court decline to exercise jurisdiction on the basis that California is the more appropriate forum?

    (iii)    Should the order sought be granted?

## V.    ANALYSIS

### 1.    Does the Court have territorial competence over Google?

[13]    Determining whether jurisdiction should be assumed in a case with interjurisdictional aspects has always been a complex question. The worldwide growth of internet or e-commerce has only made the task more challenging.

[14]    The starting point in deciding whether the Court has territorial competence to make the order sought against Google is the *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28 [*CJPTA*] which codified and replaced the common law in this area. Territorial competence is established "by the existence of defined connections between the territory or legal system… and a party to the proceeding or

the facts on which the proceeding is based": *Stanway v. Wyeth Pharmaceuticals Inc.*, 2009 BCCA 592 at para. 10.

[15]    The plaintiffs accept they bear the burden of establishing the Court's territorial competence over Google. However, the parties do not agree on the standard of proof to be applied to this analysis.

### (i)      What Standard of Proof applies?

[16]    The plaintiffs argue that they need only show a good arguable case that Google is within the Court's jurisdiction, sometimes described as a *prima facie* case. Google submits that the ordinary, higher standard of proof on a balance of probabilities applies.

[17]    The Court of Appeal held that a plaintiff need only establish an arguable case that a defendant is subject to the Court's jurisdiction: *Purple Echo Productions, Inc. v. KCTS Television*, 2008 BCCA 85 [*Purple Echo*] at paras. 41-42. That can be accomplished by asserting facts that, if proved, would found jurisdiction: *Purple Echo* at para. 36. However, this conclusion is predicated on the assumption that "[i]f an arguable case were made out, the case would continue with jurisdiction potentially still a live issue": *Purple Echo* at para. 37. The Court of Appeal noted that since a determination under what is now Rule 21-8(1) is not a final determination, a *prima facie* standard suffices: *Purple Echo* at para. 39. The standard of proof is thus clear when a <u>defendant</u> challenges jurisdiction. However, Google is not a defendant, but a non-party respondent on an interim application.

[18]    The order sought on this application is an interim one in the underlying action between the plaintiffs and defendants, and if ordered, may also turn out to be time-limited against Google. However, if the order is made it is unlikely there will be another opportunity to consider the Court's jurisdiction to make an order against Google. In that sense the issue of territorial competence on this application is a final determination.

[19]    On the other hand, the plaintiffs have had limited opportunity to gather evidence in support of the jurisdictional facts they rely on to establish the Court's territorial competence over Google. They have cross-examined Steven Smith, who is a member of the "Legal Removals" team in Google's legal department, but discovery of Google's corporate structure and operations has been limited.

[20]    The Supreme Court of Canada addressed the challenge facing a court in determining jurisdiction on interlocutory motions in *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17, [2012] 1 S.C.R. 572 [*Van Breda*] at para. 72:

> [72]    …[C]ourt decisions dealing with the assumption and the exercise of jurisdiction are usually interlocutory decisions made at the preliminary stages of litigation. These issues are typically raised before the trial begins. As a result, even though such decisions can often be of critical importance to the parties and to the further conduct of the litigation, they must be made on the basis of the pleadings, the affidavits of the parties and the documents in the record before the judge, which might include expert reports or opinions about the state of foreign law and the organization of and procedure in foreign courts. Issues of fact relevant to jurisdiction must be settled in this context, often on a *prima facie* basis. These constraints underline the delicate role of the motion judges who must consider these issues.

[21]    In my view, proof on a balance of probabilities is the appropriate standard on this application because the jurisdictional ruling is a final one *vis à vis* the applicant and respondent. However, that standard should be applied while recognizing that the plaintiffs have had a limited opportunity to marshal supporting evidence.

### *(ii)    Have the plaintiffs established territorial competence?*

[22]    I return now to the substantive question:  Does Google fall into one of the connecting factors specified in the *CJPTA*? Neither Google nor Google Canada is registered or has a place of business in British Columbia. Section 3(e) of the *CJPTA* provides that:

> 3       A court has territorial competence in a proceeding that is brought against a person only if
>
> …
>
> (e)      there is a real and substantial connection between British Columbia and the facts on which the proceeding against that person is based.

2014 BCSC 1063 (CanLII)

[23]     Section 10 of the *CJPTA* provides that "a real and substantial connection" between British Columbia and the facts on which the proceeding is based is presumed to exist if certain facts pertain. The plaintiffs rely on three of the connecting factors listed in s. 10, asserting that this application:

> (a)      is brought to enforce, assert, declare or determine proprietary or possessory rights or a security interest in property in British Columbia that is immovable or movable property,
>
> …
>
> (h)      concerns a business carried on in British Columbia,
>
> (i)      is a claim for an injunction ordering a party to do or refrain from doing anything
>
>> (i)      in British Columbia, or
>>
>> (ii)      in relation to property in British Columbia that is immovable or movable property,

[24]     Before considering any of these connecting factors individually, I note that application of the presumptive factors in s. 10 of the *CJPTA* is contextual.  The *CJPTA*, like many of the cases addressing conflicts of laws, focuses on parties to a dispute in which one has a cause of action against the other. However, proceeding is defined broadly in s. 1 of the *CJPTA* as "an action, suit, cause, matter, petition proceeding or requisition proceeding and includes a procedure and a preliminary motion". Thus, the "proceeding" with respect to which I must answer the question of jurisdiction is not the underlying dispute between the plaintiffs and defendants but the relief that is specifically sought against Google.

[25]     Turning to the connecting factors the plaintiffs rely on, I first conclude that s. 10(i) of the *CJPTA* is not applicable. The plaintiffs apply to compel Google to take steps to alter its search engine. While Google was vague about the location of the computers that operate the search engine program, it is certain that those computers are not located in British Columbia. It follows that the order sought does not relate to Google taking steps in British Columbia or in relation to property in British Columbia.

[26]     I conclude that s. 10(a) of the *CJPTA* is applicable. This connecting factor establishes a presumptive substantial connection in a proceeding brought to enforce

proprietary rights over immoveable or moveable property in British Columbia. The plaintiffs' intellectual property at the heart of the underlying action is moveable property. The plaintiffs seek to enjoin Google in order to enforce their proprietary rights.

[27]    The plaintiffs acknowledge that the vast majority of GW1000 sales occur outside of Canada, but I accept that at least to the extent that the order sought relates to the enforcement of intellectual property rights in British Columbia, s. 10(a) applies. It may be a weak connecting factor, but that is not a consideration at this stage of the jurisdictional analysis.

[28]    I conclude that s. 10(h) is also a connecting factor, and a stronger one, because the injunction sought concerns a business that Google carries on in British Columbia. The question of whether Google carries on business in British Columbia requires a detailed consideration of Google's operations.

[29]    Google Canada is a wholly owned subsidiary of Google. It is chiefly responsible for marketing Google's services, including its search advertising, engineering efforts on products other than Google search, and other forms of interaction with the Canadian public such as policy outreach. Google Canada is incorporated in Nova Scotia and has offices in Montreal, Toronto, Ottawa, and Waterloo. Google Canada is not extra-provincially registered in British Columbia.

[30]    Google is a publically traded company incorporated in Delaware, USA. Its head office is in Mountain View, California and its internet search services are "operated out of that facility". It too is not extra-provincially registered in British Columbia. Google has two wholly owned subsidiaries that are extra-provincially registered in British Columbia, Google Payment Corp. and Google Canada Payment Corp., but I have no evidence about the activities of those companies.

[31]    Google operates the Google search engine that makes internet search results available through dedicated websites for each country around the world. For example, Google provides internet search services to users in Canada through

2014 BCSC 1063 (CanLII)

"www.google.ca", to users in the United States through "www.google.com", and to users in France through "www.google.fr". Despite providing country specific search websites, Google acknowledges that internet users are not restricted to using the website dedicated to their particular country. Thus users in Canada can search through "www.google.fr", and vice versa.

[32]    There are hundreds of millions of active websites over the internet and trillions of webpages. Search engines make the internet a viable and effective information and communication resource. The internet cannot be successfully navigated without search services such as those Google provides. Although there are other internet search companies, 70-75% of internet searches worldwide are done through Google.

[33]    Google does not charge for providing internet search services. It earns money in other ways, primarily by selling advertising space on the webpages that display search results. Google's advertising success is driven by the very high quality of its search results. Its income from these commercial activities is about $50 billion annually.

[34]    Google says that the fact that an internet search is initiated in British Columbia does not equate to Google carrying on business in the province. Google argues that on the plaintiffs' reasoning there is not a country on earth whose civil courts could not assert jurisdiction over Google in respect of search results. Rather, suggests Google, "some form of actual not virtual presence is required". Google relies heavily on *Van Breda* in which LeBel J. wrote at para. 87:

> [87]    Carrying on business in the jurisdiction may also be considered an appropriate connecting factor. But considering it to be one may raise more difficult issues. Resolving those issues may require some caution in order to avoid creating what would amount to forms of universal jurisdiction in respect of tort claims arising out of certain categories of business or commercial activity. Active advertising in the jurisdiction or, for example, the fact that a Web site can be accessed from the jurisdiction would not suffice to establish that the defendant is carrying on business there. <u>The notion of carrying on business requires some form of actual, not only virtual, presence in the jurisdiction, such as maintaining an office there or regularly visiting the territory of the particular jurisdiction.</u> [Emphasis added.]

Google did not quote that paragraph in full. The next line adds what is, in my view, an important qualification:

> But the Court has not been asked in this appeal to decide whether and, if so, when e-trade in the jurisdiction would amount to a presence in the jurisdiction.

In contrast to *Van Breda*, the matter before me involves e-commerce, or at least providing an "e-service".

[35]     *Van Breda* indicates that a real and substantial connection cannot be derived from the mere fact that a passive website can be accessed in the jurisdiction. To similar effect is *Thumbnail Creative Group Inc. v. Blu Concept Inc.*, 2009 BCSC 1833 [*Thumbnail*]. In that case the plaintiff claimed the defendant breached copyright by publishing the plaintiff's images. The defendant published these images in a book in the United States which could be purchased on the internet. Madam Justice Dickson said at para 19:

> [19]     … <u>use of the Internet in the course of conducting business does not mean the business in question is carried on globally for the purposes of a territorial competence analysis</u>. As counsel for [the defendants] points out, if this were so the Supreme Court of British Columbia would have jurisdiction in any dispute involving any business that makes long-distance telephone calls into this province or relies upon the Internet. [The plaintiff] did not provide authority in support of this far reaching proposition, which is, in my view, unsustainable. [Emphasis added.]

[36]     It follows form *Van Breda* and *Thumbnail* that the ability of someone in British Columbia to open a website created by a person in another country does not of itself give this Court jurisdiction over the creator of that website. Something more is required. In *Van Breda,* the Court considered factors such as whether the defendants' representatives regularly travelled to Ontario to further the defendants' promotional activities for its resorts and whether it distributed promotional materials in the province. In *Thumbnail*, Dickson J. considered that the connection between the defendants and British Columbia appeared to be limited to the sale of one copy of the defendant's book.

2014 BCSC 1063 (CanLII)

[37]     E-commerce has exponentially increased the difficulty of determining whether a company is carrying on business in a particular jurisdiction; it raises the spectre of a company being found to carry on business all over the world, just as Google submits with some alarm. Kevin Meehan comments in "The Continuing Conundrum of International Internet Jurisdiction" (2008) 31 BC Int'l & Comp L Rev 345 at 349:

> In the traditional analog world, it is relatively easy for courts to determine the geographical locations of the persons, objects, and activities relevant to a particular case. The geography of the digital world of the Internet, however, is not as easily charted. Content providers may physically reside, conduct their business, and locate their servers in a particular location, yet their content is readily accessible from anywhere in the world. Furthermore, attempts to identify the location of a particular user over the Internet have proven extremely difficult, and many Internet users compound this problem by intentionally hiding their location. Traditional principles of international jurisdiction, particularly territoriality, are poorly suited for this sort of environment of geographic anonymity. Courts have struggled to develop a satisfactory solution, yet no progress has been made toward a uniform global standard of Internet jurisdiction.

[38]     In short, courts have traditionally focused on locating the behaviour in issue within a particular state's borders to ensure that "the connection between a state and a dispute cannot be weak or hypothetical [so as to] cast doubt upon the legitimacy of the exercise of state power over the persons affected by the dispute" [*Van Breda* at para. 32]. Online activities, whether commercial or otherwise, are not so easily pigeonholed.

[39]     In *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416, 2004 CanLII 12938 (C.A.) [*Barrick Gold*], an Ontario company sued a British Columbia resident, alleging that he was defaming the company by posting hundreds of messages on internet websites accusing the company of fraud, tax evasion, money laundering, and genocide. At para. 30 the Ontario Court of Appeal quoted with approval from a High Court of Australia decision that said:

> The Internet is essentially a decentralized, self-maintained telecommunications network. It is made up of inter-linking small networks from all parts of the world. *It is ubiquitous, borderless, global and ambient in its nature. Hence the term "cyberspace". This is a word that recognizes that the interrelationships created by the Internet exist outside conventional geographic boundaries and comprise a single interconnected body of data, potentially amounting to a single body of knowledge.* The Internet is

accessible in virtually all places on Earth where access can be obtained either by wire connection or by wireless (including satellite) links. *Effectively, the only constraint on access to the Internet is possession of the means of securing connection to a telecommunications system and possession of the basic hardware.* [Italics added by the Ontario Court of Appeal.]

[40]   The Ontario Court of Appeal went on to note that these characteristics create a challenge in the defamation context and that "Traditional approaches … may not respond adequately to the realities of the Internet world": *Barrick Gold* at para. 32.

[41]   Canadian courts have found some assistance regarding jurisdiction and the internet in American cases. As academic commentators note, American jurisprudence is "an imperfect fit, as the American approach to personal jurisdiction has its roots in that country's constitutional requirement for minimal contact in order to establish due process.": Teresa Scassa & Michael Deturbide, *Electronic Commerce and Internet Law in Canada*, 2nd ed (Toronto, Ontario: CCH Canadian Limited, 2012) at 602 [*Scassa & Deturbide*].

[42]   Canadian courts have widely considered the United States District Court decision in *Zippo Manufacturing v. Zippo Dot Com Inc.,* 952 F Supp 119 (WD Pa 1997) [*Zippo*]:  *Braintech, Inc. v. Kostiuk*, 1999 BCCA 169 [*Braintech*], *Pro-C Ltd. v. Computer City Inc.*, [2000] O.J. No. 2823 (S.C.J.), *Wiebe v. Bouchard et al.*, 2005 BCSC 47.

[43]   The plaintiff in *Zippo* is a Pennsylvania corporation that manufactures Zippo lighters. It claimed that the defendant, a California corporation that operated an internet news service and website under the domain names "ZippoNews.com", "Zippo.com" and "Zippo.net", infringed its trademark. The defendant's officers, employees, and internet servers were located in California and it had no offices, employees, or agents in Pennsylvania. Pennsylvania residents accessed the defendant's website, signed up, and received a news message service. Three thousand of the defendant's 140,000 subscribers world-wide were Pennsylvania residents. Contracts between users in Pennsylvania and the defendant were entered into on the website.

[44]    The issue was whether Pennsylvanian's long-arm statute could "reach" the defendant in California and exercise personal jurisdiction over it. As in *Van Breda* and *Thumbnail*, the Court concluded that being able to access a passive website was an insufficient basis for the state where the website was accessed to assert jurisdiction.

[45]    However, the Court found it had jurisdiction because the defendant had subjected itself to Pennsylvania's jurisdiction by conducting electronic commerce in Pennsylvania through its interactive website.

[46]    In *Scassa & Deturbide* at 604, the authors note that in the years since *Zippo*, American courts began to feel uncomfortable with the vague "interactivity" concept of *Zippo* and moved towards a test that focussed on "targeting" a jurisdiction, which fit more easily in areas like defamation where the *Zippo* test was particularly inadequate. The concepts of interactivity and targeting are of assistance in assessing whether Google carries on business in British Columbia through its websites.

[47]    Google submits that it merely offers a passive website to residents of British Columbia who wish to search the internet. It argues that its programs automatically generate search results without Google being actively involved in the particular search. Paragraph 23 of Google's written submissions state:

> [23]    … Google's internet search engine allows users to enter key-words and then Google generates a list of results in a specific ranked order. Google's search results are computer generated through the use of Google's highly confidential and proprietary algorithm and methodology. Google's web crawler program (referred to as "Googlebot") reviews the content that is available on trillions of webpages or URLs over the internet. Search results are generated based on that content [within seconds].

[48]    I conclude that Google's internet search websites are not passive information sites. As a user begins to type a few letters or a word of their query, Google anticipates the request and offers a menu of suggested potential search queries. Those offerings are based on that particular user's previous searches as well as the phrases or keywords most commonly queried by all users. As James Grimmelman

2014 BCSC 1063 (CanLII)

writes in "The Structure of Search Engine Law" (2007-2008) 93 Iowa L Rev 1 at 10-11:

> Search engines are also increasingly learning from the large volumes of query data they have accumulated. A user's history of queries can provide useful information about her probable intentions -- for example, whether she tends towards navigational or transactional queries. Similarly, search engines gain useful feedback into their own successes and failures by seeing which results users click on or by noticing long strings of searches on related terms, which may indicate that the user is having trouble finding what she's looking for.

[49]     Google collects a wide range of information as a user searches, including the user's IP address, location, search terms, and whether the user acts on the search results offered by "clicking through" to the websites on the list.

[50]     In addition to its search services, Google sells advertising to British Columbia clients. Indeed, Google entered into an advertising contract with the defendants and advertised their products up to the hearing of this application. Google acknowledges it should not advertise for the defendants and filed an affidavit explaining its inadvertent failure to suspend the defendants' Google account prior to the hearing.

[51]     Although Google's advertising business is marketed in Canada by Google Canada, British Columbia residents who wish to advertise on Google's webpages contract directly with Google and make payments directly to Google. Although those contracts stipulate that disputes will be governed by California law and adjudicated in California courts, the "choice of laws" provision in those contracts does not alter the fact that Google is carrying on a business in this province through advertising contracts with British Columbia residents.

