1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Margret M. Caruso (CA Bar No. 243473)
2    margretcaruso@quinnemanuel.com
   Carolyn M. Homer (CA Bar No. 286441)
3    carolynhomer@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
4  Redwood Shores, California 94065-2139
   Telephone:    (650) 801-5000
5  Facsimile:    (650) 801-5100

6  *Attorneys for Plaintiff*
   *Google Inc.*

7

8                  **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
9                     **SAN JOSE DIVISION**

10 **Google Inc.**,                    | Case No. 5:17-cv-04207-EJD

11            Plaintiff,               | **DECLARATION OF STEPHEN R. SCHACHTER IN SUPPORT OF GOOGLE INC'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**
12      vs.

13                                     | HEARING
   **Equustek Solution Inc.**, **Clarma Enterprises**
14 **Inc.**, and **Robert Angus**,     | DATE:  September 14, 2017
                                       | TIME:   9:00 a.m.
15            Defendants.              | PLACE: Courtroom 4 - 5th Floor
                                       | JUDGE: Hon. Edward J. Davila
16

17

18

19

20

21

22

23

24

25

26

27

28

I, Stephen R. Schachter, hereby declare as follows:

1.      I am a member of the Law Society of British Columbia, Canada, in good standing and a partner with Nathanson, Schachter & Thompson LLP.  I was counsel for Google Inc. ("Google") in the Canadian proceedings before the courts of British Columbia, which preceded this action in the United States.  I make this declaration of personal, first-hand knowledge, and if called and sworn as a witness, I could and would testify competently as follows.

2.      On June 28, 2017 the Supreme Court of Canada issued its judgment in *Google Inc. v. Equustek Inc*, 2017 SCC 34.  Attached as **Exhibit 1** is a true and correct copy of that opinion. There is no further right of appeal of this decision in Canada.

**The Original Canadian Action Between Equustek And Datalink**

3.      On April 12, 2011, Equustek Solutions Inc. and its associated business and principal (collectively, "Equustek") sued a group of individual and corporate defendants connected with a rival business (Morgan Jack and the corporate defendants are collectively referred to as "Datalink") in Vancouver, British Columbia in an action captioned *Equustek Solutions Inc. v. Jack*, Case No. S112421 (Sup. Ct. British Columbia).  Attached as **Exhibit 2** is a true and correct copy of the original Notice of Civil Claim (the Canadian counterpart to a United States Complaint), which initiated that action.  The notice of Civil Claim did not allege that it was eligible for trade secret or trademark protection under the laws of any country outside of Canada, or that Datalink had violated any non-Canadian laws, and does not name Google as a party.

4.      The British Columbia Supreme Court proceedings reflect that Datalink stopped appearing in the Canadian action in or around April of 2012.  Equustek thereafter procured multiple court orders against Datalink.  These included permission to seek a default judgment, an asset freeze, and an interlocutory injunction against Datalink continuing to sell the GW1000 product at issue, and culminated in an order dated July 26, 2012.

5.      Attached as **Exhibit 3** is a true and correct copy of that order and reasons for judgment against Datalink.  These reasons for judgment are published as *Equustek Solutions Inc. v. Jack*, 2012 BCSC 1490.

6.      Datalink did not comply with this order, continued to operate its business, and appeared to have fled the country.  On September 26, 2012 the British Columbia trial court found that the Datalink defendants may be in contempt of court and issued an arrest warrant for an individual defendant.  Attached as **Exhibit 4** is a true and correct copy of the arrest warrant.  To my knowledge, this defendant has never been apprehended.

7.      In December 2012 the British Columbia trial court expanded the prior injunction, "prohibiting [Datalink] from carrying on business through *any* website."  Attached as **Exhibit 5** is a true and correct copy of the December 13, 2012 order of the British Columbia Supreme Court.

**Equustek Brings Google Into The Datalink Action**

8.      On September 20, 2012, Equustek asked Google to "cease indexing" Datalink's websites in Google's search results.  Attached as **Exhibit 6** is a true and correct copy of the September 20, 2012 letter sent by Equustek counsel Robert Fleming.

9.      Attached as **Exhibit 7** is a true and correct copy of a September 24, 2012 fax from Google to Equustek responding to the September 20, 2012 letter.

10.      Attached as **Exhibit 8** is a true and correct copy of Equustek's November 13, 2012 Notice of Application to enjoin Datalink from online operations.  The December 2012 order against Datalink attached as Exhibit 5, above, resulted from Equustek's November application.

11.      Although the November 13, 2012 Notice of Application also sought an order against Google, Equustek adjourned its request for relief against Google in 2012.  Not satisfied with Google's voluntary delisting on Google.ca in response to the December 2012 order against Datalink (Exhibit 5), Equustek filed a Requisition to reschedule the hearing on its November 13, 2012 application against Google.  Attached as **Exhibit 9** is a true and correct copy of Equustek's Requisition dated May 13, 2013. In connection with its application, Equustek did not accuse Google of disclosing any of Equustek's alleged trade secrets.

12.      Attached as **Exhibit 10** is a true and correct copy of the June 13, 2014 British Columbia Supreme Court judgment and delisting order against Google, which is published at *Equustek Solutions Inc. v. Jack*, 2014 BCSC 1063.  Equustek did not argue, and the court did not find, that any U.S. trade secret laws were violated.

1    13.    Equustek has requested and the British Columbia Supreme Court  has continued to

2  issue additional orders requiring Google to delist more than 75 additional Datalink-associated

3  webpages and domains from its worldwide search results.  Attached as **Exhibits 11 through 19**

4  are true and correct copies of the nine supplemental delisting orders issued to date, varying the

5  original June 2014 order.  These orders are dated 11/27/2014, 2/17/2015, 4/22/2015, 6/4/2015,

6  7/3/2015, 9/15/2015, 1/12/2016, 3/30/2016, and 8/17/2016.  These orders, like the June 2014

7  Order, are available online through British Columbia's Court Services Online system,

8  https://justice.gov.bc.ca/cso/index.do (the equivalent of PACER), at Vancouver Supreme Court

9  Case File Number S112421.

10  **Google Appeals the Order**

11    14.    Google appealed the June 2014 order to the British Columbia Court of Appeal.

12  Google sought a stay of that order pending appeal, but the stay was denied.  Attached as **Exhibit**

13  **20** is a true and correct copy of the July 23, 2014 judgment dismissing the application for a stay.

14  In June 2015 the Court of Appeal dismissed the appeal.  Attached as **Exhibit 21** is a true and

15  correct copy of the June 11, 2015 judgment of the Court of Appeal, which is published at *Equustek*

16  *Solutions Inc. v. Google Inc.*, 2015 BCCA 265.

17    15.    Google appealed the order of the British Columbia Court of Appeal made in June

18  2015 to the Supreme Court of Canada, which is Canada's highest court.  The Attorney General of

19  Canada intervened in the case in support of Google's position.  Attached as **Exhibit 22** is a true

20  and correct copy of the October 4, 2016 brief of the Attorney General of Canada.  Attached as

21  **Exhibit 23** is a true and correct copy of a transcript of the December 6, 2016 oral arguments.

22  Audio and video of the argument is also available on the Supreme Court of Canada's website at:

23  http://www.scc-csc.ca/case-dossier/info/webcastview-webdiffusionvue-

24  eng.aspx?cas=36602&urlen=http://civic.neulion.com/sccen/liveembed.php?clipid=3495286,000&

25  urlfr=http://civic.neulion.com/sccfr/liveembed.php?clipid=3495294,000&date=2016-12-06

26  The Supreme Court of Canada dismissed the appeal by Google on June 28, 2017, in a judgment

27  attached as Exhibit 1 to this declaration.

28

DECLARATION OF STEPHEN R. SCHACHTER

**Other Equustek Action, And Inaction, Regarding Datalink's Websites**

16. British Columbia law provides for the sealing of court materials.  The court will consider whether the order is necessary to prevent a serious risk to an important interest, including a commercial interest, because reasonably alternative measures will not prevent the risk and whether the salutary effects of such an order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.  To my knowledge, Equustek did not request that the British Columbia courts seal the list of Datalink websites that Google has delisted.

17. To my knowledge, Equustek has not sought orders in the British Columbia Supreme Court proceedings to enjoin the registrars or webhosts of Datalink's websites, has neither sought nor obtained similar orders mandating that other search engines delist the Datalink websites, nor has it sought orders against other providers of Internet services that display links to the enjoined Datalink websites.

18. To my knowledge, Equustek has not sought orders in the British Columbia Supreme Court proceedings against any online publishers of articles with comments that publish the Datalink URLs that Google was ordered to delist.  Attached as **Exhibits 24 and 25** are true and correct copies of such posts dated June 17, 2014 and June 18, 2014, as available online as of July 20, 2017.

19. Equustek sought an asset freeze order against two Datalink defendants.   The trial court denied the application, and on April 28, 2016, the British Columbia Court of Appeal issued reasons for judgment affirming the denial, a true and correct copy of which is attached as **Exhibit 26** and published at *Equustek Solutions v. Jack*, 2016 BCCA 190.  The Court of Appeal determined that as a matter of comity, the issue of whether assets should be frozen may be better decided under the domestic laws of France where the assets are situated.  I do not have knowledge of what steps, if any, have been taken by the plaintiffs in the Equustek proceeding in the French courts to obtain any relief.

1    I declare under penalty of perjury under the laws of the United States of America and of

2  Canada that the foregoing is true and correct.  Executed this day in Vancouver, British Columbia,

3  Canada.

4  DATED:  July 26, 2017

5                                                                    _____

6                                                                    Stephen R. Schachter

7

8                                **SIGNATURE ATTESTATION**

9        Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the

10  filing of this document has been obtained from Stephen R. Schachter.

11                                                    */s/ Margret Caruso*
                                                       Margret Caruso
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



## SUPREME COURT OF CANADA

**CITATION:** Google Inc. *v.* Equustek Solutions Inc., 2017 SCC 34

**APPEAL HEARD:** December 6, 2016
**JUDGMENT RENDERED:** June 28, 2017
**DOCKET:** 36602

**BETWEEN:**

**Google Inc.**
Appellant

and

**Equustek Solutions Inc., Robert Angus and Clarma Enterprises Inc.**
Respondents

- and -

**Attorney General of Canada, Attorney General of Ontario, Canadian Civil Liberties Association, OpenMedia Engagement Network, Reporters Committee for Freedom of the Press, American Society of News Editors, Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., First Amendment Coalition, First Look Media Works, Inc., New England First Amendment Coalition, News Media Alliance (formerly known as Newspaper Association of America), AOL Inc., California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, Online News Association, Society of Professional Journalists, Human Rights Watch, ARTICLE 19, Open Net (Korea), Software Freedom Law Centre, Center for Technology and Society, Wikimedia Foundation, British Columbia Civil Liberties Association, Electronic Frontier Foundation, International Federation of the Phonographic Industry, Music Canada, Canadian Publishers' Council, Association of Canadian Publishers, International Confederation of Societies of Authors and Composers, International Confederation of Music Publishers, Worldwide Independent Network and International Federation of Film Producers Associations**
Interveners

**CORAM:** McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon, Côté, Brown and Rowe JJ.

**REASONS FOR JUDGMENT:**  Abella J. (McLachlin C.J. and Moldaver, Karakatsanis,
(paras. 1 to 54)  Wagner, Gascon and Brown JJ. concurring)

**JOINT DISSENTING REASONS:**  Côté and Rowe JJ.
(paras. 55 to 82)

**NOTE:** This document is subject to editorial revision before its reproduction in final
form in the *Canada Supreme Court Reports*.

———————————————————

GOOGLE INC. *v.* EQUUSTEK SOLUTIONS INC.

**Google Inc.**                                                                 *Appellant*


*v.*


**Equustek Solutions Inc.,**
**Robert Angus and Clarma Enterprises Inc.**                    *Respondents*


and


**Attorney General of Canada, Attorney General of Ontario,**
**Canadian Civil Liberties Association, OpenMedia**
**Engagement Network, Reporters Committee for**
**Freedom of the Press, American Society of News Editors,**
**Association of Alternative Newsmedia, The Center for**
**Investigative Reporting, Dow Jones & Company, Inc.,**
**First Amendment Coalition, First Look Media Works, Inc.,**
**New England First Amendment Coalition, News Media**
**Alliance (formerly known as Newspaper Association of America),**
**AOL Inc., California Newspaper Publishers Association,**
**The Associated Press, The Investigative Reporting**
**Workshop at American University, Online News Association,**
**Society of Professional Journalists, Human Rights Watch,**
**ARTICLE 19, Open Net (Korea), Software Freedom Law Centre,**
**Center for Technology and Society, Wikimedia Foundation,**
**British Columbia Civil Liberties Association,**
**Electronic Frontier Foundation, International Federation**
**of the Phonographic Industry, Music Canada,**
**Canadian Publishers' Council, Association of Canadian Publishers,**
**International Confederation of Societies of Authors and Composers,**
**International Confederation of Music Publishers,**
**Worldwide Independent Network and International**
**Federation of Film Producers Associations**                    *Interveners*


**Indexed as: Google Inc. *v.* Equustek Solutions Inc.**

**2017 SCC 34**

File No.: 36602.

2016: December 6; 2017: June 28.

Present: McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon, Côté, Brown and Rowe JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

> *Injunctions — Interlocutory injunction — Non-party — Technology company bringing action against distributor for unlawful use and sale of its intellectual property through Internet — Company granted interlocutory injunction against Google, a non-party to underlying action, to cease indexing or referencing certain search results on its Internet search engine — Whether Google can be ordered, pending trial of action, to globally de-index websites of distributor which, in breach of several court orders, is using those websites to unlawfully sell intellectual property of another company — Whether Supreme Court of British Columbia had jurisdiction to grant injunction with extraterritorial effect — Whether, if it did, it was just and equitable to do so.*

E is a small technology company in British Columbia that launched an action against D. E claimed that D, while acting as a distributor of E's products, began to re-label one of the products and pass it off as its own. D also acquired

confidential information and trade secrets belonging to E, using them to design and manufacture a competing product. D filed statements of defence disputing E's claims, but eventually abandoned the proceedings and left the province. Some of D's statements of defence were subsequently struck.

Despite court orders prohibiting the sale of inventory and the use of E's intellectual property, D continues to carry on its business from an unknown location, selling its impugned product on its websites to customers all over the world. E approached Google and requested that it de-index D's websites. Google refused. E then brought court proceedings, seeking an order requiring Google to do so. Google asked E to obtain a court order prohibiting D from carrying on business on the Internet saying it would comply with such an order by removing specific webpages.

An injunction was issued by the Supreme Court of British Columbia ordering D to cease operating or carrying on business through any website. Between December 2012 and January 2013, Google advised E that it had de-indexed 345 specific webpages associated with D. It did not, however, de-index all of D's websites. De-indexing webpages but not entire websites proved to be ineffective since D simply moved the objectionable content to new pages within its websites, circumventing the court orders. Moreover, Google had limited the de-indexing to searches conducted on google.ca. E therefore obtained an interlocutory injunction to enjoin Google from displaying any part of D's websites on any of its search results worldwide. The Court of Appeal for British Columbia dismissed Google's appeal.

*Held* (Côté and Rowe JJ. dissenting): The appeal is dismissed and the worldwide interlocutory injunction against Google is upheld.

*Per* McLachlin C.J. and **Abella**, Moldaver, Karakatsanis, Wagner, Gascon and Brown JJ.: The issue is whether Google can be ordered, pending a trial, to globally de-index D's websites which, in breach of several court orders, is using those websites to unlawfully sell the intellectual property of another company.

The decision to grant an interlocutory injunction is a discretionary one and entitled to a high degree of deference. Interlocutory injunctions are equitable remedies that seek to ensure that the subject matter of the litigation will be preserved so that effective relief will be available when the case is ultimately heard on the merits. Their character as "interlocutory" is not dependent on their duration pending trial. Ultimately, the question is whether granting the injunction is just and equitable in the circumstances of the case.

The test for determining whether the court should exercise its discretion to grant an interlocutory injunction against Google has been met in this case: there is a serious issue to be tried; E is suffering irreparable harm as a result of D's ongoing sale of its competing product through the Internet; and the balance of convenience is in favour of granting the order sought.

Google does not dispute that there is a serious claim, or that E is suffering irreparable harm which it is inadvertently facilitating through its search engine. Nor

does it suggest that it would be inconvenienced in any material way, or would incur any significant expense, in de-indexing D's websites. Its arguments are that the injunction is not necessary to prevent irreparable harm to E and is not effective; that as a non-party it should be immune from the injunction; that there is no necessity for the extraterritorial reach of the order; and that there are freedom of expression concerns that should have tipped the balance against granting the order.

Injunctive relief can be ordered against someone who is not a party to the underlying lawsuit. When non-parties are so involved in the wrongful acts of others that they facilitate the harm, even if they themselves are not guilty of wrongdoing, they can be subject to interlocutory injunctions. It is common ground that D was unable to carry on business in a commercially viable way without its websites appearing on Google. The injunction in this case flows from the necessity of Google's assistance to prevent the facilitation of D's ability to defy court orders and do irreparable harm to E. Without the injunctive relief, it was clear that Google would continue to facilitate that ongoing harm.

Where it is necessary to ensure the injunction's effectiveness, a court can grant an injunction enjoining conduct anywhere in the world. The problem in this case is occurring online and globally. The Internet has no borders — its natural habitat is global. The only way to ensure that the interlocutory injunction attained its objective was to have it apply where Google operates — globally. If the injunction were restricted to Canada alone or to google.ca, the remedy would be deprived of its

intended ability to prevent irreparable harm, since purchasers outside Canada could easily continue purchasing from D's websites, and Canadian purchasers could find D's websites even if those websites were de-indexed on google.ca.

Google's argument that a global injunction violates international comity because it is possible that the order could not have been obtained in a foreign jurisdiction, or that to comply with it would result in Google violating the laws of that jurisdiction, is theoretical. If Google has evidence that complying with such an injunction would require it to violate the laws of another jurisdiction, including interfering with freedom of expression, it is always free to apply to the British Columbia courts to vary the interlocutory order accordingly. To date, Google has made no such application. In the absence of an evidentiary foundation, and given Google's right to seek a rectifying order, it is not equitable to deny E the extraterritorial scope it needs to make the remedy effective, or even to put the onus on it to demonstrate, country by country, where such an order is legally permissible.

D and its representatives have ignored all previous court orders made against them, have left British Columbia, and continue to operate their business from unknown locations outside Canada. E has made efforts to locate D with limited success. D is only able to survive — at the expense of E's survival — on Google's search engine which directs potential customers to D's websites. This makes Google the determinative player in allowing the harm to occur. On balance, since the world-wide injunction is the only effective way to mitigate the harm to E pending the

trial, the only way, in fact, to preserve E itself pending the resolution of the underlying litigation, and since any countervailing harm to Google is minimal to non-existent, the interlocutory injunction should be upheld.

*Per* **Côté** and **Rowe** JJ. (dissenting): While the court had jurisdiction to issue the injunctive order against Google, it should have refrained from doing so. Numerous factors affecting the grant of an injunction strongly favour judicial restraint in this case.

First, the Google Order in effect amounts to a final determination of the action because it removes any potential benefit from proceeding to trial. In its original underlying claim, E sought injunctions modifying the way D carries out its website business. E has been given more injunctive relief than it sought in its originating claim, including requiring D to cease website business altogether. Little incentive remains for E to return to court to seek a lesser injunctive remedy. This is evidenced by E's choice to not seek default judgment during the roughly five years which have passed since it was given leave to do so. The Google Order provides E with more equitable relief than it sought against D and gives E an additional remedy that is final in nature. The order against Google, while interlocutory in form, is final in effect. The test for interlocutory injunctions does not apply to an order that is effectively final. In these circumstances, an extensive review of the merits of this case was therefore required but was not carried out by the court below, contrary to caselaw. The Google Order does not meet the test for a permanent injunction. Although E's claims were

supported by a good *prima facie* case, it was not established that D designed and sold counterfeit versions of E's product, or that this resulted in trademark infringement and unlawful appropriation of trade secrets.

Second, Google is a non-party to the proceedings between E and D. E alleged that Google's search engine was facilitating D's ongoing breach by leading customers to D's websites. However, the prior order that required D to cease carrying on business through any website was breached as soon as D established a website to conduct its business, regardless of how visible that website might be through Google searches. Google did not aid or abet the doing of the prohibited act.

Third, the Google Order is mandatory and requires ongoing modification and supervision because D is launching new websites to replace de-listed ones. Courts should avoid granting injunctions that require such cumbersome court-supervised updating.

Furthermore, the Google Order has not been shown to be effective in making D cease operating or carrying on business through any website. Moreover, the Google Order does not assist E in modifying D's websites, as E sought in its originating claim for injunctive relief. The most that can be said is the Google Order might reduce the harm to E. But it has not been shown that the Google Order is effective in doing so. D's websites can be found using other search engines, links from other sites, bookmarks, email, social media, printed material, word-of-mouth, or

other indirect means. D's websites are open for business on the Internet whether Google searches list them or not.

Finally, there are alternative remedies available to E. E sought a world-wide *Mareva* injunction to freeze D's assets in France, but the Court of Appeal for British Columbia urged E to pursue a remedy in French courts. There is no reason why E cannot do what the Court of Appeal urged it to do. E could also pursue injunctive relief against the ISP providers. In addition, E could initiate contempt proceedings in France or in any other jurisdiction with a link to the illegal websites. Therefore, the Google Order ought not to have been granted.

## Cases Cited

By Abella J.

**Applied:** *RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *MacMillan Bloedel Ltd. v. Simpson*, [1996] 2 S.C.R. 1048; **considered**: *Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133; *Mareva Compania Naviera SA v. International Bulkcarriers SA*, [1975] 2 Lloyd's Rep. 509; **referred to:** *Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110; *Seaward v. Paterson*, [1897] 1 Ch. 545; *York University v. Bell Canada Enterprises* (2009), 311 D.L.R. (4th) 755; *Cartier International AG v. British Sky Broadcasting Ltd.*, [2016] EWCA Civ 658, [2017] 1 All E.R. 700; *Warner-Lambert Co. v. Actavis Group PTC EHF*, [2015] EWHC 485 (Pat.), 144

B.M.L.R. 194; *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2; *Impulsora Turistica de Occidente, S.A. de C.V. v. Transat Tours Canada Inc.*, 2007 SCC 20, [2007] 1 S.C.R. 867; *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318; *Babanaft International Co. S.A. v. Bassatne*, [1990] 1 Ch. 13; *Republic of Haiti v. Duvalier*, [1990] 1 Q.B. 202; *Derby & Co. v. Weldon*, [1990] 1 Ch. 48; *Derby & Co. v. Weldon (Nos. 3 and 4)*, [1990] 1 Ch. 65.

By Côté and Rowe JJ. (dissenting)

*RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311; *Fourie v. Le Roux*, [2007] UKHL 1, [2007] 1 All E.R. 1087; *Guaranty Trust Co. of New York v. Hannay & Co.*, [1915] 2 K.B. 536; *Cartier International AG v. British Sky Broadcasting Ltd.*, 2014 EWHC 3354 (Ch.), [2015] 1 All E.R. 949; *Mercedes Benz A.G. v. Leiduck*, [1996] 1 A.C. 284; *John Deere Ltd. v. Firdale Farms Ltd.* (1987), 45 D.L.R. (4th) 641; *Parkin v. Thorold* (1852), 16 Beav. 59, 51 E.R. 698; *Schooff v. British Columbia (Medical Services Commission)*, 2010 BCCA 396, 323 D.L.R. (4th) 680; *McIsaac v. Healthy Body Services Inc.*, 2009 BCSC 1716; *Plouffe v. Roy*, 2007 CanLII 37693; *Spiller v. Brown* (1973), 43 D.L.R. (3d) 140; *1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, 2014 ONCA 125, 371 D.L.R. (4th) 643; *MacMillan Bloedel Ltd. v. Simpson*, [1996] 2 S.C.R. 1048; *Seaward v. Paterson*, [1897] 1 Ch. 545; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.*, [1971] 1 W.L.R. 1676; *Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133; *National Commercial Bank of Jamaica Ltd. v. Olint Corp.*, [2009] 1 W.L.R.

1405; *Redland Bricks Ltd. v. Morris*, [1970] A.C. 652; *Co-operative Insurance Society Ltd. v. Argyll Stores (Holdings) Ltd.*, [1998] A.C. 1; *Attorney General v. Observer Ltd.*, [1990] 1 A.C. 109.


**Statutes and Regulations Cited**


*Digital Millennium Copyright Act*, Pub. L. No. 105-304, 112 Stat. 2680 (1998).

*Law and Equity Act*, R.S.B.C. 1979, c. 224, s. 36.

*Law and Equity Act*, R.S.B.C. 1996, c. 253, s. 39(1).


**Authors Cited**


Bean, David, Andrew Burns and Isabel Parry. *Injunctions*, 11th ed. London: Sweet & Maxwell, 2012.

Berryman, Jeffrey. *The Law of Equitable Remedies*, 2nd ed. Toronto: Irwin Law, 2013.

Black, Vaughan, and Edward Babin. "Mareva Injunctions in Canada: Territorial Aspects" (1997), 28 *Can. Bus. L.J.* 430.

Fraser, Peter G., John W. Horn and Susan A. Griffin. *The Conduct of Civil Litigation in British Columbia*, 2nd ed. Markham, Ont.: LexisNexis, 2007 (loose-leaf updated December 2016, release 24).

Pitel, Stephen G. A., and Andrew Valentine. "The Evolution of the Extra-territorial *Mareva* Injunction in Canada: Three Issues" (2006), 2 *J. Priv. Int'l L.* 339.

Riordan, Jaani. *The Liability of Internet Intermediaries*. Oxford: Oxford University Press, 2016.

Sharpe, Robert J. *Injunctions and Specific Performance*, loose-leaf ed. Toronto: Canada Law Book, 1992 (updated November 2016, release 25).

Spry, I. C. F. *The Principles of Equitable Remedies: Specific Performance, Injunctions, Rectification and Equitable Damages*, 9th ed. Pyrmont, N.S.W.: Lawbook, 2014.

APPEAL from a judgment of the British Columbia Court of Appeal (Frankel, Groberman and Harris JJ.A.), 2015 BCCA 265, 75 B.C.L.R. (5th) 315, 373 B.C.A.C. 240, 641 W.A.C. 240, 39 B.L.R. (5th) 175, 71 C.P.C. (7th) 215, 135 C.P.R. (4th) 173, 386 D.L.R. (4th) 224, [2015] 11 W.W.R. 45, [2015] B.C.J. No. 1193 (QL), 2015 CarswellBC 1590 (WL Can.), affirming a decision of Fenlon J., 2014 BCSC 1063, 63 B.C.L.R. (5th) 145, 28 B.L.R. (5th) 265, 374 D.L.R. (4th) 537, [2014] 10 W.W.R. 652, [2014] B.C.J. No. 1190 (QL), 2014 CarswellBC 1694 (WL Can.), granting an interlocutory injunction against Google. Appeal dismissed, Côté and Rowe JJ. dissenting.

*William C. McDowell*, *Marguerite F. Ethier* and *Scott M. J. Rollwagen*, for the appellant.

*Robbie Fleming* and *Michael Sobkin*, for the respondents.

*Jeffrey G. Johnston*, for the intervener the Attorney General of Canada.

*Sandra Nishikawa*, *John Corelli* and *Brent Kettles*, for the intervener the Attorney General of Ontario.

*Mathew Good*, for the intervener the Canadian Civil Liberties Association.

*Cynthia Khoo*, for the intervener the OpenMedia Engagement Network.

Written submissions only by *Iris Fischer* and *Helen Richards*, for the interveners the Reporters Committee for Freedom of the Press, the American Society of News Editors, the Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., the First Amendment Coalition, First Look Media Works, Inc., the New England First Amendment Coalition, the News Media Alliance (formerly known as the Newspaper Association of America), AOL Inc., the California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, the Online News Association and the Society of Professional Journalists.

Written submissions only by *Paul Schabas* and *Kaley Pulfer*, for the interveners Human Rights Watch, ARTICLE 19, Open Net (Korea), the Software Freedom Law Centre and the Center for Technology and Society.

Written submissions only by *David T. S. Fraser* and *Jane O'Neill*, for the intervener the Wikimedia Foundation.

*Justin Safayeni* and *Carlo Di Carlo*, for the intervener the British Columbia Civil Liberties Association.

*David Wotherspoon* and *Daniel Byma*, for the intervener the Electronic Frontier Foundation.

*Dan Glover* and *Miranda Lam*, for the interveners the International Federation of the Phonographic Industry, Music Canada, the Canadian Publishers' Council, the Association of Canadian Publishers, the International Confederation of Societies of Authors and Composers, the International Confederation of Music Publishers and the Worldwide Independent Network.

*Gavin MacKenzie* and *Brooke MacKenzie*, for the intervener the International Federation of Film Producers Associations.

The judgment of McLachlin C.J. and Abella, Moldaver, Karakatsanis, Wagner, Gascon and Brown JJ. was delivered by

ABELLA J. —

[1]        The issue in this appeal is whether Google can be ordered, pending a trial, to globally de-index the websites of a company which, in breach of several court orders, is using those websites to unlawfully sell the intellectual property of another company. The answer turns on classic interlocutory injunction jurisprudence: is there a serious issue to be tried; would irreparable harm result if the injunction were not granted; and does the balance of convenience favour granting or refusing the

injunction. Ultimately, the question is whether granting the injunction would be just and equitable in all the circumstances of the case.

Background

[2]        Equustek Solutions Inc. is a small technology company in British Columbia. It manufactures networking devices that allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

[3]        The underlying action between Equustek and the Datalink defendants (Morgan Jack, Datalink Technology Gateways Inc., and Datalink Technologies Gateways LLC – "Datalink") was launched by Equustek on April 12, 2011. It claimed that Datalink, while acting as a distributor of Equustek's products, began to re-label one of the products and pass it off as its own. Datalink also acquired confidential information and trade secrets belonging to Equustek, using them to design and manufacture a competing product, the GW1000. Any orders for Equustek's product were filled with the GW1000. When Equustek discovered this in 2011, it terminated the distribution agreement it had with Datalink and demanded that Datalink delete all references to Equustek's products and trademarks on its websites.

[4]        The Datalink defendants filed statements of defence disputing Equustek's claims.

[5]        On September 23, 2011, Leask J. granted an injunction ordering Datalink to return to Equustek any source codes, board schematics, and any other documentation it may have had in its possession that belonged to Equustek. The court also prohibited Datalink from referring to Equustek or any of Equustek's products on its websites. It ordered Datalink to post a statement on its websites informing customers that Datalink was no longer a distributor of Equustek products and directing customers interested in Equustek's products to Equustek's website. In addition, Datalink was ordered to give Equustek a list of customers who had ordered an Equustek product from Datalink.

[6]        On March 21, 2012, Fenlon J. found that Datalink had not properly complied with this order and directed it to produce a new customer list and make certain changes to the notices on their websites.

[7]        Datalink abandoned the proceedings and left the jurisdiction without producing any documents or complying with any of the orders. Some of Datalink's statements of defence were subsequently struck.

[8]        On July 26, 2012, Punnett J. granted a *Mareva* injunction freezing Datalink's worldwide assets, including its entire product inventory. He found that Datalink had incorporated "a myriad of shell corporations in different jurisdictions", continued to sell the impugned product, reduced prices to attract more customers, and was offering additional services that Equustek claimed disclosed more of its trade secrets. He concluded that Equustek would suffer irreparable harm if the injunction

were not granted, and that, on the balance of convenience and due to a real risk of the dissipation of assets, it was just and equitable to grant the injunction against Datalink.

[9]       On August 3, 2012, Fenlon J. granted another interlocutory injunction prohibiting Datalink from dealing with broader classes of intellectual property, including "any use of whole categories of documents and information that lie at the heart of any business of a kind engaged in by both parties". She noted that Equustek's "earnings ha[d] fallen drastically since [Datalink] began [its] impugned activities" and concluded that "the effect of permitting [Datalink] to carry on [its] business [would] also cause irreparable harm to [Equustek]".

[10]      On September 26, 2012, Equustek brought an application to have Datalink and its principal, Morgan Jack, found in contempt. No one appeared on behalf of Datalink. Groves J. issued a warrant for Morgan Jack's arrest. It remains outstanding.

[11]      Despite the court orders prohibiting the sale of inventory and the use of Equustek's intellectual property, Datalink continues to carry on its business from an unknown location, selling its impugned product on its websites to customers all over the world.

[12]      Not knowing where Datalink or its suppliers were, and finding itself unable to have the websites removed by the websites' hosting companies, Equustek approached Google in September 2012 and requested that it de-index the Datalink

websites. Google refused. Equustek then brought court proceedings seeking an order requiring Google to do so.

[13]     When it was served with the application materials, Google asked Equustek to obtain a court order prohibiting Datalink from carrying on business on the Internet. Google told Equustek it would comply with such an order by removing specific webpages. Pursuant to its internal policy, Google only voluntarily de-indexes individual webpages, not entire websites. Equustek agreed to try this approach.

[14]     On December 13, 2012, Equustek appeared in court with Google. An injunction was issued by Tindale J. ordering Datalink to "cease operating or carrying on business through any website". Between December 2012 and January 2013, Google advised Equustek that it had de-indexed 345 specific webpages associated with Datalink. It did not, however, de-index *all* of the Datalink websites.

[15]     Equustek soon discovered that de-indexing webpages but not entire websites was ineffective since Datalink simply moved the objectionable content to new pages within its websites, circumventing the court orders.

[16]     Google had limited the de-indexing to those searches that were conducted on google.ca. Google's search engine operates through dedicated websites all over the world. The Internet search services are free, but Google earns money by selling advertising space on the webpages that display search results. Internet users with Canadian Internet Protocol addresses are directed to "google.ca" when performing

online searches. But users can also access different Google websites directed at other countries by using the specific Uniform Resource Locator, or URL, for those sites. That means that someone in Vancouver, for example, can access the Google search engine as though he or she were in another country simply by typing in that country's Google URL. Potential Canadian customers could, as a result, find Datalink's websites even if they were blocked on google.ca. Given that the majority of the sales of Datalink's GW1000 were to purchasers outside of Canada, Google's de-indexing did not have the necessary protective effect.

[17]      Equustek therefore sought an interlocutory injunction to enjoin Google from displaying any part of the Datalink websites on any of its search results worldwide. Fenlon J. granted the order (374 D.L.R. (4th) 537 (B.C.S.C.)). The operative part states:

> Within 14 days of the date of this order, Google Inc. is to cease indexing or referencing in search results on its internet search engines the [Datalink] websites …, including all of the subpages and subdirectories of the listed websites, *until the conclusion of the trial of this action or further order of this court*. [Emphasis added]

[18]      Fenlon J. noted that Google controls between 70-75 percent of the global searches on the Internet and that Datalink's ability to sell its counterfeit product is, in large part, contingent on customers being able to locate its websites through the use of Google's search engine. Only by preventing potential customers from accessing the Datalink websites, could Equustek be protected. Otherwise, Datalink would be able to continue selling its product online and the damages Equustek would suffer would not be recoverable at the end of the lawsuit.

[19]        Fenlon J. concluded that this irreparable harm was being facilitated through Google's search engine; that Equustek had no alternative but to require Google to de-index the websites; that Google would not be inconvenienced; and that, for the order to be effective, the Datalink websites had to be prevented from being displayed on all of Google's search results, not just google.ca. As she said:

> On the record before me it appears that to be effective, even within Canada, Google must block search results on all of its websites. Furthermore, [Datalink's] sales originate primarily in other countries, so the Court's process cannot be protected unless the injunction ensures that searchers from any jurisdiction do not find [Datalink's] websites.[1]

[20]        The Court of Appeal of British Columbia dismissed Google's appeal (386 D.L.R. (4th) 224). Groberman J.A. accepted Fenlon J.'s conclusion that she had *in personam* jurisdiction over Google and could therefore make an order with extraterritorial effect. He also agreed that courts of inherent jurisdiction could grant equitable relief against non-parties. Since ordering an interlocutory injunction against Google was the only practical way to prevent Datalink from flouting the court's several orders, and since there were no identifiable countervailing comity or freedom of expression concerns that would prevent such an order from being granted, he upheld the interlocutory injunction.

[21]        For the following reasons, I agree with Fenlon J. and Groberman J.A. that the test for granting an interlocutory injunction against Google has been met in this case.

---

[1] Para. 148.

Analysis

[22]     The decision to grant an interlocutory injunction is a discretionary one and entitled to a high degree of deference (*Manitoba (Attorney General) v. Metropolitan Stores Ltd.*, [1987] 1 S.C.R. 110, at pp. 155-56). In this case, I see no reason to interfere.

[23]     Injunctions are equitable remedies. "The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited" (Ian Spry, *The Principles of Equitable Remedies* (9th ed. 2014), at p. 333). Robert Sharpe notes that "[t]he injunction is a flexible and drastic remedy. Injunctions are not restricted to any area of substantive law and are readily enforceable through the court's contempt power" (*Injunctions and Specific Performance* (loose-leaf ed.), at para. 2.10).

[24]     An interlocutory injunction is normally enforceable until trial or some other determination of the action. Interlocutory injunctions seek to ensure that the subject matter of the litigation will be "preserved" so that effective relief will be available when the case is ultimately heard on the merits (Jeffrey Berryman, *The Law of Equitable Remedies* (2nd ed. 2013), at pp. 24-25). Their character as "interlocutory" is not dependent on their duration pending trial.

[25]     *RJR—MacDonald Inc. v. Canada (Attorney General),* [1994] 1 S.C.R. 311, sets out a three-part test for determining whether a court should exercise its

discretion to grant an interlocutory injunction: is there a serious issue to be tried; would the person applying for the injunction suffer irreparable harm if the injunction were not granted; and is the balance of convenience in favour of granting the interlocutory injunction or denying it. The fundamental question is whether the granting of an injunction is just and equitable in all of the circumstances of the case. This will necessarily be context-specific.

[26]     Google does not dispute that there is a serious claim. Nor does it dispute that Equustek is suffering irreparable harm as a result of Datalink's ongoing sale of the GW1000 through the Internet. And it acknowledges, as Fenlon J. found, that it inadvertently facilitates the harm through its search engine which leads purchasers directly to the Datalink websites.

[27]     Google argues, however, that the injunction issued against it is not necessary to prevent that irreparable harm, and that it is not effective in so doing. Moreover, it argues that as a non-party, it should be immune from the injunction. As for the balance of convenience, it challenges the propriety and necessity of the extraterritorial reach of such an order, and raises freedom of expression concerns that it says should have tipped the balance against granting the order. These arguments go both to whether the Supreme Court of British Columbia had jurisdiction to grant the injunction and whether, if it did, it was just and equitable to do so in this case.

[28]     Google's first argument is, in essence, that non-parties cannot be the subject of an interlocutory injunction. With respect, this is contrary to the

jurisprudence. Not only can injunctive relief be ordered against someone who is not a party to the underlying lawsuit, the contours of the test are not changed. As this Court said in *MacMillan Bloedel Ltd. v. Simpson* [1996] 2 S.C.R. 1048, injunctions may be issued "'in all cases in which it appears to the court to be just or convenient that the order should be made . . . on terms and conditions the court thinks just'" (para. 15, citing s. 36 of the *Law and Equity Act*, R.S.B.C. 1979, c. 224). *MacMillan Bloedel* involved a logging company seeking to restrain protesters from blocking roads. The company obtained an interlocutory injunction prohibiting not only specifically named individuals, but also "John Doe, Jane Doe and Persons Unknown" and "all persons having notice of th[e] order" from engaging in conduct which interfered with its operations at specific locations. In upholding the injunction, McLachlin J. noted that

> [i]t may be confidently asserted . . . *that both English and Canadian authorities support the view that non-parties are bound by injunctions*: if non-parties violate injunctions, they are subject to conviction and punishment for contempt of court. The courts have jurisdiction to grant interim injunctions which all people, on pain of contempt, must obey. [Emphasis added; para. 31]

See also Berryman, at pp. 57-60; Sharpe, at paras. 6.260 to 6.265.

[29]      In other words, where a non-party violates a court order, there is a principled basis for treating the non-party as if it had been bound by the order. The non-party's obligation arises "not because [it] is bound by the injunction by being a party to the cause, but because [it] is conducting [itself] so as to obstruct the course of justice" (*MacMillan Bloedel*, at para. 27, quoting *Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.), at p. 555).

[30]     The pragmatism and necessity of such an approach was concisely explained by Fenlon J. in the case before us when she offered the following example:

> . . . a non-party corporation that warehouses and ships goods for a defendant manufacturing company might be ordered on an interim injunction to freeze the defendants' goods and refrain from shipping them. That injunction could affect orders received from customers around the world. Could it sensibly be argued that the Court could not grant the injunction because it would have effects worldwide? The impact of an injunction on strangers to the suit or the order itself is a valid consideration in deciding whether to exercise the Court's jurisdiction to grant an injunction. It does not, however, affect the Court's authority to make such an order.[2]

[31]     *Norwich* orders are analogous and can also be used to compel non-parties to disclose information or documents in their possession required by a claimant (*Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133 (H.L.), at p. 175). *Norwich* orders have increasingly been used in the online context by plaintiffs who allege that they are being anonymously defamed or defrauded and seek orders against Internet service providers to disclose the identity of the perpetrator (*York University v. Bell Canada Enterprises* (2009), 311 D.L.R. (4th) 755 (Ont. S.C.J.)).   *Norwich* disclosure may be ordered against non-parties who are not themselves guilty of wrongdoing, but who are so involved in the wrongful acts of others that they facilitate the harm. In *Norwich*, this was characterized as a duty to assist the person wronged (p. 175; *Cartier International AG v. British Sky Broadcasting Ltd.*, [2017], 1 All E.R. 700 (C.A.), at para. 53). *Norwich* supplies a principled rationale for granting injunctions against non-parties who facilitate

---

[2] Para. 147.

wrongdoing (see *Cartier*, at paras. 51-55; and *Warner-Lambert Co. v. Actavis Group PTC EHF*, 144 B.M.L.R. 194 (Ch.)).

[32]     This approach was applied in *Cartier*, where the Court of Appeal of England and Wales held that injunctive relief could be awarded against five non-party Internet service providers who had not engaged in, and were not accused of any wrongful act. The Internet service providers were ordered to block the ability of their customers to access certain websites in order to avoid facilitating infringements of the plaintiff's trademarks. (See also Jaani Riordan, *The Liability of Internet Intermediaries* (2016), at pp. 412 and 498-99.)

[33]     The same logic underlies *Mareva* injunctions, which can also be issued against non-parties. *Mareva* injunctions are used to freeze assets in order to prevent their dissipation pending the conclusion of a trial or action (*Mareva Compania Naviera SA v. International Bulkcarriers SA*, [1975] 2 Lloyd's Rep. 509 (C.A.); *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2). A *Mareva* injunction that requires a defendant not to dissipate his or her assets sometimes requires the assistance of a non-party, which in turn can result in an injunction against the non-party if it is just and equitable to do so (Stephen Pitel and Andrew Valentine, "The Evolution of the Extra-territorial *Mareva* Injunction in Canada: Three Issues" (2006), 2 J. Priv. Int'l L. 339, at p. 370; Vaughan Black and Edward Babin, "Mareva Injunctions in Canada: Territorial Aspects" (1997), 28 *Can. Bus. L.J.* 430, at pp. 452-53; Berryman, at pp. 128-31). Banks and other financial institutions have, as a result,

been bound by *Mareva* injunctions even when they are not a party to an underlying action.

[34]      To preserve Equustek's rights pending the outcome of the litigation, Tindale J.'s order of December 13, 2012 required Datalink to cease carrying on business through the Internet. Google had requested and participated in Equustek's obtaining this order, and offered to comply with it voluntarily. It is common ground that Datalink was unable to carry on business in a commercially viable way unless its websites were in Google's search results. In the absence of de-indexing these websites, as Fenlon J. specifically found, Google was facilitating Datalink's breach of Tindale J.'s order by enabling it to continue carrying on business through the Internet. By the time Fenlon J. granted the injunction against Google, Google was aware that in not de-indexing Datalink's websites, it was facilitating Datalink's ongoing breach of Tindale J.'s order, the purpose of which was to prevent irreparable harm to Equustek.

[35]      Much like a *Norwich* order or a *Mareva* injunction against a non-party, the interlocutory injunction in this case flows from the necessity of Google's assistance in order to prevent the facilitation of Datalink's ability to defy court orders and do irreparable harm to Equustek. Without the injunctive relief, it was clear that Google would continue to facilitate that ongoing harm.

[36]     Google's next argument is the impropriety of issuing an interlocutory injunction with extraterritorial effect. But this too contradicts the existing jurisprudence.

[37]     The British Columbia courts in these proceedings concluded that because Google carried on business in the province through its advertising and search operations, this was sufficient to establish the existence of *in personam* and territorial jurisdiction. Google does not challenge those findings. It challenges instead the global reach of the resulting order. Google suggests that if any injunction is to be granted, it should be limited to Canada (or google.ca) alone.

[38]     When a court has *in personam* jurisdiction, and where it is necessary to ensure the injunction's effectiveness, it can grant an injunction enjoining that person's conduct anywhere in the world. (See *Impulsora Turistica de Occidente, S.A. de C.V. v. Transat Tours Canada Inc.*, [2007] 1 S.C.R. 867, at para. 6; Berryman, at p. 20; Pitel and Valentine, at p. 389; Sharpe, at para. 1.1190; Spry, at p. 37.) *Mareva* injunctions have been granted with worldwide effect when it was found to be necessary to ensure their effectiveness. (See *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 (S.C.); Berryman, at pp. 20 and 136; *Babanaft International Co. S.A. v. Bassatne*, [1990] 1 Ch. 13 (C.A.); *Republic of Haiti v. Duvalier*, [1990] 1 Q.B. 202 (C.A.); *Derby & Co. v. Weldon,* [1990] 1 Ch. 48 (C.A.); and *Derby & Co. v. Weldon (Nos. 3 and 4)* [1990] 1 Ch. 65 (C.A.); Sharpe, at paras. 1.1190 to 1.1220.)

[39]     Groberman J.A. pointed to the international support for this approach:

I note that the courts of many other jurisdictions have found it necessary, in the context of orders against Internet abuses, to pronounce orders that have international effects. Several such cases are cited in the arguments of [International Federation of Film Producers Associations and International Federation of the Phonographic Industry], including *APC v. Auchan Telecom*, 11/60013, Judgment (28 November 2013) (Tribunal de Grande Instance de Paris); *McKeogh v. Doe* (Irish High Court, case no. 20121254P); *Mosley v. Google*, 11/07970, Judgment (6 November 2013) (Tribunal de Grande Instance de Paris); *Max Mosley v. Google* (see "Case Law, Hamburg District Court: *Max Mosley v. Google Inc.* online: Inform's Blog https://inforrm.wordpress.com/ 2014/02/05/case-law-hamburg-district-court-max-mosley-v-google-inc- google-go-down-again-this-time-in-hamburg-dominic-crossley/) and *ECJ Google Spain SL, Google Inc. v. Agencia Española de Protección de Datos*, Mario Costeja González, C-131/12 [2014], CURIA.[3]

[40]      Fenlon J. explained why Equustek's request that the order have worldwide effect was necessary as follows:

The majority of GW1000 sales occur outside Canada. Thus, quite apart from the practical problem of endless website iterations, the option Google proposes is not equivalent to the order now sought which would compel Google to remove the [Datalink] websites from all search results generated by any of Google's websites worldwide. I therefore conclude that [Equustek does] not have an out-of-court remedy available to [it].[4]

. . .

. . . to be effective, even within Canada, Google must block search results on all of its websites.[5]

As a result, to ensure that Google did not facilitate Datalink's breach of court orders whose purposes were to prevent irreparable harm to Equustek, she concluded that the injunction had to have worldwide effect.

---

[3] Para. 95.
[4] Para. 76.
[5] Para. 148.

[41]        I agree. The problem in this case is occurring online and globally. The Internet has no borders — its natural habitat is global. The only way to ensure that the interlocutory injunction attained its objective was to have it apply where Google operates — globally. As Fenlon J. found, the majority of Datalink's sales take place outside Canada. If the injunction were restricted to Canada alone or to google.ca, as Google suggests it should have been, the remedy would be deprived of its intended ability to prevent irreparable harm. Purchasers outside Canada could easily continue purchasing from Datalink's websites, and Canadian purchasers could easily find Datalink's websites even if those websites were de-indexed on google.ca. Google would still be facilitating Datalink's breach of the court's order which had prohibited it from carrying on business on the Internet. There is no equity in ordering an interlocutory injunction which has no realistic prospect of preventing irreparable harm.

[42]        The interlocutory injunction in this case is necessary to prevent the irreparable harm that flows from Datalink carrying on business on the Internet, a business which would be commercially impossible without Google's facilitation. The order targets Datalink's websites — the list of which has been updated as Datalink has sought to thwart the injunction — and prevents them from being displayed where they do the most harm: on Google's global search results.

[43]        Nor does the injunction's worldwide effect tip the balance of convenience in Google's favour. The order does not require that Google take any steps around the

world, it requires it to take steps only where its search engine is controlled. This is something Google has acknowledged it can do — and does — with relative ease. There is therefore no harm to Google which can be placed on its "inconvenience" scale arising from the global reach of the order.

[44]     Google's argument that a global injunction violates international comity because it is possible that the order could not have been obtained in a foreign jurisdiction, or that to comply with it would result in Google violating the laws of that jurisdiction is, with respect, theoretical. As Fenlon J. noted, "Google acknowledges that most countries will likely recognize intellectual property rights and view the selling of pirated products as a legal wrong".[6]

[45]     And while it is always important to pay respectful attention to freedom of expression concerns, particularly when dealing with the core values of another country, I do not see freedom of expression issues being engaged in any way that tips the balance of convenience towards Google in this case. As Groberman J.A. concluded:

> In the case before us, there is no realistic assertion that the judge's order will offend the sensibilities of any other nation. It has not been suggested that the order prohibiting the defendants from advertising wares that violate the intellectual property rights of the plaintiffs offends the core values of any nation. The order made against Google is a very limited ancillary order designed to ensure that the plaintiffs' core rights are respected.

---

[6] Para. 144.

> . . . the order in this case is an interlocutory one, and one that can be
> varied by the court. In the unlikely event that any jurisdiction finds the
> order offensive to its core values, an application could be made to the
> court to modify the order so as to avoid the problem.[7]

[46]     If Google has evidence that complying with such an injunction would
require it to violate the laws of another jurisdiction, including interfering with
freedom of expression, it is always free to apply to the British Columbia courts to
vary the interlocutory order accordingly. To date, Google has made no such
application.

[47]     In the absence of an evidentiary foundation, and given Google's right to
seek a rectifying order, it hardly seems equitable to deny Equustek the extraterritorial
scope it needs to make the remedy effective, or even to put the onus on it to
demonstrate, country by country, where such an order is legally permissible. We are
dealing with the Internet after all, and the balance of convenience test has to take full
account of its inevitable extraterritorial reach when injunctive relief is being sought
against an entity like Google.

[48]     This is not an order to remove speech that, on its face, engages freedom
of expression values, it is an order to de-index websites that are in violation of several
court orders. We have not, to date, accepted that freedom of expression requires the
facilitation of the unlawful sale of goods.

---

[7] Paras. 93-94.

[49]      And I have trouble seeing how this interferes with what Google refers to as its content neutral character. The injunction does not require Google to monitor content on the Internet, nor is it a finding of any sort of liability against Google for facilitating access to the impugned websites. As for the balance of convenience, the only obligation the interlocutory injunction creates is for Google to de-index the Datalink websites. The order is, as Fenlon J. observed, "only a slight expansion on the removal of individual URLs, which Google agreed to do voluntarily".[8] Even if it could be said that the injunction engages freedom of expression issues, this is far outweighed by the need to prevent the irreparable harm that would result from Google's facilitating Datalink's breach of court orders.

[50]      Google did not suggest that it would be inconvenienced in any material way, or would incur any significant expense, in de-indexing the Datalink websites. It acknowledges, fairly, that it can, and often does, exactly what is being asked of it in this case, that is, alter search results. It does so to avoid generating links to child pornography and websites containing "hate speech". It also complies with notices it receives under the US *Digital Millennium Copyright Act*, Pub. L. No. 105-304, 112 Stat. 2680 (1998) to de-index content from its search results that allegedly infringes copyright, and removes websites that are subject to court orders.

[51]      As for the argument that this will turn into a permanent injunction, the length of an interlocutory injunction does not, by itself, convert its character from a

---

[8] Para. 137.

temporary to a permanent one. As previously noted, the order requires that the injunction be in place "until the conclusion of the trial of this action or further order of this court". There is no reason not to take this order at face value. Where an interlocutory injunction has been in place for an inordinate amount of time, it is always open to a party to apply to have it varied or vacated. Google has brought no such application.

[52]     Datalink and its representatives have ignored all previous court orders made against them, have left British Columbia, and continue to operate their business from unknown locations outside Canada. Equustek has made efforts to locate Datalink with limited success. Datalink is only able to survive — at the expense of Equustek's survival — on Google's search engine which directs potential customers to its websites. In other words, Google is how Datalink has been able to continue harming Equustek in defiance of several court orders.

[53]     This does not make Google liable for this harm. It does, however, make Google the determinative player in allowing the harm to occur. On balance, therefore, since the interlocutory injunction is the only effective way to mitigate the harm to Equustek pending the resolution of the underlying litigation, the only way, in fact, to preserve Equustek itself pending the resolution of the underlying litigation, and since any countervailing harm to Google is minimal to non-existent, the interlocutory injunction should be upheld.

[54]        I would dismiss the appeal with costs in this Court and in the Court of Appeal for British Columbia.

The following are the reasons delivered by

CÔTÉ AND ROWE JJ. —

[55]        Equustek Solutions Inc., Robert Angus and Clarma Enterprises Inc. ("Equustek") seek a novel form of equitable relief — an effectively permanent injunction, against an innocent third party, that requires court supervision, has not been shown to be effective, and for which alternative remedies are available. Our response calls for judicial restraint. While the court had jurisdiction to issue the June 13, 2014 order against Google Inc. ("Google Order") (2014 BCSC 1063, 374 D.L.R. (4th) 537, per Fenlon J.), in our view it should have refrained from doing so. The authority to grant equitable remedies has always been constrained by doctrine and practice. In our view, the Google Order slipped too easily from these constraints.

[56]        As we will explain, the Google Order is effectively final redress against a non-party that has neither acted unlawfully, nor aided and abetted illegal action. The test for interlocutory injunctions established in *RJR — MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311, does not apply to an order that is effectively final, and the test for a permanent injunction has not been satisfied. The Google Order

is mandatory and requires court supervision. It has not been shown to be effective, and there are alternative remedies available to Equustek.

I.     Judicial Restraint

[57]     The power of a court to grant injunctive relief is derived from that of the Chancery courts of England (*Fourie v. Le Roux*, [2007] UKHL 1, [2007] 1 All E.R. 1087, at para. 30), and has been confirmed in British Columbia by the *Law and Equity Act*, R.S.B.C. 1996, c. 253, s. 39(1):

> **39** (1) An injunction or an order in the nature of mandamus may be granted or a receiver or receiver manager appointed by an interlocutory order of the court in all cases in which it appears to the court to be just or convenient that the order should be made.

[58]     In *Fourie*, Lord Scott explained that "provided the court has in personam jurisdiction over the person against whom an injunction, whether interlocutory or final, is sought, the court has jurisdiction, in the strict sense, to grant it" (para. 30). However, simply because a court has the jurisdiction to grant an injunction does not mean that it should. A court "will not according to its settled practice do so except in a certain way and under certain circumstances" (Lord Scott, at para. 25, quoting from *Guaranty Trust Co. of New York v. Hannay & Co.*, [1915] 2 K.B. 536, at p. 563; see also *Cartier International AG v. British Sky Broadcasting Ltd.*, 2014 EWHC 3354 (Ch.), [2015] 1 All E.R. 949, at paras. 98-100). Professor Spry comes to similar

conclusions (I. C. F. Spry, *The Principles of Equitable Remedies* (9th ed. 2014), at p. 333):

> The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited. Injunctions are granted only when to do so accords with equitable principles, but this restriction involves, not a defect of powers, but an adoption of doctrines and practices that change in their application from time to time. [Footnote omitted.]

[59]     The importance of appropriately modifying judicial restraint to meet the needs of justice was summarized by Lord Nicholls in *Mercedes Benz A.G. v. Leiduck*, [1996] 1 A.C. 284 (P.C.), at p. 308: "As circumstances in the world change, so must the situations in which the courts may properly exercise their jurisdiction to grant injunctions. The exercise of the jurisdiction must be principled, but the criterion is injustice."

[60]     Changes to "settled practice" must not overshoot the mark of avoiding injustice. In our view, granting the Google Order requires changes to settled practice that are not warranted in this case: neither the test for an interlocutory nor a permanent injunction has been met; court supervision is required; the order has not been shown to be effective; and alternative remedies are available.

II.    Factors Suggesting Restraint in This Case

A.    *The Effects of the Google Order Are Final*

[61]     In *RJR — MacDonald*, this Court set out the test for interlocutory injunctions — a serious question to be tried, irreparable harm, and the balance of convenience — but also described an exception (at pp. 338-39):

> Two exceptions apply to the general rule that a judge should not engage in an extensive review of the merits. The first arises <u>when the result of the interlocutory motion will in effect amount to a final determination of the action. This will be the case</u> either when the right which the applicant seeks to protect can only be exercised immediately or not at all, or <u>when the result of the application will impose such hardship on one party as to remove any potential benefit from proceeding to trial.</u>
>
>                                    . . .
>
> The circumstances in which this exception will apply are rare. When it does, a more extensive review of the merits of the case must be undertaken. Then when the second and third stages of the test are considered and applied the anticipated result on the merits should be borne in mind. [Emphasis added.]

[62]     In our view, the Google Order "in effect amount[s] to a final determination of the action" because it "remove[s] any potential benefit from proceeding to trial". In order to understand this conclusion, it is useful to review Equustek's underlying claim. Equustek sought, in its Further Amended Notice of Civil Claim against Datalink, damages, declarations, and:

> A temporary and permanent injunction restraining the Defendants from:
>
> a. using the Plaintiffs' trademarks and free-riding on the goodwill of any Equustek products on any website;
>
> b. making statements disparaging or in any way referring to the Equustek products;

    c.   distributing the offending manuals and displaying images of the Plaintiff's products on any website; and

    d.   selling the GW1000 line of products which were created by the theft of the Plaintiff's trade secrets;

and obliging them to:

    e.   immediately disclose all hidden websites;

    f.   display a page on all websites correcting [their] misrepresentations about the source and continuing availability of the Equustek products and directing customers to Equustek.

In short, Equustek sought injunctions modifying the way in which Datalink carries out its website business, along with damages and declarations. On June 20, 2012, Datalink's response was struck and Equustek was given leave to apply for default judgment. It has not done so. On December 13, 2012, Justice Tindale ordered that

> [t]he Defendants Morgan Jack, Datalink Technologies Gateways Inc. and Datalink Technologies Gateways LLC (the "Datalink Defendants") cease operating or carrying on business through any website, including those contained in Schedule "A" and all associated pages, subpages and subdirectories, and that these Defendants immediately take down all such websites, until further order of this court. ["December 2012 Order"]

The December 2012 Order gives Equustek *more* than the injunctive relief it sought in its originating claim. Rather than simply ordering the modification of Datalink websites, the December 2012 Order requires the ceasing of website business altogether. In our view, little incentive remains for Equustek to return to court to seek a lesser injunctive remedy. This is evidenced by Equustek's choice to not seek default

judgment during the roughly five years which have passed since it was given leave to do so.

[63]     As for the Google Order, it provides Equustek with an additional remedy, beyond the December 2012 Order and beyond what was sought in its original claim. In our view, granting of the Google Order further erodes any remaining incentive for Equustek to proceed with the underlying action. The effects of the Google Order are final in nature. Respectfully, the pending litigation assumed by our colleague Abella J. is a fiction. The Google Order, while interlocutory in form, is final in effect. Thus, it gives Equustek more relief than it sought.

[64]     Procedurally, Equustek requested an interlocutory order in the course of its litigation with Datalink. While Equustek's action against Datalink could technically endure indefinitely (G.P. Fraser, J.W. Horn and S.A. Griffin, *The Conduct of Civil Litigation in British Columbia* (2nd ed. (loose-leaf)), at § 14.1) — and thus the interlocutory status of the injunction could technically endure indefinitely — it does not follow that the Google Order should be considered interlocutory. Courts of equity look to substance over form, because "a dogged devotion to form has often resulted in injustice" (*John Deere Ltd. v. Firdale Farms Ltd.* (1987), 45 D.L.R. (4th) 641 (Man. C.A.), at p. 645). In *Parkin v. Thorold* (1852), 16 Beav. 59, 51 E.R. 698, at p. 701, Lord Romilly explained it thus:

. . . Courts of Equity make a distinction in all cases between that which is matter of substance and that which is matter of form; and, if [they do] find that by insisting on the form, the substance will be defeated, [they

hold] it to be inequitable to allow a person to insist on such form, and thereby defeat the substance.

In our view, the substance of the Google Order amounts to a final remedy. As such, it provides Equustek with more equitable relief than it sought against Datalink, and amounts to final resolution via Google. It is, in effect, a permanent injunction.

[65]     Following *RJR — MacDonald* (at pp. 338-39), an extensive review of the merits is therefore required at the first stage of the analysis (*Schooff v. British Columbia (Medical Services Commission)*, 2010 BCCA 396, 323 D.L.R. (4th) 680, at paras. 26-27). Yet this was not done. When Justice Fenlon considered Equustek's application for an interim injunction enjoining Google to cease indexing or referencing Datalink's websites, she did not conduct an extensive review of the merits. She did however note that Equustek had raised an arguable case, and that Datalink was presumed to have admitted the allegations when its defenses were struck (para. 151). The rule is not immutable that if a statement of defense is struck, the defendant is deemed to have admitted the allegations contained in the statement of claim. While the facts relating to Datalink's liability are deemed to be admitted, the court can still exercise its discretion in assessing Equustek's claims (*McIsaac v. Healthy Body Services Inc.*, 2009 BCSC 1716, at paras. 42 and 44 (CanLII); *Plouffe v. Roy*, 2007 CanLII 37693 (Ont. S.C.J.), at para. 53; *Spiller v. Brown* (1973), 43 D.L.R. (3d) 140 (Alta. S.C. (App. Div.)), at p. 143). Equustek has avoided such an assessment. Thus, an extensive review of the merits was not carried out.

[66]        The Google Order also does not meet the test for a permanent injunction. To obtain a permanent injunction, a party is required to establish: (1) its legal rights; (2) that damages are an inadequate remedy; and (3) that there is no impediment to the court's discretion to grant an injunction (*1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, 2014 ONCA 125, 371 D.L.R. (4th) 643, at paras. 74-80; Spry, at pp. 395 and 407-8). Equustek has shown the inadequacy of damages (damages are ascertainable but unlikely to be recovered, and the wrong is continuing). However, in our view, it is unclear whether the first element of the test has been met. Equustek's claims were supported by a good *prima facie* case, but it was not established that Datalink designed and sold counterfeit versions of its product, or that this resulted in trademark infringement and unlawful appropriation of trade secrets.

[67]        In any case, the discretionary factors affecting the grant of an injunction strongly favour judicial restraint. As we will outline below, the Google Order enjoins a non-party, yet Google has not aided or abetted Datalink's wrongdoing; it holds no assets of Equustek's, and has no information relevant to the underlying proceedings. The Google Order is mandatory and requires court supervision. It has not been shown to be effective, and Equustek has alternative remedies.

B.    *Google Is a Non-Party*

[68]        A court order does not "technically" bind non-parties, but "anyone who disobeys the order or interferes with its purpose may be found to have obstructed the course of justice and hence be found guilty of contempt of court" (*MacMillan Bloedel*

*Ltd. v. Simpson*, [1996] 2 S.C.R. 1048, at paras. 23 and 27). In *MacMillan Bloedel*, the injunction prohibiting named individuals from blocking a logging road also caused non-parties to face contempt proceedings for doing the act prohibited by the injunction.

[69]      The instant case is not one where a non-party with knowledge of a court order deliberately disobeyed it and thereby deprecated the court's authority. Google did not carry out the act prohibited by the December 2012 Order. The act prohibited by the December 2012 Order is Datalink "carrying on business through any website". That act occurs whenever Datalink launches websites to carry out business — not when other parties, such as Google, make it known that such websites exist.

[70]      There is no doubt that non-parties also risk contempt proceedings by aiding and abetting the doing of a prohibited act (*Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.); D. Bean, A. Burns and I. Parry, *Injunctions* (11th ed. 2012), at para. 9-08). Lord Denning said in *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.*, [1971] 1 W.L.R. 1676 (C.A.), at p. 1682:

> It has long been held that the court has jurisdiction to commit for contempt a person, not a party to the action, who, knowing of an injunction, aids and abets the defendant in breaking it. The reason is that by aiding and abetting the defendant, he is obstructing the course of justice.

[71]      In our view, Google did not aid or abet the doing of the prohibited act. Equustek alleged that Google's search engine was facilitating Datalink's ongoing

breach by leading customers to Datalink websites (Fenlon J.'s reasons, at para. 10). However, the December 2012 Order was to cease carrying on business through any website. That Order was breached as soon as Datalink established a website to conduct its business, regardless of how visible that website might be through Google searches. If Equustek's argument were accepted, the scope of "aids and abets" would, in our view, become overbroad. It might include the companies supplying Datalink with the material to produce the derivative products, the companies delivering the products, or as Google argued in its factum, it might also include the local power company that delivers power to Datalink's physical address. Critically, Datalink breached the December 2012 Order simply by launching websites to carry out business, regardless of whether Google searches ever reveal the websites.

[72]     We agree with our colleague Justice Abella that *Mareva* injunctions and *Norwich* orders can operate against non-parties. However, we respectfully disagree that the Google Order is similar in nature to those remedies. *Mareva* injunctions are granted to freeze assets until the completion of a trial — they do not enforce a plaintiff's substantive rights (*Mercedes Benz*, at p. 302). In contrast, the Google Order enforces Equustek's asserted intellectual property rights by seeking to minimize harm to those rights. It does not freeze Datalink's assets (and, in fact, may erode those assets).

[73]        *Norwich* orders are made to compel information from third parties. In

*Norwich Pharmacal Co. v. Customs and Excise Commissioners*, [1974] A.C. 133

(H.L.), at p. 175, Lord Reid identified

> a very reasonable principle that if through no fault of his own a person
> gets mixed up in the tortious acts of others so as to facilitate their wrong-
> doing he may incur no personal liability but he comes under a duty to
> assist the person who has been wronged by giving him full information
> and disclosing the identity of the wrongdoers.

Lord Reid found that "without certain action on [Customs'] part the infringements

could never have been committed" (at 174). In spite of this finding, the court did not

require Customs to take specific action to prevent importers from infringing the

patent of Norwich Pharmacal; rather the court issued a limited order compelling

Customs to disclose the names of importers. In *Cartier*, the court analogized from

*Norwich* to support an injunction requiring Internet service providers ("ISPs") to

block access to trademark-infringing websites because "it is via the ISPs' services"

that customers view and purchase the infringing material (para. 155). That injunction

did not extend to parties merely assisting in finding the websites.

[74]        In the case at bar, we are of the view that Google does not play a role in

Datalink's breach of the December 2012 Order. Whether or not the December 2012

Order is violated does not hinge on the degree of success of the prohibited website

business. Rather, the December 2012 Order is violated merely by Datalink

conducting business through a website, regardless of the visibility of that website or

the number of customers that visit the website. Thus Google does not play a role

analogous to Customs in *Norwich* nor the ISPs in *Cartier*. And unlike the order in *Norwich*, the Google Order compels positive action aimed at the illegal activity rather than simply requiring the provision of information to the court.

C.    *The Google Order Is Mandatory*

[75]    While the distinction between mandatory and prohibitive injunctions has been questioned (see *National Commercial Bank of Jamaica Ltd. v. Olint Corp.*, [2009] 1 W.L.R. 1405 (P.C.), at para. 20), courts have rightly, in our view, proceeded cautiously where an injunction requires the defendant to incur additional expenses to take positive steps (*Redland Bricks Ltd. v. Morris*, [1970] A.C. 652 (H.L.), at pp. 665-66; J. Berryman, *The Law of Equitable Remedies* (2nd ed. 2013), at pp. 199-200). Also relevant to the decision of whether to grant a mandatory injunction is whether it might require continued supervision by the courts, especially where the terms of the order cannot be precisely drawn and where it may result in wasteful litigation over compliance (*Co-operative Insurance Society Ltd. v. Argyll Stores (Holdings) Ltd.*, [1998] A.C. 1 (H.L.).

[76]    The Google Order requires ongoing modification and supervision because Datalink is launching new websites to replace de-listed ones. In fact, the Google Order has been amended at least seven times to capture Datalink's new sites (orders dated November 27, 2014; April 22, 2015; June 4, 2015; July 3, 2015; September 15, 2015; January 12, 2016 and March 30, 2016). In our view, courts

should avoid granting injunctions that require such cumbersome court-supervised updating.

D.    *The Google Order Has Not Been Shown To Be Effective*

[77]      A court may decline to grant an injunction on the basis that it would be futile or ineffective in achieving the purpose for which it is sought (Spry, at pp. 419-20; Berryman, at p. 113). For example, in *Attorney General v. Observer Ltd.*, [1990] 1 A.C. 109 (H.L.), the *Spycatcher* memoirs of an M.I.5 agent were already readily available, thus making a perpetual injunction against publication by the defendant newspapers ineffective.

[78]      In our view, the Google Order is not effective in enforcing the December 2012 Order. It is recalled that the December 2012 Order requires that Datalink "cease operating or carrying on business through any website" — it says nothing about the visibility or success of the website business. The December 2012 Order is violated as soon as Datalink launches websites to carry on business, regardless of whether those websites appear in a Google search. Moreover, the Google Order does not assist Equustek in modifying the Datalink websites, as Equustek sought in its originating claim for injunctive relief.

[79]      The most that can be said is that the Google Order might reduce the harm to Equustek which Fenlon J. found "Google is inadvertently facilitating" (para. 152). But it has not been shown that the Google Order is effective in doing so. As Google

points out, Datalink's websites can be found using other search engines, links from other sites, bookmarks, email, social media, printed material, word-of-mouth, or other indirect means. Datalink's websites are open for business on the Internet whether Google searches list them or not. In our view, this lack of effectiveness suggests restraint in granting the Google Order.

[80]     Moreover, the quest for elusive effectiveness led to the Google Order having worldwide effect. This effect should be taken into consideration as a factor in exercising discretion. Spry explains that territorial limitations to equitable jurisdiction are "to some extent determined by reference to questions of effectiveness and of comity" (p. 37). While the worldwide effect of the Google Order does not make it more effective, it could raise concerns regarding comity.

E.    *Alternatives Are Available*

[81]     Highlighting the lack of effectiveness are the alternatives available to Equustek. An equitable remedy is not required unless there is no other appropriate remedy at law (Spry, at pp. 402-3). In our view, Equustek has an alternative remedy in law. Datalink has assets in France. Equustek sought a world-wide *Mareva* injunction to freeze those assets, but the Court of Appeal for British Columbia urged Equustek to pursue a remedy in French courts: "At present, it appears that the proposed defendants reside in France . . . . The information before the Court is that French courts will assume jurisdiction and entertain an application to freeze the assets in that country" (2016 BCCA 190, 88 B.C.L.R. (5th) 168, at para. 24). We see no

reason why Equustek cannot do what the Court of Appeal urged it to do. Equustek could also pursue injunctive relief against the ISPs, as was done in *Cartier*, in order to enforce the December 2012 Order. In addition, Equustek could initiate contempt proceedings in France or in any other jurisdiction with a link to the illegal websites.

III.   Conclusion

[82]      For these reasons, we are of the view that the Google Order ought not to have been granted. We would allow the appeal and set aside the June 13, 2014 order of the Supreme Court of British Columbia.

*Appeal dismissed with costs,* CÔTÉ *and* ROWE JJ. *dissenting.*

*Solicitors for the appellant: Lenczner Slaght Royce Smith Griffin, Toronto.*

*Solicitors for the respondents: Robert Fleming Lawyers, Vancouver; Michael Sobkin, Ottawa.*

*Solicitor for the intervener the Attorney General of Canada: Attorney General of Canada, Ottawa.*

*Solicitor for the intervener the Attorney General of Ontario: Attorney General of Ontario, Toronto.*

*Solicitors for the intervener the Canadian Civil Liberties Association: Blake, Cassels & Graydon, Vancouver.*

*Solicitor for the intervener the OpenMedia Engagement Network: Cynthia Khoo, Vancouver.*

*Solicitors for the interveners the Reporters Committee for Freedom of the Press, the American Society of News Editors, the Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., the First Amendment Coalition, First Look Media Works, Inc., the New England First Amendment Coalition, the News Media Alliance (formerly known as the Newspaper Association of America), AOL Inc., the California Newspaper Publishers Association, The Associated Press, The Investigative Reporting Workshop at American University, the Online News Association and the Society of Professional Journalists: Blake, Cassels & Graydon, Toronto.*

*Solicitors for the interveners Human Rights Watch, ARTICLE 19, Open Net (Korea), the Software Freedom Law Centre and the Center for Technology and Society: Blake, Cassels & Graydon, Toronto.*

*Solicitors for the intervener the Wikimedia Foundation: McInnes Cooper, Halifax.*

*Solicitors for the intervener the British Columbia Civil Liberties Association: Stockwoods, Toronto.*

*Solicitors for the intervener the Electronic Frontier Foundation: MacPherson Leslie & Tyerman, Vancouver; Fasken Martineau DuMoulin, Vancouver.*

*Solicitors for the interveners the International Federation of the Phonographic Industry, Music Canada, the Canadian Publishers' Council, the Association of Canadian Publishers, the International Confederation of Societies of Authors and Composers, the International Confederation of Music Publishers and the Worldwide Independent Network: McCarthy Tétrault, Toronto.*

*Solicitors for the intervener the International Federation of Film Producers Associations: MacKenzie Barristers, Toronto.*

# EXHIBIT 2

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

APR 12 2011



S = 1 1 2 4 2 1

No.
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6, and
JOHN DOE

DEFENDANTS

### NOTICE OF CIVIL CLAIM

**This action has been started by the plaintiff for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a) file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

(a) file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiff(s),

(a)   if you reside anywhere in Canada, within 21 days after the date on which a copy of the filed notice of civil claim was served on you,

(b)   if you reside in the United States of America, within 35 days after the date on which a copy of the filed notice of civil claim was served on you,

(c)   if you reside elsewhere, within 49 days after the date on which a copy of the filed notice of civil claim was served on you, or

(d)   if the time for response to civil claim has been set by order of the court, within that time.

## Claim of the Plaintiffs

## Part 1:     STATEMENT OF FACTS

1.   The Plaintiff Equustek is incorporated pursuant to the *Business Corporations Act*, S.B.C. 2002, c. 57, with its registered and records office at 1008 – 808 Nelson Street, Vancouver B.C.

2.   The Plaintiff Clarma is incorporated pursuant to the *Business Corporations Act*, with its registered and records office at 1008 – 808 Nelson Street, Vancouver B.C.

3.   The Plaintiff Robert Angus is a professional engineer and principal of Equustek and Clarma, who resides at 1838 West 19th Avenue, Vancouver B.C.

4.   Datalink Technologies Group Inc. ("Datalink 1") was incorporated in British Columbia in 2001 but was dissolved on November 26, 2007 for failure to complete its annual filings.

5.   Datalink Technologies Group Canada Inc. ("Datalink 2") was incorporated in British Columbia in 2005 but was dissolved on February 11, 2008 for failure to complete its annual filings.

6.   Datalink Technologies Group Inc. ("Datalink 3") was incorporated in Washington State in 2006 but was dissolved on February 2, 2008 for failure to complete its annual filings.

7.   The Defendant, Datalink Technologies Gateways Inc. ("Datalink 4") is incorporated pursuant to the *Business Corporations Act*, with its registered and records office at 203 – 815 Main Street, West Vancouver B.C.

8.   The Defendants, Datalink 5 and Datalink 6, are companies unknown to the Plaintiffs, and incorporated in jurisdictions of which the Plaintiffs are unaware.

9.   The Defendant Morgan Jack resides at 302 - 1005 Broughton Street, Vancouver B.C.

10.  Jack was the controlling mind of all of the companies, Datalinks 1 through 6 above (the "Datalink Companies"), at all material times.

11.  The Defendant Andrew Crawford is a Professional Engineer and a former employee of Equustek.

12.  Crawford resides in British Columbia at 309 - 16233 82nd Avenue, Surrey B.C.

13.  The Plaintiffs do not know the identity or particulars of John Doe.

**Background of Equustek**

14.  Equustek's business is the design, manufacture, and sale of high quality industrial network interface products. Equustek's products enable different pieces of complex machinery, made by different manufacturers and using different interfaces and software, to communicate with each other. For example, a brewing company might buy an Equustek product so that its bottling line could operate seamlessly with its automatic packaging machinery.

15.  Equustek's business was the brainchild of Bob Angus who was the inventor of all of the core technology giving rise to Equustek's products, described below. Angus founded Equus Technologies Inc. in 1994 ("Equus"), which manufactured and sold the Equustek products until 2005.

16. By written agreement dated March 16, 2005, Equus acknowledged that Angus was the owner of all of Equus' intellectual property, including all trade secrets, trade marks, and copyrights.

17. Clarma Enterprises was at all material times the sole shareholder of Equus. By written agreement dated September 18, 2005, Clarma sold 100% of the shares of Equus to an unrelated party, but reserved all residual intellectual property rights of Equus to Clarma.

18. Bob Angus is the 100% shareholder of Clarma.

19. By reason of the March 16, 2005 agreement above, Bob Angus is the owner of all of the intellectual property of Equus.

20. In the alternative, Clarma is the owner of all of the intellectual property of Equus by reason of the September 18, 2005 agreement noted above.

21. Bob Angus is a shareholder and principal of the Plaintiff Equustek, and beginning in the fall of 2005 Equustek carried on in the same business formerly conducted by Equus Technologies Inc.

**Equustek Products**

22. Equustek's products control approximately 35% of the global market for top-level industrial network interface devices and are well known in the industry under the following names:

- EQ7000/DL7000 - Ethernet/IP, AB Ethernet, and DH+
- EQ7000/DL7000 - Ethernet/IP, AB Ethernet, and DH-485

- EQ-DCM   - AB Ethernet, DF1, and ASCII
- EQ-DCM   - AB Ethernet, Modbus RTU/ASCII
- EQ-DCM   - Ethernet/IP, AB Ethernet, DF1, ASCII (custom)

- DL6000   - Modbus TCP to DH+
- DL6000   - Modbus TCP to DH-485

- DL4500   - Ethernet Encapsulated DF1 to DH+ (Multi-Master)

- DL4500   - Ethernet Encapsulated DF1 to DH+ (Standard Tunnel)
- DL4500   - Ethernet Encapsulated DF1 to DH-485 (Multi-Master)
- DL4500   - Ethernet Encapsulated DF1 to DH-485 (Standard Tunnel)

- DL4000
  - DFX(3DF1 connections), DMX(ModBus to DF1), MMX(ModBus RTU to ModBus ASCII)
  - DAS(DF1 to ASCII), MAS(ASCII Floating Point to ModBus RTU Slave)
  - PM(DF1 Half Duplex Master to AB Power Monitor 3000)

- DL3500
  - DF1 to DH+, DF1 to DH-485, DF1 to DH+/DH-485 Combination
  - Modbus RTU/ASCII to DH+, Modbus RTU/ASCII to DH-485
  - ASCII to DH+, ASCII to DH-485 & DH+ to DH+ Bridging

- DL2000
  - KFX – (DF1 to DH+), CMX – (Modbus RTU/ASCII to DH+), K2F – (2 DF1 to DH+)
  - KFR – (Remote/IO to DH+), ASC – (ASCII Scanner to DH+), ASM – (ASCII Monitor to DH+)
  - SCIPU – (Siemens to DH+), INV2 – (Toshiba to DH+)

- DLPCIe    - DF1 to DH+ OR DF1 to DH-485
- DLPCI     - DF1 to DH+ OR DF1 to DH-485
- DL-PC     - DF1 to DH+ OR DF1 to Remote/IO
- DL-STD    - DF1 to DH+
- DL-PC/104 - DF1 to DH+ OR DF1 to Remote/IO

**Trademarks**

23.    Equustek's products enjoy considerable goodwill in their industry. They have acquired a substantial reputation in Canada and around the world as products of high quality, and are identified by the public by their model numbers, and as such the model numbers are trademarks owned by Equustek.

24.    In addition, the names DL3500, DL4500, and DL7000 are registered trademarks of Equustek.

## Copyrights

25.  Each Equustek product comes with its own unique user manual, which was written by the Plaintiffs' employees in the course of their employment with Equus and later Equustek.

26.  Each user manual is printed with the name and logo of Equustek, which identifies Equustek as the owner of the copyright in the manuals.

27.  As set out in Part 3 below, each user manual is an original literary and artistic work in which copyright subsists, and which is owned by Equustek, or alternatively by Robert Angus or Clarma.

## Distribution Agreement

28.  In addition to selling to its own customers, from its inception Equustek also sold its products to Datalink 1 so that this company could act as Equustek's distributor.

29.  The agreement between Equustek and the Datalink 1 was based on the long standing relationship that Equus had with Datalink 1's predecessor companies, and as a consequence the agreement was not in writing but was oral and by conduct. The terms of the agreement, express or implied, were:

   a.  Equustek would sell its products to the Datalink 1 at a 30% discount from Equustek's standard price;

   b.  Datalink 1 would distribute the Equustek products and for this limited purpose was entitled to

      i.  advertise Equustek's products, and display images of those products, on Datalink 1's websites and in Datalink 1's sales materials;

      ii.  make available for download on its websites copies of Equustek's manuals for the use of Equustek products; and

   c.  When a customer ordered an Equustek product from Datalink 1, Datalink 1 would fill that order with the Equustek product ordered.

(the "Distribution Agreement").

30.     As a result of the sale and display of Equustek's products on Datalink 1's websites, these websites received considerable traffic.

31.     The Defendants maintained a complex network of related websites, including:

- www.protocolconverter.com;
- www.datalinkgateways.com;
- www.abgateways.com;
- www.datalink-gateways.com;
- www.datahighwayplus.com;
- www.datalink-networks.com;
- www.datalinktek.com
- www.datanetprotocols.com;
- www.1770-kf3.com;
- www.1770-kf2.com;
- www.1784-pktx.com;
- www.1784-ktx.com;
- www.1784-pcmk.com;
- www.ethernetgateways.com;
- www.control-logix.com; and
- www.ethernetipsolutions.com.

and others of which the Plaintiffs are not aware.

32.     The Defendants specifically designed all of their websites to take advantage of the goodwill of Equustek's products and to maximize the chances of customers looking for Equustek's products being directed to the Defendants' websites. Unbeknownst to the Plaintiffs, many of these websites were not owned by Datalink 1 and had no limited authorization under the Distribution Agreement to use the Plaintiffs' trademarks.

**Conspiracy**

33.     At a time unknown to the Plaintiffs, the Defendants Jack and Crawford, those of the Datalink Companies that were then in existence, and John Doe, agreed to act in concert using unlawful means to destroy Equustek's business in order that they could appropriate all of Equustek's business, profits, and goodwill for themselves.

34. This intention to harm the Plaintiffs was the predominant purpose of the Defendants at all material times.

35. The acts done in furtherance of the conspiracy, and the unlawful means used, include:

   a. stealing the Plaintiffs' Trade Secrets, below, in order to build their own competing line of products;

   b. claiming Equustek's products as their own, and misrepresenting to the public that their own products were an upgrade or replacement of the Equustek products, which they said were no longer available;

   c. using the Plaintiffs' trademarks to drive traffic to their websites on the false pretense that they intended to sell the Equustek products under the Distribution Agreement;

   d. breaching the Distribution Agreement;

   e. infringing the Plaintiff's copyrights; and

   f. organizing their corporate structure to make it difficult to collect any damages;

   and futher particulars are set out in the balance of this Statement of Facts.

36. The initial conspirators above caused the remaining Datalink Companies to be incorporated in multiple jurisdictions which are within the knowledge of the Defendants, in order to make their illegal profits as difficult to trace as possible.

37. As set out in Part III below, by agreeing to act in this way, the Defendants have committed the tort of conspiracy, causing the Plaintiffs to suffer loss and damages, including loss of business, reputation, and goodwill.

38. Equustek's sales are down 59% since 2006 (which represents a drop of $371,000 in annual sales), and Equustek's viability as a going concern is now in jeopardy.

**Contracting Parties**

39. Unbeknownst to the Plaintiffs, Datalink 1 ceased to exist in November 2007. However, Jack continued to deal with the Plaintiffs, under the Distribution Agreement, in the name

of "Datalink Technologies Group" after Datalink 1 ceased to exist.

40.   The Plaintiffs were not aware of the existence of Datalinks 2 or 3, but Jack continued to deal with the Plaintiffs, under the Distribution Agreement, in the name of "Datalink Technologies Group" after Datalinks 2 and 3 ceased to exist as well.

41.   The Plaintiffs were not aware of the existence of Datalinks 2, 3, 4, 5, or 6 until the fall of 2010.

42.   As set out in Part 3 below, as a result of this conduct, if the contracting party is not Datalink 1 or Jack, the true identity of the contracting party is solely within the knowledge of the Defendants. The Plaintiffs say that the Defendants are not entitled to rely on confusion which they have created themselves, and as such the Plaintiffs say in the alternative that the Distribution Agreement, below, is between Equustek and all the Defendants.

43.   Because of this confusion, for the balance of this Statement of Facts below the Plaintiffs make no further distinction between the Defendants.

**Theft of Trade Secrets**

44.   The Plaintiffs hold certain secrets of their trade and business in confidence, including:

    a.   the board schematics, which map the circuit boards of all Equustek products and describe all of the components and operations in detail;

    b.   the source code for all programming used in all the programmable board components;

    c.   the specifications of and supplier for the signal level transformer used in all Equustek products except the DL4000;

    d.   the design of the modem that is required to interface with many of the networks that the Equustek products can work with; and

    e.   the overall design of the Equustek products, and the know-how required to assemble them in order to achieve the high quality results delivered by the Equustek products.

(the "Trade Secrets").

45.   The Defendant Crawford was an employee of Equus, and then Equustek, at various times from 1994 to 2005, and as such had a duty of fidelity and good faith to his employer to hold the Trade Secrets in confidence.

46.   In addition, as a professional engineer Crawford had a further duty of good faith, arising under the Code of Ethics of the Association of Professional Engineers of British Columbia, to maintain the confidentiality of the Trade Secrets.

47.   The Defendants set out to steal the Trade Secrets by soliciting Crawford to copy the Plaintiffs' board schematics and source code and disclose the Trade Secrets to the other Defendants in order to build a competing line of products to fully replace the Equustek products in the marketplace.

48.   At a time unknown to the Plaintiffs, Crawford did disclose the Trade Secrets to the other Defendants and began working with the other Defendants to build the Defendants' GW1000 line of products.

49.   Crawford and the other Defendants knowingly used the Trade Secrets to design and build the Defendants' GW1000 line of products, which they intended to market and sell as a replacement of Equustek's entire product line.

## Passing Off and Breach of Distribution Agreement

50.   At a time unknown to the Plaintiffs and beginning in at least 2007, the Defendants, while still acting as the distributor of the Equustek products and receiving extensive customer interest in their websites as a result, began surreptitiously filling orders for Equustek products with their own products instead, in a kind of internet based 'bait and switch'.

51.   From this point forward, the Defendants continued to represent

    a.  to the public, by way of the Defendants' websites, and

    b.  to Equustek, by way of the Distribution Agreement and the Defendants' websites,

that they intended to sell and would sell Equustek's products to the public. These representations were false as the Defendants had no further intention of selling any Equustek product, and always intended to sell their own GW1000 products instead.

52.   The Defendants made these misrepresentations to induce the Plaintiffs to maintain the Distribution Agreement, with its associated limited permission to use the Plaintiffs' trademarks, in order to continue to drive traffic to the Defendants' websites.

53.   While the Defendants continued to accept orders for Equustek's products, and to accept payment on those orders, the Defendants actually shipped their own GW1000 products to fill those orders.

54.   As noted in Part 3 below, by substituting their own GW1000 products for the Equustek products, which Defendants' customers ordered from them, the Defendants breached the Distribution Agreement, causing Equustek to suffer loss and damage.

55.   By substituting their GW1000 products for the Equustek products which the Defendants' customers ordered from them, the Defendants also breached their contracts with their own customers, who received something different from what they had ordered and paid for. As noted in Part 3 below, this provides a further basis for finding that the Defendants' conduct was unlawful.

56.   Beginning at a time unknown to the Plaintiffs, the Defendants also began holding out Equustek's products as the Defendants' own products by:

   a.   Deleting references to Equustek from the Defendants' websites;

   b.   Obscuring the Equustek logo from the images of Equustek's products which the Defendants displayed on their websites;

   c.   Altering the manuals for the Equustek products, which the Defendants made available for download on their websites, to remove Equustek's logo and other features identifying the manual and products as being authored and produced by Equustek;

   d.   Supplying the Defendants' own GW1000 products with manuals substantially similar to the manuals for Equustek's products.

**Termination of Distribution Agreement**

57.     The Defendants' conduct above, among other things, represents a breach by the Defendants of the Distribution Agreement, which has caused the Plaintiffs to suffer loss and expense.

58.     The Plaintiffs discovered the conduct of the Defendants above in or around November 2010, and terminated the Distribution Agreement by letter dated January 18, 2011.

59.     In addition to terminating the Distribution Agreement, the Plaintiffs demanded that the Defendants delete all references to the Equustek products on their websites and cease relying on the goodwill of the Equustek products to drive traffic to those websites.

60.     In response to the Plaintiffs' demand, the Defendants acknowledged the termination of the Distribution Agreement and their use of the Plaintiffs' trademarks, and advised they would delete all references to the Equustek products and trademarks from their websites.

61.     However, the Defendants did not delete all references to the Equustek products and trademarks from their websites, but merely recast their use of the Plaintiffs trademarks in order to continue to divert customer interest from the Equustek products to the Defendants' competing GW1000 line of products.

**Injurious Falsehood**

62.     Beginning at a time unknown to the Plaintiffs, and accelerating after the termination of the Distribution Agreement, the Defendants also began advising customers that

        a.   the Equustek products were no longer available;

        b.   the Equustek products were obsolete; and

        c.   the GW1000 line of products was an upgrade or consolidation of the Equustek products.

63.    These representations were false, and made maliciously for the purpose of diverting business from the Plaintiffs to the Defendants, and by making these representations the Defendants violated s. 52(1) of the *Competition Act* and s. 7(a) of the *Trade-Marks Act*, and committed the tort of injurious falsehood, as set out in Part 3 below, causing the Plaintiffs to suffer loss and damage.

64.    Furthermore, the GW1000 line of products are inferior to the Equustek products and in some cases have been incompetently designed such that they are at risk of damaging a customer's hardware. Since the Defendants have been falsely representing to the public that the GW1000 product line is a consolidation of and/or upgrade of the Equustek products, the goodwill enjoyed by Equustek and its products has been further damaged as a result.

**Copyright Infringement**

65.    As set out in Part 3 below, by altering the Equustek manuals and distributing the altered manuals as described in paragraph 56c, the Defendants infringed the Plaintiffs' copyright in the manuals.

66.    The Defendants also infringed the Plaintiffs' copyright in the manuals by reproducing a substantial part of Equustek's manuals to make user manuals for the Defendants' own GW1000 line of products.

**Confusion in the Marketplace**

67.    All of the Defendants' conduct above was intended to and did cause confusion in the marketplace between the Equustek products and the Defendants' GW1000 line of products, in order that the Defendants could appropriate the Plaintiffs' goodwill and market share for themselves.

**Unjust Enrichment**

68.    By reason of all of the Defendant's conduct above, the Plaintiffs have suffered and continue to suffer deprivation, including diminution in value of Equustek's trademarks, loss of business, and loss of goodwill, and the Defendants have been unjustly enriched

as a result.

## Part 2:    RELIEF SOUGHT

The Plaintiffs claim against the Defendants as follows:

1.  A declaration that the Plaintiffs are the owners of the following trademarks and registered trademarks:

    a.  EQ7000/DL7000;

    b.  EQ7000/DL7000;

    c.  EQ-DCM;

    d.  DL6000;

    e.  DL4500;

    f.  DL4000;

    g.  DL3500;

    h.  DL2000;

    i.  DLPCIe;

    j.  DLPCI;

    k.  DL-PC;

    l.  DL-STD; and

    m.  DL-PC/104;

2.  A temporary and permanent injunction restraining the Defendants from:

    a.  using the Plaintiffs' trademarks and free-riding on the goodwill of any Equustek products on any website;

    b.  making statements disparaging or in any way referring to the Equustek products;

    c.  distributing the offending manuals and displaying images of the Plaintiff's products on any website; and

    d.  selling the GW1000 line of products which were created by the theft of the Plaintiffs' trade secrets;

and obliging them to:

    e.  immediately disclose all hidden websites;

    f.  display a page on all websites correcting thier misrepresentations about the source and continuing availability of the Equustek products and directing cutomers to Equustek;

3.    Damages for conspiracy;

4.    Damages for breach of confidence;

5.    Damages for passing off and injurious falsehood;

6.    Damages for violation of sections 7(a) and 7(b) and 22(1) of the *Trade-Marks Act*, RSC 1985, c. T-13, as amended, pursuant to s. 53.2 of the *Trade-Marks Act*;

7.    Damages for material misrepresentations to the public, contrary to s. 52(1) of the *Competition Act*, RSC 1985, c. C-34, as amended, pursuant to s. 36(1) of the *Competition Act*;

8.    Damages for trademark infringement under s. 20(1) of the *Trade-Marks Act*;

9.    Damages for copyright infringement, pursuant to sections 27(1) and 38.1 of the *Copyright Act*, RSC 1985, c. C-42, as amended;

10.    Damages for unjust enrichment;

11.    Damages for intentional interference with economic interests;

12.    Damages for breach of the Distribution Agreement;

13.    Punitive damages;

14.    An accounting and disgorgement of all profits arising from all sales of products other than Equustek's own products;

15.    A declaration that Defendants hold the amount in 14 above on constructive trust for the Plaintiffs, and equitable tracing of these funds;

16.    An order piercing the corporate veil and holding all the Defendants jointly and severally liable;

17.    Special costs, or in the alternative, costs;

18.    Interest pursuant to the *Court Order Interest Act*, RSBC 1996, c. 79, as amended; and

19.    Such further and other relief as to this Honourable Court may seem just.

**Part 3:**      **LEGAL BASIS**

### Unlawfulness and Intention to Harm

1. The Defendants committed the tort of conspiracy by forming an agreement to act, and then by acting, in concert with the predominant purpose of harming the Plaintiffs and as such have caused the Plaintiffs to suffer loss and damage.

2. An alternative basis for the Defendants' liability in conspiracy is that the Defendants formed an agreement to act, and then acted, against the Plaintiffs using unlawful means, including by:

   a.  stealing trade secrets;

   b.  breaching the Distribution Agreement;

   c.  misrepresenting to the Plaintiffs and to the public that they were selling, and intended to sell, the Equustek products;

   d.  using the Plaintiffs' trademarks to drive traffic to their websites on the false pretense that they intended to sell the Equustek products under the Distribution Agreement;

   e.  breaching their contracts with their own customers to deliver the Equustek products which those customers had ordered and paid for;

   f.  claiming Equustek's products as their own, and misrepresenting to the public that their own products were an upgrade or replacement of the Equustek products, which they said were no longer available;

   g.  infringing the Plaintiff's copyrights; and

   h.  organizing their corporate structure to make it difficult to collect any damages.

3. This same conduct also gives rise to the tort of unlawful or intentional interference with economic relations, as an alternative basis of liability.

### Breach of Confidence

4. The Defendant Crawford had a duty of confidence to the Plaintiffs to maintain the confidentiality of the Trade Secrets, which he breached by disclosing the Trade Secrets

to the Defendants and by using the Trade Secrets to design and build the Defendants' GW1000 line of products.

5.      The remaining Defendants knowingly agreed with Crawford that Crawford would breach his duty to the Plaintiffs for the benefit of all the Defendants, who used the Trade Secrets to develop a the competing GW1000 line of products and, in combination with the illegal use of the Plaintiffs' trademarks, diverted the majority of Equustek's business, profits, and goodwill to themselves. By knowingly benefiting from the breach of confidence all of the Defendants are liable to the Plaintiffs for Crawford's breach, and for their own breach of confidence.

6.      As a result, the Plaintiffs are entitled to equitable remedies against all the Defendants in relation to the Plaintiffs' Trade Secrets, including an accounting and disgorgement of profits, and a declaration that the Defendants hold all of their profits arising from the use of the Plaintiffs' Trade Secrets in trust for the Plaintiffs.

**Contract**

7.      The Distribution Agreement is a contract which the Defendants breached by substituting their GW1000 products for the Equustek products which the Defendants' customers ordered and paid for. By breaching the Distribution Agreement in this way, the Defendants caused Equustek to suffer loss and damage.

8.      The parties to the Distribution Agreement were Equustek and Datalink 1, and the Plaintiffs were not aware of the existence of the other Datalink Companies until the fall of 2010 when they began to investigate the Defendants.

9.      While Datalink 1 ceased to exist, unbeknownst to the Plaintiffs, Jack continued to communicate with the Plaintiffs in the name of Datalink 1, and as such Jack was the contracting party and is personally liable from this point forward.

10.     In the alternative, the specific identity of the contracting party is solely within the knowledge of the Defendants. The Plaintiffs say that the Defendants are not entitled to rely on confusion which they have created themselves, and as such the Plaintiffs say

that the Distribution Agreement, above, is between Equustek and all the Defendants.

## Passing Off and Injurious Falsehood

11.     The Defendants maintained the Plaintiffs' limited permission to use their trademarks under the Distribution Agreement by fraudulently misrepresenting that they were using the Plaintiffs trademarks for the purpose of distributing the Equustek products, and as such they cannot rely on the Distribution Agreement as a basis for the use of the marks.

12.     As a result, the Defendants are liable for the tort of passing off from the time they first began shipping the GW1000, and are also liable for trademark infringement under s. 20(1) of the *Trade-Marks Act*.

13.     In the alternative, by engaging in the internet 'bait and switch' referred to in Part 1 above, the Defendants deceived the public and passed off its goods as those of the Plaintiffs, by

   a.   initial interest confusion;

   b.   reverse passing off; and/or

   c.   'classic' passing off,

and as such has caused the Plaintiffs to suffer loss and damage.

14.     In addition, by falsely representing to the public that

   a.   the Equustek products were no longer available;

   b.   the Equustek products were obsolete; and

   c.   the GW1000 line of products was an upgrade or consolidation of the Equustek products;

the Defendants committed the tort of injurious falsehood, causing the Plaintiffs to suffer loss and damage.

15.     The conduct described in paragraph 14 above also constitutes a further basis for the tort of passing off.

16.     In the further alternative, only Datalink 1, and later Morgan Jack, had the limited authorization of the Plaintiffs' under the Distribution Agreement to use the Plaintiffs' trademarks. The remaining Defendants had no such authorization, and to the extent the remaining Defendants did so, they have committed the tort of passing off and are also liable for trademark infringement under s. 20(1) of the *Trade-Marks Act*.

17.     The conduct referred to in paragraphs 11 to 16 above also represents violations by the Defendants of sections 7(a), 7(b) and 22(1) of the *Trade-Marks Act*, and as such give rise to a claim for damages pursuant to s. 53.2 of the *Trade-Marks Act*.

18.     By engaging in the conduct referred to in paragraphs 11 to 16 above, the Defendants knowingly or recklessly made material misrepresentations to the public for the purpose of promoting the Defendants' business at the expense of the Plaintiffs', and as such the Defendants violated s. 52(1) of the *Competition Act*, giving rise to a claim for damages pursuant to s. 36 of the *Competition Act*.

## Copyright Infringement

19.     Each Equustek users manual is an original literary and artistic work in which copyright subsists by virtue of s. 5 of the *Copyright Act*.

20.     The copyright in these manuals is owned by Equustek, or alternatively by Angus or Clarma, by virtue of s. 13(3) of the *Copyright Act* and subsequent written agreements entered into with Equus by Equustek and Clarma.

21.     By altering the Equustek manuals and distributing the altered manuals as described in Part 1 paragraph 56c, the Defendants infringed the Plaintiffs' copyright in the manuals, by virtue of s. 27(1) of the *Copyright Act*.

22.     The Defendants also infringed the Plaintiffs' copyright in the manuals by reproducing a substantial part of the manuals to make users manuals for the Defendants' own

20

GW1000 line of products, by virtue of s. 27(1) of the *Copyright Act*.

23.     As result, the Plaintiffs are entitled to damages pursuant to s. 38.1 of the *Copyright Act*.

**Unjust Enrichment**

24.     By reason of all of the conduct described above, the Defendants have been unjustly enriched, and the Plaintiffs have suffered a corresponding deprivation.

**Interest**

25.     The Plaintiffs are entitled to interest pursuant to the *Court Order Interest Act*.

| | |
|---|---|
| Plaintiff's address for service: | Robert Fleming Lawyers<br>915 – 925 West Georgia St.<br>Vancouver, BC  V6C 3L2 |
| Fax number address for service: | n/a |
| E-mail address for service: | n/a |
| Place of trial: | Vancouver, British Columbia |
| The address of the registry is: | 800 Smithe Street<br>Vancouver, BC  V6Z 2E1 |

Date: April 12, 2011

............................................................

Signature of
[ ] plaintiff [X] lawyer for plaintiff(s)
Robbie Fleming

Rule 7-1 (1) of the Supreme Court Civil Rules states:

(1)     Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

    (a)     prepare a list of documents in Form 22 that lists

    (i)    all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

    (ii)    all other documents to which the party intends to refer at trial, and

(b)    serve the list on all parties of record.

---

## Appendix

**Part 1: CONCISE SUMMARY OF NATURE OF CLAIM:**

This is a claim for conspiracy, breach of contract, and theft of intellectual property.

**Part 2: THIS CLAIM ARISES FROM THE FOLLOWING:**

A personal injury arising out of:
[ ] a motor vehicle accident
[ ] medical malpractice
[ ] another cause

A dispute concerning:
[ ] contaminated sites
[ ] construction defects
[ ] real property (real estate)
[ ] personal property
[ ] the provision of goods or services or other general commercial matters
[ ] investment losses
[ ] the lending of money
[ ] an employment relationship
[ ] a will or other issues concerning the probate of an estate
[X] a matter not listed here

**Part 3: THIS CLAIM INVOLVES:**

[ ] a class action
[ ] maritime law
[ ] aboriginal law
[ ] constitutional law
[ ] conflict of laws
[X] none of the above
[ ] do not know

**Part 4:**

1. *Trade-Marks Act*
2. *Competition Act*
3. *Copyright Act*

# EXHIBIT 3

```
SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JUL 26 2012

ENTERED
```

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, and DATALINK TECHNOLOGIES GATEWAYS LLC

DEFENDANTS

ORDER MADE WITHOUT NOTICE

| BEFORE | ) | THE HONOURABLE | ) | Thursday, the 26th day of July 2012 |
|---|---|---|---|---|
| | ) | MR. JUSTICE PUNNETT | ) | |

THE APPLICATION of the Plaintiffs made without notice coming on for hearing at Vancouver on Thursday, July 26, 2012, and on hearing Robbie Fleming, counsel for the Plaintiffs, and on reading the affidavits referenced in the application;

AND UPON the Plaintiffs by their counsel undertaking:

(a)  to serve a copy of this order, together with the affidavits filed herein, upon the defendants;

(b)  to serve a copy of this order upon any third party to whom the plaintiffs may give notice of its terms;

(c)  to notify any third party to whom the plaintiffs may give notice of this order of his, her, or its right to apply to the court upon 24 hours notice to the plaintiff to vary or set aside this order in so far as it may affect that third party;

(d)  to pay damages in the event that this court is hereafter of the opinion that the defendants or any third party served with notice of this order has sustained damages by reason of this order which the plaintiffs ought to pay; and

(e)  not to use any information acquired as a result of this order for any purpose relating to any proceeding outside of the jurisdiction of this court, without leave of this court.

2

THIS COURT ORDERS THAT:

1.  the defendants Morgan Jack, Datalink Technology Gateways Inc. ("Datalink 4", and Datalink Technologies Gateways LLC ("Datalink 7"), who are hereinafter referred to collectively as the "Datalink Defendants", be enjoined from removing from British Columbia, selling, mortgaging, pledging, transferring, assigning, diminishing, or otherwise disposing of or dealing with any or all of their assets, property, causes of action, land, right, title, legal shares and interest, of every description, howsoever characterized, whether real or personal, legal or equitable, present or future, vested or contingent, beneficial or discretionary, sole or joint, wherever situated worldwide, including, without limiting the generality of the foregoing:

    a.  any account held at any bank or other financial institution, of any kind, and wherever held;

    b.  any bank accounts at the Toronto Dominion Bank at 1690 Davie Street, Vancouver BC;

    c.  all intellectual property, including any board schematics and source code, and any other document whether physical or electronic which records intellectual property in any way;

    d.  all websites;

    e.  all inventory, including all inventory of the product known as the GW1000; and

    f.  all customer lists

    (collectively referred to as the "Assets"); whether the same be held directly or indirectly by any of the Datalink Defendants through any company, trust, partnership, or other entity beneficially owned or controlled by any of the Datalink Defendants, wherever the assets may be situate, until further order of this court. ~~except as is necessary for the payment of ordinary living expenses;~~

2.  the Datalink Defendants, within seven days of service of this order, each make and serve upon the plaintiff's solicitors an affidavit disclosing the full value of the Assets, identifying with full particularity the nature of the Assets and their exact location as of the date of this order and whether the same are held in the name of one or more of the Datalink Defendants or jointly held or held by nominee(s), trustee(s), or otherwise on the defendants' behalf and, without prejudice to the generality of the foregoing, specifying:

    (a)  the identity of all bank or other accounts, including trading or investment accounts, term deposits, investment certificates, savings bonds, or other money market instruments in the name of one or more of the Datalink Defendants or jointly held or held by nominee(s), trustee(s), or otherwise on the defendants' behalf and the sum standing to the credit of such accounts, term deposits, investment certificates, savings bonds;

3

(b)  full details as to all real property or interest therein legally or beneficially owned
     by each of the Datalink Defendants;

(c)  full details as to any personal property or interest therein legally or beneficially
     owned by each of the Datalink Defendants; and

(d)  the name and address of any person or entity who has or may have
     possession, custody, or control of the Assets.

3.   the Datalink Defendants may apply to set aside this order on 24 hours notice. *but This*
     *order shall remain in force until further order even if such*
     AND THIS COURT FURTHER ORDERS that any and all financial institutions with notice *application*
     of this order, including *is spered in*

          a.   the Toronto Dominion Bank at 1690 Davie Street, Vancouver BC,

are hereby restrained and enjoined from dealing with any deposit accounts, money
market or other accounts, including retirement savings plan accounts, investment
certificates, treasury bills, deposits, or assets of the Datalink Defendants, whether in their
names individually or jointly, in their possession or control without further order of this
court.

EFFECT OF THIS ORDER:

1.   It is a contempt of court for any person notified of this order knowingly to assist in or
     permit a breach of the order. Any person doing so may be sent to prison, fined, or
     have their assets seized.

2.   This injunction does not prevent any bank or financial institution from exercising any
     right of set-off it may have in respect of any facility which it gave to the Datalink
     Defendants before it was notified of this order.

3.   No bank or financial institution needs to enquire as to the application or proposed
     application of any money withdrawn by one of the Datalink Defendants if the
     withdrawal appears to be permitted by this order.

EXCEPTIONS TO THIS ORDER:

1.   This order does not prohibit:

          a.   Morgan Jack from spending up to $5,000 per calendar month for his
               ordinary living expenses; or

          b.   the Datalink Defendants from spending no more than $25,000 to retain
               counsel to respond to this order,

but before spending any money pursuant to subparagraphs (a) or (b) above, the

4

*advise The in writing*

Datalink Defendants must ~~tell the plaintiffs' solicitors~~ ~~where the money is to come~~
~~from~~ *of The intended source of the funds to be expended*

BY THE COURT

*[signature]*

*[District]* REGISTRAR

APPROVED AS TO FORM:

*[signature]*

Counsel for the Plaintiffs

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:            *Equustek Solutions Inc. v. Jack,*
                     2012 BCSC 1490

Date: 20121010
Docket: S112421
Registry: Vancouver

Between:

**Equustek Solutions Inc., Robert Angus, and
Clarma Enterprises Inc.**

Plaintiffs

And:

**Morgan Jack, Andrew Crawford,
Datalink Technology Gateways Inc., Datalink 5, Datalink 6,
John Doe and Datalink Technologies Gateways LLC**

Defendants

Before: The Honourable Mr. Justice R. Punnett

## Reasons for Judgment

(In Chambers -- *Ex Parte*)

Counsel for the Plaintiffs:                                      R.S. Fleming

Defendants:                                                No appearances

Place and Date of Decision:                            Vancouver, B.C.
                                                       July 26, 2012

Place and Date of Reasons:                             Vancouver, B.C.
                                                       October 10, 2012

## Introduction

[1]      In August 2011 the plaintiffs brought an application to the court for relief that included a *Mareva* injunction.  The matter was heard by Mr. Justice Leask over two days and the *Mareva* injunction was refused.

[2]      The plaintiffs renewed their application in the summer of 2012 on the basis of events that transpired since the earlier application.  I heard the matter ex parte on July 26, 2012 and issued a *Mareva* injunction with reasons to follow.  These are those reasons.  They rely to some extent on

the written submissions of the plaintiffs without specific attribution being noted.

## Background

[3]     For the purpose of this application the plaintiffs accept the findings of fact of Leask J. in his oral unreported decision of September 8, 2011.  Leask J.'s introduction and findings of fact were as follows:

### INTRODUCTION

[2]     The plaintiffs are seeking a Mareva injunction against the defendants. Both companies are manufacturers of industrial network interface products which allow different pieces of complex machinery made by different manufacturers and using different interface and software to communicate with each other. For many years the two companies worked together with the plaintiffs designing and manufacturing products and the defendants acting as distributors and sales agents. In recent years their relationship broke down and they have become competitors. In this chambers application, the affidavit material demonstrates seriously different versions of the facts.

### FACTS

[3]     There is some common ground between the parties. The original technology for the Equus/Equustek product line was invented by the plaintiff Robert Angus.

[4]     Datalink was formerly a distributor of products manufactured by Equustek and its predecessor company, Equus Technologies. There was no formal distribution agreement in place, but for years the practice was that Datalink would take orders from its customers for Equustek products and then in turn order the product from Equustek. Datalink would then deliver the product to its customers.

[5]     In earlier years, Equus had no marketing or sales division of its own. The Equus products were marketed as "Datalink" products. Datalink actively marketed the Equus products and the products themselves had "Datalink" logos.

[6]     The products were heavily marketed by Datalink's web presence and numerous websites. The idea was that the customer would be more inclined to buy a Datalink product from Datalink if there was an association of names.

[7]     The business arrangement described above was originally devised between Equus and Colin Marsh, who operated two companies, Sage Automation Corporation and Datalink Technologies, sometimes hereafter referred to as old Datalink, which sold the Equus products in the United States and Canada. The arrangement essentially contemplated a division of labour: Sage and old Datalink were responsible for interactions with the marketplace, and Equus was responsible for hardware and software.

[8]     Over time difficulties developed between Robert Angus and Colin Marsh. This eventually led to a lawsuit in which Angus alleged that Marsh had personally guaranteed the debts of Sage. Ultimately Equus failed at trial to prove the personal guarantee.

[9]     After the relationship between Marsh and Angus collapsed, the defendant Morgan Jack, who had worked for Sage, founded the new Datalink, to carry on the business of Sage and old Datalink. Since Jack's Datalink began dealing with Angus and Equustek, the relationship has suffered from similar problems as Marsh had run into previously.

[10]     In or around 2003 or 2004, when Datalink refused to merge with Equustek, Jack says that Angus told him that Equustek would market its products directly and put Datalink out of business.

[11]     Shortly after this exchange, Equustek hired Bob Huth to take charge of its marketing functions and put Equustek labelling on the product, in addition to the DL labelling that was already there. Huth ceased putting a Datalink logo on the products. Datalink maintained its longstanding marketing practices and did not change its websites or photos at this time, so they continued to display the Datalink logo and DL on the product as before. When the new products that were developed by Equustek did become available after this point, Datalink photoshopped over the photo of the Equustek logo.

[12]     This brings us to the involvement of the defendant Andrew Crawford.

[13]     Crawford, a professional engineer, is a former employee of Equustek. He was employed by Equustek and its predecessor company, Equus Technologies, from October 1993 until January 2005. While at Equus/Equustek, Crawford was engaged in designing network interface products based on a competitor's product, an Allen Bradley network product called the 1770-KF2 which operated on its own closed proprietary network called a DH+ network, meaning that only Allen Bradley products could communicate on that network.

[14]     After Crawford left Equustek in January of 2005, he joined Tantalus Systems Corp., in February 2005, doing work that was unrelated to his work at Equus/Equustek. When he left Equustek, according to him, he did not take with him any intellectual property, nor did he have any intention of being involved with anything that competed with Equustek.

[15]     In 2006, the defendant Morgan Jack hired Crawford as an independent contractor to work on a project called QPAB with General Electric. This particular project was a DH+ interface card for a touch-screen computer.

[16]     The QPAB work required an interface that would work on Allen Bradley DH+ networks. According to Crawford, his role was limited to certain hardware and firmware developments for the QPAB, none of which involved the plaintiffs' intellectual property. Crawford says that his work on the QPAB was limited to the study and use of the Allen Bradley product and the use of open industry technical standards, expired Allen Bradley patents and common engineering techniques, such as reverse engineering, applied to the Allen Bradley product and other products made by Allen Bradley and Equustek.

[17]     Crawford says he was told by Jack to design the QPAB product independently so that there would be no complaints that it was not independently developed, as they were aware that Angus might well commence litigation if it were discovered that a DH+ product was being worked on.

[18]     According to Crawford, he worked on three things for QPAB: the selection of the central processing unit, the selection of the operating system and the initial design of the physical interface for the DH+. Crawford used a Digi Evaluation Kit for these purposes, which had pre-existing hardware and firmware elements, such as the right processor and operating system.

[19]     Crawford also wrote the firmware necessary for the DH+ connectivity that was not already pre-programmed. The firmware was written by Crawford from scratch, and the code is different from the firmware on Equustek's products.

[20]     Crawford says it took him two years to reverse engineer the Allen Bradley project for the QPAB. To aid him, he had the benefit of the Digi Kit, his personal knowledge of how the Allen Bradley project worked and expired patents.

[21]     Beginning in about 2006, while continuing to rely exclusively on Equustek's trademarks, products, images and manuals, the defendants began selling the GW1000 product in substitution for the Equustek products.

[22]     The plaintiffs' sales and the defendants' purchases of the Equustek products

declined dramatically after 2007.

|      | Total Sales '000s | Sales to Data-Link | %   |
|------|-------------------|--------------------|-----|
| 2004 | 296               | 278                | 94% |
| 2005 | 672               | 367                | 55% |
| 2006 | 643               | 410                | 64% |
| 2007 | 701               | 448                | 64% |
| 2008 | 484               | 150                | 31% |
| 2009 | 361               | 104                | 29% |
| 2010 | 259               | 27                 | 10% |

[23]     In December 2010, Equustek discovered that Datalink were not filling Equustek product orders with Equustek products. Instead, while advertising and accepting orders for Equustek products, Datalink was filling those orders with their own GW1000 line of products.

[24]     When Equustek discovered this they wrote to the defendants on January 18, 2011, and terminated the distribution agreement and demanded that the defendants delete all reference to Equustek's products and trademarks on their websites.

[25]     The plaintiffs believe that the defendants now hold approximately two-thirds of the market share formerly held by them, and since the change in the websites and the demand, sales of the Equustek products have recovered somewhat, up 19%, and they have not returned to the level they were before the defendants began selling the GW1000.

[26]     In January 2011, Equustek terminated its relationship with Datalink. Datalink sought to remove all references to Equustek products from its websites. As a result of the extensive marketing network that Datalink had established, the process was difficult and took a long time. In some cases Datalink simply shut a website down because it was too difficult to delete every single reference. As far as Datalink is aware, every reference to Equustek products on its websites has now been eliminated. The plaintiffs vehemently disagree.

[27]     The plaintiffs' view is that the GW1000 line of produc[t]s was developed by Crawford using the plaintiffs' confidential information.

[28]     Datalink's view of the similarities between the products is that the products are designed in some ways to accomplish essentially the same function and are based on pre-existing technology which is the same. The similarities result from functional necessity or their common technological roots, rather than theft or copying.

[29]     According to Crawford, the similarities between the GW1000 and the Equustek products should be expected, as both are derived from the Allen Bradley product. The GW1000 does not purport to be similar to the Equustek products, but instead it attempts to be similar to the Allen Bradley product.

[30]     The parties also have a dispute about the product manuals. Robert Angus says he wrote them and the defendants have improperly copied them in preparing GW1000 manuals. The defendants say Colin Marsh wrote the original manuals and Jack and Datalink have his permission to copy them.

…

[4]     Leask J. refused the application saying:

> [44]     The principal argument of the plaintiffs is that injunctive relief is necessary to provide a meaningful monetary remedy in the event of their being successful at trial[.] In my opinion, looking at all the difficult issues and admitted facts in this case, the plaintiffs do not have a convincing balance of convenience case. Going back to the roots of Mareva jurisprudence, the plaintiffs have failed to show a good reason why the court should deprive the defendants of control of their assets before the plaintiffs have succeeded at trial. To quote the Court of Appeal in *Silver Standard*:
>
> > [21]     … it is clear that in most cases, it will not be just or convenient to tie up a defendant's assets or funds simply to give the plaintiff security for a judgment he may never obtain. Courts will be reluctant to interfere with the parties' normal business arrangements, and affect the rights of other creditors, merely on the speculation that the plaintiff will ultimately succeed in its claim and have difficulty collecting on its judgment if the injunction is not granted.
>
> [45]     I explicitly adopt the *Tracy* formulation that "the overarching consideration in each case is the balance of justice and convenience between the parties". As between Equustek and Angus on the one hand and Datalink and Jack on the other, I find that the balance of justice and convenience favours Datalink and Jack.

[5]     Leask J. continued with the balance of the plaintiffs' application and on September 23, 2011 ordered:

> …
>
> 1.      If any of the Defendants have any such documents in their possession or control, the Defendants must immediately return to the Plaintiffs all copies of the Plaintiffs' source code, board schematics and any other documentation taken from the Plaintiffs;
>
> 2.      Except as noted in paragraph 5 below, the Defendants Datalink 4 and Morgan Jack are prohibited from
>
> > a.      referring to any of the Plaintiffs, or
> >
> > b.      referencing or using the Plaintiffs' product images, users manuals, and product names in any way on any website that they own, direct, or control in any way, and without limiting the generality of the foregoing, on the following websites:
> >
> > c.      www.protocolconverter.com;
> >
> > d.      www.datalinkgateways.com;
> >
> > e.      www.abgateways.com;
> >
> > f.      www.datalink-gateways.com;
> >
> > g.      www.datahighwayplus.com;
> >
> > h.      www.datalink-networks.com;
> >
> > i.      www.datalinktek.com
> >
> > j.      www.datanetprotocols.com
> >
> > k.      www.1770-kf3.com;
> >
> > l.      www.1770-kf2.com;

m.    www.1784-pktx.com;

n.    www.1784-ktx.com;

o.    www.1784-pcmk.com;

p.    www.ethernetgateways.com;

q.    www.control-logix.com;

r.    www.ethernetipsolutions.com;

s.    www.datatechgateways.com;

t.    www.datalinkcontrollers.com; and

u.    www.datalink-networking.com.

The Plaintiffs' products, which Defendants Datalink 4 and Morgan Jack are prohibited from referencing or using in any way (the "Equustek Products") are:

v.    EQ7000/DL7000;

w.    EQ-DCM;

x.    DL6000;

y.    DL4500;

z.    DL4000;

aa.    DL3500;

bb.    DL2000;

cc.    DLPCIe;

dd.    DLPCI;

ee.    DL-PC;

ff.    DL-STD; and

gg.    DL-PC/104;

3.    [T]he Defendants Datalink 4 and Morgan Jack are prohibited from distributing the users manuals for the Equustek Products above, but this paragraph 3 does not restrict the Defendants from continuing to distribute users manuals for the GW1000.

4.    [T]he Defendants Datalink 4 and Morgan Jack are prohibited from making any of the following statements to customers:

a.    the Equustek Products are no longer available in the market place;

b.    the Equustek Products are obsolete;

c.    the Equustek Products belong or ever belonged to the Defendants in any way;

d.    GW1000 line of products is an upgrade or consolidation of the Equustek Products in any way; or

e.    any similarly inaccurate statements,

but the Defendants shall be entitled to make comparisons (other than on their websites), based in fact, between the GW1000 and the Equustek Products in the course of fair competition between the Plaintiffs and the Defendants;

5.    The Defendants Datalink 4 and Morgan Jack shall, within 14 days of this order,

prominently post on each of their websites (as described in paragraph 2 above) in which the GW1000 is sold or advertised in any way, the following statement:

"Equustek Solutions Inc. (www.equustek.com … products are no longer distributed by Datalink, including:

| | | |
|---|---|---|
| DL4500 | DL3500 | DLPCI |
| DL6000 | DL2000 | DL-PC |
| DL7000 / EQ7000 | DL4000 | DL-STD |
| EQ-DCM | DLPCIe | DL-PC/104 |

Customers of these products should contact Equustek directly at the website above, or toll free at 1.888.387.3787 [and the Equustek logo must be displayed]."

The statement must be placed on the main or home page of each such website, above the fold of that page.

6.      The Defendants Datalink 4 and Morgan Jack shall, within 30 days of this order, disclose to the Plaintiffs the names and contact details of all customers who have ordered an Equustek Product from the Defendants since January 1, 2007.

7.      Except as noted in paragraph 1 above, the Plaintiffs' application is dismissed as against the Defendant Andrew Crawford, with costs payable on Scale B forthwith and in any event of the cause.

8.      The Plaintiffs' application for a limited *Mareva* injunction, as set out in paragraph 2 of the Notice of Application, is dismissed as against Defendants Datalink 4 and Morgan Jack.

9. Except as noted in paragraph 7 above, costs will be in the cause.

## **Present Application**

[6]      The present application is for a *Mareva* injunction against Morgan Jack, Datalink Technology Gateways Inc. ("Datalink 4"), and Datalink Technologies Gateways LLC ("Datalink 7"), collectively referred to as the "Datalink Defendants."

[7]      Counsel acknowledges that this Court cannot reconsider or come to a different decision than Leask J. did on the facts at that time.  They note that the application in August of 2011 was of a limited nature in that they were not trying to close the defendant business down but rather sought payment of the business' profits into court.  The present application seeks an unrestricted *Mareva* injunction, that is, the plaintiffs now seek an order to freeze all of the defendants' assets.  They base this renewed application on events occurring after the fall of 2011.  I now turn to those events.

[8]      On October 19, 2011 Master McDiarmid ordered that Datalink Technologies Gateways LLC be added as a defendant to this action.

[9]      On March 21, 2012, Madam Justice Fenlon, the case management judge, concluded that Morgan Jack and Datalink 4 had not adequately complied with the September 23, 2011 order of Mr.

Justice Leask and made the following additional orders:

1.      The Plaintiff's application that the Responses to Civil Claim of the defendants Morgan Jack and Datalink 4 be struck and judgment entered against them is dismissed;

2.      Morgan Jack and Datalink 4 must comply in full with the Order of Mr. Justice Leask made September 23, 2011 (the "Leask Order"), by April 30, 2012;

3.      Morgan Jack and Datalink 4 must also:

   a.      Produce a new customer list as required in paragraph 6 of the Leask Order;

   b.      Deliver an affidavit confirming that this new customer list is accurate and complete; and

   c.      By consent, deliver copies of the purchase order or credit card invoice associated with each request to purchase the Plaintiffs' products from each of the customers on the list (except that Morgan Jack and Datalink 4 may redact the first 9 digits of the 12 digits in each credit card number referenced);

by April 30, 2012;

4.      Morgan Jack and Datalink 4 must also amend the notice posted on their websites, as required by paragraph 5 of the Leask Order, to:

   a.      delete the opening phrase;

   b.      delete the Datalink phone number above the notice;

   c.      display the Equustek phone number in the same font and size, and in bold, as the Datalink phone number formerly in the banner at the top of the box which contained the notice, as displayed at page 64 of the Affidavit #2 of R. Huth (sworn January 31, 2012), which is attached here as Schedule "A", and

   d.      use an image to post the notice so that it is not searchable by internet search engines;

by April 30, 2012.

and

5.      The Plaintiffs are awarded special costs of this application, as against the defendants Morgan Jack and Datalink4, in any event of the cause and payable forthwith.

[10]    Counsel met on March 30, 2012 to attempt to resolve the noncompliance referred to in Fenlon J.'s order.  The defendants had apparently been asserting since September 2011 that they intended to apply to sever liability and quantum and on March 30, 2012 agreed that such application would be filed by April 30, 2012.  That did not occur.

[11]    On April 24, 2012 plaintiffs' counsel wrote to the Datalink defendants' counsel and counsel for Andrew Crawford, seeking document production and their agreement to some form of confidentiality order to protect their intellectual property pending trial.  They also put the defendants on notice that they would apply for default judgment if the deadline in Fenlon J.'s order was not

met.  No response was received to that letter.  Instead the Datalink Defendants filed a notice of intention to act in person on April 25, 2012.

[12]    On June 20, 2012 Madam Justice Dickson ordered that the response to civil claim of the defendants Morgan Jack and Datalink Technology Gateways Inc. be struck, and awarded special costs of the application in any event of the cause.

[13]    On June 25, 2012 the special costs of the plaintiffs' March 20 and 21, 2012 application before Fenlon J. were allowed in the total sum of $30,224.

[14]    On July 25, 2012 Andrew Crawford filed a notice of intention to act in person.

[15]    Plaintiffs' counsel advises that all of the motions and orders have been promptly delivered to the Datalink Defendants since they filed their notice of intention to act in person and that there has been no response from any of the Datalink Defendants since April 27, 2012.

[16]    No new customer list, affidavit, or supporting documents have been produced and most of the websites continue to be in violation of the orders of Leask J. and Fenlon J.  The Datalink Defendants have not paid the certificate of special costs.

[17]    The evidence indicates that Morgan Jack is now in Argentina.  He has sold his British Columbia property.  The defendants' websites state they carry on business in Vancouver, B.C., Ferndale, Washington, Tucson, Arizona and Mexico.  The Ferndale and Tucson addresses are simply the addresses of a mail box company.

[18]    After these proceedings were commenced Morgan Jack incorporated Datalink 7 in Arizona; however, Datalink 7 was not added as a party until the order of Master McDiarmid on October 19, 2011.  Datalink 7 has filed a statement of defence and attorned to the jurisdiction.  The most recent iterations of the defendant's websites now refer to another company "DataTech Inc."

**Plaintiffs' Submissions**

[19]    The plaintiffs submit that as a result of the above events and other factors that I will refer to, there has been a significant change in circumstances since September 2011.

[20]    They note firstly that the striking of the Datalink Defendants' defence results in those defendants being deemed to have admitted the claims against them.  In addition, they now have an order for costs against the Datalink Defendants and are seeking in part post-judgment relief, that being the sum owing for costs.

[21]    Secondly, they submit there has been a complete failure by the defendants to comply with

the orders for production of documents.  They advise that no document lists whatsoever have been produced and that the defendants have maintained the position that confidentiality issues must first be resolved.  Plaintiffs' counsel notes that does not explain their failure to disclose all documents that are not claimed to be confidential nor to move to deal with the confidentially issues.

[22]    While not a new issue, given it was considered by Leask J., the Datalink Defendants have continued to fail to provide any information respecting how they operate or where they manufacture the GW1000.  They have also recently dropped their prices by 33%.

[23]    The concerns of the plaintiff with the present situation are addressed in affidavit #4 of Robert Angus, a plaintiff and a principal of the two corporate plaintiffs.  In his affidavit filed July 6, 2012 he deposes as follows:

> …
>
> 3.      About six months ago, Datalink started advertising "custom solutions" on its website as follows:
>
>> "If one of GW1000's existing products does not meet your needs, we will work with you to design, develop, test, and support a new custom solution. Our engineers have become experts at developing interface solutions for many companies including Siemens and Toshiba.  Call us to discuss you application at no obligation."
>
> 4.      I attach as Exhibit "A" an example of this from February 15 of this year, and as Exhibit "B", an example from today.  The Siemens and Toshiba projects referred to were Equustek (actually Equus) projects that Andrew Crawford worked on while he was employed at Equus, so Datalink appears to be advertising our core technology for sale, just as they appear to have sold our technology with the General Electric QPAB project.
>
> 5.      This is a serious concern to us because our business model depends on the fact that our products are in a highly technical niche market that are difficult to replicate, particularly by someone outside the field.  If our trade secrets are further distributed by Datalink (or anyone else) during the course of selling our technology further, there will come a point when our trade secrets are no longer secret.  If that happens our products will become commoditized and prices will collapse.
>
> 6.      This may already be happening.  In the past few weeks, Datalink has dropped its prices approximately 30%, renamed its product to the "DT1000" and now says it is carrying on business through another company, "DataTech Inc." which we do not know the location of – this is demonstrated by the website printout from last week which is attached as Exhibit "C".  However this is only the most recent company they have used, as can be seen from the Exhibit "D", a website print out from January 30, 2012.
>
> 7.      I described the plaintiffs products and the plaintiffs trade secrets in some detail in my Affidavit #1, and I would also like to comment here on parts lists, parts specifications, and design notes.
>
> 8.      I referred to the effort required to create a parts list in paragraph 87 of my Affidavit #1.  Determining the specifications required for each part is the step before creating the parts list, and is an integral part of the design process.
>
> 9.      Most engineering work begins with design notes, and it is from these rough ideas that board schematics and source code are ultimately developed.  This means that the core

idea that is finally reflected in the source code or board schematics can often be found in the design notes.  Engineers commonly keep these notes in a log book of their daily activity, and Andrew Crawford had many of these log books when he worked for us.  Some of these, in particular from the suspect AAI period, have never been returned to us.

…

[24]    As a result the plaintiffs assert the evidence now shows that their trade secrets are in jeopardy and should they be disseminated the value of their technology will collapse.

## The Law Respecting a *Mareva* Injunction

[25]    An applicant for a *Mareva* injunction must establish a strong *prima facie*, or a good arguable case, and must show that the balance of convenience as between the parties favours the granting of the injunction.  In balancing those interests the court should have regard to all the relevant factors in each case.  Included in such factors will be evidence showing the existence of assets and "a real risk of their disposal or dissipation so as to render nugatory any judgment."  (*Mooney v. Orr* (1994), 100 B.C.L.R. (2d) 335 at para. 44 (S.C. Chambers) [*Mooney No. 2*]; *Tracy v. Instaloans Financial Solutions Centres (B.C.) Ltd.*, 2007 BCCA 481 at para. 17).

[26]    In *Tracy* the court commented on the first branch of the test, noting references in the authorities to both a "strong *prima facie* case" and "good arguable case."  The court stated that "[i]n either case, it is more than an arguable case, and may be met by an assessment that does not reach the 'bound to succeed' threshold" (para. 54).

[27]    Once a strong *prima facie* case is shown, "the interests of both parties should be balanced taking into account the particular relevant circumstances of the case, including: the nature of the transaction giving rise to the cause of action, enforcement measures available in B.C., the amount of the claim, the history of the defendant's conduct, the relative strengths of the parties' cases, and evidence of irreparable harm either way."  (*Netolitzky et al v. Barclay et al,* 2002 BCSC 1098 at para. 22).

[28]    In *Tracy,* at paras. 46 and 47, in considering the relevant factors the court must keep in mind that:

> [46]    In all cases, great caution is to be shown to avoid the mischief of litigious blackmail or bullying, and due regard must be paid to the basic premise that a claim is not established until the matter is tried.  Great unfairness may be occasioned, and the administration of justice brought into disrepute, by an order which impounds assets before the merits of the claim are decided.  It is useful to recall the words of Huddart J.A. in **Grenzservice Speditions Ges.m.b.H. et al. v. Jans et al.** (1995), 129 D.L.R. (4th) 733, 15 B.C.L.R. (3d) 370 (S.C.) at 755-756 at p. 23:
>
> > [*Mareva* and Anton Pillar orders] represent an extraordinary assumption of power by the judiciary.  Judges must be prudent and cautious in their issue.

[47]    At the same time, assets are easily moved from jurisdiction to jurisdiction, and if, as in *Mooney*, a party seeks the intervention of the court and also seeks to put his assets beyond its reach, the court has the ability to respond. As said by Newbury J. in ***Mooney No. 1***:

> [11]    … The reasons for extending Mareva injunctions to apply to foreign assets are valid in British Columbia no less than in England and Australia – the notion that a court should not permit a defendant to take action designed to frustrate existing or subsequent orders of the court, and the practical consideration that in this day of instant communication and paperless cross-border transfers, the courts must, in order to preserve the effectiveness of their judgments, adapt to new circumstances. Such adaptability has always been, and continues to be, the genius of the common law.

[29]    The approach to granting a *Mareva* injunction is a flexible one bearing in mind "[t]he fundamental question in each case is whether the granting of an injunction is just and equitable in all the circumstances of the case." (Huddart J. in *Mooney No.2* at para. 43 quoting *B.C. (A.G.) v. Wale* (1986), 9 B.C.L.R. (2d) 333 (C.A.) at 346).

[30]    The flexible approach articulated in *Mooney No.2* rejects any hard and fast rules as to when a *Mareva* injunction can be issued. A careful balancing of relevant factors will lead to a just result. In that case an injunction was found to be available even where the defendant was not actively dissipating or removing assets from the jurisdiction. It was available as a form of security given the particular circumstances before the court. Huddart J. explained the flexible approach as follows:

> …
>
> In other words, it prevents the judge from becoming a prisoner of a fixed formula and places the emphasis where it belongs, on the justice and fairness of the order *inter partes*. It is fair to both sides, because, while maintaining the burden on the plaintiff to establish grounds for the application, it justifies calling upon the defendant to meet the case brought by the plaintiff, by putting forth evidence to support his position.
>
> By this approach, the ultimate question becomes, is it fair and just that the applicant should have the right to monitor the movement or expenditure of capital assets by the respondent during the course of the proceedings between them?
>
> Along the route to an answer, the court must consider whether and to what extent the justification put forth in a particular case permits that right. This question directs attention to the value underlying the court's examination of whether there is real risk of dissipation of domestic assets and/or foreign assets, whether that analysis is performed as part of the three-pronged test that predominates at the *ex parte* stage or of the underlying "fit and just" test likely to be given flesh only at the *inter partes* continuation hearing.
>
> Implicit in the framing of this question is the view that *Mareva* injunctions are available not only to restrain the active dissipation of assets, but also as a form of security. In my view it is only fair to state directly what courts are doing in fact.
>
> …
>
> The real question on this application becomes whether this court will restrain a litigant like Mr. Mooney from dealing freely with capital assets already abroad before the proceeding was commenced, and probably before the cause of action arose. This is a different issue

from that of active and imminent dissipation of assets for which the Supreme Court of Canada approved the use of the *Mareva* injunction in **Aetna**, supra, as an exception to the long-standing practice of not requiring security before judgment.

It follows from my view of the law and practice in this province with regard to domestic *Mareva* injunctions that it is open to me to do just that. The English Court of Appeal devised the *Mareva* injunction for marauding charterers. It is equally well-suited to marauding deal-makers, to ensure that those B.C. residents who structure their business and personal lives to preserve assets out of sight and attack, may be enjoined from dealing with those assets except under the court's supervision during litigation. I am encouraged in reaching this conclusion by the decision of the Supreme Court of South Australia in **Coombs & Barei v. Dynasty Pty. Ltd.** (1986), 42 S.A.S.R. 413 (Millhouse J).

Fundamental to the exercise of the jurisdiction where no dissipation or secretion is imminent, will be the court's concern to protect its process from abuse. A litigant cannot be permitted to use the court to his advantage, while effectively disavowing in advance any judgment against him.

…

[31]    What is essential is awareness of the root issue of the particular situation before the court, so that a proper balancing of interests can take place, and a just result arrived at (*Tracy* at paras. 44-46).  In most circumstances, a real risk of dissipation of assets must be established before a party will be granted a *Mareva* injunction in British Columbia; however, this is not a strict requirement (*ICBC v. Patko,* 2008 BCCA 65 at para. 26.  In some circumstances, such as where there is evidence of fraud, a risk of dissipation of assets can be inferred (*Netolitzky*).  Where the risk of dissipation of assets is not imminent, the court's fundamental concern should be to protect its process from abuse.  As a result, given a *Mareva* injunction can be granted as a form of security, it is not essential that there be evidence of active removal or dissipation of assets.  (*Netolitzky*; *Silver Standard Resources Inc. v. Joint Stock Co. Geolog* (1998), 168 D.L.R. (4th) 309 (B.C.C.A.))

[32]    I turn now to the application of these principles to the facts of this case.

## Discussion

[33]    Renewal of an application for injunctive relief where such relief has been denied can be made where new evidence becomes available provided such evidence was not available to the plaintiffs at the original hearing but which would have affected the decision to refuse the earlier application if before the court at that time (*Cercast Inc. v. Shellcast Foundries Inc.* (No. 2) (1972), 8 C.P.R. (2d) 280 at 282 (F.C.T.D.); *DSLC Capital Corp. v. Credifinance Securities Ltd. et al*, 2011 ONSC 4044 at para. 3).

[34]    In refusing the plaintiffs' earlier application, Leask J. said that he could not say who was more likely to win at trial but that he accepted that the plaintiff had met the threshold test.  However, he concluded that irreparable harm was not established and that the plaintiffs did not have a convincing balance of convenience case.  Specifically, Leask J. found that they had not shown "a

good reason why the court should deprive the defendants of control of their assets before the plaintiffs have succeeded at trial."

[35]    In my view the subsequent events have addressed those concerns and have shifted the balance of justice and convenience in favour the plaintiffs.  With respect to the subsequent events I will address each event in turn and its relevance to the current application.

### Striking of Statement of Defence

[36]    The effect of the striking of the statement of defence of the Datalink Defendants is that it is deemed to be an admission of the allegations contained in the plaintiffs' notice of civil claim.  In *McIsaac v. Healthy Body Services Inc.*, 2009 BCSC 1716, Mr. Justice Pearlman reviewed the law on deemed admissions arising from a judgment taken in default of defence.  He concluded that the authorities established certain principles to be applied as to the effect of such deemed admissions.  At para. 44 he stated:

> [44]    I take the following principles from these cases:
>
> a)      Generally, if a statement of defence is struck, the defendant is deemed to have admitted the allegations of fact contained in the statement of claim.  Where the defence is struck with damages to be assessed, all that remains in issue is the assessment of damages.
>
> b)      The rule that the defendant is deemed to have admitted all of the allegations of fact in the statement of claim is not immutable.  The plaintiff must prove his or her claim for damages.  The court retains the discretion, which it must exercise judicially, to permit the defendant to adduce evidence and cross-examine on issues essential to a fair and just determination of the loss actually sustained by the plaintiff.
>
> ...

[37]    The order striking their defence did not find the Datalink Defendants "liable with damages to be assessed."  Therefore, while the facts respecting liability are deemed to be admitted, the court can still exercise its discretion.  The facts in the statement of claim are not "immutable."

[38]    Given the deemed admission of the facts, and the failure of the Datalink Defendants to comply with court orders resulting in the striking of their defence, the "who will win" factor has in my opinion shifted and is no longer neutral and now weighs in favour of the plaintiffs.

### Order for Costs

[39]    The fact that the defendants are, at least to the extent of the costs award, judgment debtors is a factor (although a limited one) given the amount involved for costs apparently pales in comparison to the potential damages claimed.

### Effectiveness of Court Orders

[40]    As noted in *Tracy* at paras. 21 and 22, one of the factors to consider is the effectiveness of court orders.  Citing *Mooney v. Orr* (1994)*,* 98 B.C.L.R. (2d) 318 (S.C. Chambers) [*Mooney No. 1*], where Newbury J. quoted from *Derby & Co. Ltd. v. Weldon* (No. 2), [1989] 1 All E.R. 1002 (C.A.) at 325:

> [21]    …
>
> > The fundamental principle underlying this jurisdiction [to issue a worldwide order pre-judgment] is that, within the limits of its powers, no court should permit a defendant to take action designed to ensure that subsequent orders of the court are rendered less effective than would otherwise be the case. …
>
> [22]    The chambers judge referred to passages of **Mooney No. 1** confirming the adaptability of the courts to new circumstances, the need to ensure a defendant does not take action designed to frustrate existing or subsequent orders of the court, and the caution to be applied in ensuring that there is a real risk of removal or dissipation of assets to avoid judgment. …
>
> > …

[41]    In this case I am satisfied that there has not been full compliance with the orders of Leask J. and Fenlon J.  The evidence indicates as well that the Datalink Defendants have abandoned the litigation and show no intention of compliance with either the orders of the court or the rules of court.  The defendants have established multiple corporate entities, including some outside Canada, and the defendant Morgan Jack appears to have taken up permanent residence outside the jurisdiction.

[42]    On the material filed it can be reasonably inferred that the Datalink Defendants have chosen to deal with the plaintiffs' claims by moving out of the jurisdiction, filing a notice of intention to act in person, incorporating a myriad of shell corporations in different jurisdictions and ignoring the court process.  In my view it can be reasonably inferred that there is a "real risk of dissipation of assets."

## Conclusion

[43]    In my opinion the factors discussed above weigh in favour of granting the injunction sought, especially given the ephemeral nature of intellectual property which once disseminated likely cannot be retrieved and whose value diminishes as a result.  The plaintiffs will suffer irreparable harm if the injunction is not granted.

[44]    As mentioned earlier Datalink 7 was not added as a defendant until after the application before Leask J.  As a result it is not in default of any court orders because they do not apply to it.  However, I am satisfied on the evidence filed that it is simply one more corporate shell used by the defendants to conduct the same business with the same products.  Taking into account the necessity for a finding of a strong *prima facie* case, the balance of convenience and the interests of justice, I am satisfied that it is appropriate to include Datalink 7 in the order.

[45]     In granting the injunction I have considered the significant impact it may have on the defendants' ability to carry on business.  In practical terms it will prohibit them from doing so. Notwithstanding that result the balance of convenience lies with the granting of the injunction requested.  The injunction will prohibit the Datalink Defendants from dealing with any of their assets worldwide with the exception that they may meet ordinary living expenses and retain counsel to provide advice on the setting aside of the injunction.

[46]     As a result the *Mareva* injunction shall issue.

"Punnett J."

# EXHIBIT 4



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

SEP 26 2012

ENTERED

No. S112421
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, and DATALINK TECHNOLOGIES GATEWAYS LLC

DEFENDANTS

## ORDER

| | | |
|---|---|---|
| BEFORE | ) )  THE HONOURABLE JUSTICE )  GROVES ) ) ) | Wednesday, the 26th day of September, 2012 |

ON THE APPLICATION of the Plaintiffs dated September 12, 2012 coming on for hearing on September 26, 2012, and on hearing John Zeljkovich, counsel for the Plaintiffs, and no one appearing for the Defendants;

THIS COURT ORDERS THAT:

1.   Whereas Morgan Jack, Datalink Technology Gateways Inc. and Datalink Technologies Gateways LLC may be guilty of contempt of court, that a warrant in

2

Form 115 be issued ordering that Morgan Jack be apprehended and promptly brought before a Judge of the Supreme Court of British Columbia.

BY THE COURT

*[District]* REGISTRAR

APPROVED AS TO FORM:

Counsel for the Plaintiffs

CHECKED

# EXHIBIT 5



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

DEC 1 3 2012
ENTERED

25

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGIES GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, and DATALINK TECHNOLOGIES GATEWAYS LLC

DEFENDANTS

ORDER MADE AFTER APPLICATION

|  | ) |  | ) |  |
|---|---|---|---|---|
| BEFORE | ) | THE HONOURABLE | ) | Thursday, the 13th day of |
|  | ) | JUSTICE TINDALE | ) | December 2012 |
|  | ) |  | ) |  |
|  | ) |  | ) |  |

THE APPLICATION of the Plaintiffs dated November 13, 2012, coming on for hearing in Vancouver on December 13, 2012, and on hearing Robbie Fleming, counsel for the plaintiffs, Geoff Gomery Q.C., counsel for the respondents Google Inc. and Google Canada Corporation, and no one appearing for the defendants, although duly served;

THIS COURT ORDERS THAT:

1.  The Plaintiffs' application against Google Inc. and Google Canada Corporation be and is adjourned generally, by consent.

2.  The Defendants Morgan Jack, Datalink Technologies Gateways Inc. and Datalink Technologies Gateways LLC (the "Datalink Defendants") cease operating or carrying on business through any website, including those contained in Schedule "A" and all associated pages, subpages and subdirectories, and that these Defendants immediately take down all such websites, until further order of this court.

3.  The parties be at liberty to apply to the court for further directions.

www.robertfleminglawyers.com

2

26

4.   The plaintiffs are awarded special costs of this application as against the Datalink
     Defendants, payable forthwith and in any event of the cause.


THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT
TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY
CONSENT:


Signature of [ ] party [x] lawyer for the Plaintiff

Robbie Fleming


Signature of [x] party [ ] lawyer for the
respondents Google Inc. and Google
Canada Corporation

Geoff Gomery Q.C.

By the Court.


Registrar

3

27

Schedule "A"

www.datatechgateways.com;
www.gw1000.com;
www.protocolconverter.com;
www.datalinkgateways.com;
www.datalink-gateways.com;
www.datalink-networks.com;
www.1770-kf3.com;
www.1784-ktx.com;
www.1784-pcmk.com;
www.datalinkcontrollers.com;
www.datalink-networking.com;
www.datalinkgw1000.com;
www.datalinkinterfaces.com;
www.gw-1000.com;
www.1784u2dhp.com;
www.dhtoethernet.com;
www.datalinkconverters.com;
www.multigatecommunications.com
www.americangatewaycorp.com
www.ethernetinterfaces.com
http://ethernetdhplus.com
www.gatewayinterfaces.com
www.multigatecom.com
www.dlgw1000.com
www.gw1000-dh4851.com
www.gateway-1000.com
www.gatewaytech1000.com

28

Equustek Solutions Inc. v. Morgan Jack, Andrew Crawford, Datalink Technologies
Gateways Inc et al; VA S112421

**List of websites and associated subpages subject to December 13, 2012 Order of Mr. Justice Tindale as of December 14, 2012.**

### DATATECHGATEWAYS.COM

| | |
|---|---|
| Datatechgateways.com (home) | http://www.datatechgateways.com/ |
| About us | http://www.datatechgateways.com/about-us/ |
| Ask our engineers | http://www.datatechgateways.com/ask-our-engineers |
| App notes | http://www.datatechgateways.com/downloads/ |
| Faq | http://www.datatechgateways.com/faq/ |
| Links | http://www.datatechgateways.com/links/ |
| Blog | http://www.datatechgateways.com/blog/ |
| Testimonials | http://www.datatechgateways.com/gw1000-testimonials/ |
| Contact us | http://www.datatechgateways.com/contact-us/ |
| Products | http://www.datatechgateways.com/products/ |

### PROTOCOLCONVERTER.COM

| | |
|---|---|
| Home | http://www.protocolconverter.com/ |
| About us | http://www.protocolconverter.com/about-us/ |
| Ask our engineers | http://www.protocolconverter.com/ask-our-engineers/ |
| App notes | http://www.protocolconverter.com/downloads/ |
| Faq | http://www.protocolconverter.com/faq/ |
| Links | http://www.protocolconverter.com/links/ |
| Blog | http://www.protocolconverter.com/blog/ |
| Testimonials | http://www.protocolconverter.com/gw1000-testimonials/ |
| Contact us | http://www.protocolconverter.com/contact-us/ |
| Products | http://www.protocolconverter.com/products/ |

### DATALINKGATEWAYS.COM

| | |
|---|---|
| Home | http://datalinkgateways.com/index.html |
| Products | http://datalinkgateways.com/product_products.html |
| What's new | http://datalinkgateways.com/whatsnew.html |
| Downloads | http://datalinkgateways.com/downloads.html |
| Links | http://datalinkgateways.com/links.html |
| Engineering advice | http://datalinkgateways.com/eng_advice.html |
| Faq | http://datalinkgateways.com/faq.html |
| About us | http://datalinkgateways.com/about_us.html |
| Contact us | http://datalinkgateways.com/contact_us.html |

29

DATALINK-GATEWAYS.COM

| | |
|---|---|
| Home | http://datalink-gateways.com/index.html |
| Products | http://datalink-gateways.com/product_products.html |
| What's new | http://datalink-gateways.com/whatsnew.html |
| Downloads | http://datalink-gateways.com/downloads.html |
| Links | http://datalink-gateways.com/links.html |
| Engineering advice | http://datalink-gateways.com/eng_advice.html |
| Faq | http://datalink-gateways.com/faq.html |
| About us | http://datalink-gateways.com/about_us.html |
| Contact us | http://datalink-gateways.com/contact_us.html |

1770-kf3.com

Main page(only page)    http://1770-kf3.com/

1784-ktx.com

Main page(only page)    http://1784-ktx.com/

1784-pcmk.com

Main page(only page)    http://1784-pcmk.com/

Dhtoethernet.com

| | |
|---|---|
| Home | http://www.dhtoethernet.com/ |
| Blog | http://www.dhtoethernet.com/blog |
| Order | http://www.dhtoethernet.com/order |
| Downloads | http://www.dhtoethernet.com/downloads |
| Contact | http://www.dhtoethernet.com/contact |

Gw1000.com

| | |
|---|---|
| Home | http://www.gw1000.com/ |
| About | http://www.gw1000.com/about |
| Gw1000-DH+ | http://www.gw1000.com/gw1000-dh |
| Gw1000-DH485 | http://www.gw1000.com/gw1000-dh485 |
| Products | http://www.gw1000.com/products |
| Downloads | http://www.gw1000.com/downloads |
| Blog | http://www.gw1000.com/blog |
| Order | http://www.gw1000.com/order |

30

DATALINKGW1000.COM

| | |
|---|---|
| Home | http://www.datalinkgw1000.com/ |
| Datalink GW1000 Testimonials | http://www.datalinkgw1000.com/gw1000-testimonials/ |
| Contact | http://www.datalinkgw1000.com/contact/ |

GW-1000.COM

| | |
|---|---|
| Home | http://www.gw-1000.com/ |
| GW1000 Testimonials | http://www.gw-1000.com/gw1000-testimonials/ |
| Contact | http://www.gw-1000.com/contact/ |

"1000's of GW1000's are successfully working in industrial applications"

http://www.gw-1000.com/contact/#

DLGW1000.COM

| | |
|---|---|
| Home | http://www.dlgw1000.com/ |
| GW1000 Testimonials | http://www.dlgw1000.com/gw1000-testimonials/ |
| Contact | http://www.dlgw1000.com/contact/ |

"1000's of GW1000's are successfully working in industrial applications"

http://www.dlgw1000.com/gw1000-testimonials/#

1784u2dhp.com

| | |
|---|---|
| Home | http://www.1784u2dhp.com/ |
| About GW1000 | http://www.1784u2dhp.com/about |
| GW1000-DH+ | http://www.1784u2dhp.com/gw1000-dh |
| GW1000-DH485 | http://www.1784u2dhp.com/gw1000-dh485 |
| Products | http://www.1784u2dhp.com/products |
| Downloads | http://www.1784u2dhp.com/downloads |
| Blog | http://www.1784u2dhp.com/blog |
| Order | http://www.1784u2dhp.com/order |
| Need help? | http://www.1784u2dhp.com/ask-our-engineers |

31

## GW1000-DH4851.com

| | |
|---|---|
| Home | http://www.gw1000-dh4851.com/ |
| About | http://www.gw1000-dh4851.com/about/ |
| GW1000-DH4851-DF1 to DH485 | http://www.gw1000-dh4851.com/gw1000 |
| dh485/gw1000-dh4851/ | |
| Downloads | http://www.gw1000-dh4851.com/downloads/ |
| Blog | http://www.gw1000-dh4851.com/blog/ |
| Order | http://www.gw1000-dh4851.com/order/ |
| Need help? | http://www.gw1000-dh4851.com/ask-our-engineers/ |

## DATALINK-NETWORKING.COM

| | |
|---|---|
| Main Page(only page) | http://datalink-networking.com/ |

## DATALINK-NETWORKS.COM

| | |
|---|---|
| Main Page(only page) | http://datalink-networks.com/ |

## DATALINKCONTROLLERS.COM

| | |
|---|---|
| Main Page(only page) | http://datalinkcontrollers.com/ |

## DATALINKINTERFACES.COM

| | |
|---|---|
| Home | http://www.datalinkinterfaces.com/ |
| About us | http://www.datalinkinterfaces.com/about-us/ |
| Ask our engineers | http://www.datalinkinterfaces.com/ask-our-engineers/ |
| App notes | http://www.datalinkinterfaces.com/downloads/ |
| Faq | http://www.datalinkinterfaces.com/faq/ |
| Links | http://www.datalinkinterfaces.com/links/ |
| Blog | http://www.datalinkinterfaces.com/blog/ |
| Testimonials | http://www.datalinkinterfaces.com/gw1000- |
| testimonials/ | |
| Contact us | http://www.datalinkinterfaces.com/contact-us/ |
| Products | http://www.datalinkinterfaces.com/products/ |

32

## MULTIGATECOMMUNICATIONS.COM

| | |
|---|---|
| Home | http://www.multigatecommunications.com/ |
| Blog | http://www.multigatecommunications.com/blog |
| Order | http://www.multigatecommunications.com/order |
| Contact | http://www.multigatecommunications.com/contact |

## AMERICANGATEWAYCORP.COM

| | |
|---|---|
| Home | http://www.americangatewaycorp.com/ |
| Contact | http://www.americangatewaycorp.com/contact/ |

INTERFACING SERIAL DEVICES TO ETHERNET TECHNOLOGIES!

http://www.americangatewaycorp.com/contact/#

## ETHERNETINTERFACES.COM

| | |
|---|---|
| Main Page(only page) | http://ethernetinterfaces.com/ |

## ETHERNETDHPLUS.COM

| | |
|---|---|
| Home | http://ethernetdhplus.com/ |
| About | http://ethernetdhplus.com/about/ |
| GW1000-DH+ | http://ethernetdhplus.com/gw1000-dh/ |
| GW1000-DH485 | http://ethernetdhplus.com/gw1000-dh485/ |
| Products | http://ethernetdhplus.com/products/ |
| Downloads | http://ethernetdhplus.com/downloads/ |
| Blog | http://ethernetdhplus.com/blog/ |
| Order | http://ethernetdhplus.com/order/ |

## GATEWAYINTERFACES.COM

| | |
|---|---|
| Home | http://www.gatewayinterfaces.com/ |
| Products | http://www.gatewayinterfaces.com/products/ |
| App Notes | http://www.gatewayinterfaces.com/documents/ |
| Support | http://www.gatewayinterfaces.com/request-support/ |
| Contact | http://www.gatewayinterfaces.com/contact/ |
| About us | http://www.gatewayinterfaces.com/about/ |
| What's New | http://www.gatewayinterfaces.com/category/news/ |
| Testimonials | http://www.gatewayinterfaces.com/testimonial/ |
| Buy & Order | http://www.gatewayinterfaces.com/order/ |

33

**MULTIGATECOM.COM**

| | |
|---|---|
| Home | http://www.multigatecom.com/ |
| Products | http://www.multigatecom.com/products/ |
| Troubleshooting | http://www.multigatecom.com/category/troubleshooting/ |
| Request Support | http://www.multigatecom.com/request-support/ |
| About us | http://www.multigatecom.com/about/ |
| Contact us | http://www.multigatecom.com/contact/ |

**GATEWAY-1000.COM**

| | |
|---|---|
| Home | http://www.gateway-1000.com/ |
| Products | http://www.gateway-1000.com/products/ |
| App Notes | http://www.gateway-1000.com/documents/ |
| Support | http://www.gateway-1000.com/request-support/ |
| Contact | http://www.gateway-1000.com/contact/ |
| About Us | http://www.gateway-1000.com/about/ |
| What's New | http://www.gateway-1000.com/category/news/ |
| Testimonials | http://www.gateway-1000.com/testimonial/ |
| Buy & Order | http://www.gateway-1000.com/order-2/ |

**GATEWAYTECH1000.COM**

| | |
|---|---|
| Products | http://www.gatewaytech1000.com/products/ |
| App Notes | http://www.gatewaytech1000.com/documents/ |
| Support | http://www.gatewaytech1000.com/request-support/ |
| Contact | http://www.gatewaytech1000.com/contact/ |
| About Us | http://www.gatewaytech1000.com/about/ |
| What's New | http://www.gatewaytech1000.com/category/news/ |
| Testimonials | http://www.gatewaytech1000.com/testimonial/ |
| Buy & Order | http://www.gatewaytech1000.com/order-2/ |

**DATALINKCONVERTERS.COM**

| | |
|---|---|
| Home | http://www.datalinkconverters.com/ |
| Connect | http://www.datalinkconverters.com/connect |
| Order | http://www.datalinkconverters.com/order |
| Downloads | http://www.datalinkconverters.com/downloads |
| Blog | http://www.datalinkconverters.com/blog |
| Contact | http://www.datalinkconverters.com/contact |

# EXHIBIT 6

Robert Fleming LAWYERS

915 – 925 West Georgia
Vancouver V6C 3L2
Canada
t.    +1 604 682 1659
f.    +1 604 568 8548

5

September 20, 2012

Google
10 Dundas Street East, Suite 600
Toronto, Ontario
M5B 2G9

Dear Sir or Madam:

Re:    Equustek Solutions Inc. v. Morgan Jack, Andrew Crawford, Datalink Technologies
       Gateways Inc et al; BC Supreme Court VA S112421

We are counsel for the plaintiffs in the above action, which was commenced in April of 2011.

## Summary of Request

We are requesting that Google cease displaying the Datalink Defendants' websites in search
results, because by displaying the websites Google is inadvertently assisting the Datalink
Defendants in their ongoing theft of trade secrets and breach of court orders, the details of which
are described below.

The plaintiffs claim that the Datalink Defendants' business is based on the theft of the plaintiffs'
trade secrets and the passing off of the plaintiffs' products as their own. The Datalink Defendants
are deemed to have admitted these allegations as a result of their defences in these proceedings
being struck for deliberate breach of multiple court orders.

Even after the striking of their defences, the Datalink Defendants have continued to flagrantly
breach court orders, including a *Mareva* injunction, which effectively prohibit the Datalink
Defendants from continuing to operate their business. However, the Datalink Defendants
continue to sell the products in issue via their websites which are easily accessible on Google,
and this in turn leads the plaintiffs to seek your assistance.

## Plaintiffs' Claims

The plaintiffs are claiming that the various corporate defendants, along with Morgan Jack
(together, the "Datalink Defendants"), while acting as distributors of Equustek's products
conspired with one of the plaintiffs' former engineering employees to design and manufacture a
competing product (the GW1000) using confidential trade secrets stolen from the plaintiffs.
These competing products continue to be sold through various websites controlled by the
Datalink Defendants.

2.

6

In June of 2012, the defences of the Datalink Defendants were struck by Madam Justice Dickson for willful and unexplained non-compliance with numerous court orders, and the plaintiffs were given leave to proceed as if no defences had been filed. As a result, Morgan Jack and the corporate Datalink Defendants are deemed to have admitted the facts alleged against them in the notice of claim. A copy of Madam Justice Dickson's reasons for judgment are enclosed.

### Non Compliance with *Mareva* Injunction

In July of 2012, Mr. Justice Punnett granted a *Mareva* injunction, ordering that the world wide assets the Datalink Defendants be frozen. This order effectively prohibits the Datalink Defendants from carrying on business, as the terms of the order prohibit the sale of any inventory or assets. A copy of this order is also enclosed.

### Non Compliance with Injunction Suspending Business Activities

Subsequently, the plaintiffs sought an injunction restricting the Datalink Defendants from making any use at all of any information contained on any board schematics, parts lists, source code, design notes, and any drafts of any of these. In granting this order, Madam Justice Fenlon stated in her reasons for judgment:

> The interim injunction sought by the plaintiffs [Equustek] is very broad, effectively prohibiting any use of whole categories of documents and information that lie at the heart of any business of a kind engaged in by both parties. I am mindful that the effect of this order is the suspension of the defendants' business activities and their ability to earn income.
>
> ...
>
> The defendants have effectively disappeared. They have refused to provide any information about where they operate or where they manufacture the GW1000. The operating company has changed frequently. Morgan Jack at all times contracted in the name of Datalink Technologies Group Inc., a company that has not existed since 2007. Two other Datalink companies with almost identical names also no longer exist. The plaintiffs became aware of the existence of Datalink Technology Gateways Inc. only in December 2010.
>
> Further, the company appears to be a virtual one...
>
> ...
>
> The defendants have repeatedly failed to comply with court orders made in these proceedings and are now deemed to have admitted the use of the plaintiffs' trade secrets.
>
> ...
>
> ...I have concluded that the balance of convenience favours the granting of the interim injunction, despite its breadth and potential consequences for the defendants.

A copy of the order and of Fenlon J.'s reason for judgment are both enclosed.

### The Defendants' Websites

However, notwithstanding the above, the Datalink Defendants are continuing to carry on business through their numerous websites, in direct violation of the court orders referenced above. Some of the websites currently operating include:

3

7

www.datatechgateways.com;

www.gw1000.com;

www.protocolconverter.com;

www.datalinkgateways.com;

www.datalink-gateways.com;

www.datalink-networks.com;

www.1770-kf3.com;

www.1784-ktx.com;

www.1784-pcmk.com;

www.datalinkcontrollers.com;

www.datalink-networking.com;

www.datalinkgw1000.com;

www.datalinkinterfaces.com;

www.gw-1000.com;

www.1784u2dhp.com;

www.dhtoethernet.com; and

www.datalinkconverters.com.

Additionally, the Datalink Defendants have previously operated the following websites, which might be re-launched in the future:

www.abgateways.com;

www.datahighwaysplus.com;

www.datalinktek.com;

www.datanetprotocols.com;

www.1770-kf2.com;

www.1784-pktx.com;

www.ethernetgateways.com;

www.control-logix.com; and

www.ethernetipsolutions.com.

For these reasons we are respectfully seeking Google's assistance. We ask that Google cease indexing the above websites in search results, because it is only through their websites that the defendants can continue to violate court orders (and cause the plaintiffs' business to continue to suffer harm). Can you assist?

Best regards,

Robbie Fleming

# EXHIBIT 7

Sep. 24. 2012  4:25PM                                    No. 0390   P. 1



9

Facsimile Transmission Sheet

| To: Robbie Fleming | From: Google Inc. |
|---|---|
| Company: Robert Fleming BC | Date: 9/24/2012 |
| Fax number: 1 604 568 8548 | Total no. of pages including cover: 1 |
| Phone number: | Sender's contact information: http://www.google.com/support |
| Re: Your Request to Google | Fax number: 1-650-963-3255 |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Notes/Comments:

Hello,

Thanks for reaching out to us. We are in receipt of your request dated September 20th, 2012.

We have reviewed your request based on our policies concerning content removal. After reviewing the terms of your court order, Google has decided not to take action at this time. We encourage you to resolve any disputes directly with the owner of the website in question. Please visit http://www.google.com/support/bin/answer.py?answer=9109 to learn how to contact a site's webmaster and request a change. Additionally, if you receive an updated order against this defendant mandating the removal of these specific webpages from the internet, please provide us with a copy and we can continue evaluating your complaint at that time.

We are sorry that we cannot be of more immediate assistance in this matter.

Regards,

The Google Team

# EXHIBIT 8



No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGIES GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, and DATALINK TECHNOLOGIES GATEWAYS LLC

DEFENDANTS

## NOTICE OF APPLICATION

The Plaintiffs, Equustek Solutions Inc., Robert Angus, and Clarma Enterprises Inc., claim the right to serve this Notice of Application on Google Inc. and Google Canada Corporation outside British Columbia on the grounds that there is a real and substantial connection between British Columbia and the facts on which this proceeding is based.

**Name of applicant:** The Plaintiffs

To:       the Defendants Morgan Jack, Datalink Technologies Gateways Inc. ("Datalink 4") and Datalink Technologies Gateways LLC ("Datalink 7"), collectively referred to below as the "Datalink Defendants".

And to:    the Defendant Andrew Crawford.

And to:    Google Inc.

And to:    Google Canada Corporation

TAKE NOTICE that an application will be made by the applicant(s) to the presiding judge or at the courthouse at 800 Smithe Street, Vancouver, BC on December 5, 2012, at 9:45 am for the order(s) set out in Part 1 below.

**Part 1:  ORDER(S) SOUGHT**

The Plaintiffs are seeking the following Orders:

1.    That Google Inc. and Google Canada Corporation cease indexing or referencing websites contained in Schedule "A" in search results on their internet search engines, within 14 days.

2.     Special costs, as against Morgan Jack, Datalink 4, and Datalink 7.

## Part 2: FACTUAL BASIS

### Plaintiff's Claim

1.     The Plaintiffs manufacture networking devices which allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

2.     The Plaintiffs claim that the Datalink Defendants, while acting as the distributor of the Plaintiffs' products, conspired with one of the Plaintiffs' engineering employees (the defendant Andrew Crawford) to design and manufacture a competing product, the GW1000. The Plaintiffs say that Crawford and the other Defendants designed their competing product using trade secrets that Crawford took from the Plaintiffs.

3.     The Plaintiffs also claim that for many years the Datalink Defendants covered over the Plaintiffs' name and logo and passed off the Plaintiffs' products as their own. Later, when the Defendants began manufacturing their competing product, the GW1000, the Defendants relied on the Plaintiffs' goodwill by exclusively advertising the Plaintiffs' products on their websites. When these Defendants received orders for the Plaintiffs' products, they delivered their own competing product instead, in a tactic amounting to 'bait and switch'.

Amended Notice of Civil Claim

### Proceedings to Date

4.     The plaintiffs' claim was filed on April 12, 2011.

5.     From the onset of the proceedings, the Datalink Defendants have failed to comply with various orders of this court. The Plaintiffs issued an application in default on May 11, 2012, which came on for hearing before Madam Justice Dickson on May 29, 2012. No one appeared for the Datalink Defendants, and Madam Justice Dickson reserved to June 20, 2012, granting the plaintiffs' motion and striking the defence of Morgan Jack and Datalink Technologies Gateways Inc.

6.     On July 25, 2012, the plaintiffs brought brought an *ex parte* application for a *Mareva* injunction against the Datalink Defendants, which was granted by Mr. Justice Punnett on July 26, 2012, freezing these defendants worldwide assets, including all inventory of the product known as the GW1000, and requiring them to each provide an affidavit of assets within seven days of service of the order. Furthermore, the order provided that it is a contempt of court for any persons notified of the order knowingly assist in or permit a breach of the order

Order of Punnett J., July 26, 2012

7.     The plaintiffs then brought an application, coming on for hearing before Madam Justice
       Fenlon on July 27, 2012, for, *inter alia*, an order that the defendants be prohibited from
       dealing in any way with the information claimed by the plaintiffs in as trade secrets, until
       trial of this action or further order of this court. No one appeared for the Datalink
       Defendants, and Madam Justice Fenlon reserved to August 3, 2012.

8.     Once again, no one appeared for the Datalink Defendants on August 3, 2012. In her
       reasons, Madam Justice Fenlon noted that the impact of the interim injunction sought by
       the plaintiffs was significant, as the defendants would effectively be prohibited from
       carrying on business. Nevertheless, she granted the injunction, finding:

              ...the effect of permitting the defendants to carry on their business would also
              cause irreparable harm to the plaintiffs.

              The defendants have repeatedly failed to comply with court orders made in these
              proceedings and are now deemed to have admitted the use of the plaintiffs trade
              secrets.

              The Datalink defendants have chosen not to attend to oppose the injunction
              sought in this application. There is some evidence that their non-compliance with
              court orders may be accelerating. One of the websites had the warning notice
              imposed by this court removed, and prices for the pirated products have been
              reduced significantly.

                                          Reasons for Judgment of Fenlon J., August 3, 2012
                                                   Order of Fenlon J., August 3, 2012

9.     On October 10, 2012, Justice Punnett released written reasons for judgment for the
       plaintiffs' *Mareva* application. Regarding the Datalink Defendants' conduct in this
       litigation and the impact the *Mareva* would have, he commented:

              The evidence indicates as well that the Datalink Defendants have abandoned the
              litigation and show no intention of compliance with either the orders of the court
              or the rules of court.

              ...

              In granting the injunction I have considered the significant impact it may have on
              the defendants' ability to carry on business. In practical terms it will prohibit them
              from doing so. Notwithstanding that result the balance of convenience lies with
              the granting of the injunction requested.

                                          Reasons for Judgment of Punnett J., October 10, 2012

10.    Most recently, on September 26, 2012, the plaintiffs obtained a warrant for Morgan
       Jack's apprehension, on the basis that he and the Datalink Defendants may be in
       contempt of court. The Defendant Morgan Jack did not appear at that hearing, and to
       date, court bailiffs attempting to execute the warrant have not been able to locate him.

### Datalink Websites

11.    Datalink is a virtual company, previously carrying on business at the Defendant Morgan Jack's apartment in the West End of Vancouver, and from a mailbox in Ferndale Washington at which it has no actual premises.  However, the Datalink Defendants maintain a complex and ever expanding network of websites through which they advertise and sell their product.  As they have no physical storefront, their websites appear to be their only means of distributing the GW1000, and have been the subject of numerous court orders directing that notice provisions be prominently posted identifying the plaintiffs as manufacturer of the plaintiffs' products and directing customers of those products to the plaintiffs.

Affidavit #13 of Dermot Devine

12.    The Datalink Defendants continue to operate in violation of the Punnett Order and the August 3 2012 Fenlon Order.  The GW1000 is still being sold by the Datalink Defendants on their websites, with prices of the pirated product having been reduced significantly.

Affidavit #4 of Robert Angus
Affidavit #5 of Robert Angus
Affidavit #13 of Dermot Devine

### Google

13.    The third parties Google Inc. and Google Canada Corporation (collectively "Google") operate and maintain internet search engines that actively return the Datalink Defendants' various websites in their search results.  A member of the public conducting an internet search for the GW1000 product, as a result of Google's search technologies, is provided direct links to the Datalink Defendants' websites that are continuing to sell the GW1000 in direct violation of various orders of this court.  The consequence of providing these website indexes and search results is that Google is facilitating the ongoing breach of the Punnett and August 3, 2012 Fenlon Order by the Datalink Defendants.

14.    The plaintiffs have written to Google asking them to cease displaying the Datalink Defendants in search results as in doing so, Google is inadvertently assisting these defendants in their ongoing theft of trade secrets and breach of court orders.  Copies of the relevant orders were provided to Google.  On September 24, 2012 Google responded by saying that they would not take any action at that time, but that if an the plaintiffs obtained an updated court order mandating the removal of specific websites, they would re-evaluate the plaintiffs' complaint.

Affidavit #13 of Dermot Devine

15.    Google has the ability to remove websites from appearing in their search engines, and routinely does so in various situations.  Such removal is not difficult for them to implement, and can be done manually once the address of a specific website is provided.

Affidavit #3 of John Blown

16.    The consequence of Google continuing to allow the Datalink Defendants' websites to be indexed and returned in search results is that plaintiffs are suffering irreparable harm in

the form of reduced earnings due to the GW1000 still being sold at a reduced price.  As Madam Justice Fenlon stated in her August 3, 2012 reasons for judgment, "...there is little prospect at this point of the plaintiffs recovering damages from the Datalink defendants for loss of that business should the plaintiffs' claims be proved".

17.     Furthermore, the balance of convenience favours granting the orders sought against Google, as there is little to no prejudice to Google to go to the trivial effort to stop indexing the websites in issue, while there is substantial prejudice to the plaintiffs', as the ongoing sale of the GW1000 is severely damaging it's business.  Additionally, failing to order that Google cease returning the Datalink Defendants' websites in search results robs the plaintiffs of the value of the relief they have previously obtained in the Punnett Order and August 3, 2012 Fenlon Order against the Datalink Defendants.

### Part 3:  LEGAL BASIS

18.     Rule 10-4 of the Supreme Court Civil Rules

19.     The test for injunctive relief requires an applicant to demonstrate that there is a fair question to be tried; that the applicant will suffer irreparable harm if the injunction is refused; and that the balance of convenience lies with the applicant.  The fundamental question in each case is whether the granting of an injunction is just and equitable in all the circumstances of the case.

*Tracy v. Instaloans Financial Solutions*, 2007 BCCA 481

20.     In *Tracy*, the Court of Appeal approved the reasoning of Justice McLachlin in *BC (AG) v. Wade* (1986), 9 B.C.L.R. (2d) 333, where her Ladyship stated:

> ...it is important to emphasize that the judge must not allow himself to become a prisoner of formula.  The fundamental question in each case is whether the granting of an injunction is just and equitable in all the circumstances of the case.

### Part 4:  MATERIAL TO BE RELIED ON

1.      The Pleadings, including the:

   a.  September 23, 2011 Order of Mr. Justice Leask;

   b.  March 21, 2012 Order of Madam Justice Fenlon;

   c.  June 20, 2012 Order of Madam Justice Dickson;

   d.  July 26, 2012 Order of Mr. Justice Punnett;

   e.  August 3, 2012 Order of Madam Justice Fenlon;

   f.  Warrant issued by Mr. Justice Groves, dated September 26, 2012.

2.      The March 21, 2012 reasons for Judgment of Madam Justice Fenlon, the June 20, 2012 reasons for Judgment of Madam Justice Dickson, the August 3, 2012 reasons for

Judgment of Madam Justice Fenlon and the October 10, 2012 reasons for Judgment of Mr. Justice Punnett.

3.      Affidavits #4 and 5 of Robert Angus;

4.      Affidavits #13 of Dermot Devine

5.      Affidavit #3 of John Blown


The applicant estimates that the application will take 1 hour.

[*Check the correct box.*]

[ ] This matter is within the jurisdiction of a master.

[X] This matter is not within the jurisdiction of a master.

TO THE PERSONS RECEIVING THIS NOTICE OF APPLICATION: If you wish to respond to the application, you must

(a) file an application response in Form 33 within 5 days after the date of service of this notice of application or, if the application is brought under Rule 9-7 of the Supreme Court Civil Rules, within 11 days after the date of service of this notice of application, and

(b) at least 2 days before the date set for the hearing of the application, serve on the applicant 2 copies, and on every other party one copy, of a filed copy of the application response and the other documents referred to in Rule 9-7 (12) of the Supreme Court Civil Rules.

Dated: November 13, 2012

_____
Signature of
lawyer for applicants

| To be completed by the court only: |
| --- |
| Order made |
| [ ]     in the terms requested in paragraphs ...................... of Part 1 of this notice of application |
| [ ]     with the following variations and additional terms: |
| .................................................................................................... |
| .................................................................................................... |
| .................................................................................................... |

Date: ................................

..................................................
Signature of [ ] Judge [ ] Master

# Schedule A

www.datatechgateways.com;
www.gw1000.com;
www.protocolconverter.com;
www.datalinkgateways.com;
www.datalink-gateways.com;
www.datalink-networks.com;
www.1770-kf3.com;
www.1784-ktx.com;
www.1784-pcmk.com;
www.datalinkcontrollers.com;
www.datalink-networking.com;
www.datalinkgw1000.com;
www.datalinkinterfaces.com;
www.gw-1000.com;
www.1784u2dhp.com;
www.dhtoethernet.com; and
www.datalinkconverters.com.

# EXHIBIT 9



No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6, and
JOHN DOE, and DATALINK TECHNOLOGIES GATEWAYS LLC

DEFENDANTS

REQUISITION – GENERAL

| | |
|---|---|
| **Filed by:** | The Plaintiffs |
| **Required:** | To reschedule the Plaintiffs' application dated November 13, 2012, to September 26th & 27th, 2013, before Madam Justice Fenlon BY CONSENT. |
| [X] | Not within the jurisdiction of a master. |
| **Estimated time:** | The time estimate of the Plaintiffs is 2 days. |
| **Dated:** | May 10, 2013 |

Robbie Fleming
Counsel for the Plaintiffs

www.robertfleminglawyers.com

# EXHIBIT 10

# IN THE SUPREME COURT OF BRITISH COLUMBIA

2014 BCSC 1063 (CanLII)

Citation:     *Equustek Solutions Inc. v. Jack,*
              2014 BCSC 1063

Date: 20140613
Docket: S112421
Registry: Vancouver

Between:

**Equustek Solutions Inc.**
**Robert Angus and Clarma Enterprises Inc.**

Plaintiffs

And

**Morgan Jack, Andrew Crawford,**
**Datalink Technologies Gateways Inc., Datalink 5, Datalink 6,**
**John Doe, Datalink Technologies Gateways LLC and Lee Ingraham**

Defendants

Before: The Honourable Madam Justice Fenlon

## Reasons for Judgment

| | |
|---|---|
| Counsel for the Plaintiffs: | R.S. Fleming |
| Counsel for the Respondents to Application Google Canada Corporation and Google Inc.: | S.R. Schachter, Q.C. G.B. Gomery, Q.C. |
| Place and Date of Hearing: | Vancouver, B.C. October 22 and 23, 2013 February 7, 2014 |
| Further Written Submissions: | March 7 and 24, 2014 May 23 and 29, 2014 |
| Place and Date of Judgment: | Vancouver, B.C. June 13, 2014 |

2014 BCSC 1063 (CanLII)

## I.     INTRODUCTION

[1]     The plaintiffs apply for an interim injunction restraining two non-parties, Google Inc. and Google Canada Corporation, from including the defendants' websites in search results generated by Google's search engines. This application raises novel questions about the Court's authority to make such an order against a global internet service provider.

[2]     Although the plaintiffs seek an order against Google Inc. and Google Canada Corporation, there is no evidence that Google Canada Corporation is involved in the search services the plaintiffs seek to enjoin. It was common ground at the hearing that Google Inc. provides those internet search services. The order sought, if it is to be made, must thus be made against Google Inc. Accordingly, when I use the term "Google", I am referring only to Google Inc. I use the term "Google Canada" to refer to Google Canada Corporation in places.

## II.    THE UNDERLYING ACTION

[3]     The plaintiffs manufacture networking devices that allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

[4]     The plaintiffs claim that the defendants other than Andrew Crawford and Lee Ingraham (hereinafter referred to as "the defendants"), while acting as a distributor of the plaintiffs' products, conspired with one of the plaintiffs' former engineering employees and others to design and manufacture a competing product, the GW1000. The plaintiffs say that the defendants designed their competing product using the plaintiffs' trade secrets.

[5]     The plaintiffs also claim that for many years before they made the GW1000 the defendants covered over the plaintiffs' name and logo and passed off the plaintiffs' products as their own. Later when the defendants began manufacturing the GW1000, they relied on the plaintiffs' goodwill by exclusively advertising the plaintiffs' products on their websites. The defendants then delivered their own

competing product when they received orders for the plaintiffs' products, in a tactic amounting to "bait and switch".

[6]     This underlying action was commenced on April 12, 2011. The defendants failed to comply with various court orders from the outset of proceedings, resulting in the defences of Morgan Jack and Datalink Technologies Gateways Inc. being struck in June 2012.

[7]     The defendants originally carried on business in Vancouver but now appear to operate as a virtual company. They carry on business through a complex and ever expanding network of websites through which they advertise and sell their product. These websites have been the subject of numerous court orders, including a December 2012 order prohibiting the defendants from carrying on business through any website. The defendants continue to sell the GW1000 on their websites in violation of these court orders.

[8]     Google is not a party to this action. It operates and maintains internet search services that include the defendants' various websites in Google's search results. Google acknowledges that it has the ability to remove websites from its search engine results, and routinely does so in various situations.

[9]     Following the December 2012 order prohibiting the defendants from carrying on business through any website, Google voluntarily complied with the plaintiffs' request to remove specific webpages or uniform resource locations ("URLs") from its Google.ca search results (*i.e.* from searches originating in Canada), removing 345 URLs in total. However, Google is unwilling to block an entire category of URLs, sometimes referred to as "mother sites" from its search results worldwide.

## III.     POSITION OF THE PARTIES TO THIS APPLICATION

[10]    The plaintiffs take the position that an injunction should be granted against Google because Google's search engine facilitates the defendants' ongoing breach of the Court's orders by leading customers to Datalink websites.

2014 BCSC 1063 (CanLII)

[11]    Google takes the position that the Court does not have jurisdiction over either Google Inc. or Google Canada because neither is present in British Columbia and because the application for an injunction does not relate to Google doing or refraining from doing anything in either British Columbia or Canada. Google argues that even if this Court has jurisdiction, the order sought should not be made for two main reasons:  (i) because it would amount to a worldwide order that could not be enforced and (ii) because it would constitute an unwarranted intrusion into Google's lawful business activities as a search engine.

## IV.   ISSUES

[12]    The application raises three main issues:

(i)     Does this Court have territorial competence over a worldwide internet search provider such as Google?

(ii)    If the answer to the first question is yes, should this Court decline to exercise jurisdiction on the basis that California is the more appropriate forum?

(iii)   Should the order sought be granted?

## V.   ANALYSIS

### 1.    Does the Court have territorial competence over Google?

[13]    Determining whether jurisdiction should be assumed in a case with interjurisdictional aspects has always been a complex question. The worldwide growth of internet or e-commerce has only made the task more challenging.

[14]    The starting point in deciding whether the Court has territorial competence to make the order sought against Google is the *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28 [*CJPTA*] which codified and replaced the common law in this area. Territorial competence is established "by the existence of defined connections between the territory or legal system… and a party to the proceeding or

2014 BCSC 1063 (CanLII)

the facts on which the proceeding is based": *Stanway v. Wyeth Pharmaceuticals Inc.*, 2009 BCCA 592 at para. 10.

[15]    The plaintiffs accept they bear the burden of establishing the Court's territorial competence over Google. However, the parties do not agree on the standard of proof to be applied to this analysis.

### (i)      What Standard of Proof applies?

[16]    The plaintiffs argue that they need only show a good arguable case that Google is within the Court's jurisdiction, sometimes described as a *prima facie* case. Google submits that the ordinary, higher standard of proof on a balance of probabilities applies.

[17]    The Court of Appeal held that a plaintiff need only establish an arguable case that a defendant is subject to the Court's jurisdiction: *Purple Echo Productions, Inc. v. KCTS Television*, 2008 BCCA 85 [*Purple Echo*] at paras. 41-42. That can be accomplished by asserting facts that, if proved, would found jurisdiction: *Purple Echo* at para. 36. However, this conclusion is predicated on the assumption that "[i]f an arguable case were made out, the case would continue with jurisdiction potentially still a live issue": *Purple Echo* at para. 37. The Court of Appeal noted that since a determination under what is now Rule 21-8(1) is not a final determination, a *prima facie* standard suffices:  *Purple Echo* at para. 39. The standard of proof is thus clear when a <u>defendant</u> challenges jurisdiction. However, Google is not a defendant, but a non-party respondent on an interim application.

[18]    The order sought on this application is an interim one in the underlying  action between the plaintiffs and defendants, and if ordered, may also turn out to be time-limited against Google. However, if the order is made it is unlikely there will be another opportunity to consider the Court's jurisdiction to make an order against Google. In that sense the issue of territorial competence on this application is a final determination.

2014 BCSC 1063 (CanLII)

[19]    On the other hand, the plaintiffs have had limited opportunity to gather evidence in support of the jurisdictional facts they rely on to establish the Court's territorial competence over Google. They have cross-examined Steven Smith, who is a member of the "Legal Removals" team in Google's legal department, but discovery of Google's corporate structure and operations has been limited.

[20]    The Supreme Court of Canada addressed the challenge facing a court in determining jurisdiction on interlocutory motions in *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17, [2012] 1 S.C.R. 572 [*Van Breda*] at para. 72:

> [72]    …[C]ourt decisions dealing with the assumption and the exercise of jurisdiction are usually interlocutory decisions made at the preliminary stages of litigation. These issues are typically raised before the trial begins. As a result, even though such decisions can often be of critical importance to the parties and to the further conduct of the litigation, they must be made on the basis of the pleadings, the affidavits of the parties and the documents in the record before the judge, which might include expert reports or opinions about the state of foreign law and the organization of and procedure in foreign courts. Issues of fact relevant to jurisdiction must be settled in this context, often on a *prima facie* basis. These constraints underline the delicate role of the motion judges who must consider these issues.

[21]    In my view, proof on a balance of probabilities is the appropriate standard on this application because the jurisdictional ruling is a final one *vis à vis* the applicant and respondent. However, that standard should be applied while recognizing that the plaintiffs have had a limited opportunity to marshal supporting evidence.

### *(ii)    Have the plaintiffs established territorial competence?*

[22]    I return now to the substantive question:  Does Google fall into one of the connecting factors specified in the *CJPTA*? Neither Google nor Google Canada is registered or has a place of business in British Columbia. Section 3(e) of the *CJPTA* provides that:

> 3      A court has territorial competence in a proceeding that is brought against a person only if
>
> …
>
> (e)    there is a real and substantial connection between British Columbia and the facts on which the proceeding against that person is based.

2014 BCSC 1063 (CanLII)

[23]     Section 10 of the *CJPTA* provides that "a real and substantial connection" between British Columbia and the facts on which the proceeding is based is presumed to exist if certain facts pertain. The plaintiffs rely on three of the connecting factors listed in s. 10, asserting that this application:

> (a)      is brought to enforce, assert, declare or determine proprietary or possessory rights or a security interest in property in British Columbia that is immovable or movable property,
>
> …
>
> (h)      concerns a business carried on in British Columbia,
>
> (i)       is a claim for an injunction ordering a party to do or refrain from doing anything
>
> > (i)       in British Columbia, or
> >
> > (ii)      in relation to property in British Columbia that is immovable or movable property,

[24]     Before considering any of these connecting factors individually, I note that application of the presumptive factors in s. 10 of the *CJPTA* is contextual.  The *CJPTA*, like many of the cases addressing conflicts of laws, focuses on parties to a dispute in which one has a cause of action against the other. However, proceeding is defined broadly in s. 1 of the *CJPTA* as "an action, suit, cause, matter, petition proceeding or requisition proceeding and includes a procedure and a preliminary motion". Thus, the "proceeding" with respect to which I must answer the question of jurisdiction is not the underlying dispute between the plaintiffs and defendants but the relief that is specifically sought against Google.

[25]     Turning to the connecting factors the plaintiffs rely on, I first conclude that s. 10(i) of the *CJPTA* is not applicable. The plaintiffs apply to compel Google to take steps to alter its search engine. While Google was vague about the location of the computers that operate the search engine program, it is certain that those computers are not located in British Columbia. It follows that the order sought does not relate to Google taking steps in British Columbia or in relation to property in British Columbia.

[26]     I conclude that s. 10(a) of the *CJPTA* is applicable. This connecting factor establishes a presumptive substantial connection in a proceeding brought to enforce

proprietary rights over immoveable or moveable property in British Columbia. The plaintiffs' intellectual property at the heart of the underlying action is moveable property. The plaintiffs seek to enjoin Google in order to enforce their proprietary rights.

[27]     The plaintiffs acknowledge that the vast majority of GW1000 sales occur outside of Canada, but I accept that at least to the extent that the order sought relates to the enforcement of intellectual property rights in British Columbia, s. 10(a) applies. It may be a weak connecting factor, but that is not a consideration at this stage of the jurisdictional analysis.

[28]     I conclude that s. 10(h) is also a connecting factor, and a stronger one, because the injunction sought concerns a business that Google carries on in British Columbia. The question of whether Google carries on business in British Columbia requires a detailed consideration of Google's operations.

[29]     Google Canada is a wholly owned subsidiary of Google. It is chiefly responsible for marketing Google's services, including its search advertising, engineering efforts on products other than Google search, and other forms of interaction with the Canadian public such as policy outreach. Google Canada is incorporated in Nova Scotia and has offices in Montreal, Toronto, Ottawa, and Waterloo. Google Canada is not extra-provincially registered in British Columbia.

[30]     Google is a publically traded company incorporated in Delaware, USA. Its head office is in Mountain View, California and its internet search services are "operated out of that facility". It too is not extra-provincially registered in British Columbia. Google has two wholly owned subsidiaries that are extra-provincially registered in British Columbia, Google Payment Corp. and Google Canada Payment Corp., but I have no evidence about the activities of those companies.

[31]     Google operates the Google search engine that makes internet search results available through dedicated websites for each country around the world. For example, Google provides internet search services to users in Canada through

2014 BCSC 1063 (CanLII)

"www.google.ca", to users in the United States through "www.google.com", and to users in France through "www.google.fr". Despite providing country specific search websites, Google acknowledges that internet users are not restricted to using the website dedicated to their particular country. Thus users in Canada can search through "www.google.fr", and vice versa.

[32]    There are hundreds of millions of active websites over the internet and trillions of webpages. Search engines make the internet a viable and effective information and communication resource. The internet cannot be successfully navigated without search services such as those Google provides. Although there are other internet search companies, 70-75% of internet searches worldwide are done through Google.

[33]    Google does not charge for providing internet search services. It earns money in other ways, primarily by selling advertising space on the webpages that display search results. Google's advertising success is driven by the very high quality of its search results. Its income from these commercial activities is about $50 billion annually.

[34]    Google says that the fact that an internet search is initiated in British Columbia does not equate to Google carrying on business in the province. Google argues that on the plaintiffs' reasoning there is not a country on earth whose civil courts could not assert jurisdiction over Google in respect of search results. Rather, suggests Google, "some form of actual not virtual presence is required". Google relies heavily on *Van Breda* in which LeBel J. wrote at para. 87:

> [87]    Carrying on business in the jurisdiction may also be considered an appropriate connecting factor. But considering it to be one may raise more difficult issues. Resolving those issues may require some caution in order to avoid creating what would amount to forms of universal jurisdiction in respect of tort claims arising out of certain categories of business or commercial activity. Active advertising in the jurisdiction or, for example, the fact that a Web site can be accessed from the jurisdiction would not suffice to establish that the defendant is carrying on business there. <u>The notion of carrying on business requires some form of actual, not only virtual, presence in the jurisdiction, such as maintaining an office there or regularly visiting the territory of the particular jurisdiction.</u> [Emphasis added.]

Google did not quote that paragraph in full. The next line adds what is, in my view, an important qualification:

> But the Court has not been asked in this appeal to decide whether and, if so, when e-trade in the jurisdiction would amount to a presence in the jurisdiction.

In contrast to *Van Breda*, the matter before me involves e-commerce, or at least providing an "e-service".

[35]     *Van Breda* indicates that a real and substantial connection cannot be derived from the mere fact that a passive website can be accessed in the jurisdiction. To similar effect is *Thumbnail Creative Group Inc. v. Blu Concept Inc.*, 2009 BCSC 1833 [*Thumbnail*]. In that case the plaintiff claimed the defendant breached copyright by publishing the plaintiff's images. The defendant published these images in a book in the United States which could be purchased on the internet. Madam Justice Dickson said at para 19:

> [19]     … <u>use of the Internet in the course of conducting business does not mean the business in question is carried on globally for the purposes of a territorial competence analysis</u>. As counsel for [the defendants] points out, if this were so the Supreme Court of British Columbia would have jurisdiction in any dispute involving any business that makes long-distance telephone calls into this province or relies upon the Internet. [The plaintiff] did not provide authority in support of this far reaching proposition, which is, in my view, unsustainable. [Emphasis added.]

[36]     It follows form *Van Breda* and *Thumbnail* that the ability of someone in British Columbia to open a website created by a person in another country does not of itself give this Court jurisdiction over the creator of that website. Something more is required. In *Van Breda,* the Court considered factors such as whether the defendants' representatives regularly travelled to Ontario to further the defendants' promotional activities for its resorts and whether it distributed promotional materials in the province. In *Thumbnail*, Dickson J. considered that the connection between the defendants and British Columbia appeared to be limited to the sale of one copy of the defendant's book.

2014 BCSC 1063 (CanLII)

[37]     E-commerce has exponentially increased the difficulty of determining whether a company is carrying on business in a particular jurisdiction; it raises the spectre of a company being found to carry on business all over the world, just as Google submits with some alarm. Kevin Meehan comments in "The Continuing Conundrum of International Internet Jurisdiction" (2008) 31 BC Int'l & Comp L Rev 345 at 349:

> In the traditional analog world, it is relatively easy for courts to determine the geographical locations of the persons, objects, and activities relevant to a particular case. The geography of the digital world of the Internet, however, is not as easily charted. Content providers may physically reside, conduct their business, and locate their servers in a particular location, yet their content is readily accessible from anywhere in the world. Furthermore, attempts to identify the location of a particular user over the Internet have proven extremely difficult, and many Internet users compound this problem by intentionally hiding their location. Traditional principles of international jurisdiction, particularly territoriality, are poorly suited for this sort of environment of geographic anonymity. Courts have struggled to develop a satisfactory solution, yet no progress has been made toward a uniform global standard of Internet jurisdiction.

[38]     In short, courts have traditionally focused on locating the behaviour in issue within a particular state's borders to ensure that "the connection between a state and a dispute cannot be weak or hypothetical [so as to] cast doubt upon the legitimacy of the exercise of state power over the persons affected by the dispute" [*Van Breda* at para. 32]. Online activities, whether commercial or otherwise, are not so easily pigeonholed.

[39]     In *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416, 2004 CanLII 12938 (C.A.) [*Barrick Gold*], an Ontario company sued a British Columbia resident, alleging that he was defaming the company by posting hundreds of messages on internet websites accusing the company of fraud, tax evasion, money laundering, and genocide. At para. 30 the Ontario Court of Appeal quoted with approval from a High Court of Australia decision that said:

> The Internet is essentially a decentralized, self-maintained telecommunications network. It is made up of inter-linking small networks from all parts of the world. *It is ubiquitous, borderless, global and ambient in its nature. Hence the term "cyberspace". This is a word that recognizes that the interrelationships created by the Internet exist outside conventional geographic boundaries and comprise a single interconnected body of data, potentially amounting to a single body of knowledge.* The Internet is

2014 BCSC 1063 (CanLII)

accessible in virtually all places on Earth where access can be obtained either by wire connection or by wireless (including satellite) links. *Effectively, the only constraint on access to the Internet is possession of the means of securing connection to a telecommunications system and possession of the basic hardware.* [Italics added by the Ontario Court of Appeal.]

[40]     The Ontario Court of Appeal went on to note that these characteristics create a challenge in the defamation context and that "Traditional approaches … may not respond adequately to the realities of the Internet world": *Barrick Gold* at para. 32.

[41]     Canadian courts have found some assistance regarding jurisdiction and the internet in American cases. As academic commentators note, American jurisprudence is "an imperfect fit, as the American approach to personal jurisdiction has its roots in that country's constitutional requirement for minimal contact in order to establish due process.": Teresa Scassa & Michael Deturbide, *Electronic Commerce and Internet Law in Canada*, 2nd ed (Toronto, Ontario: CCH Canadian Limited, 2012) at 602 [*Scassa & Deturbide*].

[42]     Canadian courts have widely considered the United States District Court decision in *Zippo Manufacturing v. Zippo Dot Com Inc.,* 952 F Supp 119 (WD Pa 1997) [*Zippo*]: *Braintech, Inc. v. Kostiuk*, 1999 BCCA 169 [*Braintech*], *Pro-C Ltd. v. Computer City Inc.*, [2000] O.J. No. 2823 (S.C.J.), *Wiebe v. Bouchard et al.*, 2005 BCSC 47.

[43]     The plaintiff in *Zippo* is a Pennsylvania corporation that manufactures Zippo lighters. It claimed that the defendant, a California corporation that operated an internet news service and website under the domain names "ZippoNews.com", "Zippo.com" and "Zippo.net", infringed its trademark. The defendant's officers, employees, and internet servers were located in California and it had no offices, employees, or agents in Pennsylvania. Pennsylvania residents accessed the defendant's website, signed up, and received a news message service. Three thousand of the defendant's 140,000 subscribers world-wide were Pennsylvania residents. Contracts between users in Pennsylvania and the defendant were entered into on the website.

[44]    The issue was whether Pennsylvanian's long-arm statute could "reach" the defendant in California and exercise personal jurisdiction over it. As in *Van Breda* and *Thumbnail*, the Court concluded that being able to access a passive website was an insufficient basis for the state where the website was accessed to assert jurisdiction.

[45]    However, the Court found it had jurisdiction because the defendant had subjected itself to Pennsylvania's jurisdiction by conducting electronic commerce in Pennsylvania through its interactive website.

[46]    In *Scassa & Deturbide* at 604, the authors note that in the years since *Zippo*, American courts began to feel uncomfortable with the vague "interactivity" concept of *Zippo* and moved towards a test that focussed on "targeting" a jurisdiction, which fit more easily in areas like defamation where the *Zippo* test was particularly inadequate. The concepts of interactivity and targeting are of assistance in assessing whether Google carries on business in British Columbia through its websites.

[47]    Google submits that it merely offers a passive website to residents of British Columbia who wish to search the internet. It argues that its programs automatically generate search results without Google being actively involved in the particular search. Paragraph 23 of Google's written submissions state:

> [23]    … Google's internet search engine allows users to enter key-words and then Google generates a list of results in a specific ranked order. Google's search results are computer generated through the use of Google's highly confidential and proprietary algorithm and methodology. Google's web crawler program (referred to as "Googlebot") reviews the content that is available on trillions of webpages or URLs over the internet. Search results are generated based on that content [within seconds].

[48]    I conclude that Google's internet search websites are not passive information sites. As a user begins to type a few letters or a word of their query, Google anticipates the request and offers a menu of suggested potential search queries. Those offerings are based on that particular user's previous searches as well as the phrases or keywords most commonly queried by all users. As James Grimmelman

2014 BCSC 1063 (CanLII)

writes in "The Structure of Search Engine Law" (2007-2008) 93 Iowa L Rev 1 at 10-11:

> Search engines are also increasingly learning from the large volumes of query data they have accumulated. A user's history of queries can provide useful information about her probable intentions -- for example, whether she tends towards navigational or transactional queries. Similarly, search engines gain useful feedback into their own successes and failures by seeing which results users click on or by noticing long strings of searches on related terms, which may indicate that the user is having trouble finding what she's looking for.

[49]   Google collects a wide range of information as a user searches, including the user's IP address, location, search terms, and whether the user acts on the search results offered by "clicking through" to the websites on the list.

[50]   In addition to its search services, Google sells advertising to British Columbia clients. Indeed, Google entered into an advertising contract with the defendants and advertised their products up to the hearing of this application. Google acknowledges it should not advertise for the defendants and filed an affidavit explaining its inadvertent failure to suspend the defendants' Google account prior to the hearing.

[51]   Although Google's advertising business is marketed in Canada by Google Canada, British Columbia residents who wish to advertise on Google's webpages contract directly with Google and make payments directly to Google. Although those contracts stipulate that disputes will be governed by California law and adjudicated in California courts, the "choice of laws" provision in those contracts does not alter the fact that Google is carrying on a business in this province through advertising contracts with British Columbia residents.

[52]   The Supreme Court of Canada noted that advertising in a jurisdiction is not by itself a sufficient connection to establish territorial competence: *Van Breda* at paras. 87, 114. But there is a difference between a company advertising its own services through a website or other media available to British Columbia residents, and engaging in the business of selling advertising space on the internet to other

companies in British Columbia. There is uncontradicted evidence before me that Google sells advertising to British Columbia residents, including the defendants.

[53]    Google submits that its advertising services are completely separate from its search services, and cannot justify the Court assuming jurisdiction over Google's search services. With respect, I do not agree with that proposition for two reasons.

[54]    First, Google's business model is contextual advertising; the "context" is the search done using Google's search services. Ads are linked to either the subject matter of the search, or the history of the person searching. Google does not charge users of its search services. Rather, it sells space on its websites to advertisers whose ads are displayed alongside the search results generated by a user's query.

[55]    These ads can relate to the topics searched. For example, if "Vancouver lawyers" is searched, a page showing a list of Vancouver lawyers will be generated. At the top of the list a number of ads show up for law firms that have paid Google in order to advertise there. Those ads look like the other search results but are marked by Ad.

[56]    These ads can also be unrelated to the content of the search, but geared to a particular searcher. For example, if the user has in the past searched a retail website, ads for that retail outlet may appear on the page showing the search results for the query "Vancouver lawyers". Google can individually tailor the advertising seen by a user each time they search using the information in the search query and that user's own search history.

[57]    Google made the same argument that its ad and search services are unrelated in submissions to the European Court of Justice in *Google Spain SL and Google Inc. v. Agencia Española de Protección de Datos (AEPD) and Mario Costeja González*, C-131/12 [*González*]. The European Court of Justice delivered judgment on 13 May 2014. Its reasons are available online but are not yet published. In that dispute, Mr. González lodged a complaint with the Spanish Data Protection Agency based on the fact that when an internet user entered Mr. González's name in the

2014 BCSC 1063 (CanLII)

Google search engine, the user would obtain links to two pages of a newspaper published in January and March of 1998 relating to attachment proceedings against Mr. González for the recovery of social service debts.

[58]    Mr. González applied to order the newspaper to remove or alter its webpages so that his personal data no longer appeared. He also requested that Google Spain or Google be required to remove or conceal his personal data so that it was not included in search results given that the attachment proceedings concerning him had been fully resolved for a number of years and any "reference to them was now entirely irrelevant" (para. 15).

[59]    The Spanish Data Protection Agency upheld Mr. González's complaint against Google Spain and Google on the basis that search engine operators were subject to data protection legislation. Google appealed that decision to the National High Court which in turn referred the matter to the European Court of Justice for preliminary rulings. The European Court of Justice confirmed that the promotion and sale of advertising space in relation to Spain constituted the bulk of Google's commercial activity and was "regarded as closely linked to Google Search" (para. 46). The European Court of Justice concluded at para. 56:

> [56]    … the activities of the operator of the search engine [Google] and those of its establishment situated in the Member State [Google Spain] concerned are inextricably linked since the activities relating to the advertising space constitute the means of rendering the search engine at issue economically profitable and that engine is, at the same time, the means enabling those activities to be performed.

[60]    While *González* concerned the protection of personal information and particular statutory provisions, the analysis relating to the connection between Google's advertising and search functions is of assistance. I too conclude that the two parts of Google's business are inextricably linked; neither service can stand alone.

[61]    Second, whether the advertising activity conducted in British Columbia is the same as the activity which the plaintiff seeks to enjoin is not germane to the territorial competence analysis. The difference between the advertising business and

2014 BCSC 1063 (CanLII)

2014 BCSC 1063 (CanLII)

the search business to be enjoined goes to the strength of the connection between the matter and British Columbia. It could thus be a factor when assessing whether British Columbia is the appropriate forum, but it does not affect this court's territorial competence. Once the Court has *in personam* jurisdiction, it has it for all purposes.

[62]     Further, at the territorial competence stage of the analysis, the Court is not looking for the strongest possible connection to this forum, but for a connection sufficient to meet the requirements of the *CJPTA*. In *Purple Echo* the plaintiff claimed damages for alleged breaches of a co-production agreement with broadcaster KCTS which was licenced to broadcast only in the United States, although broadcasts were available to viewers in Canada. KCTS was found to have a place of business in British Columbia because PCPTA, a federally incorporated Canadian corporation with an office in Vancouver, solicited Canadian donations for KCTS under contract and paid the money to KCTS: *Purple Echo* at paras. 44-46. The Court of Appeal's finding that British Columbia had territorial competence turned on a number of other factors as well, but the Court nonetheless included the link between the "parent" and its agent company as a factor supporting the connection between that parent company and British Columbia.

[63]     In any event, I find that Google's search and advertising services are inextricably linked.

[64]     I will address here Google's submission that this analysis would give every state in the world jurisdiction over Google's search services. That may be so. But if so, it flows as a natural consequence of Google doing business on a global scale, not from a flaw in the territorial competence analysis. As Janet Walker writes in *Castel & Walker: Canadian Conflict of Laws*, loose-leaf, 6 ed (Markham, Ontario: LexisNexis, 2005), ch 11 at 27, a legal person such as a corporation can be subject to multiple jurisdictions whether because it is resident there through registration, or because it is carrying on business in that jurisdiction. Further, the territorial competence analysis would not give every state unlimited jurisdiction over Google;

jurisdiction will be confined to issues closely associated with the forum in accordance with private international law.

[65]    In summary on this issue, I conclude that the Court has territorial competence over Google on this application.

### 2.    Is British Columbia the appropriate forum?

[66]    Should the Court decline to exercise its jurisdiction on the basis that there is another, more convenient forum in which to adjudicate this application? As the Supreme Court of Canada observed in *Van Breda* at para. 101, a clear distinction must be drawn between the existence and the exercise of jurisdiction. The former is concerned generally with preventing jurisdictional overreach and respecting the authority of foreign courts, the latter is concerned with fairness to the parties and efficient resolution of the dispute: *Van Breda* at paras. 22, 104-105. Although Google did not frame its argument expressly in terms of *forum non conveniens*, it asserted that California is a better forum to hear this application. Therefore, the issue must be addressed.

[67]    Once jurisdiction is established, the burden falls on Google to show why the Court should decline to exercise its jurisdiction and displace the forum chosen by the plaintiffs: *Van Breda* at para. 103. Google must show that the alternative forum is clearly more appropriate and that, in light of the characteristics of the alternative forum, the matter can be adjudicated more fairly and efficiently there.

[68]    In British Columbia the Court's discretion to stay the proceeding in favour of another state's jurisdiction is grounded in s. 11(1) of the *CJPTA*:

> 11 (1)  After considering the interests of the parties to a proceeding and the ends of justice, a court may decline to exercise its territorial competence in the proceeding on the ground that a court of another state is a more appropriate forum in which to hear the proceeding.

[69]    Google's submissions in support of a stay can be grouped into three main arguments:

2014 BCSC 1063 (CanLII)

(i)      The Court should decline jurisdiction because Google has agreed to block specific websites from its search results and the plaintiffs have failed to avail themselves of that out-of-court remedy;

(ii)     Google has a stronger connection to California; and

(iii)    An order made by a California court can be enforced.

I will deal with each submission in turn.

### (i)      Is an out-of-court remedy available to the plaintiffs?

[70]     Google submits that the plaintiffs have a remedy available to them without a court order but have failed to avail themselves of it. Although this is not strictly speaking another forum, it is convenient to address the question here. After Google received notice of this Court's orders in the fall of 2012 and the plaintiffs filed this application, Google agreed to take down the defendants' websites that the plaintiffs identified by way of a specific URL.

[71]     The plaintiffs initially agreed to try that route and adjourned the application generally to do so. They provided Google with specific URLs from which the defendants were selling the GW1000 in violation of the Court's orders. Google voluntarily blocked 345 websites from its search results. This is referred to as "taking down" websites.

[72]     However, the process was wholly unsatisfactory from the plaintiffs' perspective. In place of the de-indexed websites, a whole host of new websites moved up the rankings to take their place. Websites can be generated automatically, resulting in an endless game of "whac-a-mole" with the plaintiffs identifying new URLs and Google deleting them. The plaintiffs argue that any scheme that depends on the deletion of individual URLs is ineffective.

[73]     The insufficiency of the voluntary take-down of specific websites was recognized by the Regional Court of Paris in the unreported decision Trib gr inst Paris, 6 November 2013, *Max Mosely v. Google France SARL and Google Inc.*[*Max*

*Mosely*]. Mosely had been surreptitiously videotaped by the News of the World while engaging in sexual activity with several partners. The newspaper published the images and made others available on its website. In a French criminal proceeding, the newspaper was found guilty and ordered to cease publishing the images. However, the images remained widely available by searching through Google Images.

[74]     Mosely asked Google to stop indexing the pictures with reference to specific URLs. He made many such requests and Google honoured all of the requests but the images continued to be indexed through new URLs. After two years of this process, Mosely asked Google to prevent the images from being indexed at all. Google refused and Mosely applied for an injunction and damages. The Court observed that it was impossible for the plaintiff to have his right enforced by using only the procedures made available by Google (English translation of *Max Mosely* at 10).

[75]     The inadequacy of this approach in the present matter is heightened by Google's removal of specific URLs from only those searches initiated through Google.ca – a fact that came to the plaintiffs' attention only after cross-examining Mr. Smith on his affidavit on May 21, 2013. As a result, the defendants' blocked websites appear when searches are conducted from any country other than Canada, or when a search is conducted within Canada using a Google website other than www.google.ca.

[76]     The majority of GW1000 sales occur outside Canada. Thus, quite apart from the practical problem of endless website iterations, the option Google proposes is not equivalent to the order now sought which would compel Google to remove the defendants' websites from all search results generated by any of Google's websites worldwide. I therefore conclude that the plaintiffs do not have an out of court remedy available to them.

### *(ii)   Does Google have a stronger connection to California?*

[77]    Google is a Delaware company that is registered and has its head office in California. The *CJPTA*, like the common law it codified, recognizes that the ordinary residence of a person within a state is a strong connecting factor justifying the assumption of jurisdiction over that person. Residence for a legal person such as a corporation is established under s. 7 of the *CJPTA* only if:

> (a) the corporation has or is required by law to have a registered office in British Columbia,
>
> (b) pursuant to law, it
>
> > (i) has registered an address in British Columbia at which process may be served generally, or
> >
> > (ii) has nominated an agent in British Columbia upon whom process may be served generally,
>
> (c) it has a place of business in British Columbia, or
>
> (d) its central management is exercised in British Columbia.

[78]    None of these subsections apply to Google in British Columbia, but all pertain in California. Google's internet search services are said to "operate out of" its head office.

[79]    I accept that Google has a strong presence in and connection to California. But the question is "which forum is more appropriate?" not "where does Google reside?" As the Supreme Court of Canada observed in *Van Breda* at para. 109, the Court should not exercise its discretion in favour of a stay solely because it finds that comparable forums exist in other states:

> [109]   … It is not a matter of flipping a coin. A court hearing an application for a stay of proceedings must find that a forum exists that is in a better position to dispose fairly and efficiently of the litigation. But the court must be mindful that jurisdiction may sometimes be established on a rather low threshold under the conflicts rules. *Forum non conveniens* may play an important role in identifying a forum that is clearly more appropriate for disposing of the litigation and thus ensuring fairness to the parties and a more efficient process for resolving their dispute.

[80]    The factors I must consider in deciding whether California is the more appropriate forum in which to hear this application include those set out in s. 11(2) of the *CJPTA*:

> 11 (2)  A court, in deciding the question of whether it or a court outside British Columbia is the more appropriate forum in which to hear a proceeding, must consider the circumstances relevant to the proceeding, including
>
>> (a) the comparative convenience and expense for the parties to the proceeding and for their witnesses, in litigating in the court or in any alternative forum,
>>
>> (b) the law to be applied to issues in the proceeding,
>>
>> (c) the desirability of avoiding multiplicity of legal proceedings,
>>
>> (d) the desirability of avoiding conflicting decisions in different courts,
>>
>> (e) the enforcement of an eventual judgment, and
>>
>> (f) the fair and efficient working of the Canadian legal system as a whole.

[81]    I will address each of these factors in turn.

### (a)    Comparative convenience and expense

[82]    This factor is of limited significance since "the proceeding" in this case is a single application for an interim injunction.  Google has already incurred the expense of argument and appearance here. I consider it nonetheless because it could still be a factor with respect to enforcement if I grant the order sought.

[83]    This factor encompasses the Court's concern for protecting the respondent from unfairly inconvenient litigation. Google is a highly sophisticated entity with annual revenues of $50 billion and 54,000 employees worldwide. Because of the emergent nature of its business, Google often finds itself at the cutting edge of legal issues in many different fields of law all over the world, including in the areas of defamation, copyright, privacy and competition law. As a result Google has an in-house legal department of 700 people, including dedicated product counsel, national and regional counsel, and litigation counsel.

2014 BCSC 1063 (CanLII)

[84]    In contrast, the primary corporate plaintiff is a small British Columbia company which is incurring significant financial losses due to the defendants' conduct. I find this factor favours British Columbia as the more appropriate forum.

### (b)    The law to be applied to issues in the proceeding

[85]    This is a neutral factor; in either forum local law would apply. Google acknowledges that theft of intellectual property rights would be actionable in California, but I have no evidence before me of the applicable law in California governing the granting of injunctions against non-parties.

### (c)    The desirability of avoiding multiplicity of proceedings

[86]    The plaintiffs' application for an interim injunction against Google is founded on the plaintiffs' actions against the defendants and the Court's inherent jurisdiction to issue orders to protect the integrity of its own process, as recognized in s. 39(1) of the *Law and Equity Act*, R.S.B.C. 1996, c. 253. The plaintiffs seek the injunction to prevent the defendants from continued and flagrant breaches of this Court's orders in the underlying action.

[87]    Setting aside for the moment the question of whether this application could be made in California without the underlying action to support it, it would at a minimum require the plaintiffs to commence a second proceeding in California. This factor therefore favours British Columbia.

### (d)    The desirability of avoiding conflicting decisions in different courts.

[88]    This factor is of little assistance on this application as there is a single issue, whether the injunction should be granted, which is unlikely to be considered in both courts.

### (e)    Fair and efficient working of the Canadian legal system

[89]    This factor is of little assistance on the application before me.

2014 BCSC 1063 (CanLII)

### (f)      The enforcement of an eventual judgment

[90]      This is the main ground upon which Google asserts that California is the more appropriate forum. How, Google asks, can this Court force Google to take steps outside of British Columbia?

[91]      Google raises a good point. Traditionally, courts have not granted injunctive relief against defendants who reside outside the jurisdiction. In *Barrick Gold* at para. 74, the Ontario Court of Appeal explained this general rule by quoting from Robert J. Sharpe's text *Injunctions and Specific Performance*:

> <u>Claims for injunctions against foreign parties present jurisdictional constraints which are not encountered in the case of claims for money judgments.</u> In the case of a money claim, the courts need not limit assumed jurisdiction to cases where enforceability is ensured. <u>Equity, however, acts *in personam* and the effectiveness of an equitable decree depends upon the control which may be exercised over the person of the defendant.</u> If the defendant is physically present, it will be possible to require him or her to do, or permit, acts outside the jurisdiction. The courts have, however, conscientiously avoided making orders which cannot be enforced. The result is that the courts are reluctant to grant injunctions against parties not within the jurisdiction and the practical import of rules permitting service *ex juris* in respect of injunction claims is necessarily limited. Rules of court are typically limited to cases where it is sought to restrain the defendant from doing anything within the jurisdiction. As a practical matter the defendant "who is doing anything *within the jurisdiction*" will usually be physically present within the jurisdiction to allow ordinary service. [Italics in original; underlining added.]

[92]      On this basis the Court of Appeal in *United Services Funds (Trustees of) v. Richardson Greenshields of Canada Ltd.* (1988), 23 B.C.L.R. (2d) 1, 1988 CanLII 2960 (C.A.) held that a court should not grant an order compelling an out-of-country individual to attend for examination for discovery.

[93]      However, there are exceptions to the general rule. For example, in *Barrick Gold* the Ontario Court of Appeal granted a permanent injunction against a British Columbia resident in a defamation proceeding.

[94]      An injunction is an equitable remedy and is enforced through the courts' contempt power. Generally, that power is exercised through fines and imprisonment.

2014 BCSC 1063 (CanLII)

These penalties are more easily invoked when a person resides within the court's jurisdiction so that either the person or his assets can be "seized".

[95]   But these are not the only remedies available to the Court. In *Bea v. The Owners, Strata Plan LMS2138*, 2014 BCSC 826, Grauer J. cites with approval the following words of the Chief Justice of the Supreme Court of Newfoundland and Labrador:

> The law of contempt is found in the development of the common law. That law is always evolving. The state of its development is not frozen at any particular date in judicial history. So also, with respect to the types of penalty which a court may employ to vindicate its contempt power. Differing penalties may be creatively employed, either singly or in combination, in new situations to achieve the purposes behind the exercise of the contempt power.

[96]   For example, this court may dismiss or refuse to hear proceedings brought by a party who is violating a court order: *Breberin v. Santos*, 2013 BCCA 385 at para. 14; *Schmidt v. Wood*, 2012 ABCA 235 at para. 5.

[97]   While barring a person in contempt from making use of the Court's process may be a smaller stick than imprisonment, it is nonetheless a means of enforcement of some significance. That is particularly so when a non-resident corporation carries on business in British Columbia and may be sued or wish to sue in these courts. Although Google's contracts with advertisers in British Columbia are by the choice of laws provisions to be determined in California, other causes of action in defamation or tort could well arise in British Columbia (see for example *Trkulja v. Google (No 5)*, [2012] VSC 533, an Australian defamation case which raised issues of whether Google "publishes" the material displayed on its search engines).

### (iii)   An order made in California can be enforced

[98]   Google argues that the plaintiffs should apply in California because a California court order can be enforced against Google in that state. I accept that a California court order is easier to enforce in California than a British Columbia court order. However, related to the assertion that California is therefore a better forum is

2014 BCSC 1063 (CanLII)

the question of whether a California court could or would order the interlocutory relief sought by the plaintiffs.

[99]    Google asserts that the plaintiffs can make this application in California. However, Google bears the burden of proof at this stage of the analysis and has provided no support for that proposition. Indeed, neither party alluded to or attempted to prove California law. Although I need go no further given where the burden of proof lies, Canadian jurisprudence offers insight into the complexity of this question.

[100]   Assuming the plaintiffs could file an originating application in California, they would be asking for a standalone interim injunction with no underlying substantive relief sought in California. The Supreme Court of Canada has followed the approach taken by the UK House of Lords and determined that an interlocutory injunction can be issued in such circumstances, but only if two conditions are satisfied: *Brotherhood of Maintenance of Way Employees Canadian Pacific System Federation v. Canadian Pacific Ltd.*, [1996] 2 S.C.R. 495. First, the issuing court must have jurisdiction *simpliciter*, and second, the substantive underlying dispute must be a cause of action recognized by the issuing court. As I noted, I have nothing before me to say whether California courts have adopted the same approach.

[101]   Furthermore, Google's assertion that the order sought in this court could not be enforced in California ignores the potential for the plaintiffs to sue on a British Columbia court order in California. That is a distinct legal step from applying for a standalone order in California, which Google contends is the appropriate procedure.

[102]   Google submits that the plaintiffs cannot enforce a British Columbia injunction in California. Google relies on *Ingenium Technologies Corp. v. McGraw-Hill Companies*, 2005 BCSC 465 at para. 28, in which Pitfield J., on a without notice application stated that "[a]n injunction is not a form of judgment or order on which [the plaintiff] could realistically sue for recognition and enforcement on a timely basis, if it would be able to sue on such judgment at all". I conclude from a review of

the case law that there are situations in which a party can sue for enforcement of a foreign interlocutory order. Certainly, the common law is evolving in that direction.

[103]   The Ontario Court of Appeal enforced a foreign interlocutory order in *Cavell Insurance Co. Ltd. (Re)* (2006), 80 O.R. (3d) 500, 269 D.L.R. (4th) 679 (C.A.). The British Columbia Court of Appeal addressed the trend towards enforcing foreign non-monetary judgments in *Minera Aquiline Argentina SA v. IMA Exploration Inc.*, 2007 BCCA 319 at para. 92:

> [92]    … academic opinion is consistent with the general trend of private international law. The Supreme Court of Canada has recognized that the law has evolved to allow courts to deal with disputes arising in an increasingly interdependent global economy. In its recent jurisprudence, the Supreme Court has reasoned that, in the proper case, the limits of the courts' jurisdiction should be expanded, not narrowed. In *Pro Swing Inc.* (at paras. 78-79), McLachlin C.J.C. (in dissent, but not on this issue) referred to *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 at 1098, *Hunt v. T&N plc*, [1993] 4 S.C.R. 289 at 321-322, and *Beals v. Saldanha*, [2003] 3 S.C.R. 416 at para. 27, for the rationale for extending the limits of the court's jurisdiction to enforce foreign non-monetary judgments. She commented that comity, order and fairness do not exclude the courts from enforcing foreign non-monetary judgments, and in the context of modern private international law, may require it. The majority of the Court in *Pro Swing Inc.* concluded that was not the right case to extend the jurisdiction, but all of the justices agreed that the "time is ripe to review the traditional common law rule" (para. 15) in light of changing global commercial realities.

[104]   Finally, I note that Google objects to British Columbia retaining jurisdiction because the order sought would require Google to take steps in relation to its websites worldwide. That objection is not resolved by "going to California". If the order involves worldwide relief, a California court will be no more appropriate a forum than British Columbia to make such an order. Even if the order can be construed more narrowly as requiring Google to take steps at the site where the computers controlling the search programs are located, Google has not established that those computers are located in California, or that they can only be reprogrammed there.

[105]   As the Court of Appeal observed in *Olney v. Rainville*, 2009 BCCA 380 at para. 27, "What is essential is that the taking of jurisdiction be consistent with order

and fairness." I conclude on this issue that Google has not established that California is a more appropriate forum than British Columbia for adjudicating the plaintiffs' application for an interim injunction against Google.

### 3.      Should the order sought be granted?

[106]   Having determined that the Court has jurisdiction over Google and that Google has not established that California is a more appropriate forum, we come to the heart of the matter:  Should the injunction be granted?

[107]   Google asserts that the Court does not have the authority to make an order of the kind sought. In issue is whether the Court has "subject matter competence". The plaintiffs and Google agree that the type of order I am asked to make has never before been made by a Canadian court.

[108]   Google asserts that the Court lacks subject matter competence for two main reasons:  first, because the order is sought against a non-party;  second, because it would require the Court to make an order with worldwide effect. The latter objection may sound like an issue more properly addressed at the territorial competence stage of the analysis. However, the question of whether the Court has territorial competence to hear the application because of its connection to the persons or facts involved is distinct from the question of whether, in the words of s. 39 of the *Law and Equity Act*, it is "just or convenient" that the order sought should be made to enjoin or mandate the particular conduct.

### (a)      Can an order be made against a non-party?

[109]   Google submits that as a general rule a Court does not have authority to make an order against a non-party who owes no duty to the plaintiff. Google acknowledges there are two exceptions to that rule, but argues that neither exception applies to this case.

[110]   The first exception arises when a non-party with knowledge of a court order deliberately disobeys it and thereby deprecates the Court's authority. This exception

was described by Lindley L.J. in *Seaward v. Paterson*, [1897] 1 Ch. 545 (C.A.) at 555-556:

> A motion to commit a man for breach of an injunction, which is technically wrong unless he is bound by the injunction, is one thing; and a motion to commit a man for contempt of Court, not because he is bound by the injunction by being a party to the cause, but because he is conducting himself so as to obstruct the course of justice, is another and totally different thing. In the one case the party who is bound by the injunction is proceeded against for the purpose of enforcing the order of the Court for the benefit of the person who got it. In the other case the Court will not allow its process to be set at naught and treated with contempt. In the one case the person who is interested in enforcing the order enforces it for his own benefit; in the other case, if the order of the Court has been contumaciously set at naught the offender cannot square it with the person who has obtained the order and save himself from the consequences of his act. The distinction between the two kinds of contempt is perfectly well known, although in some cases there may be a little difficulty in saying on which side of the line a case falls. As to the jurisdiction, if the facts are of the character I have stated, notwithstanding the arguments of Mr. Seward Brice, I cannot bring myself to entertain any difficulty about it.

[111]  Under this "contempt" exception, the Court's objective is not to further the interests of the plaintiffs, but to uphold its authority.

[112]  The plaintiffs argue that after Google received notice of this Court's orders against the defendants, it should not have allowed the defendants' websites to be displayed in Google's search results. The plaintiffs argue that this amounts to aiding and abetting the defendants' contempt and is comparable to *Greenpeace Canada v. MacMillan Bloedel Ltd.* (1994), 96 B.C.L.R. (2d) 201, 1994 CanLII 943 (C.A.), aff'd *MacMillan Bloedel Ltd. v Simpson*, [1996] 2 S.C.R. 1048. In that case the Court granted an injunction preventing the defendants and all persons having notice of the order from physically obstructing the plaintiff's logging operations. Logging protestors who were not named as defendants protested that the order was overbroad. Macfarlane J.A. rejected that notion, citing with approval at para. 44 the following words from Robert J. Sharpe's text *Injunctions and Specific Performanc*e:

> It cannot be objected that the net of liability is cast too wide where the plaintiff is able to show that the non-party has deliberately agreed to flout the order at the instigation of the defendant. However, the court must be cautious not to hold in contempt a party who acts independently of the defendant, and who may exercise a right distinct from that of the defendant. Such a person has

not yet had his day in court and should not be bound by an order made in an action to which he was not a party. [Emphasis added.]

[113]   There is no evidence that Google acted in this case to deliberately flout this Court's orders and assist the defendants. While Google's search engines facilitate the defendants' ongoing breach by leading searchers to the defendants' websites, Google operates its search engines in the ordinary course of its business, independently of the defendants and not in order to assist them in their breach.

[114]   The plaintiffs' authorities involve quite different facts. In *MacMillan Bloedel*, those held in contempt had knowingly violated the court order to support the defendant's blockade of the logging road. In *Glazer v. Union Contractors Ltd. and Thornton* (1960), 25 D.L.R. (2d) 653, 33 W.W.R. 145 (B.C.S.C.) the Court had appointed a receiver over money owing to a company by the Government.  A government minister, aware of the order but not a party to the proceeding, was committed for contempt for causing funds owing to the company to be paid to the company's order rather than to the receiver. In *Attorney General v. Punch Ltd.*, [2002] UKHL 50, [2003] 1 All ER 289, an order prohibited the publication of certain information that the non-party published in its magazine when on notice of the order. In all of these cases, the non-parties found in contempt had engaged in conduct calculated to directly frustrate a court order. Google's search results are not of the same ilk.

[115]   The argument that Google aided and abetted the defendants' contempt of the existing court orders is stronger in relation to Google's sale of advertising space to the defendants. But as I noted earlier, when Google received notice of this Court's orders it agreed that it should not continue to do this. I accept that Google only continued to do so up to the commencement of this hearing due to an administrative oversight.

[116]   The second exception to the general rule that a Court will not make orders against a non-party extends to orders made against non-parties to aid in the fact finding necessary to the administration of justice. Examples of orders made against

non-parties who have no obligation to the plaintiff abound: subpoenas are issued to obtain evidence at trial under Rule 12-5(31)-(39); documents and oral evidence may also be obtained in advance of trial under Rules 7-1(18) and 7-5.

[117]   In addition, under the *Norwich Pharmacal Co. and Others v. Customs and Excise Commissioners,* [1974] A.C. 133, [1973] 2 All ER 943 (H.L.) [*Norwich Pharmacal*] line of authority, courts can make orders against non-parties even before an action is commenced. The remedy of pre-action discovery was articulated in *Norwich Pharmacal* by Lord Reed at 175:

> [I]f through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers. I do not think that it matters whether he became so mixed up by voluntary action on his part or because it was his duty to do what he did. It may be that if this causes him expense the person seeking the information ought to reimburse him. But justice requires that he should co-operate in righting the wrong if he unwittingly facilitated its perpetration.

*Norwich Pharmacal* has been adopted as part of the law in British Columbia: *Kenney v. Loewen* (1999), 64 B.C.L.R. (3d) 346, 1999 CanLII 6110 (S.C.), *Procon Mining and Tunnelling Ltd. et al. v. McNeil, Bonnar et al.*, 2007 BCSC 454 [*Procon Mining*], and *Pierce v. Canjex Publishing Ltd.*, 2011 BCSC 1503.

[118]   Google argues that the *Norwich Pharmacal* line of authority goes no further than compelling a non-party to provide information and is only imposed in exceptional cases with due concern for the non-party against whom the order is sought: *GEA Group AG v. Ventra Group Co.*, 2009 ONCA 619 [*Ventra*] at para. 85.

[119]   I do not accept Google's submission that the Court only has authority to make an order against a non-party in relation to contempt or to further fact finding necessary to effect justice. Lack of precedent should not be confused with lack of subject matter competence.

[120]   Lord Woolf M.R. described this distinction in *Broadmoor Hospital Authority & Anor v. R*, [1999] EWCA Civ 3039, [2000] QB 775 at para. 21:

2014 BCSC 1063 (CanLII)

> [21]     The powers of courts with equitable jurisdiction to grant injunctions
> are, subject to any relevant statutory restrictions, unlimited. Injunctions are
> granted only when to do so accords with equitable principles, but this
> restriction involves, not a defect of powers, but an adoption of doctrines and
> practices that change in their application from time to time. Unfortunately
> there have sometimes been made observations by judges that tend to
> confuse questions of jurisdiction or of powers with questions of discretions or
> of practice. The preferable analysis involves a recognition of the great width
> of equitable powers, an historical appraisal of the categories of injunctions
> that have been established and an acceptance that pursuant to general
> equitable principles injunctions may issue in new categories when this course
> appears appropriate.

[121]   The Court has inherent jurisdiction to maintain the rule of law and to control

its own process. The power to grant injunctions is a broad one and is confirmed by

s. 39 of the *Law and Equity Act*. Injunctions may be issued in "in all cases in which it

appears to the court to be just or convenient that the order should be made ... on

terms and conditions the court thinks just": *MacMillan Bloedel,* [1996] 2 S.C.R. 1048

at para. 15.

[122]   The Court's willingness to use its equitable jurisdiction against non-parties is

evident in the development of *Mareva* injunctions. This line of authority is particularly

helpful because *Mareva* injunctions also involve orders against non-parties who

reside outside of the province.

[123]   Madam Justice Newbury granted the first *Mareva* injunction in Canada in

*Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 (S.C.) [*Mooney No. 1*] on an *ex parte*

application. After referring to English and Australian cases granting such relief, she

observed at para. 11:

> The reasons for extending Mareva injunctions to apply to foreign assets are
> valid in British Columbia no less than in England and Australia - the notion
> that a court should not permit a defendant to take action designed to frustrate
> existing or subsequent orders of the court, and the practical consideration
> that in this day of instant communication and paperless cross-border
> transfers, the courts must, in order to preserve the effectiveness of their
> judgments, adapt to new circumstances.

[124]   Madam Justice Huddart continued the injunction in a hearing two months later

with both parties present: *Mooney v. Orr* (1994), 100 B.C.L.R. (2d) 335 (S.C.)

[*Mooney No. 2*]. She agreed that *Mareva* orders were a necessary development, saying at para. 60:

> Whether this extension of existing principles is seen as an expansion of the exercise of discretion given by the *Law and Equity Act* or inherent in the court's ability to control its process, I am of the view that such a discretion must be exercised whenever it is required to ensure the effective administration of justice in British Columbia..

[125]   In England, where *Mareva* injunctions were first made in 1975, such orders were originally restricted to assets within England. In the late 1980s the English courts relaxed those restrictions to apply to the defendants' assets wherever they were situated, and ancillary orders were extended to non-parties resident in foreign countries. Non-parties could not only be restrained from dealing with the defendants' assets, but could also be mandated to take steps to transfer assets to a receiver located elsewhere:

[126]   The extra-territorial reach of these orders is evident. Vaughan Black and Edward Babin commented on the development of the law in "Mareva Injunctions in Canada: Territorial Aspects" (1997) 28 Can Bus LJ 430 at 441:

> All of these considerations [favouring the granting of extra-territorial orders] run up against one principal objection: the judicial power of all national courts is territorially circumscribed and it is improper for a court to attempt to exercise its power to affect actions outside the court's territory. Stated so broadly, that limitation must now be seen as dated and lacking in general validity, or at least subject to several exceptions. <u>There now seems little doubt that Canadian courts actually have the power to employ *in personam* orders to enjoin parties to do or refrain from doing something anywhere in the world</u>. [Emphasis added.]

[127]   The expansion of *Mareva* orders to include non-parties resulted from the Courts' recognition that *Mareva* injunctions would have no practical effect without involving non-parties. That is so because unscrupulous defendants will simply fail to comply with the injunction, whereas the defendants' brokers, accountants, lawyers and bankers are less likely to engage in such conduct. However, as Black & Babin observed at 453, the rights of non-parties and the states in which they reside must be taken into account:

> [T]his practical need to control the actions of non-parties must, as is the case
> with parties, be balanced against such persons' legitimate interests in privacy
> and liberty of action (including such rights as they may have acquired by
> contract), and against the rights of other states to sovereign jurisdiction over
> persons and activities within their boundaries.

[128]   The Courts have developed protections for non-parties who are not resident
in the province, or who may have a presence within this jurisdiction but are also
present or resident in a number of jurisdictions outside the territory. In recognition of
the fact that such persons may be subject to laws in force in the foreign jurisdiction
which forbid compliance with an order made by this Court, the Court has included in
worldwide *Mareva* injunctions terms which have come to be known as the "Babanaft"
and "Baltic" provisos.

[129]   Stephen Pitel and Andrew Valentine describe these provisos and the
rationale behind their inclusion in worldwide *Mareva* injunctions in "The Evolution of
the Extra-Territorial Mareva Injunction in Canada: Three Issues" (2006) 2 J P Int'l L
339 at 371-377. *Babanaft* and *Baltic* provisos are intended to ensure that courts do
not exercise exorbitant jurisdiction over non-parties situated abroad and are
particularly important in defining the effect of worldwide *Mareva* injunctions on
corporate non-parties with a presence both inside and outside the local jurisdiction.

[130]   The *Babanaft* proviso states in part that where a corporate non-party has a
presence in and outside of the jurisdiction, it must have notice of the order and the
ability to restrain activities abroad that would aid in violation of the injunction.

[131]   The *Baltic* proviso permits corporate non-parties to comply with their foreign
legal obligations as they reasonably perceive them.

[132]   Although *Mareva* injunctions are granted at the plaintiff's suit, a *Mareva*
order's primary function is maintaining the integrity of the Court's process. Madam
Justice Huddart wrote in *Grenzservice Speditions Ges.m.b.h v. Jans* (1995), 15
B.C.L.R. (3d) 370, 1995 CanLII 2507 (S.C.) at para. 92:

> [92]   The Mareva and Anton Pillar orders were conceived not so much to
> protect plaintiffs as to protect the Court's jurisdiction against defendants bent

on dissipating or secreting their assets or evidence in order to render inconsequential the judicial process against them. …

[133]  I conclude that the Court has authority to grant an injunction against a non-party resident in a foreign jurisdiction in appropriate circumstances. The fact that an injunction has not before been made against an internet search provider such as Google is reason to tread carefully, but does not establish that the Court does not have subject matter competence. Indeed, the notion that a court may only make the orders it has made in the past is anathema to the spirit of the common law. As Newbury J. observed in *Mooney No. 1* at para. 11:

> … the courts must, in order to preserve the effectiveness of their judgments, adapt to new circumstances. Such adaptability has always been, and continues to be, the genius of the common law.

### (b)   Should I make this order against Google?

[134]  Having determined that the Court has authority to issue an injunction with extra-territorial effect against a non-party where it is just or convenient to do so, the question remains: should I grant the injunction on the facts of this case? A related question is what test should be applied in making that determination.

[135]  Google submits that it would not be just to make the order sought for four reasons.

[136]  First, Google says that it provides an important and valuable tool for navigating hundreds of trillions of webpages on the internet. Google argues it cannot, as a practical matter, monitor content or arbitrate disputes over content because of the enormous volume of content; because it cannot determine whether information is inaccurate or lawful; and because content on websites is constantly changing so even if Google could form judgments about the content of sites on its index at any given moment, those judgments would be obsolete moments later.

[137]  Whether Google is a passive indexer with no control over content has been the subject of litigation in other jurisdictions: *González*, *Max Mosely*, and *Trkulja*. However, the order sought in the present case would not require Google to monitor

the content of the defendants' websites. Rather, the order would simply require Google to remove all of the defendants' websites from its searches. To put it simply, it is not a question of blocking what is being said, but rather who is saying it. The order is, in many ways, only a slight expansion on the removal of individual URLs, which Google agreed to do voluntarily.

[138]   Second, Google submits it would be unjust to make the order sought because de-indexing entire websites without regard to content of the specific URLs would constitute undue censorship. Google's employee Mr. Smith deposed:

> URLs not specifically reviewed and identified may be used for any number of innocent purposes and a complete removal could result in possibly numerous URLs being blocked without Google having had the opportunity to review them and determine if a departure from its usual indexing process is necessary or warranted in the circumstances.

[139]   I do not find this argument persuasive. Google acknowledges that it alters search results to avoid generating links to child pornography and "hate speech" websites. It recognizes its corporate responsibility in this regard, employing 47 full-time employees worldwide who, like Mr. Smith, take down specific websites, including websites subject to court order. Excluding the defendant's prohibited websites from search results is in keeping with Google's approach to blocking websites subject to court order.

[140]   Third, Google argues that the Court should not make an order that could affect searches worldwide because it would put Google in the impossible situation of being ordered to do something that could require it to contravene a law in another jurisdiction. This raises the concern addressed by the *Baltic* proviso in *Mareva* injunctions.

[141]   Google gives as an example of such jurisdictional difficulties the case of *Yahoo! Inc. v. La Ligue Contre Le Racism et L'Antisemitisme* [*Yahoo*]. In 2000 two French anti-racism groups filed a suit in France against Yahoo alleging that Yahoo violated a French law prohibiting the display of Nazi paraphernalia by permitting users of its internet auction services to display and sell such artifacts. The plaintiffs

demanded that Yahoo's French subsidiary, Yahoo.fr, remove all hyperlinks to the parent website (Yahoo.com) containing the offending content. As in this case, Yahoo argued that the French Court lacked jurisdiction over the matter because its servers were located in the United States. The French Court held that it could properly assert jurisdiction because the damage was suffered in France and required Yahoo to "take all necessary measures" to "dissuade and render impossible" all access via yahoo.com by internet users in France to the Yahoo! internet auction service displaying Nazi artifacts, as well as to block internet users in France from accessing other online Nazi material: 145 F Supp 2d 1168 (ND Cal 2001) at 1172.

[142]   Yahoo claimed that implementing the order would violate its First Amendment rights to freedom of expression and therefore could not be enforced in the United States. The French Court did not accept that submission. Yahoo initiated a suit in California against the French plaintiffs, and obtained a declaratory judgment that the French orders were constitutionally unenforceable in the United States, contrary to the first amendment. Addressing the issue of international comity, the Court reasoned that United States Courts will generally recognize and enforce foreign judgments but could not do so on the facts of that case because enforcement of the French orders would violate Yahoo's constitutional rights to free speech: 169 F Supp 2d 1181 (ND Cal 2001) at 1192-1193. This decision was ultimately reversed on different grounds: 379 F 3d 1120 (9th Cir 2004), reheard in 433 F 3d 1199 (9th Cir 2006).

[143]   *Yahoo* provides a cautionary note. As with *Mareva* injunctions, courts must be cognizant of potentially compelling a non-party to take action in a foreign jurisdiction that would breach the law in that jurisdiction. That concern can be addressed in appropriate cases, as it is for *Mareva* injunctions, by inserting a *Baltic* type proviso, which would excuse the non-party from compliance with the order if to do so would breach local laws.

[144]   In the present case, Google is before this Court and does not suggest that an order requiring it to block the defendants' websites would offend California law, or

2014 BCSC 1063 (CanLII)

indeed the law of any state or country from which a search could be conducted. Google acknowledges that most countries will likely recognize intellectual property rights and view the selling of pirated products as a legal wrong.

[145]  Fourth, Google argues that the order sought is too broad. Google submits that if the injunction is granted it should be limited to Google.ca, the website designated for Canada, because no court should make an order that has a reach that extends around the world.

[146]  I note again that on the record before me, the injunction would compel Google to take steps in California or the state in which its search engine is controlled, and would not therefore direct that steps be taken around the world. That the <u>effect</u> of the injunction could reach beyond one state is a separate issue. Even an order mandating or enjoining conduct entirely within British Columbia may have such extraterritorial, or even worldwide effect.

[147]  For example, a non-party corporation that warehouses and ships goods for a defendant manufacturing company might be ordered on an interim injunction to freeze the defendants' goods and refrain from shipping them. That injunction could affect orders received from customers around the world. Could it sensibly be argued that the Court could not grant the injunction because it would have effects worldwide? The impact of an injunction on strangers to the suit or the order itself is a valid consideration in deciding whether to exercise the Court's jurisdiction to grant an injunction. It does not, however, affect the Court's authority to make such an order.

[148]  Further, although Google has a website for each country to which searches made within that country default, users can override that default and access other country's Google websites. For example, even if the defendants' websites were blocked from searches conducted through www.google.ca, Canadian users can go to www.google.co.uk or www.google.fr and obtain results including the defendants' websites. On the record before me it appears that to be effective, even within Canada, Google must block search results on all of its websites. Furthermore, the defendants' sales originate primarily in other countries, so the Court's process

2014 BCSC 1063 (CanLII)

cannot be protected unless the injunction ensures that searchers from any jurisdiction do not find the defendants' websites.

[149]   Google relies on *Max Mosely* in which the Regional Court of Paris acceded to Google's argument that removal of images should be restricted to searches that could be conducted from within France (English translation of *Max Mosely* at 13). That restriction was based on the images constituting a breach of France's penal code; publication of the images was not a breach of the laws of other countries. The French Court therefore ordered Google to remove the images from the "search engine that it operates, accessible in France". *Max Mosely* is distinguishable on that basis.

[150]   Accepting that an order with worldwide effect can be granted, what test should be applied in determining whether it should be granted? I conclude that the order sought against a non-party requires the Court to consider the standard test for granting an injunction but modified to take into account the direction to a non-party. In *Mooney No. 2*, Huddart J. described an appropriate standard at p. 22:

> The comparable approach to a *Mareva* injunction would be to require a strong *prima facie* (…) or a good arguable case (…) to cross the threshold, and then to balance the interests of the two parties, having regard to all the relevant factors in each case, to reach a just and convenient result.

[151]   The fair question to be tried relates of course to the plaintiffs' claim against the defendants, since that is the cause of action in relation to which the injunction is sought. Google takes no issue with that. In this case the plaintiffs have not only raised an arguable claim; two of the defendants' defences have been struck and they are presumed to have admitted the allegations.

[152]   As for balancing the interests of the plaintiffs and non-party Google, the plaintiffs have established that they are suffering irreparable harm by the defendants' ongoing sale of the GW1000 on the internet. The plaintiffs have also established that Google is inadvertently facilitating that harm through its search engines. While there are other search engines, Google does not contest the plaintiffs' assertion that Google's position as the search engine used for 70-75% of internet searches means

the defendants will not be commercially successful if they cannot be found through Google's search services.

[153]   Google acknowledges that it can do what is being asked of it. Google does not assert that it would be inconvenienced in any material way or that it would incur expense to do so. The balance of convenience thus favours granting the injunction.

[154]   Consideration of the factors identified in *Norwich Pharmacal* may also be of assistance: *Procon Mining* at para. 27; *Ventra* at para. 50. Modified to reflect the relief sought in this case they include:

> a.   Whether the applicant has provided evidence sufficient to raise a valid, *bona fide* or reasonable claim;
>
> b.   Whether the applicant has established a relationship with the third party such that it establishes that the third party is somehow involved in the acts complained of;
>
> c.   Whether the third party is the only practicable means to obtain the relief sought;
>
> d.   Whether the third party can be indemnified for costs to which the third party may be exposed because of the order; and
>
> e.   Whether the interests of justice favour the granting of the relief sought.

[155]   To this list of considerations I would add the degree to which the interests of those other than the applicant and the identified non-party could be affected – here potential purchasers will not be able to find and buy the defendants' products as easily, but that is as it should be in light of the existing court orders prohibiting the defendants from selling the GW1000 and related products.

[156]   Google is an innocent bystander but it is unwittingly facilitating the defendants' ongoing breaches of this Court's orders. There is no other practical way

2014 BCSC 1063 (CanLII)

for the defendants' website sales to be stopped. There is no other practical way to remove the defendants' websites from Google's search results.

[157]   The fundamental question in each case is whether the granting of an injunction is just and equitable in all of the circumstances of the case: *Tracey v. Instaloans Financial Solutions Centres (B.C.) Ltd.*, 2007 BCCA 481 at para. 31. A judge must not become the prisoner of a formula. As Saunders J.A. observed in *Tracey* at para. 33:

> … the criteria [for determining whether to grant an injunction] are only a judicial expression or explanation of the statutory authority for injunctions in s. 39(1) of the *Law and Equity Act*, …
>
> > 39(1)   An injunction or an order in the nature of mandamus may be granted or a receiver or receiver manager appointed by an interlocutory order of the court <u>in all cases in which it appears to the court to be just or convenient that the order should be made</u>.
>
> [Emphasis in original]

[158]   In determining whether this interim injunction should be granted, I am mindful of Madam Justice Newbury's admonition that a court should not permit a defendant to frustrate orders of the court and that "courts must, in order to preserve the effectiveness of their judgments, adapt to new circumstances": *Mooney (No. 1)* at paras. 10-11.

[159]   The Court must adapt to the reality of e-commerce with its potential for abuse by those who would take the property of others and sell it through the borderless electronic web of the internet. I conclude that an interim injunction should be granted compelling Google to block the defendants' websites from Google's search results worldwide. That order is necessary to preserve the Court's process and to ensure that the defendants cannot continue to flout the Court's orders.

[160]   Non-parties affected by *Mareva* injunctions are not normally before the Court, because applications of that kind are brought without notice. Google was named in this application, served with materials, and attended the hearing. It is not therefore necessary to craft terms anticipating possible conflicts Google could face in

2014 BCSC 1063 (CanLII)

complying with the interim injunction.  No terms of this kind have been requested by Google and I see no basis on the record before me to expect such difficulties.

## VI.    CONCLUSION

[161]   I conclude that the interim injunction sought should be granted:

> Within 14 days of the date of this judgment, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites contained in Schedule A to the notice of application.

## VII.   COSTS

[162]   The plaintiffs are entitled to special costs of this application against the defendants Morgan Jack, Datalink 4 and Datalink 7. Special costs are justified because the plaintiff's application to enjoin Google was made necessary by the defendants' flagrant and ongoing breaches of this Court's orders.


The Honourable Madam Justice L.A. Fenlon



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

SEP 22 2014

ENTERED

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGIES GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER, and IGOR CHEIFOT

DEFENDANTS

### ORDER MADE AFTER APPLICATION

| BEFORE | )<br>)<br>)<br>)<br>) | THE HONOURABLE<br>MADAM JUSTICE FENLON | )<br>)<br>)<br>)<br>) | Friday, the 13th day of<br>June 2014 |
|---|---|---|---|---|

ON THE APPLICATION of the plaintiffs dated November 13, 2012, coming on for hearing at Vancouver on October 22 and 23, 2013, and February 7, 2014, and on hearing Robbie Fleming, counsel for the plaintiffs, and Stephen R. Schachter Q.C. and Geoffrey B. Gomery Q.C., counsel for the application respondents Google Canada Corporation and Google Inc., and no one appearing for the remaining defendants; and on reading further written submissions dated March 7 and 24, 2014, and May 23 and 29, 2014; and JUDGMENT BEING RESERVED TO THIS DATE:

THIS COURT ORDERS THAT:

1. Within 14 days of the date of this order, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites listed in Schedule A, including all of the subpages and subdirectories of the listed websites, until the conclusion of the trial of this action or further order of this court;

2. By September 23, 2014, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites listed in the following

schedules, including all of the subpages and subdirectories of the listed websites:

    a.  the additional websites referenced in the December 13, 2012 Order of Tindale J., as set out in "Schedule B" attached, and

    b.  the additional websites referenced during the hearing of this application, as set out in "Schedule C" attached;

until the conclusion of the trial of this action or further order of this court;

3.     The plaintiffs and Google Inc. have liberty to apply to vary any part of this order, including the Schedules;

4.     Madam Justice Fenlon is seized of any applications brought pursuant to paragraph 3 above; and

5.     The plaintiffs are awarded special costs of this application against the defendants Morgan Jack, Datalink Technologies Gateways Inc. and Datalink Technologies Gateways LLC.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of lawyer for the plaintiffs
Robbie Fleming

_____

Signature of lawyer for Google Canada Corporation
and Google Inc.
Geoffrey B. Gomery

By the Court.

_____

Registrar

www.robertfleminglawyers.com

**"Schedule A"**

www.datatechgateways.com

www.gw1000.com

www.protocolconverter.com

www.datalinkgateways.com

www.datalink-gateways.com

www.datalink-networks.com

www.1770-kf3.com

www.1784-ktx.com

www.1784-pcmk.com

www.datalinkcontrollers.com

www.datalink-networking.com

www.datalinkgw1000.com

www.datalinkinterfaces.com

www.gw-1000.com

www.1784u2dhp.com

www.dhtoethernet.com

www.datalinkconverters.com

**"Schedule B"**

www.multigatecommunications.com

www.americangatewaycorp.com

www.ethernetinterfaces.com

www.ethernetdhplus.com

www.gatewayinterfaces.com

www.multigatecom.com

www.dlgw1000.com

www.gw1000-dh4851.com

www.gateway-1000.com

www.gatewaytech1000.com

**"Schedule C"**

www.ethernetdatahighway.com

www.dl-gw-1000.com

www.abethernetsolutions.com

www.dhethernetprotocol.com

www.gw1000-dhp1.com

www.1770kf2.com

# EXHIBIT 11



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

DEC 15 2014

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER and IGOR CHIEFOT

DEFENDANTS

ORDER MADE AFTER APPLICATION

| | | | |
|---|---|---|---|
| BEFORE | )<br>)<br>)<br>)<br>) | THE HONOURABLE<br>MADAM JUSTICE FENLON | )<br>)<br>)<br>)<br>) | Thursday, the 27th day of<br>November 2014 |

ON THE APPLICATION of the plaintiffs dated November 12, 2014, coming on for hearing at Vancouver, BC, on November 27, 2014 and on hearing John Zeljkovich, counsel for the plaintiffs, and Geoffrey B. Gomery Q.C., counsel for the application respondent Google Inc., and no one appearing for the remaining defendants;

THIS COURT ORDERS THAT:

1.      The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order;

2.      Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A to this order, including all subpages and subdirectories of those websites, until the conclusion of the trial of this action or further order of this court;

3.      Future applications brought by the plaintiffs to vary the Schedules contained in the June 13, 2014 order made in this action can be made by giving written notice of their application (including supporting materials) to Google Inc. (without notice to any of the other defendants), and requiring that Google Inc. inform the plaintiffs of its position in response to the application within 5 business days; in the event that Google Inc. opposes the application, the matter may be set down in the usual manner, with the plaintiffs providing notice to Google Inc. and the defendant Igor Cheifot; and in the event that Google Inc. does not oppose the application, the plaintiffs may proceed with the matter by way of desk order;

4.      By consent, this order, and any subsequent orders amending or supplementing the Schedules contained in the June 13, 2014 order made in this action, will stand, fall or be varied according to any order pronounced by the Court of Appeal from the order pronounced June 13, 2014.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

_____
Signature of lawyer for Google Inc.
Geoffrey B. Gomery, Q.C.

By the Court.

_____
Registrar

**Schedule A**

www.1784pktx.com

www.controllogixethernet.com

www.controllogixgateways.com

www.datalink-converters.com

www.datalink-interfaces.com

www.datalinkconverters.com

www.dhpgateway.com

www.dhpgateways.com

www.dhptoethernet.com

www.ethernetgateways.com

www.ethernetipconverter.com

www.ethernetipdhplus.com

www.gatewayprotocol.com

www.gatewayprotocols.com

www.gatewaytodhp.com

www.gw1000-abeip.com

www.gw1000-dh485eip.com

www.gw1000-dh485me.com

www.gw1000-dhpa.com

www.gw1000-dhpm.com

www.multi-gateways.com

www.multigateprotocols.com

# EXHIBIT 12



No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES INC.

PLAINTIFFS

AND:

MORGAN JACK, ANDREW CRAWFORD,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC, LEE INGRAHAM, MIKE
BUNKER and IGOR CHIEFOT

DEFENDANTS

### ORDER MADE AFTER APPLICATION

BEFORE )    A JUDGE OF THE      )    TUESDAY , the 17th day of
        )       COURT          )    February 2015
        )                      )
        )                      )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials
filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.      The June 13, 2014 order made in this action be varied to include the additional
        websites listed as Schedule "A" to this order; and

2.      Within 14 days of the date of this order, Google Inc. cease indexing or
        referencing in search results on its internet search engines the websites listed in

Schedule "A to this order, including all subpages and subdirectories of those websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

Registrar

## Schedule A

https://plus.google.com/+Ethernetallenbradleydhplus

www.ethernetallenbradley.com

www.df1todhplus.com

www.df1datahighway.com

www.gateway-gw1000abeip.com

https://twitter.com/industrialautom

# EXHIBIT 13



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

APR 2 3 2015

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )
)   A JUDGE OF THE COURT
)
)
)

)
)   Wednesday, the 22 day of
)   April 2015
)
)

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2.    Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A to this order, including all subpages and subdirectories of those

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

**55**

# Schedule A

http://www.ethernetdatahighwayplus.com

http://www.datalink-gw1000.com

# EXHIBIT 14



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JUN 0 4 2015

ᴇɴᴛᴇʀᴇᴅ
ʙᴇᴛᴡᴇᴇɴ:

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ᴏʀᴅᴇʀ ᴍᴀᴅᴇ ᴀꜰᴛᴇʀ ᴀᴘᴘʟɪᴄᴀᴛɪᴏɴ

BEFORE    )
          )   A JUDGE OF THE
          )   COURT
          )

)    _Thursday_, the 4ᵗʰ day of
)    June 2015
)
)

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2.    Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

Registrar

www.robertfleminglawyers.com

-59-

## Schedule A

www.gateway-gw1000dhp1.com

www.datalink-gw1000abeip.com

# EXHIBIT 15



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JUL 0 8 2015

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )  A JUDGE OF THE  ) _Friday_, the _3_ day of
       )      COURT        )  July 2015
       )                   )
       )                   )
       )                   )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1. The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2. Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Željkovich

By the Court.

_____
Registrar

## Schedule A

www.datalink-gw1000-abeip.com

https://ethernetiptodhplus.wordpress.com

www.ethernettodatahighwayplus.com

www.datahighwayplustoethernet.com

# EXHIBIT 16



No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE        )   ~~THE HONOURABLE~~          )   TUES, the 15th day of
              )   _____ ~~JUSTICE~~ _____     )   Sept 2015
              )   A JUDGE OF THE              )
              )   COURT                       )

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional websites listed as Schedule "A" to this order; and

2.    Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

websites, until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____

Registrar

# Schedule A

www.datalinkgw1000abeip.com

https://plus.google.com/+Ethernetallenbradleydhplus

https://kinja.com/datalinkgw1000

https://datalinkgw1000.wordpress.com

# EXHIBIT 17



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JAN 13 2016

ENTERED

No.  S112421
Vancouver Registry

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

### ORDER MADE AFTER APPLICATION

|  |  |  |  |  |
|--|--|--|--|--|
| BEFORE | ) | A JUDGE OF THE COURT | ) | TUESDAY , the 12ᵗʰ day of |
|  | ) | _____ | ) | JANUARY -2015- 2016 |
|  | ) |  | ) |  |
|  | ) |  | ) |  |

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.  The June 13, 2014 order made in this action be varied to include the additional website listed in Schedule "A" to this order;

2.  Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

websites, until the conclusion of the trial of this action or further order of this court; and

3.   The June 13, 2014 order made in this action be varied to include a term that within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the URLs listed in Schedule "B" to this order until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

www.robertfleminglawyers.com

# Schedule A

1.  http://www.ethernet-datahighwayplus.com

# Schedule B

1.  http://www.pccweb.com/wp-content/uploads/2015/08/C_DataLink_Technologies.pdf;

2.  http://www.modbus.org/viewdevice.php?id=335;

3.  http://www.manualslib.com/manual/665918/lli-Datalink-Gw1000.html;

4.  http://www.automation.com/product-showcase/gw1000-abeip-allen-bradly-data-high-way-plus-converter;

5.  http://datalinkgw1000.kinja.com/gw1000-dhpe-ethernet-df1-dh-1721122330;

6.  http://www.iebmedia.com/index.php?id=10610&parentid=52&themeid=222&hpid=4&showdetail=true&bb=1;

7.  http://www.emobility24.eu/index.php?id=10610&parentid=52&themeid=222&hpid=4&showdetail=true&bb=1;

8.  http://www.manta.com/c/mx2zsrq/datalink-technologies-gateways-inc;

9.  http://www.manta.com/c/mx4dg23/datalink-technologies-gateways;

10. http://www.manta.com/cp/mx450tw/555112b2bc36f6db05ded5bf/datalink-gw1000-dhp1-df1-to-data-highway-plus-dh-converter;

11. https://fr-fr.facebook.com/datalinkgw1000abeip/;

12. https://www.facebook.com/permalink.php?id=779277212121133&story_fbid=782111681837686;

13. https://vi-vn.facebook.com/datalinkgw1000abeip/; and

14. https://www.linkedin.com/company/datalink-technologies-group-inc.

# EXHIBIT 18

No.  S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

ORDER MADE AFTER APPLICATION

BEFORE )
)
)    A Judge of the Court
)
)

Wednesday, the 30 day of
March 2016

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1.    The June 13, 2014 order made in this action be varied to include the additional website listed in Schedule "A" to this order;

2.    Within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the websites listed in Schedule "A" to this order, including all subpages and subdirectories of those

www.robertfleminglawyers.com

-117-

websites, until the conclusion of the trial of this action or further order of this court; and

3.      The June 13, 2014 order made in this action be varied to include a term that within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the URLs listed in Schedule "B" to this order until the conclusion of the trial of this action or further order of this court.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____
Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

_____
Registrar

## Schedule A

1. http://www.datalinkcontrollers.datatechgateways.com/

2. http://www.ethernetip-datahighwayplus.com/

## Schedule B

1. http://516493715498262299.weebly.com/about.html

2. http://datalinkgw1000.kinja.com

3. http://datalinkgw1000.kinja.com/gw1000-abeip-1720388351

4. http://manualzz.com/doc/2989233/gw1000-user-manual

5. http://www.articlesbase.com/industrial-articles/datalink-technologies-gw1000-abeip-low-cost-df1-ethernet-ethernetip-converter-to-allen-bradley-data-highway-plus-dh-dh-485-7210304.html

6. http://www.artipot.com/articles/1853538/datalink-gw1000-df1-ab-ethernet-ethernet-ip-converter-to-allen-bradleyss-datahighway-plus-dh-dh-485.htm

7. http://www.docfoc.com/gw1000-abeip

8. http://www.europages.co.uk/DATALINK-TECHNOLOGIES-GW1000ABEIP/00000004659162-460217001.html

9. http://www.iebmedia.com/index.php?id=10947&parentid=52&themeid=226&hid=57662&hpid=4&showdetail=true&sup=57662&bb=&nbb=

10. http://www.manta.com/cp/mx450tw/5551180059146d3f665d05fb/datalink-gw1000-abeip-ethernet-ip-to-data-highway-plus-converter

11. http://www.mfgpages.com/company/Datalink-Technologies-in-WASHINGTON-USA-10168500/

12. http://www.sooperarticles.com/shopping-articles/electronics-articles/datalink-gw1000-alternative-allen-bradleys-1784-u2dhp-dh-interface-card-1394191.html

13. https://www.facebook.com/datalinkgw1000abeip/

14. https://www.facebook.com/datalinkgw1000abeip/posts/782453511803503

15. https://www.facebook.com/datalinkgw1000abeip/posts/889923767723143

# EXHIBIT 19



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

AUG 2 4 2016

ENTERED

No.   S112421
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

EQUUSTEK SOLUTIONS INC.,
ROBERT ANGUS, and CLARMA ENTERPRISES LTD.

PLAINTIFFS

AND:

MORGAN JACK aka MATT GARCIA aka MATT GARCI aka IAN TAYLOR,
ANDREW CRAWFORD aka DEREK SMYTHE,
DATALINK TECHNOLOGY GATEWAYS INC., DATALINK 5, DATALINK 6,
JOHN DOE, DATALINK TECHNOLOGIES GATEWAYS LLC,
LEE INGRAHAM aka DARREN LANGDON, MIKE BUNKER,
IGOR CHEIFOT aka JOLIO FERNANDEZ,
ALEXANDER CHEIFOT aka RANDY SCHTOLZ,
FRANK GEIGER aka FELIX FERNANDEZ, and
ALFONSO DOE

DEFENDANTS

### ORDER MADE AFTER APPLICATION

| BEFORE | ) A JUDGE OF THE COURT | ) Wednesday , the 17 day of August 2016 |
|---|---|---|

ON THE APPLICATION of the plaintiffs without a hearing and on reading the materials filed by the plaintiffs;

THIS COURT ORDERS THAT:

1. The June 13, 2014 order made in this action be varied to include a term that within 14 days of the date of this order, Google Inc. cease indexing or referencing in search results on its internet search engines the URLs listed in Schedule "A" to this order until the conclusion of the trial of this action or further order of this court.

BY THE COURT

ENDORSEMENTS ATTACHED

REGISTRAR

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT
TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY
CONSENT:

Signature of lawyer for the plaintiffs
John Zeljkovich

By the Court.

Registrar

## Schedule A

1. http://www.cesco.com/b2c/product/617546

2. http://www.iebmedia.com/wireless.php?id=11042&parentid=52&themeid=225
   &hid=57662&hpid=4&showdetail=true&sup=57662&bb=&nbb=

3. https://www.facebook.com/datalinkgw1000abeip/posts/782111681837686

4. http://datalinkgw1000.kinja.com/datalink-gw1000-multi-protocol-converter-
   interfacing-n-1723096976

5. http://www.articlesbase.com/industrial-articles/datalink-technologies-gw1000-
   abeip-low-cost-df1-ethernet-ethernetip-converter-to-allen-bradley-data-
   highway-plus-dh-dh-485-7210304.html

# EXHIBIT 20

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:     *Equustek Solutions Inc. v. Google Inc.,*
              2014 BCCA 295

2014 BCCA 295 (CanLII)

Date: 20140723
Docket: CA041923

Between:

**Equustek Solutions Inc., Robert Angus, and Clarma Enterprises Inc.**

Respondents
(Plaintiffs)

And:

**Morgan Jack, Datalink Technologies Gateways Inc.
and Datalink Technologies Gateways LLC**

Respondents
(Defendants)

And:

**Google Inc.**

Appellant
(Respondent)

Before:       The Honourable Mr. Justice Willcock
              (In Chambers)

On appeal from:  An order of the Supreme Court of British Columbia, dated
June 13, 2014 (*Equustek Solutions Inc. v. Jack*, 2014 BCSC 1063,
Vancouver Registry S112421).

| | |
|---|---|
| Counsel for the Appellant: | S.R. Schacter, Q.C. |
| | G.B. Gomery, Q.C. |
| | J. Bunting |
| | P.R. Senkpiel |
| Counsel for the Respondent Equustek Solutions Inc.: | R. Fleming |
| Place and Date of Hearing: | Vancouver, British Columbia |
| | July 8, 2014 |
| Place and Date of Judgment: | Vancouver, British Columbia |
| | July 23, 2014 |

*Equustek Solutions Inc. v. Google Inc.*                                    *Page 2*

2014 BCCA 295 (CanLII)

*Summary:*

*Following the granting of an injunction against a non-resident non-party, an application for leave to appeal and an interim stay of the order pending appeal were considered. Leave is granted; the appeal cannot be said to be without merit and the issues on appeal are novel and important. The interim stay is dismissed; the applicant is unable to demonstrate irreparable harm is likely to be incurred pending the hearing of the appeal.*

**Reasons for Judgment of the Honourable Mr. Justice Willcock:**

[1]      On June 13, 2014, the plaintiff, Equustek Solutions Inc., obtained an interim injunction restraining Google Inc. from indexing or referencing specific websites identified in the schedule to the plaintiffs' notice of application in search results on its search engines.

[2]      The order was made with a view toward limiting access to websites through which the defendants in the underlying action had been advertising and selling products in breach of the plaintiffs' intellectual property rights and contrary to court orders. The order was made by Madam Justice Fenlon for reasons indexed at 2014 BCSC 1063.

[3]      Google promptly brought on an application for leave to appeal that order and, in the event it could obtain leave, for a partial interim stay of the order pending the hearing of the appeal.

[4]      On the hearing of Google's application I made an order granting leave to appeal, with reasons to follow, and reserved judgment on the application for an interim stay. For reasons set out below, the application for a stay is dismissed.

## Background

[5]      The underlying action was described by the judge in paras. 3-9 of the reasons for judgment:

> [3]      The plaintiffs manufacture networking devices that allow complex industrial equipment made by one manufacturer to communicate with complex industrial equipment made by another manufacturer.

[4]      The plaintiffs claim that the defendants other than Andrew Crawford and Lee Ingraham (hereinafter referred to as "the defendants"), while acting as a distributor of the plaintiffs' products, conspired with one of the plaintiffs' former engineering employees and others to design and manufacture a competing product, the GW1000. The plaintiffs say that the defendants designed their competing product using the plaintiffs' trade secrets.

[5]      The plaintiffs also claim that for many years before they made the GW1000 the defendants covered over the plaintiffs' name and logo and passed off the plaintiffs' products as their own. Later when the defendants began manufacturing the GW1000, they relied on the plaintiffs' goodwill by exclusively advertising the plaintiffs' products on their websites. The defendants then delivered their own competing product when they received orders for the plaintiffs' products, in a tactic amounting to "bait and switch".

[6]      This underlying action was commenced on April 12, 2011. The defendants failed to comply with various court orders from the outset of proceedings, resulting in the defences of Morgan Jack and Datalink Technologies Gateways Inc. being struck in June 2012.

[7]      The defendants originally carried on business in Vancouver but now appear to operate as a virtual company. They carry on business through a complex and ever expanding network of websites through which they advertise and sell their product. These websites have been the subject of numerous court orders, including a December 2012 order prohibiting the defendants from carrying on business through any website. The defendants continue to sell the GW1000 on their websites in violation of these court orders.

[8]      Google is not a party to this action. It operates and maintains internet search services that include the defendants' various websites in Google's search results. Google acknowledges that it has the ability to remove websites from its search engine results, and routinely does so in various situations.

[9]      Following the December 2012 order prohibiting the defendants from carrying on business through any website, Google voluntarily complied with the plaintiffs' request to remove specific webpages or uniform resource locations ("URLs") from its Google.ca search results (*i.e.* from searches originating in Canada), removing 345 URLs in total. However, Google is unwilling to block an entire category of URLs, sometimes referred to as "mother sites" from its search results worldwide.

[6]   The issues addressed by the judge were described in para. 12 of the reasons for judgment:

[12]      The application raises three main issues:

(i)      Does this Court have territorial competence over a worldwide internet search provider such as Google?

      (ii)     If the answer to the first question is yes, should this Court decline to exercise jurisdiction on the basis that California is the more appropriate forum?

      (iii)    Should the order sought be granted?

[7]     These issues, in turn, required the judge to address a number of complex questions, some of which were novel. A summary description of the conclusions of the judge will not do justice to her analysis of the issues, but will serve to identify questions that may be raised on appeal:

    a)  In relation to territorial competence, the Court found:

       i.  on the onus of proof: the plaintiff is required to prove that the court has territorial competence over Google on a balance of probabilities;

      ii.  on the question of the relevant "proceeding" for the purpose of establishing a real and substantial connection between British Columbia and the facts on which the proceeding is based: the "proceeding" under consideration is not the underlying dispute between the plaintiffs and defendants but the proceeding to obtain the relief sought against Google;

     iii.  in relation to the criteria identified in the *Court Jurisdiction and Proceedings Transfer Act,* S.B.C. 2003, c. 28 ("*CJPTA*"): the order sought does not relate to Google "taking steps in British Columbia or in relation to property in British Columbia";

     iv.  in relation to those criteria: the claim may be considered to be a claim for an injunction ordering a party to refrain from doing something "in relation to movable property in British Columbia";

      v.  this is a weak but a sufficient connecting factor to give the court territorial jurisdiction under the provisions of the *CJPTA;*

     vi.  the application concerns business carried on in British Columbia as Google sells advertising to British Columbia residents, its search and advertising services are inextricably linked, and its Internet search websites are not passive information sites;

2014 BCCA 295 (CanLII)

vii. once the court has *in personam* jurisdiction, it has jurisdiction for all purposes; and

viii. held the court has territorial competence over Google.

b)  In relation to the appropriate forum, the Court:

i.  dismissed Google's argument that the order ought not to be made because an out-of-court remedy is available to the plaintiffs;

ii.  found that comparative convenience and expense favour British Columbia as a more appropriate forum than any other in which to seek the order;

iii.  found the desirability of avoiding multiplicity of proceedings favours consideration of the application in British Columbia;

iv.  dismissed Google's assertion that the court will be powerless to enforce its order outside British Columbia; and

v.  held that it has equitable jurisdiction to make an order against a non-party in the circumstances of this case noting, "the fact that an injunction has not before been made against an Internet search provider such as Google is reason to tread carefully, but does not establish that the Court does not have subject matter competence."

c)  In relation to the granting of the order, the Court:

i.  dismissed Google's argument that it should not make an order affecting searches worldwide because doing so might require Google to contravene the law of another jurisdiction, finding there was no evidence the order sought would offend the laws of any other country;

ii.  dismissed Google's argument that no court should make an order that has a reach extending around the world, finding that the injunction sought would compel Google to take steps in California or the state in which its search engine is controlled, and would not therefore direct

that steps be taken around the world, despite the fact that the effect of the injunction would reach beyond one state; and

   iii.  held the balance of convenience favours the granting of the order sought by the plaintiffs and that the granting of the injunction is just and equitable in all the circumstances of the case.

## The Application for Leave to Appeal

[8]    An order granting an injunction is a limited appeal order and leave is required to appeal such an order. On an application for leave the Court must consider:

   a)  whether the point on appeal is of significance to the parties;

   b)  whether the point raised is of significance to the action itself;

   c)  whether the appeal is *prima facie* meritorious or, on the other hand, whether it is frivolous; and

   d)  whether the appeal will unduly hinder the progress of the action.

*Power Consolidated (China) Pulp Inc. v. B.C. Resources Investment Corp.* (1988), 19 C.P.C. (3d) 396 (B.C.C.A.).

[9]    Google says the order has obvious significance to the parties and is particularly significant to Google and to the global community it serves. The order of the court below raises profound issues as to the competence of Canadian courts to issue global injunctions that affect what content users around the world can access on the Internet.

[10]   It says that while the injunction is an interim order in the underlying action, it is the final word in relation to the plaintiffs' right to enjoin Google; the appeal will decide the only issue between the plaintiffs and Google.

[11]   In relation to the merits of the appeal, Google says the order granted is unprecedented in Canadian law, insofar as the injunction was granted against a non-party conducting legitimate business independent of the impugned conduct of the defendants. Google says the jurisdiction of the court to make orders against non-

2014 BCCA 295 (CanLII)

parties has been, and should be, limited to cases of deliberate flouting of a court order by non-parties and well-established but narrow rights to obtain discovery from non-parties. Google says no case goes so far as to grant an order similar to the order granted by Fenlon J.

[12]    Further, Google says the injunction is overly broad, targeting expressions by persons rather than specific content.

[13]    While the plaintiffs acknowledge the judgment raises important issues they argue that an appeal does not lie from a judgment simply because it is a departure from precedent. They say Google must discharge the burden of identifying specific errors in the reasons for judgment in order to obtain leave to appeal.

[14]    In my view, it will not be difficult for Google to establish points at which the judgment may be said to be a departure from precedent that may be challenged in principle on appeal.

[15]    The question of a national court's jurisdiction over Google and the issue of what obligations are owed by operators of search engines to avoid harm arising from data that can be located, indexed, and made available to Internet users, has recently been considered by the Court of Justice of the European Union in *Google Spain SL and Google Inc. v. Agencia Española de Protección de Datos (AEPD) and Mario Costeja González*, C-131/12 [not yet published]. In that case, as in the case at bar, the court considered the connecting factors giving rise to jurisdiction. The case arose out of the availability and circulation of data obtained with the assistance of Google's search platform in Spain. The court grappled with questions including: whether Google was "processing data"; whether Google was a "controller" of that data; whether it could be said that Google's processing of data was carried on in the territory of a member state of the European Union; and whether the local advertising activities of Google Spain were directly linked to the indexing or storage of information by Google Inc. Although almost all of these questions were answered against the interests of Google, and in a manner that may be reconciled with the judgment appealed from in this case, the legal arguments are clearly complex. It

cannot be said that the position taken by Google in the *Gonzalez* case, resembling the position it will take on this appeal, was without merit.

[16]    Google argues that in the rare cases where the courts have granted worldwide injunctions, and specifically in this jurisdiction in *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 (C.A.), such injunctions are a departure from precedent and can said to be issued for the purpose of preserving the effectiveness of the judgment of the courts. It relies upon the view expressed in *Reynolds v. Harmanis* (1995), 39 C.P.C. (3d) 364 (B.C.S.C.), by Esson C.J.S.C., that the precedent established in *Mooney* should not be extended to apply to cases where both the defendant and its assets are outside the jurisdiction.

[17]    Google, in this regard, refers the court to discussion of the propriety of worldwide *Mareva* orders in Vaughan Black & Edward Babin, "Mareva Injunctions in Canada: Territorial Aspects" (1997) 28 Can Bus LJ 430. As the authors note, at pp. 453-454: the question of the effect of extraterritorial injunctions on non-parties not present in the jurisdiction raises concerns additional to those that arise in respect of exterritorial injunctions against those present in the jurisdiction.

[18]    The jurisprudence reflects Google's submission that the extent of the court's jurisdiction to grant injunctions with extraterritorial effect has been circumscribed but is evolving. It is arguable that the injunction was issued in this case in circumstances that do not meet the description, in the jurisprudence, of those in which the discretion to do so should be exercised.

[19]    The issues on appeal are important to the parties but, more significantly, are important to those engaged in e-commerce generally.

[20]    Although the appeal is from an interlocutory judgment it is, as the trial judge pointed out, the final word on the questions between the plaintiff and Google. In the course of argument, counsel for the plaintiff acknowledged that if the jurisdictional basis for the granting of the injunction is not considered on appeal there will be no occasion on which the issue will be revisited in the underlying litigation. The order

2014 BCCA 295 (CanLII)

made by Fenlon J. will finally determine Google's obligation to block search results on a worldwide basis at the instance of Canadian litigants.

[21]    This is clearly a case where there are arguable novel and complex issues raised on appeal and the importance of those issues to the parties, and generally, call for the granting of leave to appeal. For that reason I granted leave in chambers on July 8, 2014.

## Interim Stay

[22]    Google applies for a partial stay of the order of the court below while the appeal is pending. It does not seek a stay of the order insofar as the searches conducted on the platform Google.ca are concerned. It does, however, seek a stay of the order requiring it to block search results on all other platforms.

[23]    The onus is on Google on such an application to establish, pursuant to the three-stage test set out in *British Columbia (Milk Marketing Board) v. Grisnich* (1996), 50 C.P.C. (3d) 249 at 252 (B.C.C.A.):

> a)  there is some merit to the appeal, in the sense that there is a serious question to be determined;
>
> b)  irreparable harm will be occasioned to Google if the stay is refused; and
>
> c)  the balance of convenience favors a stay.

[24]    As noted above, there is clearly a serious question to be determined on the appeal.

[25]    Through its counsel, Google has given an undertaking as to damages with a view toward tilting the balance of convenience in favor of a stay. Although Google is not a defendant in the underlying proceedings and no relief is otherwise sought against Google, it has taken the extraordinary step of undertaking to pay such damages as the plaintiff may be able to establish it has sustained as a result of an interim partial stay of the order until the hearing of the appeal. Google will track traffic to offending websites and provide that information to plaintiff. If the plaintiff can

establish that it has lost profits as result of the continuing operation of those websites in the interim, Google will make good the damages thus sustained. This is a significant undertaking on Google's part and demonstrates the extent to which Google attaches a commercial value to its ability to provide unfiltered searches to its customers on a global basis. The plaintiff says this is a small measure of comfort. It asks rhetorically: "what value is it to have the right to sue Google for damages?" It rightly points out that, notwithstanding Google's undertaking, it will face the difficult task of establishing the value of its lost profits in the event the appeal is dismissed. That loss will be difficult to ascertain and may be incalculable. It further says there is a significant risk it will lose future sales and its intellectual property generally if access to the offending websites is not blocked.

[26]   The plaintiff says if there is a stay it will suffer irreparable harm notwithstanding the undertaking and that Google will suffer no such harm. In my view, despite the undertaking, the balance of convenience favours the dismissal of the application for a stay.

[27]   The lack of evidence of irreparable harm, in particular, leads me to the conclusion that Google's application must be dismissed. As this Court noted in *B.C. (A.G.) v. Wale* (1986), 9 B.C.L.R. (2d) 333 at 345, an interlocutory injunction should generally not be granted unless there is doubt whether damages would be an adequate remedy:

> The requirement that there be doubt as to whether damages will be an adequate remedy is basically a matter of common sense. If damages will be an adequate remedy, and if it appears that the alleged offender can pay them, the court is generally not justified in giving one party his remedy to the detriment of the other before the issues have been tried.

[28]   Irreparable harm, of course, refers to the nature of the harm suffered rather than its magnitude. Any harm that is irreparable in the legal sense may ground an injunction.

2014 BCCA 295 (CanLII)

[29]    Google says that if the order is enforced pending the hearing of the appeal and if it filters search results globally, doing so will have a "direct and irreversible impact" on Google.

[30]    Google does not lead evidence to the effect, or argue, that it or the public will suffer irreparable harm as a result of the specific order made below. There is no evidence significant costs will be incurred by Google to effect the order, or that costs of compliance will be irreparable. Nor will the inability of customers to find the offending websites online *per se* damage Google's image or business.  It does not allege that there is any harm to the public arising from the blocking of the specific Internet sites identified by the injunction.  In that sense it does not allege harm to the public interest of the sort considered in *Canadian Federation of Students v. Greater Vancouver Transportation Authority,* 2007 BCCA 221.

[31]    Google argues, rather, that it will suffer irreparable harm as a result of the precedent established by the granting and enforcement of the injunction. It says the fact a Canadian court has made an order limiting worldwide search results and the fact the order has not been stayed pending an appeal, will have serious and damaging effects on its clients and its business. It argues the enforcement of the injunction and presumably its observation by Google may result in other jurisdictions regarding Google as a vehicle for global enforcement of their laws. It makes a "floodgates" argument to the effect that similar orders in other jurisdictions may result in global content on the Internet being reduced to the lowest common denominator. It is of the view that compliance with the order would cause users to lose trust in the credibility of the Google search engine and lead to a loss of business.

[32]    In order to address this allegation of irreparable harm it is necessary to isolate the harm that is said to arise from the precedent established by the judgment of the British Columbia Supreme Court, on the one hand, from the harm said to result from the refusal to stay that judgment pending the hearing of the appeal, on the other.

[33]    The order made below is deemed to be valid and correct until and unless it is reversed on appeal. Any harm said to arise from the making of the order and its publication, the unhappy precedent, as Google sees it, has already been incurred. This Court, on an application for a stay, cannot deny the existence of the precedent established by the judgment below or pronounce upon the merits of the appeal, except to say that the appeal is not devoid of merit. If the injunction is set aside on appeal, the decision below will ultimately, and perhaps shortly, have no precedential value. In the meantime, it has precedential value whatever a justice of this Court may say on a stay application.

[34]    Google's argument that a refusal to grant a stay pending the hearing of the appeal, or what it refers to as "the enforcement of the order" pending the appeal, will itself have significant and negative precedential value. This suggests that even if the order is set aside on appeal, Google will suffer irreparable harm as a result of compliance with the court order in the interim, because its clients will think less of it or because it is more likely to be the target of injunction applications.

[35]    I cannot accede to that argument. First, while clear proof of irreparable harm is not a prerequisite to the granting of a stay, the onus rests upon the applicant to establish sufficient doubt as to the adequacy of damages before a stay will be granted: *B.C. (A.G.) v. Wale* and see Robert J. Sharpe, *Injunctions and Specific Performance,* loose-leaf (Toronto*:* Canada Law Book, 2013) at § 2.41-2.43. I am not satisfied Google has done so in this case. A stay will not change the fact that the Supreme Court of British Columbia has found jurisdiction to make the impugned order. It would only permit Google to say to its customers that a justice of the Court of Appeal has ordered that Google will not be compelled to comply with the judgment below until and unless it is been affirmed by the Court of Appeal. Google's customers will be left, as they are now, to weigh the merits of Google's argument that the court below exceeded its jurisdiction and that the judgment of the Supreme Court will be reversed on appeal. A stay should not be regarded as an expression by this Court of any considered opinion with respect to the prospect of success on appeal, except as an indication that there is an arguable appeal. The stay will only

be useful to avoid the irreparable harm alleged by Google if it is used, as it should not be, to assure Google's customers that the decision below will not withstand scrutiny on appeal.

[36]    Further, it is an argument the court should reject in principle. In my view, I should not give any weight to the argument that Google's reputation will suffer if it acts in accordance with the rule of law, appeals those decisions it believes will have an adverse impact on its clients, assiduously defends its business and its clients' interests and pursues its appeal diligently. It would be wrong in principle for me to recognize, as irreparable harm, any damage to Google's reputation that might result from its clients' misapprehension of procedure in this jurisdiction and the appropriate test on an application for an interim stay in the Court of Appeal.

[37]    The application for a stay is dismissed.

"The Honourable Mr. Justice Willcock"

# EXHIBIT 21

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:       *Equustek Solutions Inc. v. Google Inc.,*
                2015 BCCA 265

Date: 20150611
Docket: CA41923

Between:

**Equustek Solutions Inc., Robert Angus
and Clarma Enterprises Inc.**

Respondents
(Plaintiffs)

And

**Morgan Jack, Datalink Technologies Gateways Inc.
and Datalink Technologies Gateways LLC**

Respondents
(Defendants)

And

**Google Inc.**

Appellant
(Respondent)

And

**Canadian Civil Liberties Association, Electronic Frontier Foundation,
International Federation of Film Producers Associations and
International Federation of the Phonographic Industry**

Intervenors

Before:       The Honourable  Mr. Justice Frankel
              The Honourable  Mr. Justice Groberman
              The Honourable  Mr. Justice Harris

On appeal from: An order of the Supreme Court of British Columbia, dated
June 13, 2014 (*Equustek Solutions Inc. v. Jack*, 2014 BCSC 1063,
Vancouver Docket S112421)

Counsel for the Appellant:

S.R. Schachter, Q.C.
G.B. Gomery, Q.C.
J.D. Bunting

2015 BCCA 265 (CanLII)

| | |
|---|---|
| Counsel for the Respondent Plaintiffs: | R.S. Fleming<br>J. Zeljkovich |
| Counsel for the Intervenor Canadian Civil<br>Liberties Association: | J.C. McArthur<br>T.A. Posyniak |
| Counsel for the Intervenor Electronic Frontier<br>Foundation: | D.K. Wotherspoon<br>D.A. Byma |
| Counsel for the Intervenors International<br>Federation of Film Producers Assoc. and<br>International Federation of the Phonographic<br>Industry: | B.B. Sookman<br>M.L. Lam |
| No one appearing for the Defendants | |
| Place and Date of Hearing: | Vancouver, British Columbia<br>October 27 and 28, 2014 |
| Additional Submissions Received: | December 4, 22, and 23, 2014 |
| Place and Date of Judgment: | Vancouver, British Columbia<br>June 11, 2015 |

**Written Reasons by:**
The Honourable Mr. Justice Groberman

**Concurred in by:**
The Honourable Mr. Justice Frankel
The Honourable Mr. Justice Harris

2015 BCCA 265 (CanLII)

2015 BCCA 265 (CanLII)

*Summary:*

*The plaintiffs alleged that the defendants designed and sold counterfeit versions of their product. They sued for trademark infringement and unlawful appropriation of trade secrets, and obtained injunctions prohibiting the defendants from carrying on their business. The defendants continued to carry on business, but did so in a clandestine manner using a variety of websites, and relying on web search engines to direct customers to those sites. The plaintiffs successfully applied to the court for an injunction prohibiting Google, which operates the world's most popular search engine, from delivering search results pointing to the defendants' websites. Google appealed, arguing that the injunction was beyond the jurisdiction of the court, that it improperly operated against an innocent non-party to the litigation and that it had an impermissible extraterritorial reach. Held: Appeal dismissed. Under the Court Jurisdiction and Proceedings Transfer Act, territorial competence over the action between the plaintiffs and defendants was sufficient to establish territorial competence over the injunction application. Google does not have resident employees, business offices, or servers in the Province, but its activities in gathering data through web crawling software, in distributing targeted advertising to users in British Columbia, and in selling advertising to British Columbia businesses are sufficient to uphold the chambers judge's finding that it does business in the Province. The court, therefore, had in personam jurisdiction over Google. In the circumstances, it was permissible to seek relief against Google, even though it was not a party to the litigation. The injunction did not violate principles of comity.*

**Reasons for Judgment of the Honourable Mr. Justice Groberman:**

[1]     This is an appeal by Google Inc. ("Google") from an interlocutory injunction that prohibits it from including specific websites in results delivered by its search engines.

[2]     Google is not a party to the underlying litigation, nor is it alleged to have acted unlawfully or in contravention of existing court orders. The injunction granted against it is ancillary relief designed to ensure that orders already granted against the defendants are effective.

[3]     Google contends that the injunction ought not to have been granted because the application did not have a sufficient connection to the Province to give the Supreme Court of British Columbia competence to deal with the matter. It also argues that the injunction represents an inappropriate burden on an innocent non-party to the litigation. Further, it contends that the extraterritorial reach of the

2015 BCCA 265 (CanLII)

injunction is inappropriate and a violation of principles of comity. Finally, Google contends that the injunction should not have been granted because of its effect on freedom of speech.

[4]     In addition to the submissions of the parties on these matters, the Court was assisted by submissions from intervenors. Of particular note were submissions by the Canadian Civil Liberties Association, which dealt with international aspects of freedom of speech.

[5]     For reasons that follow, I am of the view that the order that was granted was one that was within the competence (i.e., jurisdiction) of the Supreme Court of British Columbia. The order did not violate any principles applicable to the granting of injunctions, nor did it violate norms of freedom of speech. The judge had evidence before her from which she was entitled to find the test for an injunction to have been made out. In the result, I would dismiss the appeal.

## Preliminary Issues

### *Scope of* the *FIAPF/IFPI Intervention*

[6]     Two preliminary issues arise on this appeal. The first is the scope of the joint intervention of the International Federation of Film Producers Associations ("FIAPF") and the International Federation of the Phonographic Industry ("IFPI"). Google takes the position that the factum filed by those intervenors goes beyond the issues on which they were granted leave to intervene. While Google has addressed all of the issues raised in the FIAPF/IFPI factum, it seeks an order that it be granted special costs against them in respect of the intervention.

[7]     On September 23, 2014, I heard applications for intervenor status in this matter, and granted the FIAPF and the IFPI the right to intervene jointly and to file a ten-page factum. In my reasons (indexed as 2014 BCCA 448), I made it clear that the intervenors' role would be a limited one:

[28]     [I]t is important that intervenor status not be granted simply to have intervenors reiterate or support the arguments of the parties. The [FIAPF] and IFPI say, in their materials that:

> The scope of a British Columbia court's order requiring non-party search engines to disable access to online illegal content and materials should be informed by reference to relevant legal developments in other jurisdictions. International legal developments can provide useful guidance on appropriate principles to govern the manner in which the court issues such orders, and may assist British Columbia courts to act in harmony with developing international jurisprudence. FIAPF and IFPI intend to bring to the Court's attention relevant jurisprudence from other jurisdictions which has a bearing on the issues on appeal not previously provided to the Court by either of the parties ….

[29]     I am persuaded that such information, and submissions based on it, will be of assistance to the Court in this matter, and I grant the [FIAPF] and IFPI intervenor status limited to that area.

[8]     The factum filed by the FIAPF/IFPI deals with the experience of courts of other countries in cases involving Internet abuses. It also discusses the role that equitable relief has been given in common law jurisdictions in cases dealing with the use of Internet resources in the violation of intellectual property rights.

[9]     When the FIAPF/IFPI factum was filed, Google advised them of its view that the arguments presented went beyond the bounds of the intervention order. The intervenors filed a slightly revised factum with a view to meeting Google's concerns. Google contends that the arguments presented in the factum still extend beyond the scope of the intervention order.

[10]     Google's concerns are, to some extent, understandable. The focus of the intervention was to be on international jurisprudence. A portion of the factum, however, deals with equitable principles, which might be thought to form part of domestic law.

[11]     I am not, however, persuaded that the amended factum is objectionable. It deals with case law of non-Canadian jurisdictions. Where it refers to cases decided in common law jurisdictions, it does so in the context of developing areas of the law, and in particular, in the context of areas of law in which Canadian law will not necessarily develop in lock-step with the law of other common law jurisdictions. The

2015 BCCA 265 (CanLII)

discussion of legal developments in other common law jurisdictions falls within the scope of the intervention order. I would add that the intervention has been of great assistance to the Court. I would, accordingly, not give effect to Google's objection.

### *Fresh Evidence*

[12]    The other preliminary issue to be dealt with is an application by the respondent to adduce fresh evidence. The fresh evidence consists of two affidavits. The first summarizes and exhibits recently disclosed documents that suggest that the defendants, early on in this litigation, were making efforts to ensure that their websites were listed in favourable positions in Google search results. The second affidavit is an expert opinion with respect to the new documents.

[13]    The affidavits deal with a subject that is very much tangential to the issues on this appeal, and they do not provide any definitive new evidence that is likely to assist the Court. I am not persuaded that the fresh evidence ought to be admitted, and I would dismiss the application to adduce it.

## Factual Background

[14]    I turn, then, to the issues on the appeal.

[15]    The plaintiffs design, manufacture and sell industrial network interface hardware. Their products allow different pieces of complex industrial equipment to communicate with one another.

[16]    At one time, the defendants were distributors of the plaintiffs' product. The plaintiffs allege that the defendants began to re-label the product and pass it off as their own. Later, the defendants are said to have unlawfully acquired confidential information and trade secrets belonging to the plaintiffs and used the information to design and manufacture a competing product, the "GW1000". The defendants continued to advertise the plaintiffs' product for sale, but filled orders with their own competing product. The plaintiffs say that the defendants continue to sell the GW1000, and in doing so violate the plaintiffs' trade secrets and trademarks.

2015 BCCA 265 (CanLII)

2015 BCCA 265 (CanLII)

[17]     In 2011, when the plaintiffs commenced their lawsuit against the defendants, the defendants' operations were based in Vancouver.  A number of interlocutory orders were made early in the litigation, including orders that the defendants cease referencing the plaintiffs' products on their websites, that they publish a notice on their websites redirecting the plaintiffs' customers to the plaintiffs, and that they disclose customers' names to the plaintiffs. The defendants did not comply with the orders. Within a year of the lawsuit having been commenced, the defendants ceased to respond to communications in the litigation. In June 2012, the statement of defence of the first two defendants was struck, and in March 2013, the statement of defence of the third defendant was also struck.

[18]     The defendants have changed their business operations since the lawsuit was commenced. They no longer operate from Vancouver.  They offer their product for sale through a number of websites that they appear to control.  They fill orders from unknown locations, apparently outside Canada. Although we are advised that the plaintiffs have made some efforts to determine where the defendants manufacture and warehouse their product, and to determine where the product is shipped from, they have not been successful.  It appears that the locations have changed from time to time. The chambers judge described them as a "virtual company". As the product that they sell is a physical one which must be delivered to customers, it may be more accurate to describe their operations as "clandestine" than as "virtual".

[19]     Web-based businesses, such as that now operated by the defendants, must have some method for directing potential customers to their websites. The defendants rely on web search engines to perform this function.  Google operates the leading search engine worldwide; the chambers judge found that between 70 and 75% of all searches are conducted through Google. Sites operated by Microsoft ("Bing") and Yahoo account for most of the non-Google searches, though there are also smaller players in the search engine business. There is considerable force to the assertion made in the  plaintiffs' factum:

> Google is the dominant player in the search engine market, and no business conducted on the internet can succeed unless [it] can be easily found by a search on Google.

[20]     Google is incorporated in Delaware and headquartered in California. It says that it does not have a physical presence in British Columbia, by which it means that it does not have offices or resident staff here, and that none of its servers are located in the Province.

[21]     Google operates its search engine services through many different websites. Internet users with Canadian IP addresses – a group comprising almost all users accessing the Internet from within Canada – are, by default, redirected from "google.com" to "google.ca" when they perform searches. Users can, however, override this redirection behaviour to access the American site. Canadian users can also access dozens (perhaps hundreds) of Google websites directed at other countries by using the URLs for those sites (e.g., "google.co.in" for India; "google.es" for Spain; "google.fr" for France; and "google.com.tr" for Turkey).

[22]     Google does not charge users to use its search engines. It earns money by displaying advertising along with its search results. Advertising is targeted. The specific ads that are displayed depend on the user's location, the search terms that the user enters, and the user's Internet search history. Google's advertising customers include businesses in British Columbia. The advertising contracts are governed by the laws of California.

[23]     Google delivers search results according to proprietary algorithms. It indexes much of the World Wide Web. Web pages may be excluded from Google's search results for a variety of reasons, however. Google employs approximately 40 people to remove webpages it considers offensive from its indexing and result displays. As a matter of policy, however, it does not voluntarily block entire domains, subdomains, or websites from its services – instead, it excludes only specific webpages.

2015 BCCA 265 (CanLII)

[24]    In 2012, the plaintiffs sought an injunction against Google to force it to remove a number of websites used by the defendants from its search indexes. Google voluntarily removed some 345 URLs from search results on google.ca, but it was not willing to go further. In early 2013, the plaintiffs indicated that they were not satisfied with the arrangement, and the matter returned to court.

[25]    The main problem initially identified by the plaintiff with the voluntary arrangement was that the defendants simply moved objectionable content to new pages within their websites to get around the voluntary de-indexing of specific pages. The plaintiffs described the effect as being like a game of "Whack-A-Mole", in which the defendants were nimble enough to circumvent Google's voluntary arrangement. Later, the plaintiffs became aware that the voluntary arrangement applied only to searches conducted on google.ca, and they also identified that as a problem. It is clear that the majority of sales of GW1000 devices are to purchasers in countries other than Canada. An arrangement limited to google.ca, therefore, is of limited value to the plaintiffs.

[26]    The plaintiffs pressed their application to a hearing. After a lengthy hearing and further written submissions, the chambers judge granted an order, the operative part of which is as follows:

> Within 14 days of the date of this judgment, Google Inc. is to cease indexing or referencing in search results on its internet search engines the websites listed in Schedule A, including all of the subpages and subdirectories of the listed websites, until the conclusion of the trial of this action or further order of this court.

[27]    Similar orders were made in respect of two other lists of websites, and the contents of Schedule A have been modified by subsequent orders. According to the plaintiffs, the injunction has been effective in decreasing the number of the defendants' websites that show up in search results, and (as importantly) the ranking of those sites within the search results. While the defendants are, to some extent, able to circumvent the order by setting up websites under domain names that are not included in the order, the pace of such activity is necessarily much slower than simply moving web content to a new page within an existing domain.

[28]     Shortly after the injunction was granted, Google applied to this Court for leave to appeal and for a partial stay of the order. In reasons indexed as 2014 BCCA 295, leave to appeal was granted, but the application for a stay was dismissed.

## Territorial Competence of the Court under the *CJPTA*

[29]     The first issue on this appeal is the "territorial competence" of the Supreme Court of British Columbia over the injunction application. Pursuant to s. 2(2) of the *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28 (the "*CJPTA*"), "[t]he territorial competence of a British Columbia court is determined solely by reference to [Part 2 of that statute]". The parties are agreed that the territorial competence of the Supreme Court to issue an injunction in this case depends on an assessment to be made under s. 3(e):

> 3. A court has territorial competence in a proceeding that is brought against a person only if
>
>> (e) there is a real and substantial connection between British Columbia and the facts on which the proceeding against that person is based.
>>
>> …

[30]     The first difficulty in interpreting s. 3(e) lies in the use of the word "proceeding". Google argues that the "proceeding" at issue is the injunction application itself, and says the court must determine whether that application has a real and substantial connection to British Columbia. The plaintiffs, on the other hand, argue that the "proceeding" is the action that they have brought against the defendants. They say that because the Supreme Court undoubtedly has territorial competence over that action, it also has territorial competence over ancillary applications arising out of the action.

[31]     The terms "procedure" and "proceeding" are defined in s. 1 of the *CJPTA*:

> "procedure" means a procedural step in a proceeding;
>
> "proceeding" means an action, suit, cause, matter, petition proceeding or requisition proceeding and includes a procedure and a preliminary motion;

2015 BCCA 265 (CanLII)

[32]    The chambers judge, relying on these definitions, held that the relevant "proceeding" was the application for the injunction:

> [24]    [P]roceeding is defined broadly in s. 1 of the *CJPTA* as "an action, suit, cause, matter, petition proceeding or requisition proceeding and includes a procedure and a preliminary motion". Thus, the "proceeding" with respect to which I must answer the question of jurisdiction is not the underlying dispute between the plaintiffs and defendants but the relief that is specifically sought against Google.

[33]    I am not convinced that the definitions lead inexorably to that conclusion. Two different interpretations of the definition of "proceeding" are possible. The judge appears to have interpreted as if it read:

> "proceeding" means an action, suit, cause, matter, petition proceeding, requisition proceeding, procedure or preliminary motion.

[34]    In accordance with that reading of the definition, she reasoned that the injunction application was a separate "proceeding" for the purposes of the *CJPTA* and that territorial competence had to be determined by looking solely to the injunction application.

[35]    The definition of "proceeding", can however, be read as having the following meaning:

> "proceeding" means an action, suit, cause, matter, petition proceeding or requisition proceeding, and such a proceeding includes any procedure or preliminary motion brought within it;

[36]    While the two interpretations of the definition are both consistent with its strict wording, I am of the view that the language of the section favours the latter interpretation, since it explains and gives meaning to the words "and includes".

[37]    Further, requiring a court to determine territorial competence separately for each "procedure" within an action would lead to undesirable consequences and make the scheme of the statute unworkable. For example, where an out-of-province plaintiff was injured in a motor vehicle accident, the court might find itself to have territorial competence over the action, but unable to order disclosure of documents dealing with the long-term medical care of the plaintiff outside the Province, since

the application for disclosure would be treated for the purposes of the *CJPTA* as a separate "proceeding". Slicing an action into individual procedures for the purpose of determining territorial competence would lead to litigation being unwieldy and impractical. Such consequences could not have been intended.

[38]    In arguing that territorial competence over an action does not carry with it territorial competence over an injunction application against a non-party, Google refers to the 1994 commentaries accompanying the Uniform Law Conference of Canada model *Court Jurisdiction and Proceedings Transfer Act*, the model for the British Columbia statute. Commentary 10.3 states:

> If a plaintiff wishes to bring proceedings against two defendants, one of whom is ordinarily resident in the enacting jurisdiction and the other of whom is not, territorial competence over the first defendant will be present under paragraph 3(d). Territorial competence over the second defendant will not be presumed merely on the ground that that person is a necessary or proper party to the proceeding against the first person. The proceeding against the second person will have to meet the real and substantial connection test in paragraph 3(e).

[39]    This commentary is of limited assistance to Google. The commentary does not deal with the question of whether territorial competence over an action carries with it territorial competence over procedures within the action. Rather, it addresses the question of whether territorial competence over an action against one defendant carries with it territorial competence over an action against another defendant. The language of s. 3(e) clearly articulates the necessity, in a proceeding against a person, to demonstrate a real and substantial connection between British Columbia and the facts on which the proceeding against *that* person is based.

[40]    Unlike an action against a defendant, I am of the view that the injunction application against Google is not, for the purposes of the *CJPTA*, its own "proceeding". Because the underlying action is within the territorial competence of the Supreme Court, that court also has territorial competence over the injunction application.

[41]    There is, in any event, a real and substantial connection between British Columbia and the facts on which the injunction application against Google was

based. The most important facts on which the injunction application is based – facts concerning the violation of trade secrets and of intellectual property rights – have a strong connection to the Province. Therefore, even if the *CJPTA* were to be interpreted as treating the injunction application as an independent proceeding, the requirements of s. 3(e) would be satisfied.

[42]   I would, therefore, find that the judge made no error in concluding that the Supreme Court of British Columbia had territorial competence over the injunction application.

[43]   In saying this, I note that the chambers judge's analysis differed from the one I have presented. She concentrated on the relationship of Google to the Province, and analysed the relationship under s. 10 of the *CJPTA*. She considered three subsections of s. 10 of the statute:

> 10. Without limiting the right of the plaintiff to prove other circumstances that constitute a real and substantial connection between British Columbia and the facts on which a proceeding is based, a real and substantial connection between British Columbia and those facts is presumed to exist if the proceeding
>
> > (a) is brought to enforce, assert, declare or determine proprietary or possessory rights or a security interest in property in British Columbia that is immovable or movable property,
> >
> > …
> >
> > (h) concerns a business carried on in British Columbia,
> >
> > (i) is a claim for an injunction ordering a party to do or refrain from doing anything
> >
> > > (i) in British Columbia, or
> > >
> > > (ii) in relation to property in British Columbia that is immovable or movable property,

[44]   The judge found that ss. 10(a) and (h) were applicable, but rejected the proposition that s. 10(i) applied. She held that the presumption in favour of a "real and substantial connection" had not been rebutted, and that the court was competent to entertain the application for an injunction.

2015 BCCA 265 (CanLII)

[45]    While I am not convinced that there was any need to resort to s. 10 to find that the Supreme Court had territorial competence over the application, the judge's findings are relevant to another issue on this appeal – that of whether the Supreme Court has *in personam* jurisdiction over Google. I will, therefore, return to her analysis in discussing that issue.

## Constitutional Limitations on Jurisdiction and Competence

[46]    Google argues that, in determining the competence of the Supreme Court of British Columbia in this matter, we must consider matters that go beyond "territorial competence" under the *CJPTA*. We must, it says, be cognizant of the constitutional aspects of the real and substantial connection test, as reflected in *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17:

> [31]    [W]e should remain mindful of the distinction between the real and substantial connection test as a constitutional principle and the same test as the organizing principle of the law of conflicts. With respect to the constitutional principle, the territorial limits on provincial legislative competence and on the authority of the courts of the provinces derive from the text of s. 92 of the *Constitution Act, 1867*. These limits are, in essence, concerned with the legitimate exercise of state power, be it legislative or adjudicative. The legitimate exercise of power rests, *inter alia*, upon the existence of an appropriate relationship or connection between the state and the persons who are brought under its authority. The purpose of constitutionally imposed territorial limits is to ensure the existence of the relationship or connection needed to confer legitimacy.
>
> [32]    As can be observed from the jurisprudence, in Canadian constitutional law, the real and substantial connection test has given expression to the constitutionally imposed territorial limits that underlie the requirement of legitimacy in the exercise of the state's power of adjudication. This test suggests that the connection between a state and a dispute cannot be weak or hypothetical. A weak or hypothetical connection would cast doubt upon the legitimacy of the exercise of state power over the persons affected by the dispute.
>
> [33]    The constitutionally imposed territorial limits on adjudicative jurisdiction are related to, but distinct from, the real and substantial connection test as expressed in conflicts rules. Conflicts rules include the rules that have been chosen for deciding when jurisdiction can be assumed over a given dispute, what law will govern a dispute or how an adjudicative decision from another jurisdiction will be recognized and enforced. The constitutional territorial limits, on the other hand, are concerned with setting the outer boundaries within which a variety of appropriate conflicts rules can be elaborated and applied. The purpose of the constitutional principle is to

ensure that specific conflicts rules remain within these boundaries and, as a result, that they authorize the assumption of jurisdiction only in circumstances representing a legitimate exercise of the state's power of adjudication.

[34]    This case concerns the elaboration of the "real and substantial connection" test as an appropriate common law conflicts rule for the assumption of jurisdiction. I leave further elaboration of the content of the constitutional test for adjudicative jurisdiction for a case in which a conflicts rule is challenged on the basis of inconsistency with constitutionally imposed territorial limits.

[47]    The plaintiffs contend that this analysis is *obiter*, and that it should be rejected as not having been "carefully considered". They point out, correctly, that provincial superior courts do not derive their jurisdiction from s. 92 of the *Constitution Act, 1867*, and that the jurisdictional limitations that they have are not the same as those that apply to Provincial legislatures. In this regard, they cite from the decision of the Supreme Court of Canada in *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] 1 S.C.R. 626 at para. 26:

> … The notion of inherent jurisdiction has developed from the role of provincial superior courts in Canada's legal system. The unique historical feature of provincial superior courts, as opposed to the Federal Court, is that they have traditionally exercised general jurisdiction over all matters of a civil or criminal nature. This general jurisdictional function in the Canadian justice system precedes Confederation, and was expressly continued by s. 129 of the *Constitution Act, 1867*, "as if the Union had not been made". Under s. 92(14), the provinces exercise authority over the "Administration of Justice in the Province", including the "Constitution, Maintenance, and Organization" of provincial superior courts. The unique institutional feature of these courts is that by s. 96 of the *Constitution Act, 1867*, judges of provincial superior courts are appointed by the Governor General, not by the provinces. Responsibility for s. 96 courts is thus shared between the two levels of government, unlike either inferior provincial courts, or courts created under s. 101. Estey J., in *Attorney General of Canada v. Law Society of British Columbia*, [1982] 2 S.C.R. 307, at pp. 326-27, explained the unique nature of provincial superior courts in the following way:
>
> > The provincial superior courts have always occupied a position of prime importance in the constitutional pattern of this country. They are the descendants of the Royal Courts of Justice as courts of general jurisdiction. They cross the dividing line, as it were, in the federal-provincial scheme of division of jurisdiction, being organized by the provinces under s. 92(14) of the [*Constitution Act, 1867*] and are presided over by judges appointed and paid by the federal government (sections 96 and 100 of the [*Constitution Act, 1867*]).

2015 BCCA 265 (CanLII)

[48]    While it is clear jurisdiction or competence of a provincial superior court does not derive from s. 92 of the *Constitution Act, 1867*, I do not accept that the quoted passage from *Van Breda* should be dismissed as ill-considered *obiter*. While the details of constitutional limitations on court jurisdiction were not fully developed in *Van Breda*, there can be no doubt that such limits do exist. Further, when a statute such as the *CJPTA* is enacted by a provincial legislature, the statute itself must fall within provincial competence under s. 92 of the *Constitution Act, 1867* (presumably under s. 92(14) which establishes Provincial jurisdiction over "The Administration of Justice in the Province").

[49]    In *Van Breda*, the Supreme Court of Canada affirmed that the "real and substantial connection test" has both conflict of laws aspects and constitutional aspects. It pointed out that the test may be differently defined as a conflict of laws principle (where issues of practicality and of comity play important roles) and as a constitutional principle. A full elaboration of the differences was not necessary in *Van Breda*.

[50]    While Google raises the issue of constitutional limitations on court jurisdiction, it has not articulated a comprehensive theory of such limitations. The plaintiffs, have, similarly, not attempted to do so. Rather, both sides have referred to a number of cases that they contend establish the contours of the extra-territorial remedial powers of the courts. In the circumstances, I do not propose to specifically address the constitutional aspects of the "real and substantial connection" test. I accept (as have the parties) that the jurisprudence is illustrative of the boundaries, and that the underlying principles that can be drawn from the cases should determine the result in this case.

### *In Personam* Jurisdiction over Google

[51]    As I have indicated, the subject matter of the underlying litigation clearly has a "real and substantial connection" to British Columbia. Equally, Google's services, which provide a link between the defendant's products and potential customers, are substantially connected to the substance of the lawsuit. There remains, however, a

2015 BCCA 265 (CanLII)

question of whether Google itself is substantially connected with British Columbia in a manner sufficient to allow the courts of this Province to assume *in personam* jurisdiction over it.

[52]    As a result of the chambers judge's approach to territorial competence under the *CJPTA*, her analysis of the connection of Google to British Columbia is largely tied to provisions of s. 10 of that statute. The considerations that she took into account, however, are equally important to an analysis of whether Google's connections to the Province are sufficient to give the Supreme Court *in personam* jurisdiction over it. The judge analyzed the question of whether Google does business in the Province in considerable detail. I quote at length from that analysis, with which I am in agreement:

> [34]    Google says that the fact that an internet search is initiated in British Columbia does not equate to Google carrying on business in the province. Google argues that on the plaintiffs' reasoning there is not a country on earth whose civil courts could not assert jurisdiction over Google in respect of search results. Rather, suggests Google, "some form of actual not virtual presence is required". Google relies heavily on *Van Breda* in which LeBel J. wrote at para. 87:
>
> > [87]    Carrying on business in the jurisdiction may also be considered an appropriate connecting factor. But considering it to be one may raise more difficult issues. Resolving those issues may require some caution in order to avoid creating what would amount to forms of universal jurisdiction in respect of tort claims arising out of certain categories of business or commercial activity. Active advertising in the jurisdiction or, for example, the fact that a Web site can be accessed from the jurisdiction would not suffice to establish that the defendant is carrying on business there. <u>The notion of carrying on business requires some form of actual, not only virtual, presence in the jurisdiction, such as maintaining an office there or regularly visiting the territory of the particular jurisdiction.</u> [Emphasis added.]
>
> Google did not quote that paragraph in full. The next line adds what is, in my view, an important qualification:
>
> > But the Court has not been asked in this appeal to decide whether and, if so, when e-trade in the jurisdiction would amount to a presence in the jurisdiction.
>
> In contrast to *Van Breda*, the matter before me involves e-commerce, or at least providing an "e-service".
>
> [35]    *Van Breda* indicates that a real and substantial connection cannot be derived from the mere fact that a passive website can be accessed in the

jurisdiction. To similar effect is *Thumbnail Creative Group Inc. v. Blu Concept Inc.*, 2009 BCSC 1833 [*Thumbnail*]. In that case the plaintiff claimed the defendant breached copyright by publishing the plaintiff's images. The defendant published these images in a book in the United States which could be purchased on the internet. Madam Justice Dickson said at para 19:

> [19]   … <u>use of the Internet in the course of conducting business does not mean the business in question is carried on globally for the purposes of a territorial competence analysis.</u> As counsel for [the defendants] points out, if this were so the Supreme Court of British Columbia would have jurisdiction in any dispute involving any business that makes long-distance telephone calls into this province or relies upon the Internet. [The plaintiff] did not provide authority in support of this far reaching proposition, which is, in my view, unsustainable. [Emphasis added.]

[36]    It follows form *Van Breda* and *Thumbnail* that the ability of someone in British Columbia to open a website created by a person in another country does not of itself give this Court jurisdiction over the creator of that website. Something more is required. In *Van Breda*, the Court considered factors such as whether the defendants' representatives regularly travelled to Ontario to further the defendants' promotional activities for its resorts and whether it distributed promotional materials in the province. In *Thumbnail*, Dickson J. considered that the connection between the defendants and British Columbia appeared to be limited to the sale of one copy of the defendant's book.

[37]    E-commerce has exponentially increased the difficulty of determining whether a company is carrying on business in a particular jurisdiction; it raises the spectre of a company being found to carry on business all over the world, just as Google submits with some alarm. Kevin Meehan comments in "The Continuing Conundrum of International Internet Jurisdiction" (2008) 31 BC Int'l & Comp L Rev 345 at 349:

> In the traditional analog world, it is relatively easy for courts to determine the geographical locations of the persons, objects, and activities relevant to a particular case. The geography of the digital world of the Internet, however, is not as easily charted. Content providers may physically reside, conduct their business, and locate their servers in a particular location, yet their content is readily accessible from anywhere in the world. Furthermore, attempts to identify the location of a particular user over the Internet have proven extremely difficult, and many Internet users compound this problem by intentionally hiding their location. Traditional principles of international jurisdiction, particularly territoriality, are poorly suited for this sort of environment of geographic anonymity. Courts have struggled to develop a satisfactory solution, yet no progress has been made toward a uniform global standard of Internet jurisdiction.

[38]    In short, courts have traditionally focused on locating the behaviour in issue within a particular state's borders to ensure that "the connection between a state and a dispute cannot be weak or hypothetical [so as to] cast doubt upon the legitimacy of the exercise of state power over the persons

affected by the dispute" [*Van Breda* at para. 32]. Online activities, whether commercial or otherwise, are not so easily pigeonholed.

…

[47]     Google submits that it merely offers a passive website to residents of British Columbia who wish to search the internet. It argues that its programs automatically generate search results without Google being actively involved in the particular search. Paragraph 23 of Google's written submissions state:

> [23]     … Google's internet search engine allows users to enter key-words and then Google generates a list of results in a specific ranked order. Google's search results are computer generated through the use of Google's highly confidential and proprietary algorithm and methodology. Google's web crawler program (referred to as "Googlebot") reviews the content that is available on trillions of webpages or URLs over the internet. Search results are generated based on that content [within seconds].

[48]     I conclude that Google's internet search websites are not passive information sites. As a user begins to type a few letters or a word of their query, Google anticipates the request and offers a menu of suggested potential search queries. Those offerings are based on that particular user's previous searches as well as the phrases or keywords most commonly queried by all users. As James Grimmelman writes in "The Structure of Search Engine Law" (2007-2008) 93 Iowa L Rev 1 at 10-11:

> Search engines are also increasingly learning from the large volumes of query data they have accumulated. A user's history of queries can provide useful information about her probable intentions -- for example, whether she tends towards navigational or transactional queries. Similarly, search engines gain useful feedback into their own successes and failures by seeing which results users click on or by noticing long strings of searches on related terms, which may indicate that the user is having trouble finding what she's looking for.

[49]     Google collects a wide range of information as a user searches, including the user's IP address, location, search terms, and whether the user acts on the search results offered by "clicking through" to the websites on the list.

[50]     In addition to its search services, Google sells advertising to British Columbia clients. Indeed, Google entered into an advertising contract with the defendants and advertised their products up to the hearing of this application. Google acknowledges it should not advertise for the defendants and filed an affidavit explaining its inadvertent failure to suspend the defendants' Google account prior to the hearing.

[51]     Although Google's advertising business is marketed in Canada by Google Canada, British Columbia residents who wish to advertise on Google's webpages contract directly with Google and make payments directly to Google. Although those contracts stipulate that disputes will be governed by California law and adjudicated in California courts, the "choice of laws" provision in those contracts does not alter the fact that Google is carrying on

a business in this province through advertising contracts with British Columbia residents.

[52]     The Supreme Court of Canada noted that advertising in a jurisdiction is not by itself a sufficient connection to establish territorial competence: *Van Breda* at paras. 87, 114. But there is a difference between a company advertising its own services through a website or other media available to British Columbia residents, and engaging in the business of selling advertising space on the internet to other companies in British Columbia. There is uncontradicted evidence before me that Google sells advertising to British Columbia residents, including the defendants.

[53]     Google submits that its advertising services are completely separate from its search services, and cannot justify the Court assuming jurisdiction over Google's search services. With respect, I do not agree with that proposition for two reasons.

[54]     First, Google's business model is contextual advertising; the "context" is the search done using Google's search services. Ads are linked to either the subject matter of the search, or the history of the person searching. Google does not charge users of its search services. Rather, it sells space on its websites to advertisers whose ads are displayed alongside the search results generated by a user's query.

[55]     These ads can relate to the topics searched. For example, if "Vancouver lawyers" is searched, a page showing a list of Vancouver lawyers will be generated. At the top of the list a number of ads show up for law firms that have paid Google in order to advertise there. Those ads look like the other search results but are marked by Ad.

[56]     These ads can also be unrelated to the content of the search, but geared to a particular searcher. For example, if the user has in the past searched a retail website, ads for that retail outlet may appear on the page showing the search results for the query "Vancouver lawyers". Google can individually tailor the advertising seen by a user each time they search using the information in the search query and that user's own search history.

…

[64]     I will address here Google's submission that this analysis would give every state in the world jurisdiction over Google's search services. That may be so. But if so, it flows as a natural consequence of Google doing business on a global scale, not from a flaw in the territorial competence analysis. As Janet Walker writes in *Castel & Walker: Canadian Conflict of Laws*, loose-leaf, 6 ed. (Markham, Ontario: LexisNexis, 2005), ch. 11 at 27, a legal person such as a corporation can be subject to multiple jurisdictions whether because it is resident there through registration, or because it is carrying on business in that jurisdiction. Further, the territorial competence analysis would not give every state unlimited jurisdiction over Google; jurisdiction will be confined to issues closely associated with the forum in accordance with private international law.

[53]     There was considerable evidence before the chambers judge as to the nature of Google's enterprise, and the degree to which it can be said to do business in British Columbia. Her findings of fact are, of course, entitled to deference.

[54]     While Google does not have servers or offices in the Province and does not have resident staff here, I agree with the chambers judge's conclusion that key parts of Google's business are carried on here. The judge concentrated on the advertising aspects of Google's business in making her findings. In my view, it can also be said that the gathering of information through proprietary web crawler software ("Googlebot") takes place in British Columbia. This active process of obtaining data that resides in the Province or is the property of individuals in British Columbia is a key part of Google's business.

[55]     Google says that even if it is concluded that it carries on business in British Columbia, the injunction was not properly granted, because it did not relate to the specific business activities that Google carries on in the Province. In my view, the business carried on in British Columbia is an integral part of Google's overall operations. Its success as a search engine depends on collecting data from websites throughout the world (including British Columbia) and providing search results (accompanied by targeted advertising) throughout the world (including British Columbia). The business conducted in British Columbia, in short, is the same business as is targeted by the injunction.

[56]     Google raises the specter of it being subjected to restrictive orders from courts in all parts of the world, each concerned with its own domestic law. I agree with the chambers judge that it is the world-wide nature of Google's business and not any defect in the law that gives rise to that possibility. As well, however, the threat of multi-jurisdictional control over Google's operations is, in my opinion, overstated. Courts must, in exercising their powers, consider many factors other than territorial competence and the existence of *in personam* jurisdiction over the parties. Courts must exercise considerable restraint in granting remedies that have international ramifications. I turn, then, to consider the nature of that restraint.

2015 BCCA 265 (CanLII)

**Limits on the Granting of Injunctions**

[57]     Google contends that apart from territorial competence, as defined under the *CJPTA*, and the common law "real and substantial connection" test, there are other limitations on the granting of injunctions.  Again, it points to the commentary of the Uniform Law Conference of Canada that accompanied the uniform model statute:

> 2.3.     The Act defines a court's territorial competence "in a proceeding" (section 3). It does not define the territorial aspects of any particular remedy. Thus, the Act does not supersede common law rules about the territorial limits on a remedy, such as the rule that a Canadian court generally will not issue an injunction to restrain conduct outside the court's own province or territory.
>
> 2.4      The Act only defines territorial competence; it does not define subject matter competence. It is not intended to affect any rules limiting a Canadian court's jurisdiction by reference to the amount of the claim, the subject matter of a claim, or any other factor besides territorial connections.

[58]     In my view, commentary 2.4 is of limited interest in this case. The subject matter at issue here – misappropriation of confidential information and violations of intellectual property rights – are clearly within the jurisdiction of a provincial superior court. Indeed, because provincial superior courts are courts of inherent jurisdiction, concerns of subject matter competence will arise in respect of them only when valid legislation serves to limit the inherent jurisdiction that would otherwise exist.

[59]     On the other hand, commentary 2.3 is of significance in a case such as the present one. Particularly in respect of discretionary remedies and particularly in respect of equitable relief, courts in common law jurisdictions have imposed limits on the availability of relief.

[60]     It is important to recognize that the issue is not, or at least not wholly,  one of jurisdiction. Common law courts have limited their exercise of remedial powers, not simply due to concerns about jurisdiction, but also as a matter of curial self-restraint.

[61]     In this case, Google argues that the authority of the Supreme Court to grant injunctive relief depends on the existence of a justiciable claim between the applicant and the respondent. It says that because the plaintiffs have not alleged

that Google has committed (or is about to commit) a legal wrong against them, they are not entitled to an order against Google.

[62]    It is unusual for courts to grant remedies against persons who are not parties to an action. The reasons for this are obvious – most civil claims are concerned with the vindication of a right, and the remedial focus will be on that right. Further, notions of justice demand that procedural protections be afforded to a person against whom a remedy is sought. The usual method of providing such protections is to require the claimant to bring an action against the respondent, giving the respondent the rights of a party.

[63]    A party claiming damages or equitable relief for a civil wrong, or a declaration of rights will normally be required to make the person against whom the claim is made a defendant in the action.

[64]    This does not mean, however, that courts are powerless to make orders against non-parties. Google acknowledges discovery orders under the principles enunciated in *Norwich Pharmacal Co. v. Customs and Excise Commissioners* (1973), [1974] A.C. 133 (H.L.) may be made against non-parties. There are, in fact, many types of orders that are routinely made against non-parties – subpoenas to witnesses, summonses for jury duty and garnishing orders are common examples. Many of these orders have a statutory basis or are purely procedural, but others derive from the inherent powers of the court or are more substantive in nature.

[65]    With respect to injunctions specifically, there is support for Google's position in cases such as *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.*, [1979] A.C. 210 (H.L.), and *South Carolina Insurance Co. v. Assurantie Maatschappij "de Zeven Provincien" N.V.* (1986), [1987] A.C. 24 (H.L.). In the latter case, Lord Brandon of Oakbrook said at 40:

> The effect of [a number of authorities, including *Siskina*], so far as material to the present case, can be summarised by saying that the power of the High Court to grant injunctions is, subject to two exceptions …, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade a legal or equitable right of the former for the enforcement of which the latter is amenable to the

jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable.

[66]    The exceptions referred to by the Court were anti-suit injunctions and freeze orders (generally referred to as *Mareva* injunctions).  While all of the Law Lords agreed generally with Lord Brandon, Lord Goff of Chieveley (with whom Lord Mackay of Clashfern agreed), at 44, expressed reservations regarding the strict limitations on the availability of injunctions postulated Lord Brandon:

> I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute; and it is impossible for us now to foresee every circumstance in which it may be thought right to make the remedy available.

[67]    In *Channel Tunnel Group Ltd. v. Balfour Beatty Construction Ltd.*, [1993] A.C. 334 (H.L.), the doubt cast on Lord Brandon's *dicta* was even more pronounced. Lord Mustill (with whom the other Law Lords agreed) said, at 362:

> I prefer not to engage the question whether the law is now firmly established in terms of Lord Brandon's statement, or whether it will call for further elaboration to deal with new practical situations at present unforeseen. For present purposes it is sufficient to say that the doctrine of the *Siskina*, put at its highest, is that the right to an interlocutory injunction cannot exist in isolation, but is always incidental to and dependant on the enforcement of a substantive right, which usually although not invariably takes the shape of a cause of action.

[68]    Lord Browne-Wilkinson added certain observations, at 343, which were endorsed by Lord Keith of Kinkel and Lord Goff of Chieveley, and so had the support of a majority of the Law Lords:

> …I should make it clear that I have merely been considering the effect of the decision in the *Siskina* on the assumption that it correctly states the law. The tests it laid down in absolute terms have already received one substantial modification: see *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. Moreover, in *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1987] A.C. 24, Lord Goff of Chieveley (with whom Lord Mackay of Clashfern agreed) reserved the question whether the law as laid down by the *Siskina* (as subsequently modified) was correct in restricting the power to grant injunctions to certain exclusive categories. With respect, I share the same doubts as are there expressed and reserve the question for consideration when it arises.

[69]     The scope of remedial jurisdiction and the practice of exercising that jurisdiction with restraint was recently considered in the comprehensive judgment of Arnold J. in *Cartier International AG v. British Sky Broadcasting Limited*, [2014] EWHC 3354 (Ch.). In that case, the plaintiffs were producers of luxury goods, for which they held well-known trademarks. They alleged that websites operating from abroad were being used to sell counterfeit merchandise that infringed their trademarks to people in England. The plaintiffs sought an injunction against a number of large English Internet service providers to require them block access to the offending websites. Subject to certain safeguards and limitations, the Court granted the order sought.

[70]     The governing legislation in *Cartier* was s. 37(1) of the U.K.'s *Senior Courts Act 1981*, 1981 c. 54:

> 37(1) The High Court may by order (whether interlocutory or final) grant an injunction or appoint a receiver in all cases in which it appears to the court to be just and convenient to do so.

[71]     Mr. Justice Arnold noted a lack of clarity in the jurisprudence respecting jurisdiction to grant an injunction, and concluded that the jurisdiction is, effectively, unlimited. He accepted that courts have observed limits on the availability of injunctions, but found those limits to be matters of practice rather than of jurisdiction, and not immutable:

> [96]     The extent of the Court's power to grant an injunction has been considered by the House of Lords, the Privy Council and the Supreme Court in at least 12 cases in the last 40 years: *Gouriet v Union of Post Office Workers* [1978] AC 335, *The Siskina* [1979] AC 210, *Castanho v Brown & Root (UK) Ltd* [1981] AC 557, *British Airways Board v Laker Airways Ltd* [1985] AC 58, *South Carolina Insurance Co Ltd v Assurantie Maatschappij De Zeven Provincien NV* [1987] AC 24, *Pickering v Liverpool Daily Post* [1991] 2 AC 370, *Kirklees MBC v Wickes Building Supplies Ltd* [1993] AC 227, *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] AC 334, *Mercedes-Benz AG v Leiduck* [1996] AC 284, *Fourie v Le Roux* [2007] UKHL 1, [2007] 1 WLR 320, *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank & Trust Company* [2011] UKPC 17, [2012] 1 WLR 1721 and *Ust-Kamenogorsk Hydropower Plant JSC v AES Ust-Kamenogorsk Hydropower Plant LLP* [2013] UKSC 35, [2013] 1 WLR 1889.
>
> [97]     Those authorities reveal a surprising divergence of views at the highest level. Analysis of the law is not helped by two factors. First, in many

of these cases the effect of section 37(1) was only indirectly in issue. For example, in some of the cases the immediate issue was one of service out of the jurisdiction. Secondly, some of the dicta in these cases contain what at first blush appear to be comprehensive statements of the law which on closer reading are revealed not to be exhaustive.

[98]    In my judgment, the most authoritative statement of the law as it currently stands is to be found in the speech of Lord Scott of Foscote, with whom all the other members of the House of Lords agreed on this issue, in *Fourie v Le Roux*. Lord Scott's analysis can be summarised in three propositions. The first is that it is necessary to distinguish between the jurisdiction of the court - that is to say, its power to grant an injunction - and the practice of the court not to do so except in a certain way and under certain circumstances.

[99]    The second is his statement at [25]:

"The power of a judge sitting in the High Court to grant an injunction against a party to proceedings properly served is confirmed by, but does not derive from, section 37 of the Supreme Court Act 1981 and its statutory predecessors. It derives from the pre-Supreme Court of Judicature Act 1873 (36 & 37 Vict c 66) powers of the Chancery courts, and other courts, to grant injunctions: see section 16 of the 1873 Act and section 19(2)(b) of the 1981 Act."

[100]   The third is the conclusion he drew at [30] from a review of many of the earlier authorities:

"My Lords, these authorities show, in my opinion, that, provided the court has in personam jurisdiction over the person against whom an injunction, whether interlocutory or final, is sought, the court has jurisdiction, in the strict sense, to grant it. The practice regarding the grant of injunctions, as established by judicial precedent and rules of court, has not stood still since *The Siskina* [1979] AC 210 was decided and is unrecognisable from the practice to which Cotton LJ was referring in *North London Railway Co v Great Northern Railway Co* (1883) 11 QBD 30, 39–40 …"

[101]   In my view this statement of the law confirms the correctness of the analysis in Spry, *Equitable Remedies* (5th ed, 1997) at 323 which was cited with approval by Lord Woolf MR in *Broadmoor Special Hospital Authority v Robinson* [2000] QB 775 at [20]:

"The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited. Injunctions are granted only when to do so accords with equitable principles, but this restriction involves, not a defect of powers, but an adoption of doctrines and practices that change in their application from time to time. Unfortunately, there have sometimes been made observations by judges that tend to confuse questions of jurisdiction or of powers with questions of discretions or of practice. The preferable analysis involves a recognition of the great width of equitable powers, an historical appraisal of the categories of injunctions that have been established and an acceptance that

pursuant to general equitable principles injunctions may issue in new categories when this course appears appropriate."

[72]    Ultimately, Arnold J. rejected the limitations set out in Lord Brandon's *dicta* in *South Carolina Insurance Co.*:

> [104]    Counsel for the ISPs submitted that the Court's jurisdiction to grant an injunction was, subject to two irrelevant exceptions, limited to two situations: (i) where one party to an action can show that the other party has invaded, or threatens to invade, a legal or equitable right of the former, for the enforcement of which the latter is amenable to the jurisdiction of the Court; and (ii) where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable. Although this submission receives support from dicta in some of the authorities cited in paragraph 96 above, I do not accept it. In my judgment the decisions in *Broadmoor* and *Fourie v Le Roux* show that there is no such limit on the Court's jurisdiction. It is true, that as a matter of practice, that the Court exercises its discretion in accordance with fairly well settled principles, but those principles are not immutable. On the contrary, as Lord Scott pointed out, they have evolved over time as the Court has faced new circumstances.

[73]    Mr. Justice Arnold found that the English High Court had jurisdiction to require Internet service providers to block availability of the offending websites.

[74]    Section 39(1) of the *Law and Equity Act*, R.S.B.C. 1996, c. 253 is rooted in the same predecessor legislation as s. 37(1) of the English *Senior Courts Act 1981*, and is in almost identical terms:

> 39 (1) An injunction or an order in the nature of mandamus may be granted or a receiver or receiver manager appointed by an interlocutory order of the court in all cases in which it appears to the court to be just or convenient that the order should be made.

[75]    Canadian law on the authority to issue injunctions has paralleled that of England. In my view, Arnold J.'s conclusions with respect to the jurisdiction of English courts to grant injunctions are equally applicable to the Supreme Court of British Columbia.

[76]    Canadian law has never endorsed the very strict limitations on the granting of injunctions set out in Lord Brandon's *dicta* in *South Carolina Insurance Co.* In *Brotherhood of Maintenance of Way Employees Canadian Pacific System Federation v. Canadian Pacific Ltd.*, [1996] 2 S.C.R. 495, the Supreme Court of

Canada held that Canadian courts have jurisdiction to grant injunctions in cases where there is a justiciable right, even if the court is not, itself, the forum where the right will be determined.

[77]     Canadian courts have also long recognized that injunctions aimed at maintaining order need not be directed solely to the parties to the litigation. In *Bartle & Gibson v. Retail Wholesale and Department Store Union, Local 580* (1971), 18 D.L.R. (3d) 232, this Court upheld an interlocutory injunction purporting to prohibit "any one having knowledge of this Order" from picketing in certain places. In *MacMillan Bloedel Ltd. v. Simpson*, [1996] 2 S.C.R. 1048, the Supreme Court of Canada endorsed such language, stating, at para. 31:

> It may be confidently asserted … that both English and Canadian authorities support the view that non-parties are bound by injunctions: if non-parties violate injunctions, they are subject to conviction and punishment for contempt of court. The courts have jurisdiction to grant interim injunctions which all people, on pain of contempt, must obey.

[78]     Google argues that *MacMillan Bloedel* does not represent an acknowledgement that superior courts have a general jurisdiction to grant injunctions against non-parties. Rather, it says, it is an example of the breadth of the contempt powers of superior courts. While injunctions can only be granted to protect justiciable claims of parties against other parties, non-parties who deliberately flout such injunctions can be liable for contempt of court.

[79]     Google contends that a wide variety of orders directed at non-parties fall within this "contempt exception", including provisions of *Mareva* injunctions directed at third parties. I have considerable difficulty accepting that proposition. Orders in the form endorsed by the Supreme Court of Canada in *MacMillan Bloedel* specifically enjoin non-parties to the litigation. Equally, orders ancillary to *Mareva* injunctions may be directed to financial institutions directly. Such orders directly enjoin third parties, and cannot be characterized as orders against the parties to the litigation.

[80]     I acknowledge that the sort of orders I am discussing depend, in the final analysis, on the existence of a justiciable issue between the parties to the litigation. Where such a justiciable issue exists, however, the granting of injunctive relief

against third parties as an ancillary means of preserving the parties' rights is a well-established jurisdiction of the courts.

**Injunctions with Extraterritorial Effect**

[81]    Google suggests that the limits on granting an injunction with extraterritorial effect are as follows:

> As a matter of law, the court is not competent to regulate the activities of non-residents in foreign jurisdictions. This competence-limiting rule is dictated both by judicial pragmatism and considerations of comity. The pragmatic consideration is that the court should not make an order that it cannot enforce. The comity consideration is that the court refrains from purporting to direct the activities of persons in other jurisdictions and expects courts in other jurisdictions to reciprocate.

[82]    In support of that proposition, Google relies on *United Services Fund (Trustee of) v. Richardson Greenshields of Canada Ltd.* (1988), 23 B.C.L.R. (2d) 1, a case in which this Court upheld the dismissal of an application by the defendant to examine an external auditor of the plaintiffs for discovery. The plaintiffs resided in the United States and carried on business there. Their external auditor resided in Texas, and had no connection to British Columbia. In dismissing the appeal, the Court stated, at p. 7:

> The chambers judge, in my view, was right in holding that the order sought should not be made because the court cannot compel obedience to it, and because to make such an order would be to purport to exercise jurisdiction in a place beyond the territorial jurisdiction of the court.

[83]    I accept that *United Services Fund* establishes the importance of both pragmatic considerations and of comity in determining the extent to which the Supreme Court will grant orders with extra-territorial effect. On the other hand, I do not accept that the case law establishes the broad proposition that "the court is not competent to regulate the activities of non-residents in foreign jurisdictions."

[84]    While British Columbia courts will generally have *in personam* jurisdiction over residents of the Province, the inverse – i.e., that British Columbia courts will not have *in personam* jurisdiction over non-residents – is not true. Courts may have *in*

*personam* jurisdiction over non-residents in a variety of situations. The chambers judge found that she had *in personam* jurisdiction over Google on the basis that it does business in the Province.

[85]     Once it is accepted that a court has *in personam* jurisdiction over a person, the fact that its order may affect activities in other jurisdictions is not a bar to it making an order.

[86]     At one time the courts of this Province refrained from granting injunctions that enjoined activities outside of British Columbia (*Zellers Inc. v. Doobay* (1989), 34 B.C.L.R. (2d) 187 (S.C.)). In 1988, however, the English Court of Appeal held that it had jurisdiction to issue a worldwide *Mareva* injunction (*Derby & Co. Ltd. v. Weldon*, [1990] Ch. 65). It is now over 25 years since the Supreme Court of British Columbia first issued a worldwide injunction (*British Columbia v. Shah* (1989), [1991] B.C.J. No. 3994). The jurisdiction to do so was re-confirmed in *Mooney v. Orr* (1994), 98 B.C.L.R. (2d) 318 and 100 B.C.L.R. (2d) 335, and is, today, well-established. Indeed, standard language for a worldwide *Mareva* injunction is included in the recent *Supreme Court of British Columbia Practice Direction – Model Order for Preservation of Assets*, PD-46.

[87]     Other cases, as well, have confirmed the jurisdiction to make *in personam* orders with effects outside the Province. For example, in *Minera Aquiline Argentina SA v. IMA Exploration Inc.*, 2007 BCCA 319, this Court upheld an order against an Argentine subsidiary of a Canadian company requiring the Argentine company to transfer title to a mineral claim in Argentina to the Argentine plaintiff.

[88]     In fact, British Columbia courts are called upon to adjudicate disputes involving foreign residents on a daily basis, and the fact that their decisions may affect the activities of those people outside the borders of British Columbia is not determinative of whether an order may be granted. In each case, the court must determine whether it has territorial competence under the *CJPTA*. If it does, it must also determine whether it should make the orders that are sought. Issues of comity and enforceability are concerns that must be taken into account, but they do not

result in a simple rule that the activities of non-residents in foreign jurisdictions cannot be affected by orders of Canadian courts.

[89]    The concept of "comity" was described in *Spencer v. The Queen*, [1985] 2 S.C.R. 278 at 283 as follows:

> "Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or other persons who are under the protection of its laws ….

[90]    This formulation has been echoed by the Supreme Court of Canada on several occasions: e.g., *Morguard Investments v. De Savoye*, [1990] 3 S.C.R. 1077 at 1096; *Amchem Products Incorporated v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897 at 913-14; *Pro Swing Inc. v. ELTA Golf Inc.*, 2006 SCC 52 at para. 26. In *Pro Swing*, the majority added, at para. 27:

> Comity is a balancing exercise. The relevant considerations are respect for a nation's acts, international duty, convenience and protection of a nation's citizens.

[91]    I have already noted that this case exhibits a sufficient real and substantial connection to British Columbia to be properly within the jurisdiction of this Province's courts. From a comity perspective, the question must be whether, in taking jurisdiction over this matter, British Columbia courts have failed to pay due respect to the right of other courts or nations. The only comity concern that has been articulated in this case is the concern that the order made by the trial judge could interfere with freedom of expression in other countries. The importance of freedom of expression should not be underestimated. As the Canadian Civil Liberties Association has said in its factum:

> A nation's treatment of freedom of expression is a core part of its self-determination, rooted in the nation's historical and social context, and the ways in which its constitutional values (whether written or unwritten), norms and legal system have evolved.

[92]    For that reason, courts should be very cautious in making orders that might place limits on expression in another country.  Where there is a realistic possibility that an order with extraterritorial effect may offend another state's core values, the order should not be made.

[93]    In the case before us, there is no realistic assertion that the judge's order will offend the sensibilities of any other nation. It has not been suggested that the order prohibiting the defendants from advertising wares that violate the intellectual property rights of the plaintiffs offends the core values of any nation. The order made against Google is a very limited ancillary order designed to ensure that the plaintiffs' core rights are respected.

[94]    I note, as well, that the order in this case is an interlocutory one, and one that can be varied by the court. In the unlikely event that any jurisdiction finds the order offensive to its core values, an application could be made to the court to modify the order so as to avoid the problem.

[95]    I note that the courts of many other jurisdictions have found it necessary, in the context of orders against Internet abuses, to pronounce orders that have international effects. Several such cases are cited in the arguments of FIAPF/IFPI, including  *APC v. Auchan Telecom*, 11/60013, Judgment (28 November 2013) (Tribunal de Grand Instance de Paris); *McKeogh v. Doe* (Irish High Court, case no. 20121254P); *Mosley v. Google*, 11/07970, Judgment (6 November 2013) (Tribunal de Grand Instance de Paris); *Max Mosley v. Google* (see "Case Law, Hamburg District Court: *Max Mosley v. Google Inc.* online: Inform's Blog https://inforrm.wordpress.com/2014/02/05/case-law-hamburg-district-court-max-mosley-v-google-inc-google-go-down-again-this-time-in-hamburg-dominic-crossley/) and *ECJ Google Spain SL, Google Inc. v. Agencia Española de Protección de Datos, Mario Costeja González*, C-131/12 [2014], CURIA.

[96]    I do not suggest that these rulings have been without controversy or problems (see, for example, *La Ligue contre le racisme et l'antisémitisme c. La Société YAHOO!Inc.*, Tribunal de Grande Instance de Paris (May 22, 2000 and November

20, 2000), Court File No. 00/05308 and *YAHOO! INC. v. La Ligue contre le racisme et l'antisémitisme*, 169 F.Supp. 2d 1181 (N. Dist. Cal., 2001) rev'd 379 F.3d 1120 (9th Cir., 2004) and 433 F.3d 1199 (9th Cir. *en banc*, 2006)). The extensive case law does indicate, however, that international courts do not see these sorts of orders as being unnecessarily intrusive or contrary to the interests of comity.

[97]    Apart from the issue of comity, Google also argues that the order that was made is unenforceable. It takes umbrage with the trial judge's suggestion (made at paras. 96 and 97 of her judgment) that Google might be prevented from using the courts of British Columbia as a penalty for non-compliance with the order.

[98]    I tend to agree with Google that barring it from access to the courts of the Province would be a draconian step, and not one that needs to be contemplated at this juncture. Given that Google does business in the Province, however, British Columbia courts are entitled to expect that it will abide by their orders. It is also likely that, in the event of non-compliance, there will be consequences that can be visited on the company.

[99]    Google's arguments do not persuade me that there is either a jurisdictional or practical bar to the granting of an injunction of the sort pronounced by the chambers judge. I turn, then, to the question of the appropriate tests for the granting of such an injunction.

**The Tests for the Granting of the Injunction**

[100]   The well-established tests for the granting of an interlocutory injunction are set out in *R.J.R-Macdonald Inc. v. Canada (Attorney General)*, [1994] 1 S.C.R. 311. The applicant must demonstrate that there is a serious question to be tried, that it will suffer irreparable harm if the injunction is not granted, and that the balance of convenience favours the granting of the injunction.

[101]   It appears obvious that the plaintiffs satisfied the first two tests in this case. Their case against the defendants appears to be a very strong one – indeed, the defendants appear to have, for all intents and purposes, abandoned the defence of

2015 BCCA 265 (CanLII)

2015 BCCA 265 (CanLII)

the claim. Further, it is clear that unless the plaintiffs are able to prevent potential customers from accessing the defendant's websites, they will suffer damages which are unlikely to be recoverable at the end of the lawsuit.

[102]  The real issue in this case is one of balance of convenience.  In addition to balancing the interests of Google and of the plaintiffs, there are important public interests that must be taken into account in this case.

[103]  The chambers judge carefully examined the evidence, and found that the injunction would not inconvenience Google in any material way, and that Google would not incur expense in complying with it. She also found that the granting of the injunction was the only practical way for the defendants' websites to be made inaccessible.

[104]   Among the important issues of public interest are the importance of avoiding unnecessarily embroiling non-parties in litigation, the importance of avoiding unnecessary orders with extraterritorial effect, and freedom of expression. As I am of the view that the chambers judge dealt adequately with each of these issues, I propose to say little about them.

[105]  The plaintiffs made considerable efforts attempting to track down the defendants, and find ways to eliminate their websites. The judge's finding that the granting of the injunction was the only practical way to impede the defendants from flouting the court's orders amounts to a finding that the involvement of Google in this matter was necessary.

[106]   With respect to extraterritorial effects, Google has, in this Court, suggested that a more limited order ought to have been made, affecting only searches that take place on the google.ca site. I accept that an order with international scope should not be made lightly,  and that where an order with only domestic consequences will accomplish all that is necessary, a more expansive order should not be made. In this respect, the jurisprudence dealing with freeze orders is helpful – where a domestic

*Mareva* injunction will freeze sufficient assets, the court should refrain from granting a more expansive world-wide injunction.

[107]   The plaintiffs have established, in my view, that an order limited to the google.ca search site would not be effective. I am satisfied that there was a basis, here, for giving the injunction worldwide effect. I have already noted that applications can be made to vary the order should unexpected issues arise concerning comity.

[108]   Finally, I note concerns expressed by Google and by the intervenors Canadian Civil Liberties Association and Electronic Frontier Foundation concerning the openness of the World Wide Web, and the need to avoid unnecessary impediments to free speech.

[109]   The order made in this case is an ancillary order designed to give force to earlier orders prohibiting the defendants from marketing their product. Those orders were made after thorough consideration of the strength of the plaintiffs' and defendants' cases. Google does not suggest that the orders made against the defendants were inappropriate, nor do the intervenors suggest that those orders constituted an inappropriate intrusion on freedom of speech.

[110]   There has, in the course of argument, been some reference to the possibility that the defendants (or others) might wish to use their websites for legitimate free speech, rather than for unlawfully marketing the GW1000. That possibility, it seems to me, is entirely speculative. There is no evidence that the websites in question have ever been used for lawful purposes, nor is there any reason to believe that the domain names are in any way uniquely suitable for any sort of expression other than the marketing of the illegal product. Of course, if the character of the websites changes, it is always open to the defendants or others to seek a variation of the injunction.

[111]   The ability of parties and others with identifiable legal interests to apply to vary the terms of the injunction is an important safeguard to ensure that it is not more restrictive than necessary.

[112]   The order under appeal is limited in time, as is usual in interlocutory orders, by the words "until the conclusion of the trial of this action or further order of the court". In an injunction against a non-party, it may be appropriate for a court to consider a limitation that is defined in months or years rather than by the progress of the action. I note that in *Cartier*, at para. 265, Arnold J. expressed an intention to include a "sunset clause" in the injunction, suggesting that two years would be an appropriate period. As the issue of the temporal limitation on the injunction was not argued on this appeal, it is not appropriate to say more on this issue.

**Conclusion**

[113]   I would dismiss the appeal.

"The Honourable Mr. Justice Groberman"

I agree:

"The Honourable Mr. Justice Frankel"

I agree:

"The Honourable Mr. Justice Harris"