1 CORYNNE MCSHERRY (SBN 221504)
corynne@eff.org
2 AARON MACKEY (SBN 286647)
amackey@eff.org
3 VERA RANIERI (SBN 271594)
vera@eff.org
4 ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
5 San Francisco, CA 94109
Telephone: (415) 436-9333
6 Facsimile: (415) 436-9993

7

8 Attorneys for Amici Curiae
Electronic Frontier Foundation, Computer &
9 Communications Industry Association,
Center for Democracy & Technology,
10 and Public Knowledge

11

12                    **UNITED STATES DISTRICT COURT**

13            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14                         **SAN JOSE DIVISION**

15 **GOOGLE INC.,**                              )   No. 5:17-cv-04207-EJD
                                               )
16                            Plaintiff,        )   ~~PROPOSED~~ **AMICUS CURIAE**
                                               )   **BRIEF OF ELECTRONIC FRONTIER**
17      v.                                      )   **FOUNDATION, THE COMPUTER &**
                                               )   **COMMUNICATIONS INDUSTRY**
18 **EQUUSTEK SOLUTIONS INC., CLARMA**          )   **ASSOCIATION, THE CENTER FOR**
**ENTERPRISES, INC., AND ROBERT**              )   **DEMOCRACY & TECHNOLOGY,**
19 **ANGUS,**                                   )   **AND PUBLIC KNOWLEDGE IN**
                                               )   **SUPPORT OF PLAINTIFF**
20                            Defendants.       )   **GOOGLE'S MOTION FOR**
                                               )   **PRELIMINARY INJUNCTION**
21                                              )

22   ─────────────────────────────────

23

24

25

26

27

28

1

### INTRODUCTION[1]

2

3

4

This case is about far more than a few websites that may sell products derived from misappropriated trade secrets. The Canadian court's order ("the Canadian Order") sets a dangerous and unbounded precedent that will have applications in countless other contexts. If one foreign court can impose its speech-restrictive rules on the entire Internet—despite the conflict between its rules and those of a foreign jurisdiction—the norms of expectations of all Internet users are at risk.

5

6

7

8

9

10

Amici file this brief to call the Court's attention to the important public interests at stake in this litigation, particularly for Internet users who are not parties to the case but will nonetheless be affected by the precedent it sets. As Google explains in its brief, the global de-listing order at issue in this case impedes Google's right to share accurate information. However, it also restricts Internet users' ability to *receive* such information. In addition, it runs directly contrary to the protections of 47 U.S.C. § 230 ("Section 230"), which have been vital to the growth of the Internet as a platform for speech.[2]

11

12

13

14

15

16

17

18

The injunction sought by Google serves the public interest by ameliorating that conflict and ensuring that Internet users in the United States, at least, continue to enjoy access to information that is protected by the First Amendment. The injunction sought here also vindicates Congress' goals in providing online intermediaries immunity under Section 230: to enable the development of robust online platforms for speech and innovation.

19

20

21

22

23

24

25

26

27

28

---

[1] Amici certify that no person or entity, other than Amici, its members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or in part.

[2] The statute was passed as Section 509 of the Communications Decency Act, part of the Telecommunications Act of 1996, Pub. L. 104-104. It is sometimes colloquially referred to as "CDA 230" or "Section 230 of the Communications Decency Act." Amici refer to it as Section 230.

1

17-cv-04207-EJD      AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF

The requested injunction would serve the public interest, and Amici urge the Court to grant it.

### INTERESTS OF AMICI CURIAE

The Electronic Frontier Foundation (EFF), a non-profit civil liberties organization with more than 37,000 dues-paying members, works to protect rights in the digital world. Based in San Francisco and founded in 1990, EFF regularly advocates in courts on behalf of users and creators of technology in support of free expression, privacy, and innovation online. With permission from the Court of Appeal for British Columbia and the Supreme Court of Canada, EFF intervened in the underlying Canadian litigation in light of EFF's concerns about the conflict with U.S. law and the rights of U.S.-based persons. *See Equustek Solutions Inc. v. Jack*, 2015 BCCA 265[3] & *Google Inc. v. Equustek Solutions Inc.*, 2017 SCC 34.[4]

The Computer & Communications Industry Association ("CCIA") represents over twenty companies of all sizes providing high technology products and services, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services—companies that collectively generate more than $540 billion in annual revenues.[5] CCIA members provide services to countries around the world and are frequently confronted with orders to block content in one jurisdiction that is lawful in another.  An environment in which such orders are enforceable—even against online services not party to the underlying case—could do extraordinary damage to the Internet economy.

The Center for Democracy & Technology (CDT) is a nonprofit public interest organization working to ensure that the human rights we enjoy in the physical world are realized

---

[3] Available at https://www.canlii.org/en/bc/bcca/doc/2015/2015bcca265/2015bcca265.html.