[52]     The Supreme Court of Canada noted that advertising in a jurisdiction is not by itself a sufficient connection to establish territorial competence: *Van Breda* at paras. 87, 114. But there is a difference between a company advertising its own services through a website or other media available to British Columbia residents, and engaging in the business of selling advertising space on the internet to other

2014 BCSC 1063 (CanLII)

companies in British Columbia. There is uncontradicted evidence before me that Google sells advertising to British Columbia residents, including the defendants.

[53]    Google submits that its advertising services are completely separate from its search services, and cannot justify the Court assuming jurisdiction over Google's search services. With respect, I do not agree with that proposition for two reasons.

[54]    First, Google's business model is contextual advertising; the "context" is the search done using Google's search services. Ads are linked to either the subject matter of the search, or the history of the person searching. Google does not charge users of its search services. Rather, it sells space on its websites to advertisers whose ads are displayed alongside the search results generated by a user's query.

[55]    These ads can relate to the topics searched. For example, if "Vancouver lawyers" is searched, a page showing a list of Vancouver lawyers will be generated. At the top of the list a number of ads show up for law firms that have paid Google in order to advertise there. Those ads look like the other search results but are marked by Ad.

[56]    These ads can also be unrelated to the content of the search, but geared to a particular searcher. For example, if the user has in the past searched a retail website, ads for that retail outlet may appear on the page showing the search results for the query "Vancouver lawyers". Google can individually tailor the advertising seen by a user each time they search using the information in the search query and that user's own search history.

[57]    Google made the same argument that its ad and search services are unrelated in submissions to the European Court of Justice in *Google Spain SL and Google Inc. v. Agencia Española de Protección de Datos (AEPD) and Mario Costeja González*, C-131/12 [*González*]. The European Court of Justice delivered judgment on 13 May 2014. Its reasons are available online but are not yet published. In that dispute, Mr. González lodged a complaint with the Spanish Data Protection Agency based on the fact that when an internet user entered Mr. González's name in the

2014 BCSC 1063 (CanLII)

2014 BCSC 1063 (CanLII)

Google search engine, the user would obtain links to two pages of a newspaper published in January and March of 1998 relating to attachment proceedings against Mr. González for the recovery of social service debts.

[58]     Mr. González applied to order the newspaper to remove or alter its webpages so that his personal data no longer appeared. He also requested that Google Spain or Google be required to remove or conceal his personal data so that it was not included in search results given that the attachment proceedings concerning him had been fully resolved for a number of years and any "reference to them was now entirely irrelevant" (para. 15).

[59]     The Spanish Data Protection Agency upheld Mr. González's complaint against Google Spain and Google on the basis that search engine operators were subject to data protection legislation. Google appealed that decision to the National High Court which in turn referred the matter to the European Court of Justice for preliminary rulings. The European Court of Justice confirmed that the promotion and sale of advertising space in relation to Spain constituted the bulk of Google's commercial activity and was "regarded as closely linked to Google Search" (para. 46). The European Court of Justice concluded at para. 56:

> [56]     … the activities of the operator of the search engine [Google] and those of its establishment situated in the Member State [Google Spain] concerned are inextricably linked since the activities relating to the advertising space constitute the means of rendering the search engine at issue economically profitable and that engine is, at the same time, the means enabling those activities to be performed.

[60]     While *González* concerned the protection of personal information and particular statutory provisions, the analysis relating to the connection between Google's advertising and search functions is of assistance. I too conclude that the two parts of Google's business are inextricably linked; neither service can stand alone.

[61]     Second, whether the advertising activity conducted in British Columbia is the same as the activity which the plaintiff seeks to enjoin is not germane to the territorial competence analysis. The difference between the advertising business and

the search business to be enjoined goes to the strength of the connection between the matter and British Columbia. It could thus be a factor when assessing whether British Columbia is the appropriate forum, but it does not affect this court's territorial competence. Once the Court has *in personam* jurisdiction, it has it for all purposes.

[62]     Further, at the territorial competence stage of the analysis, the Court is not looking for the strongest possible connection to this forum, but for a connection sufficient to meet the requirements of the *CJPTA*. In *Purple Echo* the plaintiff claimed damages for alleged breaches of a co-production agreement with broadcaster KCTS which was licenced to broadcast only in the United States, although broadcasts were available to viewers in Canada. KCTS was found to have a place of business in British Columbia because PCPTA, a federally incorporated Canadian corporation with an office in Vancouver, solicited Canadian donations for KCTS under contract and paid the money to KCTS: *Purple Echo* at paras. 44-46. The Court of Appeal's finding that British Columbia had territorial competence turned on a number of other factors as well, but the Court nonetheless included the link between the "parent" and its agent company as a factor supporting the connection between that parent company and British Columbia.

[63]     In any event, I find that Google's search and advertising services are inextricably linked.

[64]     I will address here Google's submission that this analysis would give every state in the world jurisdiction over Google's search services. That may be so. But if so, it flows as a natural consequence of Google doing business on a global scale, not from a flaw in the territorial competence analysis. As Janet Walker writes in *Castel & Walker: Canadian Conflict of Laws*, loose-leaf, 6 ed (Markham, Ontario: LexisNexis, 2005), ch 11 at 27, a legal person such as a corporation can be subject to multiple jurisdictions whether because it is resident there through registration, or because it is carrying on business in that jurisdiction. Further, the territorial competence analysis would not give every state unlimited jurisdiction over Google;

2014 BCSC 1063 (CanLII)

jurisdiction will be confined to issues closely associated with the forum in accordance with private international law.

[65]   In summary on this issue, I conclude that the Court has territorial competence over Google on this application.

### 2.   Is British Columbia the appropriate forum?

[66]   Should the Court decline to exercise its jurisdiction on the basis that there is another, more convenient forum in which to adjudicate this application? As the Supreme Court of Canada observed in *Van Breda* at para. 101, a clear distinction must be drawn between the existence and the exercise of jurisdiction. The former is concerned generally with preventing jurisdictional overreach and respecting the authority of foreign courts, the latter is concerned with fairness to the parties and efficient resolution of the dispute: *Van Breda* at paras. 22, 104-105. Although Google did not frame its argument expressly in terms of *forum non conveniens*, it asserted that California is a better forum to hear this application. Therefore, the issue must be addressed.

[67]   Once jurisdiction is established, the burden falls on Google to show why the Court should decline to exercise its jurisdiction and displace the forum chosen by the plaintiffs:  *Van Breda* at para. 103. Google must show that the alternative forum is clearly more appropriate and that, in light of the characteristics of the alternative forum, the matter can be adjudicated more fairly and efficiently there.

[68]   In British Columbia the Court's discretion to stay the proceeding in favour of another state's jurisdiction is grounded in s. 11(1) of the *CJPTA*:

> 11 (1)  After considering the interests of the parties to a proceeding and the ends of justice, a court may decline to exercise its territorial competence in the proceeding on the ground that a court of another state is a more appropriate forum in which to hear the proceeding.

[69]   Google's submissions in support of a stay can be grouped into three main arguments:

2014 BCSC 1063 (CanLII)

(i)      The Court should decline jurisdiction because Google has agreed to block specific websites from its search results and the plaintiffs have failed to avail themselves of that out-of-court remedy;

(ii)     Google has a stronger connection to California; and

(iii)    An order made by a California court can be enforced.

I will deal with each submission in turn.

### *(i)    Is an out-of-court remedy available to the plaintiffs?*

[70]    Google submits that the plaintiffs have a remedy available to them without a court order but have failed to avail themselves of it. Although this is not strictly speaking another forum, it is convenient to address the question here. After Google received notice of this Court's orders in the fall of 2012 and the plaintiffs filed this application, Google agreed to take down the defendants' websites that the plaintiffs identified by way of a specific URL.

[71]    The plaintiffs initially agreed to try that route and adjourned the application generally to do so. They provided Google with specific URLs from which the defendants were selling the GW1000 in violation of the Court's orders. Google voluntarily blocked 345 websites from its search results. This is referred to as "taking down" websites.

[72]    However, the process was wholly unsatisfactory from the plaintiffs' perspective. In place of the de-indexed websites, a whole host of new websites moved up the rankings to take their place. Websites can be generated automatically, resulting in an endless game of "whac-a-mole" with the plaintiffs identifying new URLs and Google deleting them. The plaintiffs argue that any scheme that depends on the deletion of individual URLs is ineffective.

[73]    The insufficiency of the voluntary take-down of specific websites was recognized by the Regional Court of Paris in the unreported decision Trib gr inst Paris, 6 November 2013, *Max Mosely v. Google France SARL and Google Inc.*[*Max*

*Mosely*]. Mosely had been surreptitiously videotaped by the News of the World while engaging in sexual activity with several partners. The newspaper published the images and made others available on its website. In a French criminal proceeding, the newspaper was found guilty and ordered to cease publishing the images. However, the images remained widely available by searching through Google Images.

[74]    Mosely asked Google to stop indexing the pictures with reference to specific URLs. He made many such requests and Google honoured all of the requests but the images continued to be indexed through new URLs. After two years of this process, Mosely asked Google to prevent the images from being indexed at all. Google refused and Mosely applied for an injunction and damages. The Court observed that it was impossible for the plaintiff to have his right enforced by using only the procedures made available by Google (English translation of *Max Mosely* at 10).

[75]    The inadequacy of this approach in the present matter is heightened by Google's removal of specific URLs from only those searches initiated through Google.ca – a fact that came to the plaintiffs' attention only after cross-examining Mr. Smith on his affidavit on May 21, 2013. As a result, the defendants' blocked websites appear when searches are conducted from any country other than Canada, or when a search is conducted within Canada using a Google website other than www.google.ca.

[76]    The majority of GW1000 sales occur outside Canada. Thus, quite apart from the practical problem of endless website iterations, the option Google proposes is not equivalent to the order now sought which would compel Google to remove the defendants' websites from all search results generated by any of Google's websites worldwide. I therefore conclude that the plaintiffs do not have an out of court remedy available to them.

2014 BCSC 1063 (CanLII)

### *(ii)    Does Google have a stronger connection to California?*

[77]    Google is a Delaware company that is registered and has its head office in California. The *CJPTA*, like the common law it codified, recognizes that the ordinary residence of a person within a state is a strong connecting factor justifying the assumption of jurisdiction over that person. Residence for a legal person such as a corporation is established under s. 7 of the *CJPTA* only if:

> (a) the corporation has or is required by law to have a registered office in British Columbia,
>
> (b) pursuant to law, it
>
> > (i) has registered an address in British Columbia at which process may be served generally, or
> >
> > (ii) has nominated an agent in British Columbia upon whom process may be served generally,
>
> (c) it has a place of business in British Columbia, or
>
> (d) its central management is exercised in British Columbia.

[78]    None of these subsections apply to Google in British Columbia, but all pertain in California. Google's internet search services are said to "operate out of" its head office.

[79]    I accept that Google has a strong presence in and connection to California. But the question is "which forum is more appropriate?" not "where does Google reside?" As the Supreme Court of Canada observed in *Van Breda* at para. 109, the Court should not exercise its discretion in favour of a stay solely because it finds that comparable forums exist in other states:

> [109]    … It is not a matter of flipping a coin. A court hearing an application for a stay of proceedings must find that a forum exists that is in a better position to dispose fairly and efficiently of the litigation. But the court must be mindful that jurisdiction may sometimes be established on a rather low threshold under the conflicts rules. *Forum non conveniens* may play an important role in identifying a forum that is clearly more appropriate for disposing of the litigation and thus ensuring fairness to the parties and a more efficient process for resolving their dispute.

[80]    The factors I must consider in deciding whether California is the more appropriate forum in which to hear this application include those set out in s. 11(2) of the *CJPTA*:

> 11 (2)  A court, in deciding the question of whether it or a court outside British Columbia is the more appropriate forum in which to hear a proceeding, must consider the circumstances relevant to the proceeding, including
>
>> (a) the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum,
>>
>> (b) the law to be applied to issues in the proceeding,
>>
>> (c) the desirability of avoiding multiplicity of legal proceedings,
>>
>> (d) the desirability of avoiding conflicting decisions in different courts,
>>
>> (e) the enforcement of an eventual judgment, and
>>
>> (f) the fair and efficient working of the Canadian legal system as a whole.

[81]    I will address each of these factors in turn.

### (a)    Comparative convenience and expense

[82]    This factor is of limited significance since "the proceeding" in this case is a single application for an interim injunction.  Google has already incurred the expense of argument and appearance here. I consider it nonetheless because it could still be a factor with respect to enforcement if I grant the order sought.

[83]    This factor encompasses the Court's concern for protecting the respondent from unfairly inconvenient litigation. Google is a highly sophisticated entity with annual revenues of $50 billion and 54,000 employees worldwide. Because of the emergent nature of its business, Google often finds itself at the cutting edge of legal issues in many different fields of law all over the world, including in the areas of defamation, copyright, privacy and competition law. As a result Google has an in-house legal department of 700 people, including dedicated product counsel, national and regional counsel, and litigation counsel.

2014 BCSC 1063 (CanLII)

[84]     In contrast, the primary corporate plaintiff is a small British Columbia company which is incurring significant financial losses due to the defendants' conduct. I find this factor favours British Columbia as the more appropriate forum.

### (b)     The law to be applied to issues in the proceeding

[85]     This is a neutral factor; in either forum local law would apply. Google acknowledges that theft of intellectual property rights would be actionable in California, but I have no evidence before me of the applicable law in California governing the granting of injunctions against non-parties.

### (c)     The desirability of avoiding multiplicity of proceedings

[86]     The plaintiffs' application for an interim injunction against Google is founded on the plaintiffs' actions against the defendants and the Court's inherent jurisdiction to issue orders to protect the integrity of its own process, as recognized in s. 39(1) of the *Law and Equity Act*, R.S.B.C. 1996, c. 253. The plaintiffs seek the injunction to prevent the defendants from continued and flagrant breaches of this Court's orders in the underlying action.

[87]     Setting aside for the moment the question of whether this application could be made in California without the underlying action to support it, it would at a minimum require the plaintiffs to commence a second proceeding in California. This factor therefore favours British Columbia.

### (d)     The desirability of avoiding conflicting decisions in different courts.

[88]     This factor is of little assistance on this application as there is a single issue, whether the injunction should be granted, which is unlikely to be considered in both courts.

### (e)     Fair and efficient working of the Canadian legal system

[89]     This factor is of little assistance on the application before me.

2014 BCSC 1063 (CanLII)

2014 BCSC 1063 (CanLII)

### (f)      The enforcement of an eventual judgment

[90]     This is the main ground upon which Google asserts that California is the more appropriate forum. How, Google asks, can this Court force Google to take steps outside of British Columbia?

[91]     Google raises a good point. Traditionally, courts have not granted injunctive relief against defendants who reside outside the jurisdiction. In *Barrick Gold* at para. 74, the Ontario Court of Appeal explained this general rule by quoting from Robert J. Sharpe's text *Injunctions and Specific Performance*:

> Claims for injunctions against foreign parties present jurisdictional constraints which are not encountered in the case of claims for money judgments. In the case of a money claim, the courts need not limit assumed jurisdiction to cases where enforceability is ensured. Equity, however, acts *in personam* and the effectiveness of an equitable decree depends upon the control which may be exercised over the person of the defendant. If the defendant is physically present, it will be possible to require him or her to do, or permit, acts outside the jurisdiction. The courts have, however, conscientiously avoided making orders which cannot be enforced. The result is that the courts are reluctant to grant injunctions against parties not within the jurisdiction and the practical import of rules permitting service *ex juris* in respect of injunction claims is necessarily limited. Rules of court are typically limited to cases where it is sought to restrain the defendant from doing anything within the jurisdiction. As a practical matter the defendant "who is doing anything *within the jurisdiction*" will usually be physically present within the jurisdiction to allow ordinary service. [Italics in original; underlining added.]

[92]     On this basis the Court of Appeal in *United Services Funds (Trustees of) v. Richardson Greenshields of Canada Ltd.* (1988), 23 B.C.L.R. (2d) 1, 1988 CanLII 2960 (C.A.) held that a court should not grant an order compelling an out-of-country individual to attend for examination for discovery.

[93]     However, there are exceptions to the general rule. For example, in *Barrick Gold* the Ontario Court of Appeal granted a permanent injunction against a British Columbia resident in a defamation proceeding.

[94]     An injunction is an equitable remedy and is enforced through the courts' contempt power. Generally, that power is exercised through fines and imprisonment.

2014 BCSC 1063 (CanLII)

These penalties are more easily invoked when a person resides within the court's jurisdiction so that either the person or his assets can be "seized".

[95]    But these are not the only remedies available to the Court. In *Bea v. The Owners, Strata Plan LMS2138*, 2014 BCSC 826, Grauer J. cites with approval the following words of the Chief Justice of the Supreme Court of Newfoundland and Labrador:

> The law of contempt is found in the development of the common law. That law is always evolving. The state of its development is not frozen at any particular date in judicial history. So also, with respect to the types of penalty which a court may employ to vindicate its contempt power. Differing penalties may be creatively employed, either singly or in combination, in new situations to achieve the purposes behind the exercise of the contempt power.

[96]    For example, this court may dismiss or refuse to hear proceedings brought by a party who is violating a court order: *Breberin v. Santos*, 2013 BCCA 385 at para. 14; *Schmidt v. Wood*, 2012 ABCA 235 at para. 5.

[97]    While barring a person in contempt from making use of the Court's process may be a smaller stick than imprisonment, it is nonetheless a means of enforcement of some significance. That is particularly so when a non-resident corporation carries on business in British Columbia and may be sued or wish to sue in these courts. Although Google's contracts with advertisers in British Columbia are by the choice of laws provisions to be determined in California, other causes of action in defamation or tort could well arise in British Columbia (see for example *Trkulja v. Google (No 5)*, [2012] VSC 533, an Australian defamation case which raised issues of whether Google "publishes" the material displayed on its search engines).

### (iii)    An order made in California can be enforced

[98]    Google argues that the plaintiffs should apply in California because a California court order can be enforced against Google in that state. I accept that a California court order is easier to enforce in California than a British Columbia court order. However, related to the assertion that California is therefore a better forum is

the question of whether a California court could or would order the interlocutory relief sought by the plaintiffs.