[4] Available at https://www.canlii.org/en/ca/scc/doc/2017/2017scc34/2017scc34.html.

[5] A list of CCIA members is available at https://www.ccianet.org/members.  Google is a CCIA member, but took no part in the preparation of this brief.

17-cv-04207-EJD          AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF

online, and that technology serves as an empowering force for people worldwide. Integral to this work is CDT's representation of the public interest in the creation of an open and innovative Internet that promotes the constitutional and democratic values of free expression, privacy, and individual liberty.  For more than twenty years, CDT has advocated in support of laws and policies to expand access to information and promote the vibrant exchange of ideas.

Public Knowledge is a non-profit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to access information and use innovative technology lawfully.

## ARGUMENT

I.   **The Canadian Order Interferes with Internet Users' First Amendment Rights to Receive Information Online.**

The impact of the Canadian Order goes far beyond inhibiting Google's speech.

As Google explains, the Canadian Order undermines First Amendment protections for platforms that provide search results. *See, e.g.*, *Search King, Inc. v. Google Technology, Inc.*, 2003 WL 21464568 (W.D. Okla. 2003); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629–30 (D. Del. 2007); *Zhang v. Baidu.com, Inc.*, 2014 WL 1282730 (S.D.N.Y. 2014); *see also* Eugene Volokh & Donald M. Falk, *Google First Amendment Protection for Search Engine Search Results*, 8 J.L. Econ. & Pol'y 883 (2012).

But the Canadian Order also undermines the interests of the Internet users who have a right to receive information from a variety of sources, including results of a Google search. The Supreme Court has held that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). The Ninth Circuit has held that the right to receive

3

1

2

information "and the right to speak are flip sides of the same coin." *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

Thus, just as web search engines have a right to provide search results, users have a corollary right to receive those results. They do not lose that right simply because some of the information on a website involves products rather than explicit social commentary or other forms of speech. The right to receive information does not turn on the underlying social value of the ideas communicated. As the Supreme Court has recognized, "the right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (protecting the right to possess obscene materials at home), because it is essential to fostering open debate. Indeed, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen'l*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (protecting the "right to receive" foreign publications). Similarly, the First Amendment protects the right to gather information. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (plurality) (protecting the right to gather information in courtrooms, because "free speech carries with it some freedom to listen").

18

19

20

21

22

23

Nor do users lose the right to access information via search results where, as alleged here, those results include allegedly unlawful information. Prohibiting access to protected speech as a means to deny access to unprotected speech "turns the First Amendment upside down," *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), essentially "burning the house to roast the pig." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127 (1989).

24

25

26

27

28

The Canadian Order forcing Google to remove content from its search results does just that. It prevents Internet users from obtaining accurate and complete search results from Google because those results might include information about products allegedly derived from misappropriated trade secrets under Canadian law. Thus, the injunction inhibits access to a broad

4

swatch of protected and non-infringing speech, requiring Google to de-list entire websites, not just specific pages on which the products alleged to have been derived from trade secret information are being sold. Users who might want to access those pages include everyone from journalists doing stories about the underlying dispute that gave rise to the Canadian Order, academics researching issues related to trade secrets, and curious individuals who desire to learn more about a particular topic.

The Canadian Order stands in direct conflict with the U.S. Constitution. Enforcement in the U.S should be enjoined for this reason alone.

## II. The Canadian Order Undermines Congress' Clear Intent to Protect Online Expression and Innovation.

### a. Congress Passed Section 230 to Encourage the Development of Open Platforms and Enable Robust Online Speech.

The Canadian Order's restrictions on online speech also run directly counter to the letter and spirit of Section 230 of the Communications Act, 47 U.S.C. § 230 ("Section 230"). That, in turn, undermines the public interest in the continued growth of the Internet as a platform for speech and innovation.

Much of the modern Internet depends upon the services of intermediaries, which serve "as a vehicle for the speech of others." Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. 501, 514 (2015). Intermediaries create democratic forums in which anyone can become "a pamphleteer" or "a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. ACLU*, 521 U.S. 844, 870 (1997). They give a single person, with minimal resources and technical expertise, the ability to communicate with others. Online platforms host a wide range of diverse speech on behalf of their users, helping ensure that all views—especially controversial ones—can be presented and received by platform users.

17-cv-04207-EJD          AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
                         FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF

Congress understood the essential function online intermediaries play in our digital lives, and the Internet's power to sustain and promote robust individual speech. Congress recognized that if our legal system failed to forcefully protect intermediaries, it would fail to protect free speech online. *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997). Given the volume of information being published online, it would be impossible for most intermediaries to review every single bit of information published through their platforms prior to publication. If intermediaries were forced to second-guess decisions about managing and presenting content authored by third parties, fewer would choose to provide platforms for that content.

Congress responded to this dilemma with Section 230, which provided broad immunity to service providers that host user-generated content. *See* Section 230 (b)(2), (3) ("It is the policy of the United States . . . to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."); *see also Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) ("Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce.").