[99]     Google asserts that the plaintiffs can make this application in California. However, Google bears the burden of proof at this stage of the analysis and has provided no support for that proposition. Indeed, neither party alluded to or attempted to prove California law. Although I need go no further given where the burden of proof lies, Canadian jurisprudence offers insight into the complexity of this question.

[100]   Assuming the plaintiffs could file an originating application in California, they would be asking for a standalone interim injunction with no underlying substantive relief sought in California. The Supreme Court of Canada has followed the approach taken by the UK House of Lords and determined that an interlocutory injunction can be issued in such circumstances, but only if two conditions are satisfied: *Brotherhood of Maintenance of Way Employees Canadian Pacific System Federation v. Canadian Pacific Ltd.*, [1996] 2 S.C.R. 495. First, the issuing court must have jurisdiction *simpliciter*, and second, the substantive underlying dispute must be a cause of action recognized by the issuing court. As I noted, I have nothing before me to say whether California courts have adopted the same approach.

[101]   Furthermore, Google's assertion that the order sought in this court could not be enforced in California ignores the potential for the plaintiffs to sue on a British Columbia court order in California. That is a distinct legal step from applying for a standalone order in California, which Google contends is the appropriate procedure.

[102]   Google submits that the plaintiffs cannot enforce a British Columbia injunction in California. Google relies on *Ingenium Technologies Corp. v. McGraw-Hill Companies*, 2005 BCSC 465 at para. 28, in which Pitfield J., on a without notice application stated that "[a]n injunction is not a form of judgment or order on which [the plaintiff] could realistically sue for recognition and enforcement on a timely basis, if it would be able to sue on such judgment at all". I conclude from a review of

the case law that there are situations in which a party can sue for enforcement of a foreign interlocutory order. Certainly, the common law is evolving in that direction.

[103]   The Ontario Court of Appeal enforced a foreign interlocutory order in *Cavell Insurance Co. Ltd. (Re)* (2006), 80 O.R. (3d) 500, 269 D.L.R. (4th) 679 (C.A.). The British Columbia Court of Appeal addressed the trend towards enforcing foreign non-monetary judgments in *Minera Aquiline Argentina SA v. IMA Exploration Inc.*, 2007 BCCA 319 at para. 92:

> [92]     … academic opinion is consistent with the general trend of private international law. The Supreme Court of Canada has recognized that the law has evolved to allow courts to deal with disputes arising in an increasingly interdependent global economy. In its recent jurisprudence, the Supreme Court has reasoned that, in the proper case, the limits of the courts' jurisdiction should be expanded, not narrowed. In *Pro Swing Inc.* (at paras. 78-79), McLachlin C.J.C. (in dissent, but not on this issue) referred to *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 at 1098, *Hunt v. T&N plc*, [1993] 4 S.C.R. 289 at 321-322, and *Beals v. Saldanha*, [2003] 3 S.C.R. 416 at para. 27, for the rationale for extending the limits of the court's jurisdiction to enforce foreign non-monetary judgments. She commented that comity, order and fairness do not exclude the courts from enforcing foreign non-monetary judgments, and in the context of modern private international law, may require it. The majority of the Court in *Pro Swing Inc.* concluded that was not the right case to extend the jurisdiction, but all of the justices agreed that the "time is ripe to review the traditional common law rule" (para. 15) in light of changing global commercial realities.

[104]   Finally, I note that Google objects to British Columbia retaining jurisdiction because the order sought would require Google to take steps in relation to its websites worldwide. That objection is not resolved by "going to California". If the order involves worldwide relief, a California court will be no more appropriate a forum than British Columbia to make such an order. Even if the order can be construed more narrowly as requiring Google to take steps at the site where the computers controlling the search programs are located, Google has not established that those computers are located in California, or that they can only be reprogrammed there.

[105]   As the Court of Appeal observed in *Olney v. Rainville*, 2009 BCCA 380 at para. 27, "What is essential is that the taking of jurisdiction be consistent with order

2014 BCSC 1063 (CanLII)

and fairness." I conclude on this issue that Google has not established that California is a more appropriate forum than British Columbia for adjudicating the plaintiffs' application for an interim injunction against Google.

### 3.      Should the order sought be granted?

[106]   Having determined that the Court has jurisdiction over Google and that Google has not established that California is a more appropriate forum, we come to the heart of the matter:  Should the injunction be granted?

[107]   Google asserts that the Court does not have the authority to make an order of the kind sought. In issue is whether the Court has "subject matter competence". The plaintiffs and Google agree that the type of order I am asked to make has never before been made by a Canadian court.

[108]   Google asserts that the Court lacks subject matter competence for two main reasons:  first, because the order is sought against a non-party;  second, because it would require the Court to make an order with worldwide effect. The latter objection may sound like an issue more properly addressed at the territorial competence stage of the analysis. However, the question of whether the Court has territorial competence to hear the application because of its connection to the persons or facts involved is distinct from the question of whether, in the words of s. 39 of the *Law and Equity Act*, it is "just or convenient" that the order sought should be made to enjoin or mandate the particular conduct.

### (a)      Can an order be made against a non-party?

[109]   Google submits that as a general rule a Court does not have authority to make an order against a non-party who owes no duty to the plaintiff. Google acknowledges there are two exceptions to that rule, but argues that neither exception applies to this case.

[110]   The first exception arises when a non-party with knowledge of a court order deliberately disobeys it and thereby deprecates the Court's authority.  This exception

2014 BCSC 1063 (CanLII)

was described by Lindley L.J. in *Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.) at 555-556:

> A motion to commit a man for breach of an injunction, which is technically wrong unless he is bound by the injunction, is one thing; and a motion to commit a man for contempt of Court, not because he is bound by the injunction by being a party to the cause, but because he is conducting himself so as to obstruct the course of justice, is another and totally different thing. In the one case the party who is bound by the injunction is proceeded against for the purpose of enforcing the order of the Court for the benefit of the person who got it. In the other case the Court will not allow its process to be set at naught and treated with contempt. In the one case the person who is interested in enforcing the order enforces it for his own benefit; in the other case, if the order of the Court has been contumaciously set at naught the offender cannot square it with the person who has obtained the order and save himself from the consequences of his act. The distinction between the two kinds of contempt is perfectly well known, although in some cases there may be a little difficulty in saying on which side of the line a case falls. As to the jurisdiction, if the facts are of the character I have stated, notwithstanding the arguments of Mr. Seward Brice, I cannot bring myself to entertain any difficulty about it.

[111]   Under this "contempt" exception, the Court's objective is not to further the interests of the plaintiffs, but to uphold its authority.

[112]   The plaintiffs argue that after Google received notice of this Court's orders against the defendants, it should not have allowed the defendants' websites to be displayed in Google's search results. The plaintiffs argue that this amounts to aiding and abetting the defendants' contempt and is comparable to *Greenpeace Canada v. MacMillan Bloedel Ltd.* (1994), 96 B.C.L.R. (2d) 201, 1994 CanLII 943 (C.A.), aff'd *MacMillan Bloedel Ltd. v Simpson*, [1996] 2 S.C.R. 1048. In that case the Court granted an injunction preventing the defendants and all persons having notice of the order from physically obstructing the plaintiff's logging operations. Logging protestors who were not named as defendants protested that the order was overbroad. Macfarlane J.A. rejected that notion, citing with approval at para. 44 the following words from Robert J. Sharpe's text *Injunctions and Specific Performance*:

> It cannot be objected that the net of liability is cast too wide where the plaintiff is able to show that the non-party has deliberately agreed to flout the order at the instigation of the defendant. However, the court must be cautious not to hold in contempt a party who acts independently of the defendant, and who may exercise a right distinct from that of the defendant. Such a person has

not yet had his day in court and should not be bound by an order made in an action to which he was not a party. [Emphasis added.]

[113]   There is no evidence that Google acted in this case to deliberately flout this Court's orders and assist the defendants. While Google's search engines facilitate the defendants' ongoing breach by leading searchers to the defendants' websites, Google operates its search engines in the ordinary course of its business, independently of the defendants and not in order to assist them in their breach.

[114]   The plaintiffs' authorities involve quite different facts. In *MacMillan Bloedel*, those held in contempt had knowingly violated the court order to support the defendant's blockade of the logging road. In *Glazer v. Union Contractors Ltd. and Thornton* (1960), 25 D.L.R. (2d) 653, 33 W.W.R. 145 (B.C.S.C.) the Court had appointed a receiver over money owing to a company by the Government.  A government minister, aware of the order but not a party to the proceeding, was committed for contempt for causing funds owing to the company to be paid to the company's order rather than to the receiver. In *Attorney General v. Punch Ltd.*, [2002] UKHL 50, [2003] 1 All ER 289, an order prohibited the publication of certain information that the non-party published in its magazine when on notice of the order. In all of these cases, the non-parties found in contempt had engaged in conduct calculated to directly frustrate a court order. Google's search results are not of the same ilk.

[115]   The argument that Google aided and abetted the defendants' contempt of the existing court orders is stronger in relation to Google's sale of advertising space to the defendants. But as I noted earlier, when Google received notice of this Court's orders it agreed that it should not continue to do this. I accept that Google only continued to do so up to the commencement of this hearing due to an administrative oversight.

[116]   The second exception to the general rule that a Court will not make orders against a non-party extends to orders made against non-parties to aid in the fact finding necessary to the administration of justice. Examples of orders made against

non-parties who have no obligation to the plaintiff abound: subpoenas are issued to obtain evidence at trial under Rule 12-5(31)-(39); documents and oral evidence may also be obtained in advance of trial under Rules 7-1(18) and 7-5.

[117]  In addition, under the *Norwich Pharmacal Co. and Others v. Customs and Excise Commissioners,* [1974] A.C. 133, [1973] 2 All ER 943 (H.L.) [*Norwich Pharmacal*] line of authority, courts can make orders against non-parties even before an action is commenced. The remedy of pre-action discovery was articulated in *Norwich Pharmacal* by Lord Reed at 175:

> [I]f through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers. I do not think that it matters whether he became so mixed up by voluntary action on his part or because it was his duty to do what he did. It may be that if this causes him expense the person seeking the information ought to reimburse him. But justice requires that he should co-operate in righting the wrong if he unwittingly facilitated its perpetration.

*Norwich Pharmacal* has been adopted as part of the law in British Columbia: *Kenney v. Loewen* (1999), 64 B.C.L.R. (3d) 346, 1999 CanLII 6110 (S.C.), *Procon Mining and Tunnelling Ltd. et al. v. McNeil, Bonnar et al.*, 2007 BCSC 454 [*Procon Mining*], and *Pierce v. Canjex Publishing Ltd.*, 2011 BCSC 1503.

[118]  Google argues that the *Norwich Pharmacal* line of authority goes no further than compelling a non-party to provide information and is only imposed in exceptional cases with due concern for the non-party against whom the order is sought:  *GEA Group AG v. Ventra Group Co.*, 2009 ONCA 619 [*Ventra*] at para. 85.

[119]  I do not accept Google's submission that the Court only has authority to make an order against a non-party in relation to contempt or to further fact finding necessary to effect justice. Lack of precedent should not be confused with lack of subject matter competence.

[120]  Lord Woolf M.R. described this distinction in *Broadmoor Hospital Authority & Anor v. R*, [1999] EWCA Civ 3039, [2000] QB 775 at para. 21:

> [21]    The powers of courts with equitable jurisdiction to grant injunctions
> are, subject to any relevant statutory restrictions, unlimited. Injunctions are
> granted only when to do so accords with equitable principles, but this
> restriction involves, not a defect of powers, but an adoption of doctrines and
> practices that change in their application from time to time. Unfortunately
> there have sometimes been made observations by judges that tend to
> confuse questions of jurisdiction or of powers with questions of discretions or
> of practice. The preferable analysis involves a recognition of the great width
> of equitable powers, an historical appraisal of the categories of injunctions
> that have been established and an acceptance that pursuant to general
> equitable principles injunctions may issue in new categories when this course
> appears appropriate.

[121]   The Court has inherent jurisdiction to maintain the rule of law and to control

its own process. The power to grant injunctions is a broad one and is confirmed by

s. 39 of the *Law and Equity Act*. Injunctions may be issued in "in all cases in which it

appears to the court to be just or convenient that the order should be made ... on

terms and conditions the court thinks just": *MacMillan Bloedel,* [1996] 2 S.C.R. 1048

at para. 15.

[122]   The Court's willingness to use its equitable jurisdiction against non-parties is

evident in the development of *Mareva* injunctions. This line of authority is particularly

helpful because *Mareva* injunctions also involve orders against non-parties who

reside outside of the province.

[123]   Madam Justice Newbury granted the first *Mareva* injunction in Canada in

*Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 (S.C.) [*Mooney No. 1*] on an *ex parte*

application. After referring to English and Australian cases granting such relief, she

observed at para. 11:

> The reasons for extending Mareva injunctions to apply to foreign assets are
> valid in British Columbia no less than in England and Australia - the notion
> that a court should not permit a defendant to take action designed to frustrate
> existing or subsequent orders of the court, and the practical consideration
> that in this day of instant communication and paperless cross-border
> transfers, the courts must, in order to preserve the effectiveness of their
> judgments, adapt to new circumstances.

[124]   Madam Justice Huddart continued the injunction in a hearing two months later

with both parties present: *Mooney v. Orr* (1994), 100 B.C.L.R. (2d) 335 (S.C.)

2014 BCSC 1063 (CanLII)

[*Mooney No. 2*]. She agreed that *Mareva* orders were a necessary development, saying at para. 60:

> Whether this extension of existing principles is seen as an expansion of the exercise of discretion given by the *Law and Equity Act* or inherent in the court's ability to control its process, I am of the view that such a discretion must be exercised whenever it is required to ensure the effective administration of justice in British Columbia..

[125]   In England, where *Mareva* injunctions were first made in 1975, such orders were originally restricted to assets within England. In the late 1980s the English courts relaxed those restrictions to apply to the defendants' assets wherever they were situated, and ancillary orders were extended to non-parties resident in foreign countries. Non-parties could not only be restrained from dealing with the defendants' assets, but could also be mandated to take steps to transfer assets to a receiver located elsewhere:

[126]   The extra-territorial reach of these orders is evident. Vaughan Black and Edward Babin commented on the development of the law in "Mareva Injunctions in Canada: Territorial Aspects" (1997) 28 Can Bus LJ 430 at 441:

> All of these considerations [favouring the granting of extra-territorial orders] run up against one principal objection: the judicial power of all national courts is territorially circumscribed and it is improper for a court to attempt to exercise its power to affect actions outside the court's territory. Stated so broadly, that limitation must now be seen as dated and lacking in general validity, or at least subject to several exceptions. <u>There now seems little doubt that Canadian courts actually have the power to employ *in personam* orders to enjoin parties to do or refrain from doing something anywhere in the world</u>. [Emphasis added.]

[127]   The expansion of *Mareva* orders to include non-parties resulted from the Courts' recognition that *Mareva* injunctions would have no practical effect without involving non-parties. That is so because unscrupulous defendants will simply fail to comply with the injunction, whereas the defendants' brokers, accountants, lawyers and bankers are less likely to engage in such conduct. However, as Black & Babin observed at 453, the rights of non-parties and the states in which they reside must be taken into account:

> [T]his practical need to control the actions of non-parties must, as is the case with parties, be balanced against such persons' legitimate interests in privacy and liberty of action (including such rights as they may have acquired by contract), and against the rights of other states to sovereign jurisdiction over persons and activities within their boundaries.

[128]   The Courts have developed protections for non-parties who are not resident in the province, or who may have a presence within this jurisdiction but are also present or resident in a number of jurisdictions outside the territory. In recognition of the fact that such persons may be subject to laws in force in the foreign jurisdiction which forbid compliance with an order made by this Court, the Court has included in worldwide *Mareva* injunctions terms which have come to be known as the "Babanaft" and "Baltic" provisos.

[129]   Stephen Pitel and Andrew Valentine describe these provisos and the rationale behind their inclusion in worldwide *Mareva* injunctions in "The Evolution of the Extra-Territorial Mareva Injunction in Canada: Three Issues" (2006) 2 J P Int'l L 339 at 371-377. *Babanaft* and *Baltic* provisos are intended to ensure that courts do not exercise exorbitant jurisdiction over non-parties situated abroad and are particularly important in defining the effect of worldwide *Mareva* injunctions on corporate non-parties with a presence both inside and outside the local jurisdiction.

[130]   The *Babanaft* proviso states in part that where a corporate non-party has a presence in and outside of the jurisdiction, it must have notice of the order and the ability to restrain activities abroad that would aid in violation of the injunction.

[131]   The *Baltic* proviso permits corporate non-parties to comply with their foreign legal obligations as they reasonably perceive them.

[132]   Although *Mareva* injunctions are granted at the plaintiff's suit, a *Mareva* order's primary function is maintaining the integrity of the Court's process. Madam Justice Huddart wrote in *Grenzservice Speditions Ges.m.b.h v. Jans* (1995), 15 B.C.L.R. (3d) 370, 1995 CanLII 2507 (S.C.) at para. 92:

> [92]   The Mareva and Anton Pillar orders were conceived not so much to protect plaintiffs as to protect the Court's jurisdiction against defendants bent

on dissipating or secreting their assets or evidence in order to render inconsequential the judicial process against them. …

[133]  I conclude that the Court has authority to grant an injunction against a non-party resident in a foreign jurisdiction in appropriate circumstances.  The fact that an injunction has not before been made against an internet search provider such as Google is reason to tread carefully,  but does not establish that the Court does not have subject matter competence. Indeed, the notion that a court may only make the orders it has made in the past is anathema to the spirit of the common law. As Newbury J. observed in *Mooney No. 1* at para. 11:

> … the courts must, in order to preserve the effectiveness of their judgments, adapt to new circumstances. Such adaptability has always been, and continues to be, the genius of the common law.

### (b)      Should I make this order against Google?

[134]   Having determined that the Court has authority to issue an injunction with extra-territorial effect against a non-party where it is just or convenient to do so, the question remains:  should I grant the injunction on the facts of this case? A related question is what test should be applied in making that determination.