Against this legal background, intermediary platforms—such as social media websites, blogging platforms, video-sharing services, and web-hosting companies—have become the essential architecture of today's Internet. Indeed, they are often the primary way in which the majority of people engage with one another online. Search platforms such as Google, which aggregate third-party information, are a primary way people discover content and the expression

17-cv-04207-EJD          AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF

of others online.[6] *See, e.g.*, K. Purcell, *Search and email still top the list of most popular online activities*, Pew Research Center, Internet & American Life Project (2011), available at http://www.pewinternet.org/2011/08/09/search-and-email-still-top-the-list-of-most-popular-online-activities/; *see also* J. Mander, *15 Trends for 2015: The Slow Death of Search*, Global Web Index (Dec. 19, 2014) (showing over 50% of Internet users use search engines to engage in online research), available at http://blog.globalwebindex.net/chart-of-the-day/15-trends-for-2015-the-slow-death-of-search/.

But these platforms could not exist without the immunities Section 230 provide. For example, search engines need not fear expensive litigation or damages based on their role as hosts of third-party content presented as search results. Thanks to Section 230, these services can facilitate Internet users' access to a vast amount of online content without risking liability for their publication of that information should it happen to run afoul of some state's idiosyncratic laws.

### b. Any Efforts to Evade Section 230 by Circumventing U.S. Legal Process Undermine Congress' Policy Choice and Harm the Public Interest.

In creating Section 230's platform immunity, Congress made the intentional policy choice that individuals harmed by speech online will need to seek relief from the speakers themselves, rather than the platforms those speakers used or the search results that may lead third parties to that speech. *See Zeran*, 129 F.3d at 330–31. By limiting liability in this way, Congress decided that creating a forum for unrestrained and robust communication was of utmost importance. And while Congress certainly did not intend to promote speech that violates foreign

---

[6] Web search services provide an "interactive computer service" under 47 U.S.C. § 230(c)(1). An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

trade secret law, Congress *did* decide that promoting platforms that would allow robust online dialogue was more important than ridding the Internet of all harmful speech.

The Canadian Order thwarts Congress' judgment by requiring Google to remove search results on penalty of judicial sanctions.[7] Allowing the Order to be enforced in the U.S. will send a message that platforms cannot rely on Section 230 protections, even when they are U.S.-based and target U.S.-based Internet users. If foreign injunctions premised on foreign law are allowed to issue against U.S.-based intermediaries in order to affect U.S.-based search results, it will fundamentally alter the relationship between search platforms and their users. Instead of offering search results that show the true availability of relevant information to U.S. users (as Google here would like to do), search platforms will be forced to limit results even though the material may be completely lawful in the U.S. *See supra*, Part I.

The Canadian Order further undermines Congress' intent by placing the burden on the intermediary to show it is protected. Although Google has chosen to contest the Canadian Order in this Court, other search engines or intermediaries may not be able to in similar circumstances. Intermediaries faced with a foreign order for a worldwide takedown may find it easier to comply than fight back, impacting the public's interest in and right to receive lawful speech.

Section 230 was judiciously crafted to protect the public interest in fostering innovation and free expression. By undermining that careful judgment, the Order thwarts that interest.

---

[7] Section 230's limited exception for "intellectual property" claims, 47 U.S.C. § 230(e)(2), would not apply to trade secret claims such as those at issue here. The recently enacted federal trade secret law, the Defend Trade Secrets Act of 2016, Pub. L. 114-153, codified at 18 U.S.C. § 1836 *et seq.*, specifically provides that it "shall not be construed to be a law pertaining to intellectual property for purposes of any other Act of Congress," a provision added specifically to make sure trade secret claims were not exempted from Section 230 immunity. 18 U.S.C. § 1833 note. Moreover, the Ninth Circuit has construed Section 230's intellectual property exception to be limited to well-established *federal* intellectual property claims, i.e. copyright and patents. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007).

17-cv-04207-EJD          AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF

1

## **CONCLUSION**

2        For the foregoing reasons, Amici respectfully request that this Court grant Google's

3    motion for a preliminary injunction.

4

5

6                                                          Respectfully submitted,
     DATED: August 7, 2017

7
                                                      By  */s/ Corynne McSherry*
8                                                          Corynne McSherry

9                                                          Aaron Mackey
                                                           Vera Ranieri
10                                                         ELECTRONIC FRONTIER FOUNDATION
                                                           815 Eddy Street
11                                                         San Francisco, CA  94109
                                                           corynne@eff.org
12
                                                           Attorneys for Amici Curiae
13                                                         Electronic Frontier Foundation, Computer &
                                                           Communications Industry Association,
14                                                         Center for Democracy & Technology,
                                                           and Public Knowledge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

17-cv-04207-EJD        AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER
                       FOUNDATION, ET AL. IN SUPPORT OF PLAINTIFF