[135]   Google submits that it would not be just to make the order sought for four reasons.

[136]   First, Google says that it provides an important and valuable tool for navigating hundreds of trillions of webpages on the internet. Google argues it cannot, as a practical matter, monitor content or arbitrate disputes over content because of the enormous volume of content; because it cannot determine whether information is inaccurate or lawful; and because content on websites is constantly changing so even if Google could form judgments about the content of sites on its index at any given moment, those judgments would be obsolete moments later.

[137]   Whether Google is a passive indexer with no control over content has been the subject of litigation in other jurisdictions: *González*, *Max Mosely*, and *Trkulja*. However, the order sought in the present case would not require Google to monitor

2014 BCSC 1063 (CanLII)

the content of the defendants' websites. Rather, the order would simply require Google to remove all of the defendants' websites from its searches. To put it simply, it is not a question of blocking what is being said, but rather who is saying it. The order is, in many ways, only a slight expansion on the removal of individual URLs, which Google agreed to do voluntarily.

[138]  Second, Google submits it would be unjust to make the order sought because de-indexing entire websites without regard to content of the specific URLs would constitute undue censorship. Google's employee Mr. Smith deposed:

> URLs not specifically reviewed and identified may be used for any number of innocent purposes and a complete removal could result in possibly numerous URLs being blocked without Google having had the opportunity to review them and determine if a departure from its usual indexing process is necessary or warranted in the circumstances.

[139]  I do not find this argument persuasive. Google acknowledges that it alters search results to avoid generating links to child pornography and "hate speech" websites. It recognizes its corporate responsibility in this regard, employing 47 full-time employees worldwide who, like Mr. Smith, take down specific websites, including websites subject to court order. Excluding the defendant's prohibited websites from search results is in keeping with Google's approach to blocking websites subject to court order.

[140]  Third, Google argues that the Court should not make an order that could affect searches worldwide because it would put Google in the impossible situation of being ordered to do something that could require it to contravene a law in another jurisdiction. This raises the concern addressed by the *Baltic* proviso in *Mareva* injunctions.

[141]  Google gives as an example of such jurisdictional difficulties the case of *Yahoo! Inc. v. La Ligue Contre Le Racism et L'Antisemitisme* [*Yahoo*]. In 2000 two French anti-racism groups filed a suit in France against Yahoo alleging that Yahoo violated a French law prohibiting the display of Nazi paraphernalia by permitting users of its internet auction services to display and sell such artifacts. The plaintiffs

demanded that Yahoo's French subsidiary, Yahoo.fr, remove all hyperlinks to the parent website (Yahoo.com) containing the offending content. As in this case, Yahoo argued that the French Court lacked jurisdiction over the matter because its servers were located in the United States. The French Court held that it could properly assert jurisdiction because the damage was suffered in France and required Yahoo to "take all necessary measures" to "dissuade and render impossible" all access via yahoo.com by internet users in France to the Yahoo! internet auction service displaying Nazi artifacts, as well as to block internet users in France from accessing other online Nazi material: 145 F Supp 2d 1168 (ND Cal 2001) at 1172.

[142]   Yahoo claimed that implementing the order would violate its First Amendment rights to freedom of expression and therefore could not be enforced in the United States. The French Court did not accept that submission. Yahoo initiated a suit in California against the French plaintiffs, and obtained a declaratory judgment that the French orders were constitutionally unenforceable in the United States, contrary to the first amendment. Addressing the issue of international comity, the Court reasoned that United States Courts will generally recognize and enforce foreign judgments but could not do so on the facts of that case because enforcement of the French orders would violate Yahoo's constitutional rights to free speech: 169 F Supp 2d 1181 (ND Cal 2001) at 1192-1193. This decision was ultimately reversed on different grounds: 379 F 3d 1120 (9th Cir 2004), reheard in 433 F 3d 1199 (9th Cir 2006).

[143]   *Yahoo* provides a cautionary note. As with *Mareva* injunctions, courts must be cognizant of potentially compelling a non-party to take action in a foreign jurisdiction that would breach the law in that jurisdiction. That concern can be addressed in appropriate cases, as it is for *Mareva* injunctions, by inserting a *Baltic* type proviso, which would excuse the non-party from compliance with the order if to do so would breach local laws.

[144]   In the present case, Google is before this Court and does not suggest that an order requiring it to block the defendants' websites would offend California law, or

indeed the law of any state or country from which a search could be conducted. Google acknowledges that most countries will likely recognize intellectual property rights and view the selling of pirated products as a legal wrong.

[145]   Fourth, Google argues that the order sought is too broad. Google submits that if the injunction is granted it should be limited to Google.ca, the website designated for Canada, because no court should make an order that has a reach that extends around the world.

[146]   I note again that on the record before me, the injunction would compel Google to take steps in California or the state in which its search engine is controlled, and would not therefore direct that steps be taken around the world. That the <u>effect</u> of the injunction could reach beyond one state is a separate issue. Even an order mandating or enjoining conduct entirely within British Columbia may have such extraterritorial, or even worldwide effect.

[147]   For example, a non-party corporation that warehouses and ships goods for a defendant manufacturing company might be ordered on an interim injunction to freeze the defendants' goods and refrain from shipping them. That injunction could affect orders received from customers around the world. Could it sensibly be argued that the Court could not grant the injunction because it would have effects worldwide? The impact of an injunction on strangers to the suit or the order itself is a valid consideration in deciding whether to exercise the Court's jurisdiction to grant an injunction. It does not, however, affect the Court's authority to make such an order.

[148]   Further, although Google has a website for each country to which searches made within that country default, users can override that default and access other country's Google websites. For example, even if the defendants' websites were blocked from searches conducted through www.google.ca, Canadian users can go to www.google.co.uk or www.google.fr and obtain results including the defendants' websites. On the record before me it appears that to be effective, even within Canada, Google must block search results on all of its websites. Furthermore, the defendants' sales originate primarily in other countries, so the Court's process

cannot be protected unless the injunction ensures that searchers from any jurisdiction do not find the defendants' websites.

[149]   Google relies on *Max Mosely* in which the Regional Court of Paris acceded to Google's argument that removal of images should be restricted to searches that could be conducted from within France (English translation of *Max Mosely* at 13). That restriction was based on the images constituting a breach of France's penal code; publication of the images was not a breach of the laws of other countries. The French Court therefore ordered Google to remove the images from the "search engine that it operates, accessible in France". *Max Mosely* is distinguishable on that basis.

[150]   Accepting that an order with worldwide effect can be granted, what test should be applied in determining whether it should be granted? I conclude that the order sought against a non-party requires the Court to consider the standard test for granting an injunction but modified to take into account the direction to a non-party. In *Mooney No. 2*, Huddart J. described an appropriate standard at p. 22:

> The comparable approach to a *Mareva* injunction would be to require a strong *prima facie* (…) or a good arguable case (…) to cross the threshold, and then to balance the interests of the two parties, having regard to all the relevant factors in each case, to reach a just and convenient result.

[151]   The fair question to be tried relates of course to the plaintiffs' claim against the defendants, since that is the cause of action in relation to which the injunction is sought. Google takes no issue with that. In this case the plaintiffs have not only raised an arguable claim; two of the defendants' defences have been struck and they are presumed to have admitted the allegations.

[152]   As for balancing the interests of the plaintiffs and non-party Google, the plaintiffs have established that they are suffering irreparable harm by the defendants' ongoing sale of the GW1000 on the internet. The plaintiffs have also established that Google is inadvertently facilitating that harm through its search engines. While there are other search engines, Google does not contest the plaintiffs' assertion that Google's position as the search engine used for 70-75% of internet searches means

2014 BCSC 1063 (CanLII)

the defendants will not be commercially successful if they cannot be found through Google's search services.

[153]   Google acknowledges that it can do what is being asked of it. Google does not assert that it would be inconvenienced in any material way or that it would incur expense to do so. The balance of convenience thus favours granting the injunction.

[154]   Consideration of the factors identified in _Norwich Pharmacal_ may also be of assistance: _Procon Mining_ at para. 27; _Ventra_ at para. 50. Modified to reflect the relief sought in this case they include:

> a.   Whether the applicant has provided evidence sufficient to raise a valid, _bona fide_ or reasonable claim;
>
> b.   Whether the applicant has established a relationship with the third party such that it establishes that the third party is somehow involved in the acts complained of;
>
> c.   Whether the third party is the only practicable means to obtain the relief sought;
>
> d.   Whether the third party can be indemnified for costs to which the third party may be exposed because of the order; and
>
> e.   Whether the interests of justice favour the granting of the relief sought.

[155]   To this list of considerations I would add the degree to which the interests of those other than the applicant and the identified non-party could be affected – here potential purchasers will not be able to find and buy the defendants' products as easily, but that is as it should be in light of the existing court orders prohibiting the defendants from selling the GW1000 and related products.

[156]   Google is an innocent bystander but it is unwittingly facilitating the defendants' ongoing breaches of this Court's orders. There is no other practical way

for the defendants' website sales to be stopped. There is no other practical way to remove the defendants' websites from Google's search results.

[157]   The fundamental question in each case is whether the granting of an injunction is just and equitable in all of the circumstances of the case: *Tracey v. Instaloans Financial Solutions Centres (B.C.) Ltd.*, 2007 BCCA 481 at para. 31. A judge must not become the prisoner of a formula. As Saunders J.A. observed in *Tracey* at para. 33:

> … the criteria [for determining whether to grant an injunction] are only a judicial expression or explanation of the statutory authority for injunctions in s. 39(1) of the *Law and Equity Act*, …
>
> > 39(1)   An injunction or an order in the nature of mandamus may be granted or a receiver or receiver manager appointed by an interlocutory order of the court <u>in all cases in which it appears to the court to be just or convenient that the order should be made</u>.
>
> [Emphasis in original]

[158]   In determining whether this interim injunction should be granted, I am mindful of Madam Justice Newbury's admonition that a court should not permit a defendant to frustrate orders of the court and that "courts must, in order to preserve the effectiveness of their judgments, adapt to new circumstances": *Mooney (No. 1)* at paras. 10-11.

[159]   The Court must adapt to the reality of e-commerce with its potential for abuse by those who would take the property of others and sell it through the borderless electronic web of the internet. I conclude that an interim injunction should be granted compelling Google to block the defendants' websites from Google's search results worldwide. That order is necessary to preserve the Court's process and to ensure that the defendants cannot continue to flout the Court's orders.

[160]   Non-parties affected by *Mareva* injunctions are not normally before the Court, because applications of that kind are brought without notice. Google was named in this application, served with materials, and attended the hearing. It is not therefore necessary to craft terms anticipating possible conflicts Google could face in

complying with the interim injunction. No terms of this kind have been requested by Google and I see no basis on the record before me to expect such difficulties.

## VI.   CONCLUSION

[161]   I conclude that the interim injunction sought should be granted:

> Within 14 days of the date of this judgment, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites contained in Schedule A to the notice of application.

## VII.   COSTS

[162]   The plaintiffs are entitled to special costs of this application against the defendants Morgan Jack, Datalink 4 and Datalink 7. Special costs are justified because the plaintiff's application to enjoin Google was made necessary by the defendants' flagrant and ongoing breaches of this Court's orders.

The Honourable Madam Justice L.A. Fenlon

2014 BCSC 1063 (CanLII)



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

SEP 22 2014

ENTERED

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGIES GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER, and IGOR CHEIFOT

DEFENDANTS

### ORDER MADE AFTER APPLICATION

| BEFORE | ) | THE HONOURABLE | ) | Friday, the 13th day of |
|---|---|---|---|---|
| | ) | MADAM JUSTICE FENLON | ) | June 2014 |

ON THE APPLICATION of the plaintiffs dated November 13, 2012, coming on for hearing at Vancouver on October 22 and 23, 2013, and February 7, 2014, and on hearing Robbie Fleming, counsel for the plaintiffs, and Stephen R. Schachter Q.C. and Geoffrey B. Gomery Q.C., counsel for the application respondents Google Canada Corporation and Google Inc., and no one appearing for the remaining defendants; and on reading further written submissions dated March 7 and 24, 2014, and May 23 and 29, 2014; and JUDGMENT BEING RESERVED TO THIS DATE:

THIS COURT ORDERS THAT:

1.     Within 14 days of the date of this order, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites listed in Schedule A, including all of the subpages and subdirectories of the listed websites, until the conclusion of the trial of this action or further order of this court;

2.     By September 23, 2014, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites listed in the following

schedules, including all of the subpages and subdirectories of the listed websites:

    a. the additional websites referenced in the December 13, 2012 Order of Tindale J., as set out in "Schedule B" attached, and

    b. the additional websites referenced during the hearing of this application, as set out in "Schedule C" attached;

until the conclusion of the trial of this action or further order of this court;

3.      The plaintiffs and Google Inc. have liberty to apply to vary any part of this order, including the Schedules;

4.      Madam Justice Fenlon is seized of any applications brought pursuant to paragraph 3 above; and

5.      The plaintiffs are awarded special costs of this application against the defendants Morgan Jack, Datalink Technologies Gateways Inc. and Datalink Technologies Gateways LLC.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
Robbie Fleming

Signature of lawyer for Google Canada Corporation and Google Inc.
Geoffrey B. Gomery

By the Court.

Registrar

## "Schedule A"

www.datatechgateways.com

www.gw1000.com

www.protocolconverter.com

www.datalinkgateways.com

www.datalink-gateways.com

www.datalink-networks.com

www.1770-kf3.com

www.1784-ktx.com

www.1784-pcmk.com

www.datalinkcontrollers.com

www.datalink-networking.com

www.datalinkgw1000.com

www.datalinkinterfaces.com

www.gw-1000.com

www.1784u2dhp.com

www.dhtoethernet.com

www.datalinkconverters.com

**"Schedule B"**

www.multigatecommunications.com

www.americangatewaycorp.com

www.ethernetinterfaces.com

www.ethernetdhplus.com

www.gatewayinterfaces.com

www.multigatecom.com

www.dlgw1000.com

www.gw1000-dh4851.com

www.gateway-1000.com

www.gatewaytech1000.com

**-47-**

## "Schedule C"

www.ethernetdatahighway.com

www.dl-gw-1000.com

www.abethernetsolutions.com

www.dhethernetprotocol.com

www.gw1000-dhp1.com

www.1770kf2.com

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

DEC 15 2014

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER and IGOR CHIEFOT

DEFENDANTS

### ORDER MADE AFTER APPLICATION

| BEFORE | ) | THE HONOURABLE | ) | Thursday, the 27th day of |
|--------|---|----------------|---|---------------------------|
|        | ) | MADAM JUSTICE FENLON | ) | November 2014 |

ON THE APPLICATION of the plaintiffs dated November 12, 2014, coming on for hearing at Vancouver, BC, on November 27, 2014 and on hearing John Zeljkovich, counsel for the plaintiffs, and Geoffrey B. Gomery Q.C., counsel for the application respondent Google Inc., and no one appearing for the remaining defendants;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order;

- 50 -

2.      Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A to this order, including all subpages and subdirectories of those websites, until the conclusion of the trial of this action or further order of this court;

3.      Future applications brought by the plaintiffs to vary the Schedules contained in the June 13, 2014 order made in this action can be made by giving written notice of their application (including supporting materials) to Google Inc. (without notice to any of the other defendants), and requiring that Google Inc. inform the plaintiffs of its position in response to the application within 5 business days; in the event that Google Inc. opposes the application, the matter may be set down in the usual manner, with the plaintiffs providing notice to Google Inc. and the defendant Igor Cheifot; and in the event that Google Inc. does not oppose the application, the plaintiffs may proceed with the matter by way of desk order;

4.      By consent, this order, and any subsequent orders amending or supplementing the Schedules contained in the June 13, 2014 order made in this action, will stand, fall or be varied according to any order pronounced by the Court of Appeal from the order pronounced June 13, 2014.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
John Zeljkovich

Signature of lawyer for Google Inc.
Geoffrey B. Gomery, Q.C.

By the Court.

Registrar

**Schedule A**

www.1784pktx.com

www.controllogixethernet.com

www.controllogixgateways.com

www.datalink-converters.com

www.datalink-interfaces.com

www.datalinkconverters.com

www.dhpgateway.com

www.dhpgateways.com

www.dhptoethernet.com

www.ethernetgateways.com

www.ethernetipconverter.com

www.ethernetipdhplus.com

www.gatewayprotocol.com

www.gatewayprotocols.com

www.gatewaytodhp.com

www.gw1000-abeip.com

www.gw1000-dh485eip.com

www.gw1000-dh485me.com

www.gw1000-dhpa.com

www.gw1000-dhpm.com

www.multi-gateways.com

www.multigateprotocols.com



No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER and IGOR CHIEFOT

DEFENDANTS

### ORDER MADE AFTER APPLICATION

BEFORE )    A JUDGE OF THE    )    TUESDAY , the 17ᵗʰ day of
        )       COURT         )    February 2015
        )                     )
        )                     )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.      The June 13, 2014 order made in this action be varied to include the additional
        websites listed as Schedule "A" to this order; and

2.      Within 14 days of the date of this order, Google Inc. cease indexing or
        referencing in search results on its internet search engines the websites listed in

Schedule "A to this order, including all subpages and subdirectories of those websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____

Registrar

## Schedule A

https://plus.google.com/+Ethernetallenbradleydhplus

www.ethernetallenbradley.com

www.df1todhplus.com

www.df1datahighway.com

www.gateway-gw1000abeip.com

https://twitter.com/industrialautom



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

APR 2 3 2015

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE    )
          )  A JUDGE OF THE COURT
          )
          )
          )

)
)  Wednesday, the 22 day of
)  April 2015
)
)

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.   The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2.   Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A to this order, including all subpages and subdirectories of those

-54-

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

Registrar

# Schedule A

http://www.ethernetdatahighwayplus.com

http://www.datalink-gw1000.com

-57-



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JUN 0 4 2015

ᴇɴᴛᴇʀᴇᴅ

BᴇᴛᴡEEN:

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

Oʀᴅᴇʀ Mᴀᴅᴇ Aғᴛᴇʀ Aᴘᴘʟɪᴄᴀᴛɪᴏɴ

BEFORE          )                                )   __Thursday__, the _4th_ day of
                )   A JUDGE OF THE    )   June 2015
                )   COURT                 )
                )                                )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.      The June 13, 2014 order made in this action be varied to include the additional
        websites listed as Schedule "A" to this order; and

2.      Within 14 days of the date of this order, Google Inc. cease indexing or
        referencing in search results on its internet search engines the websites listed in
        Schedule "A to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

www.robertfleminglawyers.com

## Schedule A

www.gateway-gw1000dhp1.com

www.datalink-gw1000abeip.com



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JUL 0 8 2015

ENTERED

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )
)  A JUDGE OF THE
)       COURT
)
)
)

)
)  Friday, the 3 day of
)  July 2015
)
)
)

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2.    Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
John Željkovich

By the Court.

Registrar

# Schedule A

www.datalink-gw1000-abeip.com

https://ethernetiptodhplus.wordpress.com

www.ethernettodatahighwayplus.com

www.datahighwayplustoethernet.com



No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )      ~~THE HONOURABLE~~              )      _TUES_, the _15th_ day of
       )      _____ ~~JUSTICE~~ _____       )      _Sept_ 2015
       )      A JUDGE OF THE                 )
       )      COURT                          )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional
      websites listed as Schedule "A" to this order; and

2.    Within 14 days of the date of this order, Google Inc. cease indexing or
      referencing in search results on its internet search engines the websites listed in
      Schedule "A" to this order, including all subpages and subdirectories of those

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

www.robertfleminglawyers.com

# Schedule A

www.datalinkgw1000abeip.com

https://plus.google.com/+Ethernetallenbradleydhplus

https://kinja.com/datalinkgw1000

https://datalinkgw1000.wordpress.com



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JAN 13 2016

ENTERED

No.   S112421
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

## ORDER MADE AFTER APPLICATION

| | | |
|---|---|---|
| BEFORE | A JUDGE OF THE COURT | TUESDAY , the 12 th day of |
| | _____ | JANUARY -2015- 2016 |

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.   The June 13, 2014 order made in this action be varied to include the additional website listed in Schedule "A" to this order;

2.   Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

-112-

websites, until the conclusion of the trial of this action or further order of this court; and

3.  The June 13, 2014 order made in this action be varied to include a term that within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the URLs listed in Schedule "B" to this order until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

## Schedule A

1.  http://www.ethernet-datahighwayplus.com

# Schedule B

1.  http://www.pccweb.com/wp-content/uploads/2015/08/C_DataLink_Technologies.pdf;

2.  http://www.modbus.org/viewdevice.php?id=335;

3.  http://www.manualslib.com/manual/665918/Ili-Datalink-Gw1000.html;

4.  http://www.automation.com/product-showcase/gw1000-abeip-allen-bradly-data-high-way-plus-converter;

5.  http://datalinkgw1000.kinja.com/gw1000-dhpe-ethernet-df1-dh-1721122330;

6.  http://www.iebmedia.com/index.php?id=10610&parentid=52&themeid=222&hpid=4&showdetail=true&bb=1;

7.  http://www.emobility24.eu/index.php?id=10610&parentid=52&themeid=222&hpid=4&showdetail=true&bb=1;

8.  http://www.manta.com/c/mx2zsrq/datalink-technologies-gateways-inc;

9.  http://www.manta.com/c/mx4dg23/datalink-technologies-gateways;

10. http://www.manta.com/cp/mx450tw/555112b2bc36f6db05ded5bf/datalink-gw1000-dhp1-df1-to-data-highway-plus-dh-converter;

11. https://fr-fr.facebook.com/datalinkgw1000abeip/;

12. https://www.facebook.com/permalink.php?id=779277212121133&story_fbid=782111681837686;

13. https://vi-vn.facebook.com/datalinkgw1000abeip/; and

14. https://www.linkedin.com/company/datalink-technologies-group-inc.

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )
) A Judge of the Court )
) )
) )
) )

Wednesday, the 30 day of
March 2016

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional
      website listed in Schedule "A" to this order;

2.    Within 14 days of the date of this order, Google Inc. cease indexing or
      referencing in search results on its internet search engines the websites listed in
      Schedule "A" to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

websites, until the conclusion of the trial of this action or further order of this
court; and

3.      The June 13, 2014 order made in this action be varied to include a term that
within 14 days of the date of this order, Google Inc. cease indexing or referencing
in search results on its internet search engines the URLs listed in Schedule "B" to
this order until the conclusion of the trial of this action or further order of this
court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT
TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY
CONSENT:

_____

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____

Registrar

## Schedule A

1. http://www.datalinkcontrollers.datatechgateways.com/

2. http://www.ethernetip-datahighwayplus.com/

Schedule B

1.  http://516493715498262299.weebly.com/about.html

2.  http://datalinkgw1000.kinja.com

3.  http://datalinkgw1000.kinja.com/gw1000-abeip-1720388351

4.  http://manualzz.com/doc/2989233/gw1000-user-manual

5.  http://www.articlesbase.com/industrial-articles/datalink-technologies-gw1000-abeip-low-cost-df1-ethernet-ethernetip-converter-to-allen-bradley-data-highway-plus-dh-dh-485-7210304.html

6.  http://www.artipot.com/articles/1853538/datalink-gw1000-df1-ab-ethernet-ethernet-ip-converter-to-allen-bradleys-datahighway-plus-dh-dh-485.htm

7.  http://www.docfoc.com/gw1000-abeip

8.  http://www.europages.co.uk/DATALINK-TECHNOLOGIES-GW1000ABEIP/00000004659162-460217001.html

9.  http://www.iebmedia.com/index.php?id=10947&parentid=52&themeid=226&hid=57662&hpid=4&showdetail=true&sup=57662&bb=&nbb=

10. http://www.manta.com/cp/mx450tw/5551180059146d3f665d05fb/datalink-gw1000-abeip-ethernet-ip-to-data-highway-plus-converter

11. http://www.mfgpages.com/company/Datalink-Technologies-in-WASHINGTON-USA-10168500/

12. http://www.sooperarticles.com/shopping-articles/electronics-articles/datalink-gw1000-alternative-allen-bradleys-1784-u2dhp-dh-interface-card-1394191.html

13. https://www.facebook.com/datalinkgw1000abeip/

14. https://www.facebook.com/datalinkgw1000abeip/posts/782453511803503

15. https://www.facebook.com/datalinkgw1000abeip/posts/889923767723143



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

AUG 2 4 2016

ENTERED

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

### ORDER MADE AFTER APPLICATION

BEFORE )
) A JUDGE OF THE COURT )  Wednesday, the 17 day of
) August 2016
)
)

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.   The June 13, 2014 order made in this action be varied to include a term that
within 14 days of the date of this order, Google Inc. cease indexing or referencing
in search results on its internet search engines the URLs listed in Schedule "A" to
this order until the conclusion of the trial of this action or further order of this
court.

BY THE COURT

ENDORSEMENTS ATTACHED

REGISTRAR

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT
TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY
CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

# Schedule A

1.  http://www.cesco.com/b2c/product/617546

2.  http://www.iebmedia.com/wireless.php?id=11042&parentid=52&themeid=225&hid=57662&hpid=4&showdetail=true&sup=57662&bb=&nbb=

3.  https://www.facebook.com/datalinkgw1000abeip/posts/782111681837686

4.  http://datalinkgw1000.kinja.com/datalink-gw1000-multi-protocol-converter-interfacing-n-1723096976

5.  http://www.articlesbase.com/industrial-articles/datalink-technologies-gw1000-abeip-low-cost-df1-ethernet-ethernetip-converter-to-allen-bradley-data-highway-plus-dh-dh-485-7210304.html

# EXHIBIT B



## SUPREME COURT OF CANADA

CITATION: Google Inc. *v.* Equustek Solutions Inc., 2017 SCC 34

APPEAL HEARD: December 6, 2016
JUDGMENT RENDERED: June 28, 2017
DOCKET: 36602

BETWEEN:

**Google Inc.**
Appellant

and

**Equustek Solutions Inc., Robert Angus and Clarma Enterprises Inc.**
Respondents

- and -

Attorney General of Canada, Attorney General of Ontario, Canadian Civil Liberties Association, OpenMedia Engagement Network, Reporters Committee for Freedom of the Press, American Society of News Editors, Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., First Amendment Coalition, First Look Media Works, Inc., New England First Amendment Coalition, News Media Alliance (formerly known as Newspaper Association of America), AOL Inc., California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, Online News Association, Society of Professional Journalists, Human Rights Watch, ARTICLE 19, Open Net (Korea), Software Freedom Law Centre, Center for Technology and Society, Wikimedia Foundation, British Columbia Civil Liberties Association, Electronic Frontier Foundation, International Federation of the Phonographic Industry, Music Canada, Canadian Publishers' Council, Association of Canadian Publishers, International Confederation of Societies of Authors and Composers, International Confederation of Music Publishers, Worldwide Independent Network and International Federation of Film Producers Associations
Interveners

CORAM: McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon, Côté, Brown and Rowe JJ.

**REASONS FOR JUDGMENT:**          Abella J. (McLachlin C.J. and Moldaver, Karakatsanis,
(paras. 1 to 54)                                  Wagner, Gascon and Brown JJ. concurring)


**JOINT DISSENTING REASONS:**          Côté and Rowe JJ.
(paras. 55 to 82)


**NOTE:** This document is subject to editorial revision before its reproduction in final
form in the *Canada Supreme Court Reports*.

---

GOOGLE INC. *v.* EQUUSTEK SOLUTIONS INC.


**Google Inc.**                                                              *Appellant*


*v.*


**Equustek Solutions Inc.,**
**Robert Angus and Clarma Enterprises Inc.**                    *Respondents*


and


**Attorney General of Canada, Attorney General of Ontario,**
**Canadian Civil Liberties Association, OpenMedia**
**Engagement Network, Reporters Committee for**
**Freedom of the Press, American Society of News Editors,**
**Association of Alternative Newsmedia, The Center for**
**Investigative Reporting, Dow Jones & Company, Inc.,**
**First Amendment Coalition, First Look Media Works, Inc.,**
**New England First Amendment Coalition, News Media**
**Alliance (formerly known as Newspaper Association of America),**
**AOL Inc., California Newspaper Publishers Association,**
**The Associated Press, The Investigative Reporting**
**Workshop at American University, Online News Association,**
**Society of Professional Journalists, Human Rights Watch,**
**ARTICLE 19, Open Net (Korea), Software Freedom Law Centre,**
**Center for Technology and Society, Wikimedia Foundation,**
**British Columbia Civil Liberties Association,**
**Electronic Frontier Foundation, International Federation**
**of the Phonographic Industry, Music Canada,**
**Canadian Publishers' Council, Association of Canadian Publishers,**
**International Confederation of Societies of Authors and Composers,**
**International Confederation of Music Publishers,**
**Worldwide Independent Network and International**
**Federation of Film Producers Associations**              *Interveners*


**Indexed as: Google Inc. *v.* Equustek Solutions Inc.**

**2017 SCC 34**

File No.: 36602.

2016: December 6; 2017: June 28.

Present: McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon, Côté, Brown and Rowe JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Injunctions — Interlocutory injunction — Non-party — Technology company bringing action against distributor for unlawful use and sale of its intellectual property through Internet — Company granted interlocutory injunction against Google, a non-party to underlying action, to cease indexing or referencing certain search results on its Internet search engine — Whether Google can be ordered, pending trial of action, to globally de-index websites of distributor which, in breach of several court orders, is using those websites to unlawfully sell intellectual property of another company — Whether Supreme Court of British Columbia had jurisdiction to grant injunction with extraterritorial effect — Whether, if it did, it was just and equitable to do so.*

E is a small technology company in British Columbia that launched an action against D. E claimed that D, while acting as a distributor of E's products, began to re-label one of the products and pass it off as its own. D also acquired

confidential information and trade secrets belonging to E, using them to design and manufacture a competing product. D filed statements of defence disputing E's claims, but eventually abandoned the proceedings and left the province. Some of D's statements of defence were subsequently struck.

Despite court orders prohibiting the sale of inventory and the use of E's intellectual property, D continues to carry on its business from an unknown location, selling its impugned product on its websites to customers all over the world. E approached Google and requested that it de-index D's websites. Google refused. E then brought court proceedings, seeking an order requiring Google to do so. Google asked E to obtain a court order prohibiting D from carrying on business on the Internet saying it would comply with such an order by removing specific webpages.

An injunction was issued by the Supreme Court of British Columbia ordering D to cease operating or carrying on business through any website. Between December 2012 and January 2013, Google advised E that it had de-indexed 345 specific webpages associated with D. It did not, however, de-index all of D's websites. De-indexing webpages but not entire websites proved to be ineffective since D simply moved the objectionable content to new pages within its websites, circumventing the court orders. Moreover, Google had limited the de-indexing to searches conducted on google.ca. E therefore obtained an interlocutory injunction to enjoin Google from displaying any part of D's websites on any of its search results worldwide. The Court of Appeal for British Columbia dismissed Google's appeal.

*Held* (Côté and Rowe JJ. dissenting): The appeal is dismissed and the worldwide interlocutory injunction against Google is upheld.

*Per* McLachlin C.J. and **Abella**, Moldaver, Karakatsanis, Wagner, Gascon and Brown JJ.: The issue is whether Google can be ordered, pending a trial, to globally de-index D's websites which, in breach of several court orders, is using those websites to unlawfully sell the intellectual property of another company.

The decision to grant an interlocutory injunction is a discretionary one and entitled to a high degree of deference. Interlocutory injunctions are equitable remedies that seek to ensure that the subject matter of the litigation will be preserved so that effective relief will be available when the case is ultimately heard on the merits. Their character as "interlocutory" is not dependent on their duration pending trial. Ultimately, the question is whether granting the injunction is just and equitable in the circumstances of the case.

The test for determining whether the court should exercise its discretion to grant an interlocutory injunction against Google has been met in this case: there is a serious issue to be tried; E is suffering irreparable harm as a result of D's ongoing sale of its competing product through the Internet; and the balance of convenience is in favour of granting the order sought.

Google does not dispute that there is a serious claim, or that E is suffering irreparable harm which it is inadvertently facilitating through its search engine. Nor

does it suggest that it would be inconvenienced in any material way, or would incur any significant expense, in de-indexing D's websites. Its arguments are that the injunction is not necessary to prevent irreparable harm to E and is not effective; that as a non-party it should be immune from the injunction; that there is no necessity for the extraterritorial reach of the order; and that there are freedom of expression concerns that should have tipped the balance against granting the order.

Injunctive relief can be ordered against someone who is not a party to the underlying lawsuit. When non-parties are so involved in the wrongful acts of others that they facilitate the harm, even if they themselves are not guilty of wrongdoing, they can be subject to interlocutory injunctions. It is common ground that D was unable to carry on business in a commercially viable way without its websites appearing on Google. The injunction in this case flows from the necessity of Google's assistance to prevent the facilitation of D's ability to defy court orders and do irreparable harm to E. Without the injunctive relief, it was clear that Google would continue to facilitate that ongoing harm.

Where it is necessary to ensure the injunction's effectiveness, a court can grant an injunction enjoining conduct anywhere in the world. The problem in this case is occurring online and globally. The Internet has no borders — its natural habitat is global. The only way to ensure that the interlocutory injunction attained its objective was to have it apply where Google operates — globally. If the injunction were restricted to Canada alone or to google.ca, the remedy would be deprived of its

intended ability to prevent irreparable harm, since purchasers outside Canada could easily continue purchasing from D's websites, and Canadian purchasers could find D's websites even if those websites were de-indexed on google.ca.

Google's argument that a global injunction violates international comity because it is possible that the order could not have been obtained in a foreign jurisdiction, or that to comply with it would result in Google violating the laws of that jurisdiction, is theoretical. If Google has evidence that complying with such an injunction would require it to violate the laws of another jurisdiction, including interfering with freedom of expression, it is always free to apply to the British Columbia courts to vary the interlocutory order accordingly. To date, Google has made no such application. In the absence of an evidentiary foundation, and given Google's right to seek a rectifying order, it is not equitable to deny E the extraterritorial scope it needs to make the remedy effective, or even to put the onus on it to demonstrate, country by country, where such an order is legally permissible.

D and its representatives have ignored all previous court orders made against them, have left British Columbia, and continue to operate their business from unknown locations outside Canada. E has made efforts to locate D with limited success. D is only able to survive — at the expense of E's survival — on Google's search engine which directs potential customers to D's websites. This makes Google the determinative player in allowing the harm to occur. On balance, since the world-wide injunction is the only effective way to mitigate the harm to E pending the

trial, the only way, in fact, to preserve E itself pending the resolution of the underlying litigation, and since any countervailing harm to Google is minimal to non-existent, the interlocutory injunction should be upheld.

*Per* **Côté** and **Rowe** JJ. (dissenting): While the court had jurisdiction to issue the injunctive order against Google, it should have refrained from doing so. Numerous factors affecting the grant of an injunction strongly favour judicial restraint in this case.

First, the Google Order in effect amounts to a final determination of the action because it removes any potential benefit from proceeding to trial. In its original underlying claim, E sought injunctions modifying the way D carries out its website business. E has been given more injunctive relief than it sought in its originating claim, including requiring D to cease website business altogether. Little incentive remains for E to return to court to seek a lesser injunctive remedy. This is evidenced by E's choice to not seek default judgment during the roughly five years which have passed since it was given leave to do so. The Google Order provides E with more equitable relief than it sought against D and gives E an additional remedy that is final in nature. The order against Google, while interlocutory in form, is final in effect. The test for interlocutory injunctions does not apply to an order that is effectively final. In these circumstances, an extensive review of the merits of this case was therefore required but was not carried out by the court below, contrary to caselaw. The Google Order does not meet the test for a permanent injunction. Although E's claims were

supported by a good *prima facie* case, it was not established that D designed and sold counterfeit versions of E's product, or that this resulted in trademark infringement and unlawful appropriation of trade secrets.

Second, Google is a non-party to the proceedings between E and D. E alleged that Google's search engine was facilitating D's ongoing breach by leading customers to D's websites. However, the prior order that required D to cease carrying on business through any website was breached as soon as D established a website to conduct its business, regardless of how visible that website might be through Google searches. Google did not aid or abet the doing of the prohibited act.

Third, the Google Order is mandatory and requires ongoing modification and supervision because D is launching new websites to replace de-listed ones. Courts should avoid granting injunctions that require such cumbersome court-supervised updating.

Furthermore, the Google Order has not been shown to be effective in making D cease operating or carrying on business through any website. Moreover, the Google Order does not assist E in modifying D's websites, as E sought in its originating claim for injunctive relief. The most that can be said is the Google Order might reduce the harm to E. But it has not been shown that the Google Order is effective in doing so. D's websites can be found using other search engines, links from other sites, bookmarks, email, social media, printed material, word-of-mouth, or

other indirect means. D's websites are open for business on the Internet whether Google searches list them or not.

Finally, there are alternative remedies available to E. E sought a world-wide *Mareva* injunction to freeze D's assets in France, but the Court of Appeal for British Columbia urged E to pursue a remedy in French courts. There is no reason why E cannot do what the Court of Appeal urged it to do. E could also pursue injunctive relief against the ISP providers. In addition, E could initiate contempt proceedings in France or in any other jurisdiction with a link to the illegal websites. Therefore, the Google Order ought not to have been granted.

**Cases Cited**

By Abella J.

**Applied:** *RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *MacMillan Bloedel Ltd. v. Simpson*, [1996] 2 S.C.R. 1048; **considered**: *Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133; *Mareva Compania Naviera SA v. International Bulkcarriers SA*, [1975] 2 Lloyd's Rep. 509; **referred to:** *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110; *Seaward v. Paterson*, [1897] 1 Ch. 545; *York University v. Bell Canada Enterprises* (2009), 311 D.L.R. (4th) 755; *Cartier International AG v. British Sky Broadcasting Ltd.*, [2016] EWCA Civ 658, [2017] 1 All E.R. 700; *Warner-Lambert Co. v. Actavis Group PTC EHF*, [2015] EWHC 485 (Pat.), 144

B.M.L.R. 194; *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2; *Impulsora Turistica de Occidente, S.A. de C.V. v. Transat Tours Canada Inc.*, 2007 SCC 20, [2007] 1 S.C.R. 867; *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318; *Babanaft International Co. S.A. v. Bassatne*, [1990] 1 Ch. 13; *Republic of Haiti v. Duvalier*, [1990] 1 Q.B. 202; *Derby & Co. v. Weldon*, [1990] 1 Ch. 48; *Derby & Co. v. Weldon (Nos. 3 and 4)*, [1990] 1 Ch. 65.

By Côté and Rowe JJ. (dissenting)

 *RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *Fourie v. Le Roux*, [2007] UKHL 1, [2007] 1 All E.R. 1087; *Guaranty Trust Co. of New York v. Hannay & Co.*, [1915] 2 K.B. 536; *Cartier International AG v. British Sky Broadcasting Ltd.*, 2014 EWHC 3354 (Ch.), [2015] 1 All E.R. 949; *Mercedes Benz A.G. v. Leiduck*, [1996] 1 A.C. 284; *John Deere Ltd. v. Firdale Farms Ltd.* (1987), 45 D.L.R. (4th) 641; *Parkin v. Thorold* (1852), 16 Beav. 59, 51 E.R. 698; *Schooff v. British Columbia (Medical Services Commission)*, 2010 BCCA 396, 323 D.L.R. (4th) 680; *McIsaac v. Healthy Body Services Inc.*, 2009 BCSC 1716; *Plouffe v. Roy*, 2007 CanLII 37693; *Spiller v. Brown* (1973), 43 D.L.R. (3d) 140; *1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, 2014 ONCA 125, 371 D.L.R. (4th) 643; *MacMillan Bloedel Ltd. v. Simpson*, [1996] 2 S.C.R. 1048; *Seaward v. Paterson*, [1897] 1 Ch. 545; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.*, [1971] 1 W.L.R. 1676; *Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133; *National Commercial Bank of Jamaica Ltd. v. Olint Corp.*, [2009] 1 W.L.R.

1405; *Redland Bricks Ltd. v. Morris*, [1970] A.C. 652; *Co-operative Insurance Society Ltd. v. Argyll Stores (Holdings) Ltd.*, [1998] A.C. 1; *Attorney General v. Observer Ltd.*, [1990] 1 A.C. 109.

**Statutes and Regulations Cited**

*Digital Millennium Copyright Act*, Pub. L. No. 105-304, 112 Stat. 2680 (1998).

*Law and Equity Act*, R.S.B.C. 1979, c. 224, s. 36.

*Law and Equity Act*, R.S.B.C. 1996, c. 253, s. 39(1).

**Authors Cited**

Bean, David, Andrew Burns and Isabel Parry. *Injunctions*, 11th ed. London: Sweet & Maxwell, 2012.

Berryman, Jeffrey. *The Law of Equitable Remedies*, 2nd ed. Toronto: Irwin Law, 2013.

Black, Vaughan, and Edward Babin. "Mareva Injunctions in Canada: Territorial Aspects" (1997), 28 *Can. Bus. L.J.* 430.

Fraser, Peter G., John W. Horn and Susan A. Griffin. *The Conduct of Civil Litigation in British Columbia*, 2nd ed. Markham, Ont.: LexisNexis, 2007 (loose-leaf updated December 2016, release 24).

Pitel, Stephen G. A., and Andrew Valentine. "The Evolution of the Extra-territorial *Mareva* Injunction in Canada: Three Issues" (2006), 2 *J. Priv. Int'l L.* 339.

Riordan, Jaani. *The Liability of Internet Intermediaries*. Oxford: Oxford University Press, 2016.

Sharpe, Robert J. *Injunctions and Specific Performance*, loose-leaf ed. Toronto: Canada Law Book, 1992 (updated November 2016, release 25).

Spry, I. C. F. *The Principles of Equitable Remedies: Specific Performance, Injunctions, Rectification and Equitable Damages*, 9th ed. Pyrmont, N.S.W.: Lawbook, 2014.

APPEAL from a judgment of the British Columbia Court of Appeal (Frankel, Groberman and Harris JJ.A.), 2015 BCCA 265, 75 B.C.L.R. (5th) 315, 373 B.C.A.C. 240, 641 W.A.C. 240, 39 B.L.R. (5th) 175, 71 C.P.C. (7th) 215, 135 C.P.R. (4th) 173, 386 D.L.R. (4th) 224, [2015] 11 W.W.R. 45, [2015] B.C.J. No. 1193 (QL), 2015 CarswellBC 1590 (WL Can.), affirming a decision of Fenlon J., 2014 BCSC 1063, 63 B.C.L.R. (5th) 145, 28 B.L.R. (5th) 265, 374 D.L.R. (4th) 537, [2014] 10 W.W.R. 652, [2014] B.C.J. No. 1190 (QL), 2014 CarswellBC 1694 (WL Can.), granting an interlocutory injunction against Google. Appeal dismissed, Côté and Rowe JJ. dissenting.

*William C. McDowell*, *Marguerite F. Ethier* and *Scott M. J. Rollwagen*, for the appellant.

*Robbie Fleming* and *Michael Sobkin*, for the respondents.

*Jeffrey G. Johnston*, for the intervener the Attorney General of Canada.

*Sandra Nishikawa*, *John Corelli* and *Brent Kettles*, for the intervener the Attorney General of Ontario.

*Mathew Good*, for the intervener the Canadian Civil Liberties Association.

*Cynthia Khoo*, for the intervener the OpenMedia Engagement Network.

Written submissions only by *Iris Fischer* and *Helen Richards*, for the interveners the Reporters Committee for Freedom of the Press, the American Society of News Editors, the Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., the First Amendment Coalition, First Look Media Works, Inc., the New England First Amendment Coalition, the News Media Alliance (formerly known as the Newspaper Association of America), AOL Inc., the California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, the Online News Association and the Society of Professional Journalists.

Written submissions only by *Paul Schabas* and *Kaley Pulfer*, for the interveners Human Rights Watch, ARTICLE 19, Open Net (Korea), the Software Freedom Law Centre and the Center for Technology and Society.

Written submissions only by *David T. S. Fraser* and *Jane O'Neill*, for the intervener the Wikimedia Foundation.

*Justin Safayeni* and *Carlo Di Carlo*, for the intervener the British Columbia Civil Liberties Association.

*David Wotherspoon* and *Daniel Byma*, for the intervener the Electronic Frontier Foundation.

*Dan Glover* and *Miranda Lam*, for the interveners the International Federation of the Phonographic Industry, Music Canada, the Canadian Publishers' Council, the Association of Canadian Publishers, the International Confederation of Societies of Authors and Composers, the International Confederation of Music Publishers and the Worldwide Independent Network.

*Gavin MacKenzie* and *Brooke MacKenzie*, for the intervener the International Federation of Film Producers Associations.

The judgment of McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon and Brown JJ. was delivered by

ABELLA J. —

[1]        The issue in this appeal is whether Google can be ordered, pending a trial, to globally de-index the websites of a company which, in breach of several court orders, is using those websites to unlawfully sell the intellectual property of another company. The answer turns on classic interlocutory injunction jurisprudence: is there a serious issue to be tried; would irreparable harm result if the injunction were not granted; and does the balance of convenience favour granting or refusing the

injunction. Ultimately, the question is whether granting the injunction would be just and equitable in all the circumstances of the case.

Background

[2]        Equustek Solutions Inc. is a small technology company in British Columbia. It manufactures networking devices that allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

[3]        The underlying action between Equustek and the Datalink defendants (Morgan Jack, Datalink Technology Gateways Inc., and Datalink Technologies Gateways LLC – "Datalink") was launched by Equustek on April 12, 2011. It claimed that Datalink, while acting as a distributor of Equustek's products, began to re-label one of the products and pass it off as its own. Datalink also acquired confidential information and trade secrets belonging to Equustek, using them to design and manufacture a competing product, the GW1000. Any orders for Equustek's product were filled with the GW1000. When Equustek discovered this in 2011, it terminated the distribution agreement it had with Datalink and demanded that Datalink delete all references to Equustek's products and trademarks on its websites.

[4]        The Datalink defendants filed statements of defence disputing Equustek's claims.

[5]        On September 23, 2011, Leask J. granted an injunction ordering Datalink to return to Equustek any source codes, board schematics, and any other documentation it may have had in its possession that belonged to Equustek. The court also prohibited Datalink from referring to Equustek or any of Equustek's products on its websites. It ordered Datalink to post a statement on its websites informing customers that Datalink was no longer a distributor of Equustek products and directing customers interested in Equustek's products to Equustek's website. In addition, Datalink was ordered to give Equustek a list of customers who had ordered an Equustek product from Datalink.

[6]        On March 21, 2012, Fenlon J. found that Datalink had not properly complied with this order and directed it to produce a new customer list and make certain changes to the notices on their websites.

[7]        Datalink abandoned the proceedings and left the jurisdiction without producing any documents or complying with any of the orders. Some of Datalink's statements of defence were subsequently struck.

[8]        On July 26, 2012, Punnett J. granted a *Mareva* injunction freezing Datalink's worldwide assets, including its entire product inventory. He found that Datalink had incorporated "a myriad of shell corporations in different jurisdictions", continued to sell the impugned product, reduced prices to attract more customers, and was offering additional services that Equustek claimed disclosed more of its trade secrets. He concluded that Equustek would suffer irreparable harm if the injunction

were not granted, and that, on the balance of convenience and due to a real risk of the dissipation of assets, it was just and equitable to grant the injunction against Datalink.

[9]          On August 3, 2012, Fenlon J. granted another interlocutory injunction prohibiting Datalink from dealing with broader classes of intellectual property, including "any use of whole categories of documents and information that lie at the heart of any business of a kind engaged in by both parties". She noted that Equustek's "earnings ha[d] fallen drastically since [Datalink] began [its] impugned activities" and concluded that "the effect of permitting [Datalink] to carry on [its] business [would] also cause irreparable harm to [Equustek]".

[10]         On September 26, 2012, Equustek brought an application to have Datalink and its principal, Morgan Jack, found in contempt. No one appeared on behalf of Datalink. Groves J. issued a warrant for Morgan Jack's arrest. It remains outstanding.

[11]         Despite the court orders prohibiting the sale of inventory and the use of Equustek's intellectual property, Datalink continues to carry on its business from an unknown location, selling its impugned product on its websites to customers all over the world.

[12]         Not knowing where Datalink or its suppliers were, and finding itself unable to have the websites removed by the websites' hosting companies, Equustek approached Google in September 2012 and requested that it de-index the Datalink

websites. Google refused. Equustek then brought court proceedings seeking an order requiring Google to do so.

[13]     When it was served with the application materials, Google asked Equustek to obtain a court order prohibiting Datalink from carrying on business on the Internet. Google told Equustek it would comply with such an order by removing specific webpages. Pursuant to its internal policy, Google only voluntarily de-indexes individual webpages, not entire websites. Equustek agreed to try this approach.

[14]     On December 13, 2012, Equustek appeared in court with Google. An injunction was issued by Tindale J. ordering Datalink to "cease operating or carrying on business through any website". Between December 2012 and January 2013, Google advised Equustek that it had de-indexed 345 specific webpages associated with Datalink. It did not, however, de-index *all* of the Datalink websites.

[15]     Equustek soon discovered that de-indexing webpages but not entire websites was ineffective since Datalink simply moved the objectionable content to new pages within its websites, circumventing the court orders.

[16]     Google had limited the de-indexing to those searches that were conducted on google.ca. Google's search engine operates through dedicated websites all over the world. The Internet search services are free, but Google earns money by selling advertising space on the webpages that display search results. Internet users with Canadian Internet Protocol addresses are directed to "google.ca" when performing

online searches. But users can also access different Google websites directed at other countries by using the specific Uniform Resource Locator, or URL, for those sites. That means that someone in Vancouver, for example, can access the Google search engine as though he or she were in another country simply by typing in that country's Google URL. Potential Canadian customers could, as a result, find Datalink's websites even if they were blocked on google.ca. Given that the majority of the sales of Datalink's GW1000 were to purchasers outside of Canada, Google's de-indexing did not have the necessary protective effect.

[17]     Equustek therefore sought an interlocutory injunction to enjoin Google from displaying any part of the Datalink websites on any of its search results worldwide. Fenlon J. granted the order (374 D.L.R. (4th) 537 (B.C.S.C.)). The operative part states:

> Within 14 days of the date of this order, Google Inc. is to cease indexing or referencing in search results on its internet search engines the [Datalink] websites …, including all of the subpages and subdirectories of the listed websites, *until the conclusion of the trial of this action or further order of this court*. [Emphasis added]

[18]     Fenlon J. noted that Google controls between 70-75 percent of the global searches on the Internet and that Datalink's ability to sell its counterfeit product is, in large part, contingent on customers being able to locate its websites through the use of Google's search engine. Only by preventing potential customers from accessing the Datalink websites, could Equustek be protected. Otherwise, Datalink would be able to continue selling its product online and the damages Equustek would suffer would not be recoverable at the end of the lawsuit.

[19]       Fenlon J. concluded that this irreparable harm was being facilitated through Google's search engine; that Equustek had no alternative but to require Google to de-index the websites; that Google would not be inconvenienced; and that, for the order to be effective, the Datalink websites had to be prevented from being displayed on all of Google's search results, not just google.ca. As she said:

> On the record before me it appears that to be effective, even within Canada, Google must block search results on all of its websites. Furthermore, [Datalink's] sales originate primarily in other countries, so the Court's process cannot be protected unless the injunction ensures that searchers from any jurisdiction do not find [Datalink's] websites.[1]

[20]       The Court of Appeal of British Columbia dismissed Google's appeal (386 D.L.R. (4th) 224). Groberman J.A. accepted Fenlon J.'s conclusion that she had *in personam* jurisdiction over Google and could therefore make an order with extraterritorial effect. He also agreed that courts of inherent jurisdiction could grant equitable relief against non-parties. Since ordering an interlocutory injunction against Google was the only practical way to prevent Datalink from flouting the court's several orders, and since there were no identifiable countervailing comity or freedom of expression concerns that would prevent such an order from being granted, he upheld the interlocutory injunction.

[21]       For the following reasons, I agree with Fenlon J. and Groberman J.A. that the test for granting an interlocutory injunction against Google has been met in this case.

---

[1] Para. 148.

Analysis

[22]     The decision to grant an interlocutory injunction is a discretionary one and entitled to a high degree of deference (*Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110, at pp. 155-56). In this case, I see no reason to interfere.

[23]     Injunctions are equitable remedies. "The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited" (Ian Spry, *The Principles of Equitable Remedies* (9th ed. 2014), at p. 333). Robert Sharpe notes that "[t]he injunction is a flexible and drastic remedy. Injunctions are not restricted to any area of substantive law and are readily enforceable through the court's contempt power" (*Injunctions and Specific Performance* (loose-leaf ed.), at para. 2.10).

[24]     An interlocutory injunction is normally enforceable until trial or some other determination of the action. Interlocutory injunctions seek to ensure that the subject matter of the litigation will be "preserved" so that effective relief will be available when the case is ultimately heard on the merits (Jeffrey Berryman, *The Law of Equitable Remedies* (2nd ed. 2013), at pp. 24-25). Their character as "interlocutory" is not dependent on their duration pending trial.

[25]     *RJR—MacDonald Inc. v. Canada (Attorney General),* [1994] 1 S.C.R. 311, sets out a three-part test for determining whether a court should exercise its

discretion to grant an interlocutory injunction: is there a serious issue to be tried; would the person applying for the injunction suffer irreparable harm if the injunction were not granted; and is the balance of convenience in favour of granting the interlocutory injunction or denying it. The fundamental question is whether the granting of an injunction is just and equitable in all of the circumstances of the case. This will necessarily be context-specific.

[26]     Google does not dispute that there is a serious claim. Nor does it dispute that Equustek is suffering irreparable harm as a result of Datalink's ongoing sale of the GW1000 through the Internet. And it acknowledges, as Fenlon J. found, that it inadvertently facilitates the harm through its search engine which leads purchasers directly to the Datalink websites.

[27]     Google argues, however, that the injunction issued against it is not necessary to prevent that irreparable harm, and that it is not effective in so doing. Moreover, it argues that as a non-party, it should be immune from the injunction. As for the balance of convenience, it challenges the propriety and necessity of the extraterritorial reach of such an order, and raises freedom of expression concerns that it says should have tipped the balance against granting the order. These arguments go both to whether the Supreme Court of British Columbia had jurisdiction to grant the injunction and whether, if it did, it was just and equitable to do so in this case.

[28]     Google's first argument is, in essence, that non-parties cannot be the subject of an interlocutory injunction. With respect, this is contrary to the

jurisprudence. Not only can injunctive relief be ordered against someone who is not a party to the underlying lawsuit, the contours of the test are not changed. As this Court said in *MacMillan Bloedel Ltd. v. Simpson* [1996] 2 S.C.R. 1048, injunctions may be issued "'in all cases in which it appears to the court to be just or convenient that the order should be made . . . on terms and conditions the court thinks just'" (para. 15, citing s. 36 of the *Law and Equity Act*, R.S.B.C. 1979, c. 224). *MacMillan Bloedel* involved a logging company seeking to restrain protesters from blocking roads. The company obtained an interlocutory injunction prohibiting not only specifically named individuals, but also "John Doe, Jane Doe and Persons Unknown" and "all persons having notice of th[e] order" from engaging in conduct which interfered with its operations at specific locations. In upholding the injunction, McLachlin J. noted that

> [i]t may be confidently asserted . . . *that both English and Canadian authorities support the view that non-parties are bound by injunctions*: if non-parties violate injunctions, they are subject to conviction and punishment for contempt of court. The courts have jurisdiction to grant interim injunctions which all people, on pain of contempt, must obey. [Emphasis added; para. 31]

See also Berryman, at pp. 57-60; Sharpe, at paras. 6.260 to 6.265.

[29]     In other words, where a non-party violates a court order, there is a principled basis for treating the non-party as if it had been bound by the order. The non-party's obligation arises "not because [it] is bound by the injunction by being a party to the cause, but because [it] is conducting [itself] so as to obstruct the course of justice" (*MacMillan Bloedel*, at para. 27, quoting *Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.), at p. 555).

[30]     The pragmatism and necessity of such an approach was concisely explained by Fenlon J. in the case before us when she offered the following example:

> . . . a non-party corporation that warehouses and ships goods for a defendant manufacturing company might be ordered on an interim injunction to freeze the defendants' goods and refrain from shipping them. That injunction could affect orders received from customers around the world. Could it sensibly be argued that the Court could not grant the injunction because it would have effects worldwide? The impact of an injunction on strangers to the suit or the order itself is a valid consideration in deciding whether to exercise the Court's jurisdiction to grant an injunction. It does not, however, affect the Court's authority to make such an order.[2]

[31]     *Norwich* orders are analogous and can also be used to compel non-parties to disclose information or documents in their possession required by a claimant (*Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133 (H.L.), at p. 175). *Norwich* orders have increasingly been used in the online context by plaintiffs who allege that they are being anonymously defamed or defrauded and seek orders against Internet service providers to disclose the identity of the perpetrator (*York University v. Bell Canada Enterprises* (2009), 311 D.L.R. (4th) 755 (Ont. S.C.J.)). *Norwich* disclosure may be ordered against non-parties who are not themselves guilty of wrongdoing, but who are so involved in the wrongful acts of others that they facilitate the harm. In *Norwich*, this was characterized as a duty to assist the person wronged (p. 175; *Cartier International AG v. British Sky Broadcasting Ltd.*, [2017], 1 All E.R. 700 (C.A.), at para. 53). *Norwich* supplies a principled rationale for granting injunctions against non-parties who facilitate

---

[2] Para. 147.

wrongdoing (see *Cartier*, at paras. 51-55; and *Warner-Lambert Co. v. Actavis Group PTC EHF*, 144 B.M.L.R. 194 (Ch.)).

[32]     This approach was applied in *Cartier*, where the Court of Appeal of England and Wales held that injunctive relief could be awarded against five non-party Internet service providers who had not engaged in, and were not accused of any wrongful act. The Internet service providers were ordered to block the ability of their customers to access certain websites in order to avoid facilitating infringements of the plaintiff's trademarks. (See also Jaani Riordan, *The Liability of Internet Intermediaries* (2016), at pp. 412 and 498-99.)

[33]     The same logic underlies *Mareva* injunctions, which can also be issued against non-parties. *Mareva* injunctions are used to freeze assets in order to prevent their dissipation pending the conclusion of a trial or action (*Mareva Compania Naviera SA v. International Bulkcarriers SA*, [1975] 2 Lloyd's Rep. 509 (C.A.); *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2). A *Mareva* injunction that requires a defendant not to dissipate his or her assets sometimes requires the assistance of a non-party, which in turn can result in an injunction against the non-party if it is just and equitable to do so (Stephen Pitel and Andrew Valentine, "The Evolution of the Extra-territorial *Mareva* Injunction in Canada: Three Issues" (2006), 2 J. Priv. Int'l L. 339, at p. 370; Vaughan Black and Edward Babin, "Mareva Injunctions in Canada: Territorial Aspects" (1997), 28 *Can. Bus. L.J.* 430, at pp. 452-53; Berryman, at pp. 128-31). Banks and other financial institutions have, as a result,

been bound by *Mareva* injunctions even when they are not a party to an underlying action.

[34]      To preserve Equustek's rights pending the outcome of the litigation, Tindale J.'s order of December 13, 2012 required Datalink to cease carrying on business through the Internet. Google had requested and participated in Equustek's obtaining this order, and offered to comply with it voluntarily. It is common ground that Datalink was unable to carry on business in a commercially viable way unless its websites were in Google's search results. In the absence of de-indexing these websites, as Fenlon J. specifically found, Google was facilitating Datalink's breach of Tindale J.'s order by enabling it to continue carrying on business through the Internet. By the time Fenlon J. granted the injunction against Google, Google was aware that in not de-indexing Datalink's websites, it was facilitating Datalink's ongoing breach of Tindale J.'s order, the purpose of which was to prevent irreparable harm to Equustek.

[35]      Much like a *Norwich* order or a *Mareva* injunction against a non-party, the interlocutory injunction in this case flows from the necessity of Google's assistance in order to prevent the facilitation of Datalink's ability to defy court orders and do irreparable harm to Equustek. Without the injunctive relief, it was clear that Google would continue to facilitate that ongoing harm.

[36]    Google's next argument is the impropriety of issuing an interlocutory injunction with extraterritorial effect. But this too contradicts the existing jurisprudence.

[37]    The British Columbia courts in these proceedings concluded that because Google carried on business in the province through its advertising and search operations, this was sufficient to establish the existence of *in personam* and territorial jurisdiction. Google does not challenge those findings. It challenges instead the global reach of the resulting order. Google suggests that if any injunction is to be granted, it should be limited to Canada (or google.ca) alone.

[38]    When a court has *in personam* jurisdiction, and where it is necessary to ensure the injunction's effectiveness, it can grant an injunction enjoining that person's conduct anywhere in the world. (See *Impulsora Turistica de Occidente, S.A. de C.V. v. Transat Tours Canada Inc.*, [2007] 1 S.C.R. 867, at para. 6; Berryman, at p. 20; Pitel and Valentine, at p. 389; Sharpe, at para. 1.1190; Spry, at p. 37.) *Mareva* injunctions have been granted with worldwide effect when it was found to be necessary to ensure their effectiveness. (See *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 (S.C.); Berryman, at pp. 20 and 136; *Babanaft International Co. S.A. v. Bassatne*, [1990] 1 Ch. 13 (C.A.); *Republic of Haiti v. Duvalier*, [1990] 1 Q.B. 202 (C.A.); *Derby & Co. v. Weldon,* [1990] 1 Ch. 48 (C.A.); and *Derby & Co. v. Weldon (Nos. 3 and 4)* [1990] 1 Ch. 65 (C.A.); Sharpe, at paras. 1.1190 to 1.1220.)

[39]    Groberman J.A. pointed to the international support for this approach:

I note that the courts of many other jurisdictions have found it necessary, in the context of orders against Internet abuses, to pronounce orders that have international effects. Several such cases are cited in the arguments of [International Federation of Film Producers Associations and International Federation of the Phonographic Industry], including *APC v. Auchan Telecom*, 11/60013, Judgment (28 November 2013) (Tribunal de Grande Instance de Paris); *McKeogh v. Doe* (Irish High Court, case no. 20121254P); *Mosley v. Google*, 11/07970, Judgment (6 November 2013) (Tribunal de Grande Instance de Paris); *Max Mosley v. Google* (see "Case Law, Hamburg District Court: *Max Mosley v. Google Inc.* online: Inform's Blog https://inforrm.wordpress.com/2014/02/05/case-law-hamburg-district-court-max-mosley-v-google-inc-google-go-down-again-this-time-in-hamburg-dominic-crossley/) and *ECJ Google Spain SL, Google Inc. v. Agencia Española de Protección de Datos*, Mario Costeja González,  C-131/12 [2014], CURIA.[3]

[40]      Fenlon J. explained why Equustek's request that the order have worldwide effect was necessary as follows:

The majority of GW1000 sales occur outside Canada. Thus, quite apart from the practical problem of endless website iterations, the option Google proposes is not equivalent to the order now sought which would compel Google to remove the [Datalink] websites from all search results generated by any of Google's websites worldwide. I therefore conclude that [Equustek does] not have an out-of-court remedy available to [it].[4]

. . .

. . . to be effective, even within Canada, Google must block search results on all of its websites.[5]

As a result, to ensure that Google did not facilitate Datalink's breach of court orders whose purposes were to prevent irreparable harm to Equustek, she concluded that the injunction had to have worldwide effect.

---

[3] Para. 95.
[4] Para. 76.
[5] Para. 148.

[41]     I agree. The problem in this case is occurring online and globally. The Internet has no borders — its natural habitat is global. The only way to ensure that the interlocutory injunction attained its objective was to have it apply where Google operates — globally. As Fenlon J. found, the majority of Datalink's sales take place outside Canada. If the injunction were restricted to Canada alone or to google.ca, as Google suggests it should have been, the remedy would be deprived of its intended ability to prevent irreparable harm. Purchasers outside Canada could easily continue purchasing from Datalink's websites, and Canadian purchasers could easily find Datalink's websites even if those websites were de-indexed on google.ca. Google would still be facilitating Datalink's breach of the court's order which had prohibited it from carrying on business on the Internet. There is no equity in ordering an interlocutory injunction which has no realistic prospect of preventing irreparable harm.

[42]     The interlocutory injunction in this case is necessary to prevent the irreparable harm that flows from Datalink carrying on business on the Internet, a business which would be commercially impossible without Google's facilitation. The order targets Datalink's websites — the list of which has been updated as Datalink has sought to thwart the injunction — and prevents them from being displayed where they do the most harm: on Google's global search results.

[43]     Nor does the injunction's worldwide effect tip the balance of convenience in Google's favour. The order does not require that Google take any steps around the

world, it requires it to take steps only where its search engine is controlled. This is something Google has acknowledged it can do — and does — with relative ease. There is therefore no harm to Google which can be placed on its "inconvenience" scale arising from the global reach of the order.

[44]     Google's argument that a global injunction violates international comity because it is possible that the order could not have been obtained in a foreign jurisdiction, or that to comply with it would result in Google violating the laws of that jurisdiction is, with respect, theoretical. As Fenlon J. noted, "Google acknowledges that most countries will likely recognize intellectual property rights and view the selling of pirated products as a legal wrong".[6]

[45]     And while it is always important to pay respectful attention to freedom of expression concerns, particularly when dealing with the core values of another country, I do not see freedom of expression issues being engaged in any way that tips the balance of convenience towards Google in this case. As Groberman J.A. concluded:

> In the case before us, there is no realistic assertion that the judge's order will offend the sensibilities of any other nation. It has not been suggested that the order prohibiting the defendants from advertising wares that violate the intellectual property rights of the plaintiffs offends the core values of any nation. The order made against Google is a very limited ancillary order designed to ensure that the plaintiffs' core rights are respected.

---

[6] Para. 144.

> . . . the order in this case is an interlocutory one, and one that can be varied by the court. In the unlikely event that any jurisdiction finds the order offensive to its core values, an application could be made to the court to modify the order so as to avoid the problem.[7]

[46]     If Google has evidence that complying with such an injunction would require it to violate the laws of another jurisdiction, including interfering with freedom of expression, it is always free to apply to the British Columbia courts to vary the interlocutory order accordingly. To date, Google has made no such application.

[47]     In the absence of an evidentiary foundation, and given Google's right to seek a rectifying order, it hardly seems equitable to deny Equustek the extraterritorial scope it needs to make the remedy effective, or even to put the onus on it to demonstrate, country by country, where such an order is legally permissible. We are dealing with the Internet after all, and the balance of convenience test has to take full account of its inevitable extraterritorial reach when injunctive relief is being sought against an entity like Google.

[48]     This is not an order to remove speech that, on its face, engages freedom of expression values, it is an order to de-index websites that are in violation of several court orders. We have not, to date, accepted that freedom of expression requires the facilitation of the unlawful sale of goods.

---

[7] Paras. 93-94.

[49]     And I have trouble seeing how this interferes with what Google refers to as its content neutral character. The injunction does not require Google to monitor content on the Internet, nor is it a finding of any sort of liability against Google for facilitating access to the impugned websites. As for the balance of convenience, the only obligation the interlocutory injunction creates is for Google to de-index the Datalink websites. The order is, as Fenlon J. observed, "only a slight expansion on the removal of individual URLs, which Google agreed to do voluntarily".[8] Even if it could be said that the injunction engages freedom of expression issues, this is far outweighed by the need to prevent the irreparable harm that would result from Google's facilitating Datalink's breach of court orders.

[50]     Google did not suggest that it would be inconvenienced in any material way, or would incur any significant expense, in de-indexing the Datalink websites. It acknowledges, fairly, that it can, and often does, exactly what is being asked of it in this case, that is, alter search results. It does so to avoid generating links to child pornography and websites containing "hate speech". It also complies with notices it receives under the US *Digital Millennium Copyright Act*, Pub. L. No. 105-304, 112 Stat. 2680 (1998) to de-index content from its search results that allegedly infringes copyright, and removes websites that are subject to court orders.

[51]     As for the argument that this will turn into a permanent injunction, the length of an interlocutory injunction does not, by itself, convert its character from a

---

[8] Para. 137.

temporary to a permanent one. As previously noted, the order requires that the injunction be in place "until the conclusion of the trial of this action or further order of this court". There is no reason not to take this order at face value. Where an interlocutory injunction has been in place for an inordinate amount of time, it is always open to a party to apply to have it varied or vacated. Google has brought no such application.

[52]    Datalink and its representatives have ignored all previous court orders made against them, have left British Columbia, and continue to operate their business from unknown locations outside Canada. Equustek has made efforts to locate Datalink with limited success. Datalink is only able to survive — at the expense of Equustek's survival — on Google's search engine which directs potential customers to its websites. In other words, Google is how Datalink has been able to continue harming Equustek in defiance of several court orders.

[53]    This does not make Google liable for this harm. It does, however, make Google the determinative player in allowing the harm to occur. On balance, therefore, since the interlocutory injunction is the only effective way to mitigate the harm to Equustek pending the resolution of the underlying litigation, the only way, in fact, to preserve Equustek itself pending the resolution of the underlying litigation, and since any countervailing harm to Google is minimal to non-existent, the interlocutory injunction should be upheld.

[54]       I would dismiss the appeal with costs in this Court and in the Court of Appeal for British Columbia.

The following are the reasons delivered by

        CÔTÉ AND ROWE JJ. —

[55]       Equustek Solutions Inc., Robert Angus and Clarma Enterprises Inc. ("Equustek") seek a novel form of equitable relief — an effectively permanent injunction, against an innocent third party, that requires court supervision, has not been shown to be effective, and for which alternative remedies are available. Our response calls for judicial restraint. While the court had jurisdiction to issue the June 13, 2014 order against Google Inc. ("Google Order") (2014 BCSC 1063, 374 D.L.R. (4th) 537, per Fenlon J.), in our view it should have refrained from doing so. The authority to grant equitable remedies has always been constrained by doctrine and practice. In our view, the Google Order slipped too easily from these constraints.

[56]       As we will explain, the Google Order is effectively final redress against a non-party that has neither acted unlawfully, nor aided and abetted illegal action. The test for interlocutory injunctions established in *RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311, does not apply to an order that is effectively final, and the test for a permanent injunction has not been satisfied. The Google Order

is mandatory and requires court supervision. It has not been shown to be effective, and there are alternative remedies available to Equustek.

I.      Judicial Restraint

[57]      The power of a court to grant injunctive relief is derived from that of the Chancery courts of England (*Fourie v. Le Roux*, [2007] UKHL 1, [2007] 1 All E.R. 1087, at para. 30), and has been confirmed in British Columbia by the *Law and Equity Act*, R.S.B.C. 1996, c. 253, s. 39(1):

> **39** (1) An injunction or an order in the nature of mandamus may be granted or a receiver or receiver manager appointed by an interlocutory order of the court in all cases in which it appears to the court to be just or convenient that the order should be made.

[58]      In *Fourie*, Lord Scott explained that "provided the court has in personam jurisdiction over the person against whom an injunction, whether interlocutory or final, is sought, the court has jurisdiction, in the strict sense, to grant it" (para. 30). However, simply because a court has the jurisdiction to grant an injunction does not mean that it should. A court "will not according to its settled practice do so except in a certain way and under certain circumstances" (Lord Scott, at para. 25, quoting from *Guaranty Trust Co. of New York v. Hannay & Co.*, [1915] 2 K.B. 536, at p. 563; see also *Cartier International AG v. British Sky Broadcasting Ltd.*, 2014 EWHC 3354 (Ch.), [2015] 1 All E.R. 949, at paras. 98-100). Professor Spry comes to similar

conclusions (I. C. F. Spry, *The Principles of Equitable Remedies* (9th ed. 2014), at p. 333):

> The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited. Injunctions are granted only when to do so accords with equitable principles, but this restriction involves, not a defect of powers, but an adoption of doctrines and practices that change in their application from time to time. [Footnote omitted.]

[59]      The importance of appropriately modifying judicial restraint to meet the needs of justice was summarized by Lord Nicholls in *Mercedes Benz A.G. v. Leiduck*, [1996] 1 A.C. 284 (P.C.), at p. 308: "As circumstances in the world change, so must the situations in which the courts may properly exercise their jurisdiction to grant injunctions. The exercise of the jurisdiction must be principled, but the criterion is injustice."

[60]      Changes to "settled practice" must not overshoot the mark of avoiding injustice. In our view, granting the Google Order requires changes to settled practice that are not warranted in this case: neither the test for an interlocutory nor a permanent injunction has been met; court supervision is required; the order has not been shown to be effective; and alternative remedies are available.

II.    Factors Suggesting Restraint in This Case

A.    *The Effects of the Google Order Are Final*

[61]     In *RJR — MacDonald*, this Court set out the test for interlocutory injunctions — a serious question to be tried, irreparable harm, and the balance of convenience — but also described an exception (at pp. 338-39):

> Two exceptions apply to the general rule that a judge should not engage in an extensive review of the merits. The first arises <u>when the result of the interlocutory motion will in effect amount to a final determination of the action. This will be the case</u> either when the right which the applicant seeks to protect can only be exercised immediately or not at all, or <u>when the result of the application will impose such hardship on one party as to remove any potential benefit from proceeding to trial.</u>
>
> . . .
>
> The circumstances in which this exception will apply are rare. When it does, a more extensive review of the merits of the case must be undertaken. Then when the second and third stages of the test are considered and applied the anticipated result on the merits should be borne in mind. [Emphasis added.]

[62]     In our view, the Google Order "in effect amount[s] to a final determination of the action" because it "remove[s] any potential benefit from proceeding to trial". In order to understand this conclusion, it is useful to review Equustek's underlying claim. Equustek sought, in its Further Amended Notice of Civil Claim against Datalink, damages, declarations, and:

> A temporary and permanent injunction restraining the Defendants from:
>
> a. using the Plaintiffs' trademarks and free-riding on the goodwill of any Equustek products on any website;
>
> b. making statements disparaging or in any way referring to the Equustek products;

     c.  distributing the offending manuals and displaying images of the Plaintiff's products on any website; and

     d.  selling the GW1000 line of products which were created by the theft of the Plaintiff's trade secrets;

and obliging them to:

     e.  immediately disclose all hidden websites;

     f.  display a page on all websites correcting [their] misrepresentations about the source and continuing availability of the Equustek products and directing customers to Equustek.

In short, Equustek sought injunctions modifying the way in which Datalink carries out its website business, along with damages and declarations. On June 20, 2012, Datalink's response was struck and Equustek was given leave to apply for default judgment. It has not done so. On December 13, 2012, Justice Tindale ordered that

> [t]he Defendants Morgan Jack, Datalink Technologies Gateways Inc. and Datalink Technologies Gateways LLC (the "Datalink Defendants") cease operating or carrying on business through any website, including those contained in Schedule "A" and all associated pages, subpages and subdirectories, and that these Defendants immediately take down all such websites, until further order of this court. ["December 2012 Order"]

The December 2012 Order gives Equustek *more* than the injunctive relief it sought in its originating claim. Rather than simply ordering the modification of Datalink websites, the December 2012 Order requires the ceasing of website business altogether. In our view, little incentive remains for Equustek to return to court to seek a lesser injunctive remedy. This is evidenced by Equustek's choice to not seek default

judgment during the roughly five years which have passed since it was given leave to do so.

[63]        As for the Google Order, it provides Equustek with an additional remedy, beyond the December 2012 Order and beyond what was sought in its original claim. In our view, granting of the Google Order further erodes any remaining incentive for Equustek to proceed with the underlying action. The effects of the Google Order are final in nature. Respectfully, the pending litigation assumed by our colleague Abella J. is a fiction. The Google Order, while interlocutory in form, is final in effect. Thus, it gives Equustek more relief than it sought.

[64]        Procedurally, Equustek requested an interlocutory order in the course of its litigation with Datalink. While Equustek's action against Datalink could technically endure indefinitely (G.P. Fraser, J.W. Horn and S.A. Griffin, *The Conduct of Civil Litigation in British Columbia* (2nd ed. (loose-leaf)), at § 14.1) — and thus the interlocutory status of the injunction could technically endure indefinitely — it does not follow that the Google Order should be considered interlocutory. Courts of equity look to substance over form, because "a dogged devotion to form has often resulted in injustice" (*John Deere Ltd. v. Firdale Farms Ltd.* (1987), 45 D.L.R. (4th) 641 (Man. C.A.), at p. 645). In *Parkin v. Thorold* (1852), 16 Beav. 59, 51 E.R. 698, at p. 701, Lord Romilly explained it thus:

>          . . . Courts of Equity make a distinction in all cases between that which is matter of substance and that which is matter of form; and, if [they do] find that by insisting on the form, the substance will be defeated, [they]

> hold] it to be inequitable to allow a person to insist on such form, and
> thereby defeat the substance.

In our view, the substance of the Google Order amounts to a final remedy. As such, it provides Equustek with more equitable relief than it sought against Datalink, and amounts to final resolution via Google. It is, in effect, a permanent injunction.

[65]      Following *RJR — MacDonald* (at pp. 338-39), an extensive review of the merits is therefore required at the first stage of the analysis (*Schooff v. British Columbia (Medical Services Commission)*, 2010 BCCA 396, 323 D.L.R. (4th) 680, at paras. 26-27). Yet this was not done. When Justice Fenlon considered Equustek's application for an interim injunction enjoining Google to cease indexing or referencing Datalink's websites, she did not conduct an extensive review of the merits. She did however note that Equustek had raised an arguable case, and that Datalink was presumed to have admitted the allegations when its defenses were struck (para. 151). The rule is not immutable that if a statement of defense is struck, the defendant is deemed to have admitted the allegations contained in the statement of claim. While the facts relating to Datalink's liability are deemed to be admitted, the court can still exercise its discretion in assessing Equustek's claims (*McIsaac v. Healthy Body Services Inc.*, 2009 BCSC 1716, at paras. 42 and 44 (CanLII); *Plouffe v. Roy*, 2007 CanLII 37693 (Ont. S.C.J.), at para. 53; *Spiller v. Brown* (1973), 43 D.L.R. (3d) 140 (Alta. S.C. (App. Div.)), at p. 143). Equustek has avoided such an assessment. Thus, an extensive review of the merits was not carried out.

[66]       The Google Order also does not meet the test for a permanent injunction. To obtain a permanent injunction, a party is required to establish: (1) its legal rights; (2) that damages are an inadequate remedy; and (3) that there is no impediment to the court's discretion to grant an injunction (*1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, 2014 ONCA 125, 371 D.L.R. (4th) 643, at paras. 74-80; Spry, at pp. 395 and 407-8). Equustek has shown the inadequacy of damages (damages are ascertainable but unlikely to be recovered, and the wrong is continuing). However, in our view, it is unclear whether the first element of the test has been met. Equustek's claims were supported by a good *prima facie* case, but it was not established that Datalink designed and sold counterfeit versions of its product, or that this resulted in trademark infringement and unlawful appropriation of trade secrets.

[67]       In any case, the discretionary factors affecting the grant of an injunction strongly favour judicial restraint. As we will outline below, the Google Order enjoins a non-party, yet Google has not aided or abetted Datalink's wrongdoing; it holds no assets of Equustek's, and has no information relevant to the underlying proceedings. The Google Order is mandatory and requires court supervision. It has not been shown to be effective, and Equustek has alternative remedies.

B.     *Google Is a Non-Party*

[68]       A court order does not "technically" bind non-parties, but "anyone who disobeys the order or interferes with its purpose may be found to have obstructed the course of justice and hence be found guilty of contempt of court" (*MacMillan Bloedel*

*Ltd. v. Simpson*, [1996] 2 S.C.R. 1048, at paras. 23 and 27). In *MacMillan Bloedel*, the injunction prohibiting named individuals from blocking a logging road also caused non-parties to face contempt proceedings for doing the act prohibited by the injunction.

[69]     The instant case is not one where a non-party with knowledge of a court order deliberately disobeyed it and thereby deprecated the court's authority. Google did not carry out the act prohibited by the December 2012 Order. The act prohibited by the December 2012 Order is Datalink "carrying on business through any website". That act occurs whenever Datalink launches websites to carry out business — not when other parties, such as Google, make it known that such websites exist.

[70]     There is no doubt that non-parties also risk contempt proceedings by aiding and abetting the doing of a prohibited act (*Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.); D. Bean, A. Burns and I. Parry, *Injunctions* (11th ed. 2012), at para. 9-08). Lord Denning said in *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.*, [1971] 1 W.L.R. 1676 (C.A.), at p. 1682:

> It has long been held that the court has jurisdiction to commit for contempt a person, not a party to the action, who, knowing of an injunction, aids and abets the defendant in breaking it. The reason is that by aiding and abetting the defendant, he is obstructing the course of justice.

[71]     In our view, Google did not aid or abet the doing of the prohibited act. Equustek alleged that Google's search engine was facilitating Datalink's ongoing

breach by leading customers to Datalink websites (Fenlon J.'s reasons, at para. 10). However, the December 2012 Order was to cease carrying on business through any website. That Order was breached as soon as Datalink established a website to conduct its business, regardless of how visible that website might be through Google searches. If Equustek's argument were accepted, the scope of "aids and abets" would, in our view, become overbroad. It might include the companies supplying Datalink with the material to produce the derivative products, the companies delivering the products, or as Google argued in its factum, it might also include the local power company that delivers power to Datalink's physical address. Critically, Datalink breached the December 2012 Order simply by launching websites to carry out business, regardless of whether Google searches ever reveal the websites.

[72]      We agree with our colleague Justice Abella that *Mareva* injunctions and *Norwich* orders can operate against non-parties. However, we respectfully disagree that the Google Order is similar in nature to those remedies. *Mareva* injunctions are granted to freeze assets until the completion of a trial — they do not enforce a plaintiff's substantive rights (*Mercedes Benz*, at p. 302). In contrast, the Google Order enforces Equustek's asserted intellectual property rights by seeking to minimize harm to those rights. It does not freeze Datalink's assets (and, in fact, may erode those assets).

[73]        *Norwich* orders are made to compel information from third parties. In *Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133 (H.L.), at p. 175, Lord Reid identified

> a very reasonable principle that if through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers.

Lord Reid found that "without certain action on [Customs'] part the infringements could never have been committed" (at 174). In spite of this finding, the court did not require Customs to take specific action to prevent importers from infringing the patent of Norwich Pharmacal; rather the court issued a limited order compelling Customs to disclose the names of importers. In *Cartier*, the court analogized from *Norwich* to support an injunction requiring Internet service providers ("ISPs") to block access to trademark-infringing websites because "it is via the ISPs' services" that customers view and purchase the infringing material (para. 155). That injunction did not extend to parties merely assisting in finding the websites.

[74]        In the case at bar, we are of the view that Google does not play a role in Datalink's breach of the December 2012 Order. Whether or not the December 2012 Order is violated does not hinge on the degree of success of the prohibited website business. Rather, the December 2012 Order is violated merely by Datalink conducting business through a website, regardless of the visibility of that website or the number of customers that visit the website. Thus Google does not play a role

analogous to Customs in *Norwich* nor the ISPs in *Cartier*. And unlike the order in *Norwich*, the Google Order compels positive action aimed at the illegal activity rather than simply requiring the provision of information to the court.

C.     *The Google Order Is Mandatory*

[75]     While the distinction between mandatory and prohibitive injunctions has been questioned (see *National Commercial Bank of Jamaica Ltd. v. Olint Corp.*, [2009] 1 W.L.R. 1405 (P.C.), at para. 20), courts have rightly, in our view, proceeded cautiously where an injunction requires the defendant to incur additional expenses to take positive steps (*Redland Bricks Ltd. v. Morris*, [1970] A.C. 652 (H.L.), at pp. 665-66; J. Berryman, *The Law of Equitable Remedies* (2nd ed. 2013), at pp. 199-200). Also relevant to the decision of whether to grant a mandatory injunction is whether it might require continued supervision by the courts, especially where the terms of the order cannot be precisely drawn and where it may result in wasteful litigation over compliance (*Co-operative Insurance Society Ltd. v. Argyll Stores (Holdings) Ltd.*, [1998] A.C. 1 (H.L.).

[76]     The Google Order requires ongoing modification and supervision because Datalink is launching new websites to replace de-listed ones. In fact, the Google Order has been amended at least seven times to capture Datalink's new sites (orders dated November 27, 2014; April 22, 2015; June 4, 2015; July 3, 2015; September 15, 2015; January 12, 2016 and March 30, 2016). In our view, courts

should avoid granting injunctions that require such cumbersome court-supervised updating.

D.     *The Google Order Has Not Been Shown To Be Effective*

[77]     A court may decline to grant an injunction on the basis that it would be futile or ineffective in achieving the purpose for which it is sought (Spry, at pp. 419-20; Berryman, at p. 113). For example, in *Attorney General v. Observer Ltd.*, [1990] 1 A.C. 109 (H.L.), the *Spycatcher* memoirs of an M.I.5 agent were already readily available, thus making a perpetual injunction against publication by the defendant newspapers ineffective.

[78]     In our view, the Google Order is not effective in enforcing the December 2012 Order. It is recalled that the December 2012 Order requires that Datalink "cease operating or carrying on business through any website" — it says nothing about the visibility or success of the website business. The December 2012 Order is violated as soon as Datalink launches websites to carry on business, regardless of whether those websites appear in a Google search. Moreover, the Google Order does not assist Equustek in modifying the Datalink websites, as Equustek sought in its originating claim for injunctive relief.

[79]     The most that can be said is that the Google Order might reduce the harm to Equustek which Fenlon J. found "Google is inadvertently facilitating" (para. 152). But it has not been shown that the Google Order is effective in doing so. As Google

points out, Datalink's websites can be found using other search engines, links from other sites, bookmarks, email, social media, printed material, word-of-mouth, or other indirect means. Datalink's websites are open for business on the Internet whether Google searches list them or not. In our view, this lack of effectiveness suggests restraint in granting the Google Order.

[80]       Moreover, the quest for elusive effectiveness led to the Google Order having worldwide effect. This effect should be taken into consideration as a factor in exercising discretion. Spry explains that territorial limitations to equitable jurisdiction are "to some extent determined by reference to questions of effectiveness and of comity" (p. 37). While the worldwide effect of the Google Order does not make it more effective, it could raise concerns regarding comity.

E.    *Alternatives Are Available*

[81]       Highlighting the lack of effectiveness are the alternatives available to Equustek. An equitable remedy is not required unless there is no other appropriate remedy at law (Spry, at pp. 402-3). In our view, Equustek has an alternative remedy in law. Datalink has assets in France. Equustek sought a world-wide *Mareva* injunction to freeze those assets, but the Court of Appeal for British Columbia urged Equustek to pursue a remedy in French courts: "At present, it appears that the proposed defendants reside in France . . . . The information before the Court is that French courts will assume jurisdiction and entertain an application to freeze the assets in that country" (2016 BCCA 190, 88 B.C.L.R. (5th) 168, at para. 24). We see no

reason why Equustek cannot do what the Court of Appeal urged it to do. Equustek could also pursue injunctive relief against the ISPs, as was done in *Cartier*, in order to enforce the December 2012 Order. In addition, Equustek could initiate contempt proceedings in France or in any other jurisdiction with a link to the illegal websites.

III.   Conclusion

[82]     For these reasons, we are of the view that the Google Order ought not to have been granted. We would allow the appeal and set aside the June 13, 2014 order of the Supreme Court of British Columbia.

*Appeal dismissed with costs,* CÔTÉ *and* ROWE JJ. *dissenting.*

*Solicitors for the appellant: Lenczner Slaght Royce Smith Griffin, Toronto.*

*Solicitors for the respondents: Robert Fleming Lawyers, Vancouver; Michael Sobkin, Ottawa.*

*Solicitor for the intervener the Attorney General of Canada: Attorney General of Canada, Ottawa.*

*Solicitor for the intervener the Attorney General of Ontario: Attorney General of Ontario, Toronto.*

*Solicitors for the intervener the Canadian Civil Liberties Association: Blake, Cassels & Graydon, Vancouver.*

*Solicitor for the intervener the OpenMedia Engagement Network: Cynthia Khoo, Vancouver.*

*Solicitors for the interveners the Reporters Committee for Freedom of the Press, the American Society of News Editors, the Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., the First Amendment Coalition, First Look Media Works, Inc., the New England First Amendment Coalition, the News Media Alliance (formerly known as the Newspaper Association of America), AOL Inc., the California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, the Online News Association and the Society of Professional Journalists: Blake, Cassels & Graydon, Toronto.*

*Solicitors for the interveners Human Rights Watch, ARTICLE 19, Open Net (Korea), the Software Freedom Law Centre and the Center for Technology and Society: Blake, Cassels & Graydon, Toronto.*

*Solicitors for the intervener the Wikimedia Foundation: McInnes Cooper, Halifax.*

*Solicitors for the intervener the British Columbia Civil Liberties Association: Stockwoods, Toronto.*

*Solicitors for the intervener the Electronic Frontier Foundation: MacPherson Leslie & Tyerman, Vancouver; Fasken Martineau DuMoulin, Vancouver.*

*Solicitors for the interveners the International Federation of the Phonographic Industry, Music Canada, the Canadian Publishers' Council, the Association of Canadian Publishers, the International Confederation of Societies of Authors and Composers, the International Confederation of Music Publishers and the Worldwide Independent Network: McCarthy Tétrault, Toronto.*

*Solicitors for the intervener the International Federation of Film Producers Associations: MacKenzie Barristers, Toronto.*